UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK
——————————————————————————

WIGBERTO OSORIO,

                                        Petitioner,

v.                                                                      9:21-cv-00708-BKS-TWD


SUPT. JOHNSON,

                                        Respondent.
——————————————————————————

APPEARANCES:                            OF COUNSEL:

WIGBERTO OSORIO,
*Petitioner, pro se*
17-B-1928
Green Haven Correctional Facility
P.O. Box 4000
Stormville, NY 12582

LETITIA JAMES                           PRISCILLA I. STEWARD, ESQ.
Attorney General for the State of New York    Assistant Attorney General
*Attorney for Respondent*
28 Liberty Street
New York, NY 10005

**THÉRÈSE WILEY DANCKS**, United States Magistrate Judge

## REPORT-RECOMMENDATION AND ORDER

## I.      INTRODUCTION

        This matter has been referred for a report and recommendation by the Hon. Brenda K.

Sannes, Chief United States District Judge, pursuant to 28 U.S.C. § 636(b)(1)(B) and Local Rule

72.3(c).  Petitioner Wigberto Osorio ("Petitioner"), a New York State prisoner appearing *pro se*,

seeks federal habeas corpus relief pursuant to 28 U.S.C. § 2254.  (Dkt. No. 1.)  He is currently

incarcerated at Green Haven Correctional Facility.  *Id.* at 1.  In 2017, following a trial by jury,

Petitioner was convicted in Onondaga County Court of murder in the second degree, assault in

the first degree, attempted kidnapping in the second degree, gang assault in the first degree, and

criminal possession of a weapon in the third degree.  State Court Record ("SR") 12.[1]  He was

sentenced, as a second felony offender, to an aggregate prison term of 25 years to life.  *Id.*  The

Appellate Division, Fourth Department, affirmed the conviction on January 31, 2020, and the

Court of Appeals denied leave to appeal on April 27, 2020.  SR 605-06, 619.  This action

followed.  (Dkt. No. 1.)

   Petitioner contends he is entitled to federal habeas relief because (1) he was denied the

effective assistance of trial counsel; (2) he was denied the effective assistance of appellate

counsel; (3) he is actually innocent of the crimes of which he was convicted; and (4) the

indictment was defective because of the false testimony of two prosecution witnesses at the

Grand Jury.  (Dkt. No. 1 at 6, 8, 9.)  Respondent, through the State of New York, filed an answer

to the petition, together with the pertinent state court records and a memorandum of law.  (Dkt.

Nos. 10, 11.)  Respondent contends Petitioner's claim the Grand Jury proceedings were defective

is meritless and not cognizable; his actual innocence claim is meritless and not cognizable; and

his ineffective assistance of counsel claims are meritless and unexhausted.  (Dkt. No. 10-1 at 15-

26.)  Petitioner then filed a traverse.  (Dkt. No. 13.)

   For the reasons that follow, the Court recommends the petition be denied and dismissed,

and that no certificate of appealability be issued.

## II.   BACKGROUND

   On August 1, 2014, at around 6:15 PM, brothers Juan Martinez and Edward Loraino were

shot in the City of Syracuse, killing Martinez and severely injuring Loraino.  (Dkt. No. 11-3 at

186-88.)  On August 3, 2014, at 12:16 AM, Syracuse Police were dispatched to a shooting at 825

---

[1]  The State Court record can be found at Dkt. Nos. 11 and 11-1.

South Wilbur Street.  (Dkt. No. 11-2 at 603-04.)  When they arrived, the victim, Juan Fuentes Diaz was unconscious and not breathing.  *Id.* at 604-07.  Diaz later died.  *Id.* at 618.

According to the trial testimony of the sole accomplice, Cesar Sanchez, Diaz was killed in retaliation for Martinez's death.  *Id.* at 644-45.  On the night of August 2, 2014, Jose Cruz-Rivera, Petitioner, Marcus Carrasquillo, and Ricky Santa drove around in a minivan looking for Diaz because they believed he was responsible for killing Sanchez, who was the brother of Cruz-Rivera's girlfriend.  *Id.* at 639-45; (Dkt. No. 11-3 at 186).  At around midnight, Petitioner's group found Diaz talking with Cesar Sanchez on the street.  (Dkt. No. 11-2 at 639-40, 743, 769.)  Petitioner, Carrasquillo, and Santa exited the van and beat Diaz with baseball bats.  *Id.* at 640, 644-45.)  Cruz-Rivera then ordered Sanchez to put Diaz in the van.  *Id.* at 646-47.  When Sanchez was unable to do so, Cruz-Rivera pulled out a handgun and shot Diaz multiple times, killing him.  *Id.* at 647-50.

### A.    Pre-Trial Proceedings

An Onondaga County grand jury charged Petitioner with murder in the second degree, attempted kidnapping in the second degree, gang assault in the first degree, two counts of assault in the first degree, gang assault in the second degree, two counts of assault in the second degree, and criminal possession of a weapon in the third degree.  SR 16-18.  Prior to trial, Petitioner moved to dismiss the indictment on the grounds that the evidence was legally insufficient to support the indictment and that the proceeding was defective.  SR 22.  In a written decision issued on August 11, 2016, the court denied the motion.  SR 22-23.

In a letter dated October 13, 2016, the prosecutor notified the defense and the court that she had met with Leslie Osorio, who testified before the grand jury and was scheduled to testify at trial.  SR 93-94.  Osorio admitted she had lied to avoid testifying.  SR 93.  Specifically, Osorio

stated she had lied both in her statement to the police and in her grand jury testimony about Petitioner and Sanchez coming to her house after the murder with blood on their clothes, and Cruz-Rivera coming to her house with a gun. *Id.* Osorio stated her boyfriend, Ricardo Colberg, had coerced her into giving the false statements because he thought it would benefit him in an unrelated pending criminal case. *Id.* Osorio maintained, however, the other aspects of her statements and grand jury testimony were truthful, including that before the murder, Diaz had come to her house and soon thereafter Petitioner and Cruz-Rivera stopped by looking for Diaz. *Id.* Based on Osorio's disclosure, Petitioner renewed his motion to dismiss the indictment. SR 98-103. Petitioner argued Osorio's perjured testimony rendered the grand jury proceeding defective and, without her testimony, Sanchez's accomplice testimony was uncorroborated. *Id.*

The Court heard Petitioner's argument on the motion on October 17, 2016. (Dkt. No. 11-2 at 132-64.) The People argued dismissal was unwarranted because the People did not knowingly use perjured testimony, the People immediately advised defense counsel of the perjury, and even without that testimony, the evidence was legally sufficient to support each count of the indictment, and Sanchez's testimony was sufficiently corroborated. *Id.* at 141-46. Attorneys for Petitioner and Cruz-Rivera both argued that if Osorio had offered perjured testimony, then Sanchez also gave perjured testimony in providing the same account of having gone to Osorio's house after the murder with Petitioner, wearing bloody clothes. *Id.* at 150-58. However, the prosecutor claimed Sanchez denied lying to the grand jury when confronted with Osorio's recantation. *Id.* at 147.

The Court denied Petitioner's motion to dismiss the indictment, finding that the

prosecution did not intentionally use perjured testimony, the remaining testimony provided legally sufficient evidence to support the crimes charged, and the integrity of the proceedings was not compromised. *Id.* at 160-61.

On April 22, 2017, two days before trial was set to begin, the prosecutor informed the defense and the Court she had met with Sanchez and again confronted him about Osorio's recantation of her grand jury testimony. SR 127. Sanchez admitted his grand jury testimony about going to Osorio's house with Petitioner after the murder with blood on their clothes was false. *Id.* He also claimed Colberg had told him to give this false information because Colberg believed it would help him in an unrelated criminal matter. *Id.* However, Sanchez claimed that the remainder of his testimony had been truthful. *Id.*

Based on Sanchez's disclosure, Petitioner renewed his motion to dismiss the indictment. SR 121-28. On April 24, 2017, the Court denied the renewed motion on the same grounds on which the initial motion was rejected: the People did not knowingly or negligently present perjured testimony to the grand jury, the remainder of the evidence was legally sufficient to support the charges, and the proceeding was not rendered defective. (Dkt. No. 11-2 at 193-94, 201.)

### B. Jury Trial

Petitioner's jury trial commenced on April 24, 2017, in Onondaga County Supreme Court. (Dkt. No. 11-2 at 177.) The People called Joshua Emmons, Donna Silkworth, Det. Steven Kilburn, Cesar Sanchez, and Leslie Osorio.

Joshua Emmons and Donna Silkworth lived in the area where Diaz was killed and witnessed portions of Diaz's murder from their homes. At around midnight, on August 3, 2014, Emmons was watching television when he "heard a lot of commotion outside" which he

described as "[a] guy yelling" what sounded like "[n]o, please." (Dkt. No. 11-2 at 776.) He looked out his window onto South Wilbur Avenue and saw "a guy hitting another guy with a baseball bat." *Id.* at 777. The attacker, whose back was facing Emmons, wore all black with a hood over his head and was hitting the victim on his head, legs, and arms. *Id.* at 779.

Soon thereafter, another person, also dressed in black with his hood over his head, went to the back of a minivan, grabbed another baseball bat, and started hitting the victim. *Id.* at 780. Emmons could not see his face. *Id.* at 781. The attackers then tried to get the victim into a minivan by dragging him by his shirt and arms. *Id.* at 782. When that effort failed, another man who "looked like he got tired of it" pulled a gun from his waist area and shot the victim. *Id.* at 782, 785.

Additionally, Emmons saw one person sitting in the driver's seat of the van and another person sitting on its hood. *Id.* at 783. Emmons did not see a third person with a baseball bat. *Id.* at 802.

After seeing the shooter fire two or three shots, Emmons backed away from the window. *Id.* at 786. He then heard an additional six or seven shots. *Id.* at 786-87. Soon thereafter, he heard tires screeching and, when he looked out the window again, he saw the minivan driving toward Seymour Avenue. *Id.* at 787. The victim lay motionless on the sidewalk. *Id.* at 788.

Donna Silkworth lived near the corner of Amy Street and Seymour Avenue. *Id.* at 863. On August 3, 2014, Silkworth was sitting on her back porch when she saw three men walk past her house. *Id.* at 863, 865-66. They were "all pulling shirts down over their faces" and went into a backyard on Seymour Avenue. *Id.* at 864-66, 868. The men appeared to have weapons, at least one of which looked like a baseball bat and one that looked like a gun. *Id.* at 868-69. Silkworth then saw a white van with sliding doors pull up to the corner of Seymour Avenue and

Amy Street, opposite her house. *Id.* at 869-70. Three or four men jumped out of the van. *Id.* at 871. Silkworth briefly lost sight of them but saw them return to the minivan and drive through Sakran Plaza. *Id.* at 872. The van then drove onto Amy Street before turning onto Wilbur Avenue. *Id.* at 873. Silkworth again lost sight of the van and, shortly afterward, heard multiple gunshots coming from the direction of Wilbur Avenue. *Id.* at 874. She went to the end of her driveway and saw the white van "heading up toward Burnet Park on Wilbur." *Id.*

On March 10, 2015, Det. Kilburn interviewed Petitioner in connection with Diaz's death. (Dkt. No. 11-3 at 251.) Petitioner denied any involvement with Diaz's murder. *Id.* at 251-54. Petitioner claimed because he had a curfew, he could not have been around when Diaz was killed. *Id.* at 256. He further denied being close with Martinez, although he admitted that he went to the hospital when Martinez died. *Id.* at 253-54. Petitioner acknowledged he and a few other people had gotten shirts made with Martinez's picture on them and he was present at a gathering commemorating Martinez's life. *Id.* at 254. Petitioner knew Martinez was close with Cruz-Rivera and suggested it was possible Diaz had set up Martinez to be killed. *Id.* at 256-57.

Both Sanchez and Osorio testified about lying to law enforcement officers and to the grand jury. (Dkt. No. 11-2 at 670-71; Dkt. No. 11-3 at 17.) They admitted they falsely stated that after Diaz's death, Sanchez and Petitioner stopped by Osorio's house with blood on their clothes. (Dkt. No. 11-2 at 670-71; Dkt. No. 11-3 at 17.) Sanchez also falsely told the grand jury he saw Petitioner leave Osorio's house wearing a change of clothes. (Dkt. No. 11-2 at 670-71; Dkt. No. 11-3 at 17.) At trial, Sanchez admitted he did not go to Osorio's house after the murder, and he did not see Petitioner after he left the scene in the minivan. (Dkt. No. 11-2 at 670, 680-82.)

Both Sanchez and Osorio testified the false accounts were furnished by Osorio's

7

boyfriend, Ricardo Colberg.  Sanchez encountered Colberg when he was in jail on unrelated

charges.  (Dkt. No. 11-2 at 670-73.)  Osorio testified Colberg had coerced her into giving the

false account by threatening her.  (Dkt. No. 11-3 at 17-19.)  She also believed that providing the

false information would help Colberg get out of jail following his arrest on unrelated drug and

weapon charges.  *Id.* at 21-22.

###### C.    Petitioner's Case

Petitioner called his father, Wigberto Osorio, Sr., and his brother, Christian Osorio, as

witnesses.  Wigberto Sr. testified on August 2, 2014, he was having a "family reunion" on the

porch of his home at 211 Putnam Street because one of his neighbors had been killed.  (Dkt. No.

11-3 at 326, 330-31.)  Petitioner arrived at about 10 PM.  *Id.* at 326, 329-31.  Wigberto Sr. stated

he and Petitioner entered the house at about 10:30 PM.  *Id.* at 332-33.  Petitioner then went to his

bedroom while Wigberto Sr. remained awake in the living room until about 1 AM.  *Id.* at 333.

Christian testified Petitioner and Wigberto Sr. were still out on the porch when he

entered the house and went to his bedroom at around 10:30 PM.  *Id.* at 348-51.  Christian heard

Petitioner go into his bedroom and fell asleep at about 11 PM.  *Id.* at 354.  Christian testified

Petitioner was home at 8 AM when he woke up.  *Id.* at 357.

###### D.    Verdict and Sentence

As set forth above, Petitioner was convicted of murder in the second degree, attempted

kidnapping in the second degree, gang assault in the first degree, assault in the first degree, and

criminal possession of a weapon in the third degree.  (Dkt. No. 11-3 at 566-68.)

On June 22, 2017, Petitioner was sentenced, as a second felony offender, to concurrent

prison terms of 25 years to life for the murder conviction, 15 years, plus 5 years of post-release

supervision for the attempted kidnapping conviction; 25 years, plus 5 years of post-release

supervision for the assault and gang assault convictions; and 3½ to 7 years for the weapon conviction.  (Dkt. No. 11-3 at 576-77.)

### E.    Direct Appeal

Petitioner filed a counseled brief in the Appellate Division, Fourth Department, arguing, *inter alia*, that (1) Sanchez's accomplice testimony establishing Petitioner's participation in the murder was not corroborated by other evidence and (2) the integrity of the grand jury proceedings was impaired by the false testimony of two prosecution witnesses.  SR 424-518. The People filed an opposing brief, and Petitioner filed a reply brief.  SR 519-82, 583-602.

The Appellate Division unanimously affirmed the judgment on January 31, 2002.[2]  SR 605-06.  The Court rejected Petitioner's claim that the accomplice testimony was insufficiently corroborated.  *Id.*  The Court found Petitioner's statements to the police demonstrated his motive to harm the victim, and that Petitioner, Cruz-Rivera, and another participant in the crime were close friends.  *Id.*  Other testimony established Petitioner, Cruz-Rivera, and two other participants were seen together just hours before the murder and Petitioner was holding a baseball bat and asking where Diaz was.  *Id.*  Further, "forensic evidence substantiated much of [Sanchez's] testimony, and testimony of eyewitnesses at and near the scene of the crime harmonized with [Sanchez's] testimony."  *Id.*  The Court thus concluded "the corroborative evidence tends to connect [Petitioner] with the commission of the crime in such a way as may reasonably satisfy the jury that the accomplice is telling the truth."  *Id.* (internal quotation marks and citations omitted).

The Court also rejected Petitioner's grand jury claim, just as it had in Cruz-Rivera's appeal, because "'inasmuch as the prosecutor did not knowingly offer perjured testimony and

---

[2]  *People v. Osorio*, 179 A.D.3d 1512 (4th Dep't 2020).

there was sufficient evidence before the grand jury to support the charges without considering the perjured testimony, dismissal of the indictment was not required.'" *Id.* (quoting *People v. Cruz-Rivera*, 174 A.D.3d 1512, 1513 (4th Dep't 2019)).

Petitioner filed a counseled application for leave to appeal to the New York Court of Appeals, asking the Court to review his claims that Sanchez's accomplice testimony was not sufficiently corroborated and that the integrity of the grand jury proceedings was impaired. SR 607-13. The People filed a letter opposing the application. SR 614-18. On April 27, 2020, the Court of Appeals denied leave to appeal. SR 619.[3]

### F.    Coram Nobis Motion

Petitioner brought a *pro se* coram nobis motion alleging he was denied the effective assistance of appellate counsel because counsel failed to assert claims that: (1) trial counsel was ineffective for overlooking "numerous issues of violated law related to the prosecution[']s key witnesses[] recanting their factual events that pointed to [Petitioner's] participation and guilt in this assault and murder of the crime victim"; (2) false testimony provided at the grand jury proceeding prejudiced Petitioner; (3) the witnesses were incredible and testified falsely; and (4) Petitioner is actually innocent. SR 620-636. The People filed an affirmation opposing the motion. SR 828-35. The Appellate Division summarily denied the motion on April 30, 2021. SR 838. Petitioner did not seek leave to appeal the denial of the motion.

## III.    PETITION

In his petition for writ of habeas corpus, filed on May 20, 2021, Petitioner argues he is entitled to habeas relief because: (1) he was denied effective assistance of trial counsel; (2) he was denied effective assistance of appellate counsel; (3) he is actually innocent of the crimes of

---

[3] *People v. Osorio*, 35 N.Y.3d 972 (2020).

which he was convicted; and (4) the indictment was defective due to the false testimony of two

prosecution witnesses at the grand jury proceedings.  (Dkt. No. 1 at 6, 8, 9.)

## IV.    ANALYSIS

### A.    Standard of Review

Under the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), a federal

court may grant habeas corpus relief with respect to a claim adjudicated on the merits in state

court only if, based upon the record before the state court, the state court's decision was

"contrary to, or involved an unreasonable application of, clearly established federal law, as

determined by the Supreme Court of the United States" or "was based on an unreasonable

determination of the facts in light of the evidence presented in the State court proceeding."  28

U.S.C. §§ 2254(d)(1), (2); *Cullen v. Pinholster*, 563 U.S. 170, 180-81, 185 (2011); *Premo v.

Moore*, 562 U.S. 115, 120-21 (2011); *Schriro v. Landrigan*, 550 U.S. 465, 473 (2007).  This

standard is "highly deferential" and "demands that state-court decisions be given the benefit of

the doubt."  *Felkner v. Jackson*, 562 U.S. 594, 598 (2011) (per curiam) (quoting *Renico v. Lett*,

559 U.S. 766, 773 (2010) (internal quotation marks omitted)).

The Supreme Court has repeatedly explained "a federal habeas court may overturn a state

court's application of federal law only if it is so erroneous that 'there is no possibility fairminded

jurists could disagree that the state court's decision conflicts with [the Supreme] Court's

precedents.'"  *Nevada v. Jackson*, 569 U.S. 505, 508-09 (2013) (per curiam) (quoting *Harrington

v. Richter*, 562 U.S. 86, 102 (2011)); *see Metrish v. Lancaster*, 569 U.S. 351, 358 (2013)

(explaining that success in a habeas case premised on § 2254(d)(1) requires the petitioner to

"show that the challenged state-court ruling rested on 'an error well understood and

comprehended in existing law beyond any possibility for fairminded disagreement.'") (quoting *Richter*, 562 U.S. at 103).

Additionally, AEDPA foreclosed "'using federal habeas corpus review as a vehicle to second-guess the reasonable decisions of state courts.'" *Parker v. Matthews*, 567 U.S. 37, 38 (2012) (per curiam) (quoting *Renico*, 559 U.S. at 779). A state court's findings are not unreasonable under § 2254(d)(2) simply because a federal habeas court reviewing the claim in the first instance would have reached a different conclusion. *Wood v. Allen*, 558 U.S. 290, 301 (2010). "The question under AEDPA is not whether a federal court believes the state court's determination was incorrect but whether that determination was unreasonable - a substantially higher threshold." *Schriro*, 550 U.S. at 473.

Federal habeas courts must presume the state courts' factual findings are correct unless a petitioner rebuts that presumption with "'clear and convincing evidence.'" *Id.* at 473-74 (quoting § 2254(e)(1)). "A state court decision is based on a clearly erroneous factual determination if the state court failed to weigh all of the relevant evidence before making its factual findings." *Lewis v. Conn. Comm'r of Corr.*, 790 F.3d 109, 121 (2d Cir. 2015). Finally, "[w]hen a state court rejects a federal claim without expressly addressing that claim, a federal habeas court must presume that the federal claim was adjudicated on the merits." *Johnson v. Williams*, 568 U.S. 289, 301 (2013).

**B.    Defective Indictment**

Petitioner claims "JURISDICTION HAS BEEN LOST PURSUANT TO INDICTMENT AND GRAND JURY DEFECTIVENESS, PERJURY AND RECANTATION EVIDENCE

PRESENTED AT THE GRAND JURY."[4]  (Dkt. No. 1 at 9.)  Construed liberally, Petitioner

claims the indictment should be dismissed as defective because the integrity of the grand jury

proceedings was impaired due to Osorio's and Sanchez's partially false grand jury testimony.

(*See generally* Dkt. No. 1 at 85-105.)  Respondent counters this claim is not cognizable and is

meritless.  (Dkt. No. 10-1 at 15-18.)  The Court agrees with Respondent.

        In the first instance, to the extent Petitioner is challenging the propriety of the grand jury

proceedings, including the prosecutor obtaining and proceeding on a "defective indictment,"

such claim fails.  There is no federal constitutional right to a grand jury proceeding.  *See*

*Alexander v. Louisiana*, 405 U.S. 625, 633 (1972); *LanFranco v. Murray*, 313 F.3d 112, 118 (2d

Cir. 2002).  In New York, a grand jury indictment arises from the "State Constitution and other

state laws . . . and federal habeas relief may not be granted for violations of state law."  *Robinson*

*v. LaClair*, No. 09-CV-3501, 2011 WL 115490, at *8 (E.D.N.Y. Jan. 13, 2011).  Therefore,

"[c]laims of deficiencies in state grand jury proceedings are not cognizable in a habeas corpus

proceeding in federal court."  *Davis v. Mantello*, 42 F. App'x 488, 490-91 (2d Cir. 2002)

(summary order), *cert. denied sub nom Davis v. Filion*, 538 U.S. 986 (2003); *see also Van*

*Stuyvesant v. Conway*, No. 03 Civ. 3856, 2007 WL 2584775, at *25 (S.D.N.Y. Sept. 7, 2007)

(claim that false testimony was presented before the grand jury is not cognizable on habeas

review) (citing *Lopez v. Riley*, 865 F.2d 30, 32-33 (2d Cir. 1989)); *Mayes v. Donnelly*, No. 03-

CV-417, 2009 WL 2601106, at *9 (W.D.N.Y. Aug. 21, 2009) ("To the extent that Mayes is

attempting to assert a claim that Anderson perjured himself when he testified before the grand

---

[4]  Unless otherwise indicated, excerpts from the record are reproduced exactly as they appear in
the original and errors in spelling, punctuation, and grammar have not been corrected.

jury, habeas relief is not warranted because the claim is not cognizable in this federal habeas proceeding[.]").

Further, following a guilty verdict rendered by a petit jury, alleged deficiencies in a state grand jury proceeding are not cognizable on habeas review. *See Lopez*, 865 F.2d at 31; *Dunn v. Sears*, 561 F. Supp. 2d 444, 453 (S.D.N.Y. 2008). Thus, after a conviction, habeas relief is unavailable for claims of prosecutorial misconduct in the grand jury. *See Campbell v. Poole*, 555 F. Supp. 2d 345, 367-68 (W.D.N.Y. 2008); *Evans v. Poole*, No. 05 Civ. 5951, 2005 WL 2847769, at *1 (S.D.N.Y. Oct. 31, 2005).

Even if this claim was cognizable, it is ultimately meritless. Petitioner had previously argued "Sanchez's and Osorio's conspiracy to falsely implicate [Petitioner] to ensure his indictment [along with] their false Grand Jury testimony is the 'fraudulent conduct' undermining the integrity of the" Grand Jury proceedings—warranting dismissal of the indictment. (Dkt. No. 11-1 at 240-41.)

A grand jury proceeding is defective, and warrants dismissal of the indictment, "where the 'proceeding fails to conform to the requirements of CPL article 190 to such degree that the integrity thereof is impaired and prejudice to the defendant may result.'" *People v. Sealy*, 181 A.D.3d 893, 894 (2d Dep't 2020), *lv denied*, 35 N.Y.3d 1070 (2020) (internal brackets and ellipses omitted) (quoting *People v. Huston*, 88 N.Y.2d 400, 409 (1996)); *see also People v. Moffitt*, 20 A.D.3d 687, 688 (3d Dep't 2005). "Dismissal of an indictment under CPL 210.35 (5) must meet a high test and is limited to instances of prosecutorial misconduct, fraudulent conduct[,] or errors which potentially prejudice the ultimate decision reached by the grand jury." *People v Elioff*, 110 A.D.3d 1477, 1477 (4th Dep't 2013), *lv denied*, 22 N.Y.3d 1040 (2013) (internal quotation marks, brackets, and citations omitted). "While the defendant need not

demonstrate actual prejudice before an indictment is considered defective, but rather, must merely show the 'possibility' of prejudice from the conduct of the prosecutor . . .  this possibility of prejudice must follow from *some* identifiable misconduct on the part of the prosecutor such as would have impaired the integrity of the Grand Jury process." *People v. Johnson*, 282 A.D.2d 309, 310 (1st Dep't 2001), *lv denied*, 96 N.Y.2d 903 (2001) (emphasis added) (internal citation omitted).

"As the Court of Appeals has stated, 'not every improper comment, elicitation of inadmissible testimony, impermissible question or mere mistake renders an indictment defective. Typically, the submission of some inadmissible evidence will be deemed fatal only when the remaining evidence is insufficient to sustain the indictment.'" *Elioff*, 110 A.D.3d at 1477-78 (quoting *Huston*, 88 N.Y.2d at 409); *see also People v Miller*, 110 A.D.3d 1150, 1151 (3d Dep't 2013).

Here, although Osorio and Sanchez later admitted to lying during their Grand Jury testimony, the trial court found the People did not knowingly or negligently present perjured testimony to the Grand Jury.  (Dkt. No. 11-2 at 193-94.)  Moreover, the Fourth Department found "inasmuch as the prosecutor did not knowingly offer perjured testimony and there was sufficient evidence before the grand jury to support the charges without considering the perjured testimony, dismissal of the indictment was not required."  SR 606 (internal quotation marks and citation omitted).   Therefore, the Court recommends denying relief on this ground.

### C.   Actual Innocence

Petitioner contends he is entitled to habeas relief because he is actually innocent of all the crimes of which he was convicted.  (Dkt. No. 1 at 8.)  Specifically, Petitioner argues

> THERE EXIST MERITORIOUS CONSTITUTIONAL
> VIOLATIONS, ENOUGH TO ESTABLI SH A PRIMA FACIE

> SHOWING THAT A MISCARRIAGE OE JUSTICE HAS
> TAKEN PLACE . . . .
> THE PERTITIONER ASK THAT THIS COURT REVIEW THE
> ENTIRE TRIAL RECORD, STATEMENT'S, ARREST, DD'5'S,
> PERJURY/RECONTATION EVIDENCE, GRAND JURY
> PRESENTATION, FELONY COMPLAINT'S AND ALL
> ISSUES BROUGHT BY APPELLATE COUNSEL FOR ANY
> MERITABLE RELIEF, DE NOVO AND PURSUSANT TO A
> FUNDAMENTAL MISCARRIAGE OF JUSTICE STANDARD,
> WHICH HAS TAKEN PLACE.

*Id.*

Respondent asserts a freestanding claim of actual innocence is not cognizable, and even if it were cognizable, it is meritless.  (Dkt. No. 10-1 at 18-19.)  The Court agrees the claim is not cognizable, and further finds that even if such a claim were cognizable, Petitioner's allegations do not show he is actually innocent.

Although the Supreme Court has determined a federal habeas petitioner may assert a "gateway claim" of actual innocence to overcome the procedural default of a constitutional claim or to equitably toll AEDPA's statute of limitations, it has not resolved whether a non-capital prisoner may be entitled to habeas relief based on a freestanding claim of actual innocence. *McQuiggin v. Perkins*, 569 U.S. 383, 385-87, 392 (2013).

Even if a freestanding actual innocence claim were cognizable in a 28 U.S.C. § 2254 proceeding brought by a non-capital prisoner, the Supreme Court has suggested the required showing would be even higher than the demanding standard in *Schlup v. Delo*, 513 U.S. 298 (1995), for gateway actual innocence claims.  *See House v. Bell*, 547 U.S. 518, 555 (2006) ("The sequence of the [Supreme] Court's decisions in [*Herrera v. Collins*, 506 U.S. 390] and *Schlup*— first leaving unresolved the status of freestanding claims and then establishing the gateway

standard—implies at the least that *Herrera* requires more convincing proof of innocence than *Schlup*.").

To meet the *Schlup* gateway standard, an actual innocence claim must be "credible," meaning the petitioner has supported it by "new reliable evidence—whether it be exculpatory scientific evidence, trustworthy eyewitness accounts, or critical physical evidence—that was not presented at trial."  513 U.S. at 324.  The claim also must be "compelling," which requires the petitioner to demonstrate that "more likely than not, in light of the new evidence, no reasonable juror would find him guilty beyond a reasonable doubt—or to remove the double negative, that more likely than not any reasonable juror would have reasonable doubt."  *House*, 547 U.S. at 538.  "The fact that new evidence is credible does not necessarily make it compelling under the *Schlup* standard for actual innocence."  *Hyman v. Brown*, 927 F.3d 639, 662 (2d Cir. 2019) (citing *Schlup*, 927 F.3d 639).

Petitioner does not present any "new reliable evidence" and instead asks the Court to review the entire trial record, statements, arrest, perjury/recantation evidence, grand jury presentation, felony complaints, and all issues brought by Appellate Counsel to support his claim of actual innocence.  (Dkt. No. 1 at 8.)  However, such evidence cannot be considered "new" because the jury already heard and evaluated this evidence.  *See Rivas v. Fischer*, 687 F.3d 514, 543 (2d Cir. 2012) (explaining "new" reliable evidence under *Schlup* is "evidence not heard by the jury").  Moreover, the jury is exclusively responsible for determining the credibility of the witnesses and resolving any inconsistencies in their testimony.  *See*, *e.g.*, *Bossett v. Walker*, 41 F.3d 825, 830 (2d Cir. 1994) ("[A] conviction may be based upon circumstantial evidence and inferences based upon the evidence, and the jury is exclusively responsible for determining a witness'[s] credibility") (internal quotation marks and citation omitted).  "[T]he fact that the jury

may have chosen to credit less reliable aspects of the testimony of [Sanchez and Osorio], or to resolve inconsistencies in their testimony in favor of the prosecution, does not undermine the reliability of the jury's verdict." *Simmons v. McGinnis*, No. 04 CIV. 6150 PACDF, 2006 WL 3746739, at *11 (S.D.N.Y. Dec. 19, 2006) (citing *Bossett*, 41 F.3d at 830). Moreover, even assuming "the alleged testimonial inconsistencies could be construed as a due process claim of legally insufficient evidence, that still would be inadequate." *Smith v. Noeth*, No. 1:18-CV-00883 (JLS/MJR), 2023 WL 4936942, at *28 (W.D.N.Y. June 27, 2023), *report and recommendation adopted*, 2023 WL 4933981 (W.D.N.Y. Aug. 1, 2023). The Supreme Court has clearly stated actual innocence means "factual innocence, not mere legal insufficiency." *Bousley v. United States*, 523 U.S. 614, 623 (1998). "Because Petitioner cannot meet the demanding *Schlup* standard for a gateway claim of actual innocence, he necessarily cannot meet the more demanding hypothetical standard that the Supreme Court has said a freestanding claim of actual innocence would entail." *Smith*, 2023 WL 4936942, at *29. Therefore, the Court recommends denying relief on this ground.

### D. Ineffective Assistance of Counsel

Petitioner claims he was denied effective assistance of trial and appellate counsel. (Dkt. No. 1 at 6.) Although he does not specify how his trial and appellate counsel were ineffective in his habeas petition, it appears he is basing the claims on the same grounds as his coram nobis motion. There, he argued appellate counsel was ineffective for failing to assert (1) trial counsel was ineffective for overlooking "numerous issues of violated law related to the prosecution[']s key witnesses, recanting their factual events that pointed to [Petitioner's] participation and guilt in this assault and murder of the crime victim"; (2) false testimony at the Grand Jury proceedings was prejudicial to Petitioner; (3) the witnesses were "incredible on its face" and gave false

testimony; and (4) the "evidence is severely circumstantial and a claim of actual innocence

should have been preserved and/or mentioned in the interest of justice."  SR 633-35.

Respondent argues Petitioner's ineffective assistance of trial and appellate counsel claims

are both unexhausted and, ultimately, meritless.  (Dkt. No. 10-1 at 19-26.)  The Court agrees.

## 1.    Exhaustion

A federal court may not grant the habeas petition of a state prisoner unless it appears "the

applicant has exhausted the remedies available in the courts of the State;" or that "there is either

an absence of available State corrective process;" or "circumstances exist that render such

process ineffective to protect the rights of the applicant."  28 U.S.C. § 2254(b)(1).  To satisfy §

2254's exhaustion requirement, a petitioner must present the substance of "the same federal

constitutional claim[s] that he now urges upon the federal courts," to the highest court in the

appropriate state.  *Turner v. Artuz*, 262 F.3d 118, 123-24 (2d Cir. 2001); *Pesina v. Johnson*, 913

F.2d 53, 54 (2d Cir. 1990).

As an initial matter, Petitioner's ineffective assistance of appellate counsel claim is

barred because he failed to fully exhaust his remedies as to that claim.  Although Petitioner

timely filed a motion for a writ of error coram nobis with the Appellate Division, when the

Appellate Division denied Petitioner's motion on April 30, 2021, Petitioner was required to

further move for leave to appeal to the Court of Appeals in order to fully exhaust this claim.  SR

838; *see Diaz v. Graham*, No. CV–07–5379 (SJF), 2011 WL 1303924, at *2 n.1 (E.D.N.Y. Mar.

31, 2011) (finding a habeas petitioner's claim for ineffective assistance of counsel remained

unexhausted where the petitioner did not appeal to the Court of Appeals following the Appellate

Division's denial of a writ of error coram nobis); *see also Fulcher v. Graham*, No. 14-CV-3910

(LDH), 2022 WL 523555, at *10 (E.D.N.Y. Feb. 22, 2022) (same).

Petitioner's ineffective assistance of trial counsel is also barred as unexhausted. Petitioner indirectly raised his ineffective assistance of trial counsel claim in state court through his coram nobis motion where he alleged *appellate* counsel had been ineffective for failing to raise the instances of alleged ineffectiveness by trial counsel. *See Allen v. Artuz,* No. 6:17-CV-6074 CJS, 2020 WL 6785498, at *12 (W.D.N.Y. Nov. 18, 2020); SR 633-35.

Courts in this circuit have routinely held raising an ineffective assistance of appellate counsel claim in a coram nobis motion does not exhaust the underlying claims appellate counsel allegedly failed to raise. *See Turner v. Artuz,* 262 F.3d 118, 123 (2d Cir. 2001) (concluding the petitioner's underlying claim was not exhausted through his coram nobis petition alleging ineffective assistance of counsel for failing to raise said claim); *Roberts v. Lamanna*, No. 19 CV 880 (AMD)(LB), 2020 WL 5633871, at *6 (E.D.N.Y. Aug. 31, 2020) ("'[C]ourts in this circuit have consistently recognized[ ] an ineffective assistance claim is an insufficient vehicle for exhausting the underlying allegations when those allegations are asserted for the first time as separate claims on habeas.'") (alterations in original) (citation omitted), *report and recommendation adopted*, 2020 WL 5633078 (E.D.N.Y. Sept. 21, 2020); *Zimmerman v. Burge*, 492 F. Supp. 2d 170, 189 (E.D.N.Y. 2007) ("a petition for a writ of error coram nobis does not exhaust the underlying claims advanced to support the claim of ineffective assistance of appellate counsel"); *Miller v. Chapplus*, No. 9:16-CV-512 (TJM/CFH), 2018 WL 2709228, at *9 (N.D.N.Y. Apr. 2, 2018), *report and recommendation adopted*, 2018 WL 2694425 (N.D.N.Y. June 5, 2018) (same). "In other words, no claim besides ineffective assistance of appellate counsel can be exhausted through an application for a writ of error coram nobis." *Allen*, 2020 WL 6785498, at *12. Therefore, Petitioner's ineffective assistance of trial and appellate counsel claims remain unexhausted.

## 2.    Merits

However, even if these claims were exhausted, they ultimately fail on the merits.  To establish an ineffective assistance of counsel claim, the petitioner must show (1) counsel's performance was deficient and (2) the deficient performance prejudiced the petitioner. *Strickland v. Washington*, 466 U.S. 668, 687-90 (1984).

Under the first prong, "[j]udicial scrutiny of counsel's performance must be highly deferential . . . a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action might be considered sound trial strategy."  *Strickland,* 466 U.S. at 689 (internal quotation marks and citations omitted).  *See Richter,* 562 U.S. at 110 ("*Strickland* does not guarantee perfect representation, only a reasonably competent attorney") (internal quotation marks and citation omitted).

Under the second prong, to establish prejudice,

> [t]he defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.  A reasonable probability is a probability sufficient to undermine confidence in the outcome. In making the determination whether the specified errors resulted in the required prejudice, a court should presume, absent challenge to the judgment on grounds of evidentiary insufficiency, that the judge or jury acted according to law.

*Strickland,* 466 U.S. at 694.  Here, the "likelihood of a different result must be substantial, not just conceivable."  *Richter*, 562 U.S. at 112.

As set forth above, Petitioner asserts his trial counsel was ineffective for overlooking "numerous issues of violated law related to the prosecution[']s key witnesses[] recanting their factual events that pointed to [Petitioner's] participation and guilt in this assault and murder of the crime victim."  SR 633-34.  Despite Petitioner's claims, trial counsel twice moved to dismiss

the indictment as defective due to Osorio's and Sanchez's false testimony at the Grand Jury

proceedings.  SR 98-103, 121-26.  Further, trial counsel vigorously cross-examined Sanchez and

Osorio at trial about their false testimony and argued at summation that the jury should not credit

these witnesses' accounts.  (Dkt. No. 11-2 at 700-04, 726-30, 757; Dkt. No. 11-3 at 50-54, 408-

10, 418-31.)  Therefore, Petitioner's claim he was denied ineffective assistance of trial counsel is

unavailing.  *See McKee v. United States*, 167 F.3d 103, 106 (2d Cir. 1999) ("[a]ctions or

omissions by counsel that 'might be considered sound trial strategy' do not constitute ineffective

assistance of counsel") (quoting *Strickland*, 466 U.S. at 689).

As noted above, Petitioner also argues his appellate counsel was ineffective for failing to

bring claims asserting (1) trial counsel was ineffective for overlooking "numerous issues of

violated law related to the prosecution[']s key witnesses[] recanting their factual events that

pointed to [Petitioner's] participation and guilt in this assault and murder of the crime victim";

(2) false testimony at the Grand Jury proceedings was prejudicial to Petitioner; (3) the witnesses

were "incredible on its face" and gave false testimony; and (4) the "evidence is severely

circumstantial and a claim of actual innocence should have been preserved and/or mentioned in

the interest of justice."  SR 633-35.

"Although the *Strickland* test was formulated in the context of evaluating a claim of

ineffective assistance of trial counsel, the same test is used with respect to appellate counsel."

*Mayo v. Henderson,* 13 F.3d 528, 533 (2d Cir. 1994) (*citing Claudio v. Scully,* 982 F.2d 798, 803

(2d Cir. 1992), *cert. denied,* 508 U.S. 912 (1993)).  Petitioner may establish ineffective

assistance of appellate counsel by demonstrating counsel omitted "significant and obvious"

arguments in favor of those that "were clearly and significantly weaker."  *Id.* at 533.  Appellate

counsel does not have a duty to advance every available non-frivolous argument, given that

"[e]xperienced advocates since time beyond memory have emphasized the importance of winnowing out weaker arguments on appeal and focusing on one central issue if possible, or at most on a few key issues." *Jones v. Barnes*, 463 U.S. 745, 751-52 (1983).

Petitioner's claims with regard to the ineffective assistance of appellate counsel are baseless. As to the first claim, trial counsel moved twice to dismiss the indictment based on Osorio's and Sanchez's false testimony, preserving the issue for appeal. SR 98-103, 121-28. Therefore, there was no basis for appellate counsel to assert trial counsel was ineffective on this issue.

As to Petitioner's second and third claims, appellate counsel did challenge the integrity of the Grand Jury proceedings based on Osorio's and Sanchez's false testimony. (Dkt. No. 1 at 85-105.) Further, appellate counsel asserted Osorio and Sanchez were not credible when arguing the corroborative evidence did not connect Petitioner to the charged crimes or harmonize with Sanchez's accomplice testimony. (Dkt. No. 1 at 60-73.) As appellate counsel "made the very arguments that petitioner asserts should have been made on direct appeal, there is no basis to conclude that counsel was ineffective on this ground." (Dkt. No. 10-1 at 26.)

Finally, Petitioner asserts appellate counsel should have argued he was actually innocent. Petitioner could move to vacate his judgment under N.Y. Crim. Proc. Law § 440.10(g) if

> [n]ew evidence [had] been discovered since the entry of a judgment based upon a verdict of guilty after trial, which could not have been produced by the [Petitioner] at the trial even with due diligence on his part and which is of such character as to create a probability that had such evidence been received at the trial the verdict would have been more favorable to the [Petitioner]; provided that a motion based upon such ground must be made with due diligence after the discovery of such alleged new evidence.

As such, it is not the proper basis of a direct appeal. Further, as discussed *supra* in Section IV.C, Plaintiff has not presented any new evidence which would support his claim of actual innocence.

Therefore, the Court recommends dismissing Plaintiff's ineffective assistance of counsel claims as unexhausted and meritless.

## V.    CERTIFICATE OF APPEALABILITY

28 U.S.C. § 2253(c)(1) provides that "[u]nless a circuit justice or judge issues a certificate of appealability, an appeal may not be taken to the court of appeals from . . . the final order in a habeas corpus proceeding in which the detention complained of arises out of process issued by a State court."  A court may only issue a certificate of appealability "if the applicant has made a substantial showing of the denial of a constitutional right."  28 U.S.C. § 2553(c)(2). Since Petitioner has failed to make such a showing with regard to any of his claims, the Court recommends that no certificate of appealability be issued.  *See Hohn v. United States*, 524 U.S. 236, 239-40 (1998).

## VI.    CONCLUSION

After carefully reviewing the entire record in this matter, the parties' submissions, and the applicable law, and for the reasons stated herein, it is hereby

**RECOMMENDED** that Petitioner's *pro se* petition for a writ of habeas corpus (Dkt. No. 1) be **DENIED** and **DISMISSED**; and it is further

**RECOMMENDED** that no certificate of appealability be issued; and it is further

**ORDERED** that the Clerk of the Court shall file and serve a copy of this Report-Recommendation and Order on the parties in accordance with the Local Rules, along with copies of the unpublished decisions cited herein in accordance with the Second Circuit's decision in *Lebron v. Sanders*, 557 F.3d 76 (2d Cir. 2009) (per curiam).

Pursuant to 28 U.S.C. § 636(b)(1), the parties have fourteen (14) days within which to file written objections to the foregoing report.[5]  Such objections shall be filed with the Clerk of the Court.  **FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN (14) DAYS WILL PRECLUDE APPELLATE REVIEW.**  *Roldan v. Racette*, 984 F.2d 85, 89 (2d Cir. 1993) (citing *Small v. Sec'y of Health and Human Servs.*, 892 F.2d 15 (2d Cir. 1989)); *see also* 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72 & 6(a).

**IT IS SO ORDERED.**

Dated:  November 3, 2023
        Syracuse, New York

Therese Wiley Dancks
United States Magistrate Judge

---

[5]  If you are proceeding *pro se* and are served with this Report-Recommendation & Order by mail, three additional days will be added to the fourteen-day period, meaning that you have seventeen days from the date the Report-Recommendation & Order was mailed to you to serve and file objections.  Fed. R. Civ. P. 6(d).  If the last day of that prescribed period falls on a Saturday, Sunday, or legal holiday, then the deadline is extended until the end of the next day that is not a Saturday, Sunday, or legal holiday.  Fed. R. Civ. 6(a)(1)(C).

2011 WL 115490
Only the Westlaw citation is currently available.
NOT FOR PUBLICATION
United States District Court,
E.D. New York.

Todd ROBINSON, Petitioner,

v.

Supt. D.E. LaCLAIR, Franklin
Correctional Facility, Respondent.

No. 09–CV–3501 (KAM).
|
Jan. 13, 2011.

**Attorneys and Law Firms**

Todd Robinson, Malone, NY, pro se.

Michael John Shollar, Staten Island, NY, New York State Attorney Generals Office, Richmond County District Attorneys Office, for Respondent.

### *MEMORANDUM AND ORDER*

MATSUMOTO, District Judge.

 **\*1** On August 3, 2009, Todd Robinson ("petitioner") filed a *pro se* petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254. (ECF No. 1, Pet. for Writ of Habeas Corpus ("Pet.").) On October 15, 2009, D.E. LaClair ("respondent") filed an opposition and memorandum of law in opposition to petitioner's habeas petition. (ECF No. 5, Resp't Affidavit in Opp. to Writ of Habeas Corpus ("Resp't Opp."); ECF No. 5–1, Resp't Mem. of Law ("Resp't Mem.").) Following court orders requesting additional information, respondent filed a letter, attaching several supporting exhibits, on December 21, 2010. (ECF Orders dated 11/18/10 and 11/23/10; ECF No. 6, Ltr. by D.E. LaClair.) Having considered all of the submissions, the court denies the petition for habeas corpus.

### *BACKGROUND*

Petitioner's habeas petition seeks relief from his March 14, 2006 conviction in the Supreme Court of the State of New York, Richmond County, for one count of Burglary in the Second Degree, N.Y. Penal Law § 140.25(2), three counts

of Criminal Possession of Stolen Property in the Fourth Degree, N.Y. Penal Law § 165.45(2), two counts of Criminal Possession of Stolen Property in the Fifth Degree, N.Y. Penal Law § 165.40, and one count of Petit Larceny, N.Y. Penal Law § 155.25.

The conviction was in connection with an incident that took place in Staten Island on January 30, 2005. Carlee Goodridge ("Goodridge") found petitioner, an uninvited stranger, asleep on her couch when she arrived home shortly after midnight. (Resp't Opp. at 2, 4; ECF No. 5–6, Direct Appeal at 1, [1] Br. for Defendant–Appellant ("Pet. Direct Appeal Br.") at 3.) Upon seeing petitioner in her home, Goodridge called 911. (*Id.*) After petitioner explained that he was homeless and that he had hoped Goodridge, a real estate agent, could help him find a place to live, Goodridge tried to cancel the 911 call but was unable to do so. (Resp't Opp. at 2, 4–5; Pet. Direct Appeal Br. at 3.) The police arrived shortly thereafter. (Resp't Opp. at 5.) The police determined that there were no signs of forced entry, but while escorting Goodridge through her house, Goodridge discovered that several items in her house, including clothing, mail, and a remote control, had been moved, and that a can of food had been opened and placed in a bowl. (*Id.;* Pet. Direct Appeal Br. at 3.) Petitioner was then searched, and the police found a pair of Goodridge's underwear in his pants pocket and a stack of credit cards, a driver's license, and a check belonging to Goodridge's neighbors in his jacket pocket. (Resp't Opp. at 5–6; Pet. Direct Appeal Br. at 3.) Petitioner was arrested. (Resp't Opp. at 3, 6; Pet. Direct Appeal Br. at 3.) The police searched petitioner's belongings at the homeless shelter in Orange County, New York, where petitioner had been staying, finding additional credit cards and two savings bonds belonging to Goodridge's other neighbors. (Resp't Opp. at 3, 6–7; Pet. Direct Appeal Br. at 7–8.)

[1]     As all direct appeal materials were filed as one document, the court refers to the page number assigned by the Electronic Court Filing system ("ECF"), which marks the beginning of the particular direct appeal document referenced.

 **\*2** Petitioner was first indicted on February 17, 2005 under Richmond County Indictment No. 28/2005 with one count of Burglary in the Second Degree, one count of Petit Larceny, two counts of Criminal Possession of Stolen Property in the Fourth Degree, and two counts of Criminal Possession of Stolen Property in the Fifth Degree. (*See* Pet., Ex. 2 at 33 [2]; Resp't Opp. at 3.) Petitioner was arraigned on this indictment. Indictment No. 28/2005, on February 23, 2005.

(*See* Pet., Ex. B at 33; Resp't Mem. at 4; ECF No. 6–1, Bucksheet for Indictment No. 28/2005.) The superseding indictment, Richmond County Indictment No. 71/2005, was filed on March 24, 2005. (*See* Pet. Direct Appeal Br. at 1.) The superseding indictment charged petitioner with one count of Burglary in the Second Degree, one count of Petit Larceny, four counts of Criminal Possession of Stolen Property in the Fourth Degree, and six counts of Criminal Possession of Stolen Property in the Fifth Degree. (Resp't Opp. at 3.)[3] Petitioner was arraigned on the superseding indictment, Indictment No. 71/2005, on April 6, 2005. (*See* Resp't Mem. at 4; ECF No. 6–2, Bucksheet for Indictment No. 71/2005.) The previous indictment, Indictment No. 28/2005, was dismissed on April 6, 2005. (*See* ECF No. 6–3, Transcript of Arraignment on Indictment No. 71/2005 at 3.)

[2]    As the exhibits are not numbered, the court refers to the numbers assigned by the Electronic Case Filing System ("ECF").

[3]    Respondent's opposition contains inconsistent information regarding the counts charged in the superseding Indictment No. 71/2005. On page 3, paragraph 6 of the opposition, respondent states that Indictment No. 71/2005 charged petitioner with, *inter alia,* four counts of Criminal Possession of Stolen Property in the Fourth Degree and six counts of Criminal Possession of Stolen Property in the Fifth Degree. (Resp't Opp. at 3.) Paragraph 7, however, states that Indictment No. 71/2005 charged petitioner with only three counts of Criminal Possession of Stolen Property in the Fourth Degree and two counts of Criminal Possession of Stolen Property in the Fifth Degree. (*Id.*) This difference is not relevant to the determination of petitioner's claims for habeas relief.

The case thereafter proceeded to trial. At the close of the trial, and during jury deliberations, the jury sent a note to the court stating that it was unable to reach a decision as to the Burglary in the Second Degree charge. (Resp't Opp. at 7; Pet. Direct Appeal Br. at 10; ECF No. 5–4, Transcript of Trial pages 534 to end ("Trial Tr. II") at 695.) Both the prosecutor and counsel for petitioner asked the judge to read a "deadlocked jury" instruction. (Resp't Opp. at 7; Trial Tr. II at 695–96.) The court and counsel agreed on a standard instruction that was published by the Office of Court Administration. (Resp't Opp. at 7; Trial Tr. II at 696.)

The jury ultimately found petitioner guilty on seven counts: one count of Burglary in the Second Degree, three counts of Criminal Possession of Stolen Property in the Fourth Degree, two counts of Criminal Possession of Stolen Property in the Fifth Degree, and one count of Petit Larceny. (Resp't Opp. at 1–2, 7; Pet. Direct Appeal Br. at 10–11.) On March 14, 2006, petitioner was sentenced as a second felony offender to concurrent terms of incarceration of ten years on the Burglary count with five years of post-release supervision, two to four years on the Criminal Possession in the Fourth Degree counts, one year each on the Criminal Possession in the Fifth Degree counts, and one year on the Petit Larceny count. (Resp't Opp. at 2, 8.)

Petitioner appealed his conviction to the New York State Appellate Division, Second Department. Petitioner submitted two briefs to the Appellate Division: one submitted by counsel, *see* Pet. Direct Appeal Br., and one submitted *pro se* by petitioner, *see* ECF No. 5–6, Direct Appeal at 50, *Pro Se* Br. for Defendant–Appellant ("*Pro Se* Direct Appeal Br."). The brief submitted by counsel argued that the prosecution presented insufficient evidence to establish that petitioner had an intent to commit a crime when he entered the Goodridge home, and therefore the conviction on Burglary in the Second Degree had to be reversed. (*See* Pet. Direct Appeal Br. at 11–20.) The *pro se* brief argued, *inter alia,* that the charges against petitioner were dismissed by the use of a superseding indictment, that the indictment was otherwise defective, that petitioner did not receive a timely arraignment, and that the Allen charge read to the jury violated his rights. (*See generally Pro Se* Direct Appeal Br.; Resp't Opp. at 8–9.)

**\*3** The Appellate Division affirmed petitioner's conviction on October 7, 2008, holding that petitioner's "contention that his conviction for burglary in the second degree must be reversed because the People failed to prove by legally sufficient evidence that he intended to commit a crime at the time he entered the premises is unpreserved for appellate review." *People v. Robinson,* 55 A.D.3d 636, 636, 867 N.Y.S.2d 97 (N.Y.App.Div.2008). The court also reasoned that "[i]n any event, viewing the evidence in the light most favorable to the prosecution, ... the evidence was legally sufficient to establish the defendant's guilt beyond a reasonable doubt ... [and] we are satisfied that the verdict of guilt was not against the weight of the evidence." *Id.* The Appellate Division also rejected the arguments raised in petitioner's supplemental *pro se* brief as "unpreserved for appellate review" and "in any event, ... without merit." *Id.* On February 9, 2009, the Appellate Division denied petitioner's

2011 WL 115490

request to reargue his direct appeal. *See People v. Robinson,* 2009 N.Y. Slip Op. 63185(U) (N.Y.App.Div.2009).

The New York State Court of Appeals subsequently denied petitioner leave to appeal on February 25, 2009. *See People v. Robinson,* 12 N.Y.3d 762 (N.Y.2009). On June 26, 2009, the Court of Appeals also denied petitioner's application for leave to appeal the Appellate Division's February 9, 2009 decision denying petitioner's motion for leave to reargue his appeal. *See People v. Robinson,* 12 N.Y.3d 920 (N.Y.2009).

Petitioner raises the following claims in his habeas petition: (1) that he was prosecuted by a defective indictment, which had been dismissed; (2) that he was denied due process and a fair trial because of a delay in his arraignment, i.e. that he was denied a speedy trial;[4] (3) that the trial court erred by presenting the jury with a coercive Allen charge; and (4) that the Appellate Division denied him due process by affirming his conviction because the evidence was legally insufficient to satisfy the requirements for Burglary in the Second Degree.[5] (*See* Pet.; *see also* Resp't Opp. at 10.)

[4]    Petitioner groups the defective indictment and untimely arraignment claims, listing both claims under "Ground One" in his habeas petition. (*See* Pet. at 6.) However, as they raise different issues, the court analyzes each separately.

[5]    It is difficult to understand, from the petition alone, exactly what petitioner claims as his fourth ground for relief. Respondent, in its opposition and memorandum of law, characterized this last claim a legal insufficiency claim with respect to the conviction for Burglary in the Second Degree, the same claim raised by appellate counsel on direct appeal. (*See* Resp't Mem. at 6–10.) Petitioner did not file a reply, despite the opportunity to do so, to correct that interpretation or otherwise clarify his position. Further, the court cannot discern any other meaning that would raise a meritorious claim for relief. Therefore, the court accepts respondent's interpretation of petitioner's fourth claim for relief as a legal insufficiency claim with respect to his conviction for Burglary in the Second Degree.

Respondent argues that petitioner is not entitled to habeas relief because his "proposed grounds for relief were each denied by an adequate and independent state ground," here, that the claims were unpreserved at trial for direct appellate

review. (Resp't Mem. at 2–3.) Respondent additionally argues that petitioner's claims are without merit. (Resp't Mem. at 4– 10.)

*DISCUSSION*

**I. Standard of Review**

The Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), Pub.L. No. 104–132, 110 Stat. 1214 (1996), established a deferential standard that federal courts must apply in reviewing state court decisions on habeas review. Under AEDPA, a federal court may grant habeas relief with respect to a federal claim adjudicated on the merits in state court only if the adjudication of the claim resulted in a decision that was either: (1) "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," or (2) "based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d). In addition, "a determination of a factual issue made by a State court shall be presumed to be correct," and the applicant for habeas relief has the "burden of rebutting the presumption of correctness by clear and convincing evidence." 28 U.S.C. § 2254(e)(1).

**\*4**  Furthermore, a habeas petition shall not be granted unless the petitioner "has exhausted the remedies available in the courts of the State." 28 U.S.C. § 2254(b)(1)(A). Even if the exhaustion requirement is satisfied, federal habeas corpus review may be barred by the independent and adequate state law grounds doctrine, which provides that a federal court may "not review a question of federal law decided by a state court if the decision of that court rests on a state law ground that is independent of the federal question and adequate to support the judgment." *Coleman v. Thompson,* 501 U.S. 722, 729, 111 S.Ct. 2546, 115 L.Ed.2d 640 (1991).

In the instant action, petitioner presented the claims raised in his petition to the state courts on direct appeal of his conviction. (*See* Pet. Direct Appeal Br.; *Pro Se* Direct Appeal Br.) Therefore, the claims are exhausted.[6] However, the claims are dismissed under the independent and adequate state law ground doctrine, as explained below. Moreover, even if the claims raised in the petition were not procedurally barred by the independent and adequate state law doctrine, the claims lack merit.

6    Respondent argues that, to the extent that petitioner claims that the Appellate Division acted improperly in denying his appeal, that claim of misconduct is not exhausted, as petitioner raises this issue for the first time in his habeas petition. (*See* Resp't Mem. at 6 n.1.) However, as explained in the preceding note, the court interprets petitioner's last ground for relief as a legal insufficiency claim with respect to his conviction for Burglary in the Second Degree, and not a claim alleging misconduct on the part of the Appellate Division.

## III. Independent and Adequate State Law Ground

Petitioner's claims are dismissed under the independent and adequate state grounds doctrine because on direct appeal the Appellate Division found these claims to be unpreserved for appellate review under the contemporaneous objection rule. *Robinson,* 55 A.D.3d at 636, 867 N.Y.S.2d 97. "Federal courts generally will not consider a federal issue in a case 'if the decision of the state court rests on a state law ground that is independent of the federal question and adequate to support the judgment.' " *Garvey v. Duncan,* 485 F.3d 709, 713 (2d Cir.2007) (quoting *Lee v. Kemna,* 534 U.S. 362, 375, 122 S.Ct. 877, 151 L.Ed.2d 820 (2002)). "This rule applies regardless of whether the independent state law ground is substantive or procedural and whether the case is in federal court on direct review or from state court via a habeas corpus petition." *Garvey,* 485 F.3d at 713 (citing *Lee,* 534 U.S. at 375).

A state law ground is "only adequate to support the judgment and foreclose review of a federal claim if it is 'firmly established and regularly followed' in the state." *Garvey,* 485 F.3d at 713 (quoting *Lee,* 534 U.S. at 376). The Supreme Court has noted that although a firmly established and regularly followed rule will ordinarily preclude review of a federal claim, "[t]here are ... exceptional cases in which exorbitant application of a generally sound rule renders the state ground inadequate to stop consideration of a federal question." *Lee,* 534 U.S. at 376. In *Lee,* the Supreme Court identified three factors (the "*Lee* factors") to guide a federal court's determination of whether application of a state law ground is "adequate" to preclude consideration of a federal question:

> (1) whether the alleged procedural violation was actually relied on in the trial court, and whether perfect compliance with the state

rule would have changed the trial court's decision; (2) whether state caselaw indicated that compliance with the rule was demanded in the specific circumstances presented; and (3) whether petitioner had "substantially complied" with the rule given "the realities of trial," and, therefore, whether demanding perfect compliance with the rule would serve a legitimate governmental interest.

**\*5** *Cotto v. Herbert,* 331 F.3d 217, 240 (2d Cir.2003) (citing *Lee,* 534 U.S. at 381–85). These *Lee* factors "are not a three-prong test: [rather] they are guideposts to aid inquiry" of adequacy. *Clark v. Perez,* 510 F.3d 382, 391 (2d Cir.2008); *see also Cotto,* 331 F.3d at 240 (noting that the *Lee* factors "were not presented as a 'test' for determining adequacy, we use them as guideposts in 'evaluat[ing] the state interest in a procedural rule against the circumstances of a particular case.' " (quoting *Lee,* 534 U.S. at 381–85)).

Alternatively, a federal court may also review a federal claim that is barred by an independent and adequate state law ground if "the prisoner can demonstrate cause for the default and actual prejudice as a result of the alleged violation of federal law, or demonstrate that failure to consider the claims will result in a fundamental miscarriage of justice." *Coleman,* 501 U.S. at 750; *see also Cotto,* 331 F.3d at 239 n. 10 (noting that "a habeas petitioner may also bypass the independent and adequate state ground bar by demonstrating a constitutional violation that resulted in a fundamental miscarriage of justice").

In the instant action, the New York State Appellate Division held that petitioner failed to preserve his defective indictment, delayed arraignment, Allen charge, and legal insufficiency [7] claims for appellate review under the "contemporaneous objection" rule. [8] *See Robinson,* 55 A.D.3d at 636, 867 N.Y.S.2d 97 (noting that claims raised in *pro se* appellate brief, including petitioner's first three federal habeas claims, were "unpreserved for appellate review," citing the contemporaneous objection rule, N.Y.Crim. Proc. Law § 470. 05(2)). [9] Under New York law, "an issue is properly preserved for appeal as a matter of law only if the appellant objected on that ground in the trial below." *Glenn v. Bartlett,* 98 F.3d

2011 WL 115490

721, 724 n. 2 (2d Cir.1996) (citing N.Y.Crim. Proc. Law § 470.05(2) and New York State case law).

7    Even though defense counsel moved to dismiss the charges following the close of the government's case and at the conclusion of the trial (*see* Trial Tr. II at 540–41, 549), a general motion to dismiss is not enough to preserve the legal insufficiency claim raised by petitioner here. It is clear that under New York law, "the preservation requirement compels that the argument be 'specifically directed' at the alleged error" in order to preserve a legal insufficiency challenge for review on direct appeal. *See People v. Gray,* 86 N.Y.2d 10, 629 N.Y.S.2d 173, 652 N.E.2d 919, 921 (N.Y.1995); *see also People v. Bork,* 77 A.D.3d 1278, 907 N.Y.S.2d 907, 907 (N.Y.App.Div.2010) (holding that "defendant contends that the evidence is legally insufficient to support the conviction" but made "only a general motion for a trial order of dismissal at the close of the People's case and thus ... failed to preserve her contention for [appellate] review").

8    The contemporaneous objection rule, N.Y.Crim. Proc. Law § 470.05(2), provides in part that "[f]or purposes of appeal, a question of law with respect to a ruling or instruction of a criminal court during a trial or proceeding is presented when a protest thereto was registered, by the party claiming error, at the time of such ruling or instruction or at any subsequent time when the court had an opportunity of effectively changing the same."

9    The fact that the Appellate Division found petitioner's claims also to be without merit, in addition to finding them unpreserved, does not affect the outcome. "[F]ederal habeas review is foreclosed when a state court has expressly relied on a procedural default as an independent and adequate state ground, even where the state court has also ruled in the alternative on the merits of the federal claim.' " *Glenn v. Bartlett,* 98 F.3d 721, 724 (2d Cir.1996) (quoting *Velasquez v. Leonardo,* 898 F.2d 7, 9 (2d Cir.1990)).

It is well-settled that the contemporaneous objection rule has been recognized as a firmly established and regularly followed independent state procedural ground in New York barring federal review of a federal claim. *See, e.g., Garcia v. Lewis,* 188 F.3d 71, 76–78 (2d Cir.1999) (holding that "the

Appellate Division's explicit invocation of the procedural bar constitutes" an independent and adequate state law ground). Thus, the critical issue in this case is whether application of the contemporaneous objection rule was "adequate" under the *Lee* factors to preclude federal review. *See Cotto,* 331 F.3d at 240 (noting that "[a]fter *Lee,* ... the relevant question ... is whether application of the procedural [contemporaneous objection] rule is 'firmly established and regularly followed' in the specific circumstances presented in the case, an inquiry that includes an evaluation of the" *Lee* factors).

The *Lee* factors indicate that the application of the firmly established and regularly followed contemporaneous objection rule in this case was adequate to preclude federal review of petitioner's claims. First, because the procedural bar is the contemporaneous objection rule, the first *Lee* guidepost "is less applicable ... because the lack of a contemporaneous objection would not, almost by definition, be mentioned by the trial court." *Cotto,* 331 F.3d at 242. Further, because the trial court had no opportunity to make a determination about petitioner's claims, it is impossible to know whether perfect compliance would have changed the trial court's decision under the first Lee factor. *See Donaldson v. Ercole,* No. 06–5781–pr, 2009 U.S.App. LEXIS 624, at *5–*6, 2009 WL 82716 (2d Cir. Jan. 14, 2009).

 *6    Under the second *Lee* factor, well-established state case law demanded compliance with the contemporaneous objection rule in the specific circumstances presented, namely, objection to: (1) a defective indictment, *see, e.g., People v. Nash,* 77 A.D.3d 687, 908 N.Y.S.2d 708, 710 (N.Y.App.Div.2010) ("The defendant's argument on appeal that the counts ... were vague and duplicitous is not preserved for appellate review ... as the defendant failed to make a pretrial motion to dismiss those counts of the indictment within 45 days of his arraignment."); *People v. Iannone,* 45 N.Y.2d 589, 412 N.Y.S.2d 110, 384 N.E.2d 656, 663–64 (N.Y.1978) (holding that "the defendants in these two appeals have failed to preserve a question of law which this court may review and have waived their objections to the sufficiency of the factual allegations in the indictments by which they were brought before the courts"); (2) speedy trial, *see, e.g., People v. Jordan,* 62 N.Y.2d 825, 477 N.Y.S.2d 605, 466 N.E.2d 145, 146 (N.Y.1984) (holding that because "[n]o application for the relief now sought having been made in Supreme Court in the criminal action and accordingly there having been no denial of a request for such relief, as a matter of appellate procedure, as the Appellate Division recognized, there was no ruling of the trial court in this action to be reviewed by the Appellate

Division, or now in our court"); *People v. Mack,* 306 A.D.2d 115, 759 N.Y.S.2d 878, 878 (N.Y.App.Div.2003) (denying review of unpreserved speedy trial issue); (3) a coercive *Allen* charge, *see, e.g., People v. Cowen,* 249 A.D.2d 560, 672 N.Y.S.2d 138, 138 (N.Y.App.Div.1998) ( "The defendant's contention that the court's *Allen* charge was coercive is not preserved for appellate review since he did not raise a specific objection on that ground before the trial court." (citation omitted)); *Francesehi v. Walsh,* 2004 U.S. Dist. LEXIS 9404, at *25 & n. 4, 2004 WL 1166650 (E.D.N.Y. May 24, 2004) ("New York courts have consistently found *Allen* charge claims to be unpreserved where the defense counsel did not alert the trial court to the offensive language at issue."); and (4) legal insufficiency of the evidence, *see, e.g., People v. Gray,* 86 N.Y.2d 10, 629 N.Y.S.2d 173, 652 N.E.2d 919, 920–21 (N.Y.1995) ("We hold that where a defendant seeks to argue on appeal ... that the People have failed to establish [an element of the offense charged], preservation of that contention is required in an appropriate objection."). This second factor, therefore, weighs in favor of respondent.

Finally, because petitioner's counsel never raised any objection to the superseding indictment, the timeliness of his arraignment, the *Allen* charge, or the legal sufficiency of the evidence for the burglary charge, as reflected by the record, the third *Lee* factor—"whether petitioner had substantially complied with the rule given the realities of trial," *Cotto,* 331 F.3d at 240 (citation omitted)—weighs in favor of respondent as well. Inherently, no "substantial compliance with a contemporaneous objection rule" is possible when the issues were not "even implied in the trial court." *Donaldson,* 2009 U.S.App. LEXIS 624, at *7, 2009 WL 82716. Thus, weighing all three *Lee* factors the court finds that not only is the contemporaneous objection rule firmly established and regularly followed, but it is also "adequate" under the specific circumstances of this case to prelude federal review of petitioner's defective indictment, speedy trial, improper *Allen* charge, and legal insufficiency claims.

**\*7** Additionally, there is nothing in the record to suggest that petitioner can establish cause and prejudice or a fundamental miscarriage of justice to excuse the procedural default in this case. *See Cotto,* 331 F.3d at 239 n. 10. Accordingly, the Appellate Division's denial of these claims for failure to preserve precludes federal review of the claims. *See, e.g., Garcia,* 188 F.3d at 78–79 ("[I]f a state appellate court refuses to review the merits of a criminal defendant's claim of constitutional error because of his failure to comply with ... a contemporaneous objection rule, a federal court generally

may not consider the merits of the constitutional claim on habeas corpus review." (internal quotation marks and citation omitted)). Petitioner's request for habeas relief is denied.

**IV. Alternatively, Claims Are Dismissed On The Merits**
Moreover, even if petitioner could overcome the procedural bar in this case and allow the court to reach the merits of his claims, his petition would still be dismissed. First, the defective indictment claim does not present a question of federal law proper for consideration by the court on federal habeas review. Second, the remaining claims are without merit.

Under AEDPA, a federal court can grant habeas relief only if the state court's determination of the claims on the merits was "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," or "was based on an unreasonable determination of the facts in light of the evidence presented." 28 U.S.C. § 2254(d). "An 'adjudication on the merits' is one that '(1) disposes of the claim on the merits, and (2) reduces its disposition to judgment.' " *Bell v. Miller,* 500 F.3d 149, 155 (2d Cir.2007) (quoting *Sellan v. Kuhlman,* 261 F.3d 303, 312 (2d Cir.2001)). Here, the Appellate Division ruled that petitioner's legal insufficiency claim was "unpreserved for appellate review" and that "[i]n any event, viewing the evidence in the light most favorable to the prosecution, ... the evidence was legally sufficient to establish [petitioner's] guilt beyond a reasonable doubt." *Robinson,* 55 A.D.3d at 636, 867 N.Y.S.2d 97 (internal citation omitted). Further, the Appellate Division found petitioner's remaining claims to be "unpreserved for appellate review and, in any event, ... without merit." *Id.* (internal citation omitted). This disposition by the Appellate Division constitutes a determination on the merits. *See Zarvela v. Artuz,* 364 F.3d 415, 417 (2d Cir.2004) (concluding that state court had reviewed the claim on the merits where it found "petitioner's claim to be unpreserved, and, in any event, without merit," constituted an adjudication on the merits). Therefore, assuming the court could reach the merits of petitioner's claims, habeas relief could only be granted if the Appellate Division's determination was "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," or "based on an unreasonable determination of the facts in light of the evidence presented." 28 U.S.C. § 2254(d).

### A. Deficient State Indictment Not Proper For Federal Habeas Review

**\*8** Petitioner first claims that he was denied due process and a fair trial because he was prosecuted under a defective indictment. (*See* Pet. at 6.) Petitioner is not entitled to federal habeas review of this claim because the claim does not raise a question of federal law proper for consideration by this court. Claims concerning state grand jury proceedings do not entitle a petitioner to federal habeas relief. *See Lopez v. Riley,* 865 F.2d 30, 32 (2d Cir.1989) (finding that "claims concerning a state grand jury proceeding are ... foreclosed in a collateral attack brought in a federal court"). Indictment by a grand jury in a New York State is a right dependent on the New York State Constitution and other state laws, not on federal law, and federal habeas relief may not be granted for violations of state law. *See, e.g., Venable v. Walsh,* 2009 U.S. Dist. LEXIS 27887, at \*31, 2009 WL 750230 (E.D.N.Y. Mar. 19, 2009) (finding that a defective state indictment claim "fails to state a violation of federal law"); *Fulton v. Greene,* 2009 U.S. Dist. LEXIS 102971, at \*14, 2009 WL 3733046 (W.D.N.Y. Nov. 5, 2009) ("It is well-settled that any errors in state grand jury proceedings involving sufficiency of grand jury evidence, use of misleading and prejudicial evidence, and instructions given to the grand jury do not entitle a petitioner to habeas relief."); *Whaley v. Graham,* 2008 U.S. Dist. LEXIS 82987, at \*21–\*22, 2008 WL 4693318 (E.D.N.Y. Oct. 15, 2008) ("As a threshold matter, the form of a grand jury indictment is statutorily created ... and such alleged defects in a state grand jury proceeding cannot provide grounds for habeas relief.").

Further, even if a defective state indictment constituted proper grounds for federal habeas review, any injury that petitioner claims from the defective indictment was cured by the jury's verdict of guilt beyond a reasonable doubt at his trial. *See Thigpen v. Brown,* 2008 U.S. Dist. LEXIS 101679, at \*39 (E.D.N.Y. Sept. 26, 2008) (holding that "any problem with the indictment was cured upon petitioner's conviction" (citing *United States v. Mechanik,* 475 U.S. 66, 73, 106 S.Ct. 938, 89 L.Ed.2d 50 (1986))); *Chacko v. United States,* 2005 U.S. Dist. LEXIS 11380, at \*16 (S.D.N.Y. June 8, 2005) (finding that "an error in a grand jury proceeding is generally considered harmless once a defendant has been convicted at trial after a jury has found that defendant guilty of crimes charged in the indictment beyond a reasonable doubt").

Consequently, even if petitioner could overcome the procedural bar for his defective indictment claim, the claim must be dismissed because petitioner does not raise a question of federal law appropriate for federal habeas review and, in any event, any defect in his indictment was cured by the finding of guilt beyond a reasonable doubt by the jury.

### B. No Speedy Trial Violation

Petitioner next alleges that he was denied due process and a fair trial because he received an "untimely [s]upreme court [a]rraignment." (*See* Pet. at 6.) Petitioner was arrested on January 30, 2005. (*See* Resp't Opp. at 2–3, 6.) Petitioner was first indicted on February 17, 2005 under Richmond County Indictment No. 28/2005. (*See* Pet., Ex. 2 at 33; Resp't Opp. at 3.) Petitioner was arraigned on this indictment, Indictment No. 28/2005, on February 23, 2005. (*See* Pet., Ex. B at 33; Resp't Mem. at 4; Bucksheet for Indictment No. 28/2005.) The superseding indictment, Richmond County Indictment No. 71/2005, was filed on March 24, 2005. (*See* Pet. Direct Appeal Br. at 1.) Petitioner was arraigned on the superseding indictment, Indictment No. 71/2005, on April 6, 2005. (*See* Resp't Mem. at 4; Bucksheet for Indictment No. 71/2005.) This delay, petitioner argues, denied him due process and a fair trial.

**\*9** The right to a speedy trial is guaranteed by the Sixth Amendment. *See* U.S. Const. amend. VI ("In all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial ...."). This fundamental right is imposed on the states by the Due Process Clause of the Fourteenth Amendment. *Klopfer v. North Carolina,* 386 U.S. 213, 223, 87 S.Ct. 988, 18 L.Ed.2d 1 (1967). The Supreme Court has adopted a balancing test to determine whether the right to speedy trial has been violated in a particular case. *See Barker v. Wingo,* 407 U.S. 514, 530, 92 S.Ct. 2182, 33 L.Ed.2d 101 (1972). Courts faced with speedy trial violation claims must weight whether: (1) the delay before trial was uncommonly long; (2) the government or the defendant is more to blame for that delay; (3) the defendant asserted his right to a speedy trial in due course; and (4) the defendant suffered prejudice. *See Doggett v. United States,* 505 U.S. 647, 651, 112 S.Ct. 2686, 120 L.Ed.2d 520 (1992). The first inquiry—whether the delay was uncommonly long— is considered a threshold issue, and courts will not reach the rest of the balancing test if this threshold inquiry is not satisfied. *See id.* at 651–52 ("Simply to trigger a speedy trial analysis, an accused must allege that the interval between the accusation and trial has crossed the threshold dividing ordinary from presumptively prejudicial delay, since, by definition, he cannot complain that the government has denied him a 'speedy' trial if it has, in fact, prosecuted his case with customary promptness." (internal quotation marks and citations omitted)); *see also United States v. Solomon,* 1996

U.S. Dist. LEXIS 9948, at *3–*4 (S.D.N.Y. July 16, 1996) ("Before embarking upon this four-part inquiry, a court must determine if the delay is "presumptively prejudicial" or only an "ordinary" delay.... If the latter, then the claim must fail and the four-part inquiry is mooted." (internal citation omitted)).

Although there is no precise formula for determining what constitutes a presumptively prejudicial delay, *see, e.g., Barker,* 407 U.S. at 531 ("[T]he delay that can be tolerated for an ordinary street crime is considerably less than for a serious, complex conspiracy charge."), courts in this district have found that "[a] delay of many months is sufficient to establish presumptive prejudice." *Varricchio v. County of Nassau,* 702 F.Supp.2d 40, 51 (E.D.N.Y.2010); *see also Unites States v. Vassell,* 970 F.2d 1162, 1164 (2d Cir.1992) (noting general consensus that "a delay of over eight months meets [the presumptive prejudice] standard, while a delay of less than five months does not").

In the instant action, petitioner complains only of the delay in his arraignment, not of the delay between his arraignment and trial. (*See* Pet.) The delay from the time petitioner was arrested, on January 30, 2005, to his arraignment on the first indictment, on February 23, 2005, was 25 days, and on the superseding indictment, on April 6, 2005, was 2 months and 8 days. This length of delay is insufficient to meet the threshold inquiry of a presumptive prejudice and does not trigger the rest of the analysis for a speedy trial violation. *See, e.g., United States v. Infanti,* 474 F.2d 522, 527 (2d Cir.1973) ("[T]he length of time from arrest to indictment was 21 months and from arrest to trial 28 months, neither extraordinary."); *Holmes v. Bartlett,* 810 F.Supp. 550, 562 (S.D.N.Y.1993) (finding that "the length of delay, eighteen months," between arrest and arraignment "was considerably shorter than the delays in other cases where courts found no Sixth Amendment violation"); *Vassell,* 970 F.2d at 1164 (noting consensus that "a delay ... of less than five months does not" meet the presumptive prejudice standard); *Varricchio,* 702 F.Supp.2d at 51 (delay of many months meets standard); *Velez v. New York,* 941 F.Supp. 300, 318 (E.D.N.Y.1996) ("As an initial matter, a court will not entertain a speedy trial claim unless the interval between accusation and trial has crossed the threshold dividing ordinary from presumptively prejudicial delay" and "[h]ere, the 377–day period between Petitioner's arrest and the commencement of his trial, while apparently sufficient to trigger a speedy trial inquiry, ... is certainly not extraordinary, and federal courts have found that much longer delays do not violate the Sixth Amendment." (internal quotation marks

and citations omitted)). Furthermore, petitioner has made no showing of how the delay between his arrest and ultimate arraignment prejudiced his defense. Having failed to satisfy the threshold inquiry requiring a showing of some prejudice by the delay, petitioner's speedy trial claim fails and the rest of the balancing test inquiry is mooted. *See, e.g. Solomon,* 1996 U.S. Dist. LEXIS 9948, at *4 (noting that if petitioner fails to show presumptive prejudice, "then the claim must fail and the four-part inquiry is mooted").

**\*10** Therefore, the Appellate Division's determination that petitioner's speedy trial claim was without merit was not contrary to federal law or based on an unreasonable determination of the facts. Consequently, even if petitioner could overcome the procedural default, his claim for relief on the ground that he was untimely arraigned would be denied.

### C. Allen Charge Was Not Improper

Petitioner next alleges that the trial court delivered an improper Allen charge to the jury after the jurors declared that they were deadlocked. [10] (Pet. at 7; *Pro Se* Direct Appeal Br. at 37–38.) Specifically, petitioner claims that the Allen charge was coercive. (*Pro Se* Direct Appeal Br. at 37–38.) Respondent argues that the charge was not coercive, and notes that the language of the Allen charge came directly from a standard deadlocked jury instruction published by the New York Office of Court Administration. (Resp't Mem. at 5.) Further, respondent notes that the judge cautioned the jurors not to abandon their "conscientiously held beliefs." (*Id.*)

[10]     In his supplemental *pro se* brief to the Appellate Division, petitioner called the Allen Charge, "the intimadation [sic] of the guilty verdict." (*Pro Se* Direct Appeal Br. at 38.) Petitioner argued that the "[t]rial court must not attempt to coerc[e] or compel the jury to agree on a particular verdict ... but pro[p]erly discharge its responsibilities, to avoid mistrial by encouraging jurors to adhe[re] to [their] oaths and make one final effort to review the evidenc[e] under the approp[r]iate circumstances[.]" (*Id.*)

Upon review of the trial record, the court finds that petitioner's Allen charge claim lacks merit. A trial judge may give supplemental instructions to a deadlocked jury, asking the jury to continue deliberating to try to reach a unanimous verdict. *See Allen v. United States,* 164 U.S. 492, 501–02, 17 S.Ct. 154, 41 L.Ed. 528 (1896). However, the supplemental instructions must not "improperly coerce[ ]"

2011 WL 115490

the jury. *Lowenfield v. Phelps,* 484 U.S. 231, 237, 108 S.Ct. 546, 98 L.Ed.2d 568 (U.S.1988). In determining whether the supplemental charge is coercive, the charge must be considered " 'in its context and under all the circumstances.' " *Id.* (quoting *Jenkins v. United States,* 380 U.S. 445, 446, 85 S.Ct. 1059, 13 L.Ed.2d 957 (1965)). A reviewing court must determine whether the supplemental charge "pressured any juror to abandon any conscientiously held beliefs that were based on the evidence." *Ramirez v. Senkowski,* 1999 U.S.App. LEXIS 20143, at *8 (2d Cir.1999) (citing *United States v. Ruggiero,* 928 F.2d 1289, 1299 (2d Cir.1991)). If the instructions direct "jurors to consider the views of other jurors, specific cautionary language reminding jurors not to abandon their own conscientious beliefs is generally required." *Spears v. Greiner,* 459 F.3d 200, 205 (2d Cir.2006) (citing *United States v. Henry,* 325 F.3d 93, 107 (2d Cir.2003) and *Smalls v. Batista,* 191 F.3d 272, 280 (2d Cir.1999)). [11]

[11]    In *Spears,* the charge delivered by the trial court lacked the language reminding jurors "not to abandon their own conscientious beliefs." *Spears,* 459 F.3d at 206. Still, the court determined that the charge was not coercive because it "asked the jurors to consider the facts 'with an *attempt* to reach a verdict if *that be possible,'* and to continue deliberations 'with a view toward arriving at a verdict *if that's possible.'* " *Id.* (emphasis in original). The court also considered that the defense counsel failed to object to the charge, so the potential for coercion was not apparent from the charging. *Id.*

In the instant case, the trial judge specifically instructed the jurors not to abandon their conscientiously held beliefs. The judge emphasized, "I'm not asking any juror to violate his or her conscience or to abandon his or her best judgement [sic]. Any verdict you reach must be the verdict of each juror, and not merely acquiescence in the conclusion of others." (Trial Tr. II at 698.) The judge further instructed the jurors to "make every possible effort to arrive at a just verdict here. Make certain that the decision you reach is based solely on the evidence and the law, and is not influenced or affected by sympathy for or against any individual, or for or against either side." (*Id.* at 699.) The judge urged that while it is not "uncommon for a jury to have difficulty initially in reaching a unanimous verdict ... [,] after further deliberations, most juries are able to reach a unanimous verdict." (*Id.* at 697.) The judge asked the jurors to "resume deliberations with an open mind," to "[h]ave the courage to be flexible" and "to change your

position if a reevaluation of the evidence convinces you that a change is appropriate. Do not, out of pride or stubbornness, adhere to an opinion or conclusion that you no longer believe is correct." (*Id.* at 698.)

 **\*11** This review of the trial record demonstrates that the Allen charge read by the judge in petitioner's case was not coercive. The judge reminded the jurors not to violate their consciences and informed the jury that if they cannot "reach a unanimous agreement on a particular count, you cannot return a verdict on that count and a new trial would have to be scheduled as to that count or those counts." (*Id.* at 697.) Consequently, even if petitioner could overcome the procedural bar, his Allen charge claim should be dismissed on the merits because the Appellate Division's finding that the claim lacked merit was not contrary to federal law or based on an unreasonable determination of the facts in his case.

### *D. Evidence Was Legally Sufficient*

Petitioner's final claim for relief is that the evidence at trial was legally insufficient to support his conviction for Burglary in the Second Degree. (Pet. at 14.) A legal insufficiency claim is cognizable on habeas review. *See Jackson v. Virginia,* 443 U.S. 307, 324, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979). "In evaluating whether the evidence [was] sufficient [to sustain a conviction, the court] must view the evidence in the light most favorable to the prosecution." *Einaugler v. Supreme Court of the State of New York,* 109 F.3d 836, 840 (2d Cir.1997) (internal quotation marks and citation omitted). The court must uphold a petitioner's conviction if *"any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson,* 443 U.S. at 319 (emphasis in original).

When examining this type of claim, "[a] federal court must look to state law to determine the elements of the crime." *Quartararo v. Hanslmaier,* 186 F.3d 91, 97 (2d Cir.1999) (citations omitted). Under New York law, a person commits Burglary in the Second Degree when he or she knowingly enters or remains unlawfully in a building with the intent to commit a crime therein, and the building is a dwelling. N.Y. Penal Law § 140.25(2).

The elements of Burglary in the Second Degree, as defined under New York law, were proved beyond a reasonable doubt at trial. The jury heard evidence that petitioner entered the Goodridge home without permission. (*See* ECF No. 5–3, Transcript of Trial pages 300 to 533 ("Trial Tr. I") at 327–30, 369.) Further, the jury heard testimony that, upon inspection

of her apartment, Goodridge discovered that petitioner had moved her mail and remote control, threw her children's clothes on the floor of a bedroom, and opened a can of food in the kitchen. (*See id.* at 334, 354–55, 371, 373.) The jury also heard testimony that the police officers found a pair of Goodridge's underwear in the petitioner's possession. (*See id.* at 336, 377, 402–03.) Finally, the jury heard evidence that petitioner was found in possession of credit cards and mail belonging to Goodridge's neighbors. (*See id.* at 380–90, 392, 404, 426–27, 430, 452–54, 473–74, 476–77.)

Viewing all this evidence in the light most favorable to the prosecution, as required under Supreme Court precedent, proof of the elements of Burglary in the Second Degree was sufficient to sustain the conviction. Consequently, even if petitioner could overcome the procedural default, his legal insufficiency claim would be rejected because the Appellate Division's determination that the evidence was legally sufficient was not based on an unreasonable interpretation of the facts.

### CONCLUSION

**\*12** Based on the foregoing, the court denies petitioner's application for a writ of habeas corpus. Because petitioner has not made a substantial showing of the denial of any constitutional right, the court will not issue a certificate of appealability. 28 U.S.C. § 2253; *Lozada v. United States,* 107 F.3d 1011, 1017 (2d Cir.1997), *abrogated on other grounds, United States v. Perez,* 129 F.3d 255, 259–60 (2d Cir.1997) (discussing the standard for issuing a certificate of appealability). The court certifies, pursuant to 28 U.S.C. § 1915(a), that any appeal from this judgment denying the petition would not be taken in good faith. *Coppedge v. United States,* 369 U.S. 438, 82 S.Ct. 917, 8 L.Ed.2d 21 (1962). The Clerk of the Court is respectfully requested to serve a copy of this Memorandum and Order upon petitioner and to close the case.

### SO ORDERED.

### All Citations

Not Reported in F.Supp.2d, 2011 WL 115490

---

WESTLAW    © 2023 Thomson Reuters. No claim to original U.S. Government Works.    10

2007 WL 2584775

2007 WL 2584775
Only the Westlaw citation is currently available.
United States District Court,
S.D. New York.

Curtis VAN STUYVESANT, Petitioner,
v.
James CONWAY, Superintendent,
Attica Correctional Facility, Respondent.

No. 03 Civ. 3856(LAK).
|
Sept. 7, 2007.

**Attorneys and Law Firms**

Mr. Curtis Van Stuyvesant, Collins Correctional Facility, Collins, New York, pro se.

ORDER

KAPLAN, J.

**\*1** *Pro se* petitioner Curtis Van Stuyvesant filed a 233-page habeas corpus petition challenging, on 18 separate grounds, his June 1999 conviction in New York Supreme Court for, *inter alia,* falsely holding himself out as a licensed attorney. Magistrate Judge Debra Freeman issued a painstaking and thorough report and recommendation on July 9, 2007 [docket item 24] (the "R & R") recommending that the petition be denied in its entirety. In an August 15, 2007 letter to the Court, which was not received until August 21, petitioner stated that he had been admitted to a hospital for an emergency operation only days before the R & R was issued, was incapacitated for some time, and therefore was unable to submit timely objections to the R & R. Attached to the letter, however, were objections to the R & R that petitioner claims he "had the foresight to draft ... in May of 2006." Docket item 25 (letter) at 2. The objections, which consist mostly of recitations of law and restatements of the original asserted grounds for habeas relief, appear also to raise new grounds for relief. On August 30, petitioner moved for leave to amend the objections.

As a preliminary matter, petitioners' objections are untimely, as they were filed more than ten days after the R & R issued. This alone would be ground to reject them. *See, e.g., IUE AFL-CIO Pension Fund v. Herrmann,* 9 F.3d 1049, 1054 (2d Cir.1993) (citing authority). Nevertheless, the Court has

considered the objections and concludes that they are without merit. Moreover, while the Court has doubts that petitioner properly may raise new grounds for relief in an objection to a report and recommendation, *see Hightower v. Kelly,* 657 F.Supp. 516, 518 (S.D.N.Y.1987) (expressing doubt); *but see Jones v. Blanas,* 393 F.3d 918, 935 (9th Cir.2004) (district court should consider new evidence offered by *pro se* plaintiff for the first time in an objection to a magistrate judge's report), it has considered petitioner's new arguments and concludes that they, too, lack merit.

Finally, the motion for leave to amend must be denied as futile. Petitioner has offered little indication of what a new set of objections would look like. And while portions of the rambling declaration attached to the motion for leave may be construed as new objections, they nevertheless are meritless. Petitioner therefore has offered no basis to believe that a new set of objections would persuade the Court that the R & R, which in 78 pages meticulously discredits each of petitioner's 18 claims to relief, should be rejected. This especially is so in light of the dubiousness of the claim that the objections submitted were not drafted between July 11 and August 15, 2007, but rather in May 2006, some fourteen months before the R & R issued.

Accordingly, petitioner's objections to the R & R are overruled, and his motion for leave to amend [docket item 29] denied. The Court adopts the R & R in its entirety. The petition for habeas corpus is denied and the case dismissed. As no substantial question is presented, a certificate of appealability is denied, and the Court certifies that any appeal would not be taken in good faith within the meaning of 28 U.S.C. § 1915(a) (3).

**\*2** SO ORDERED.

REPORT AND RECOMMENDATION

FREEMAN, Magistrate J.

*INTRODUCTION*

*Pro se* petitioner Curtis Van Stuyvesant ("Petitioner"), seeking a writ of habeas corpus under 28 U.S.C. § 2254, challenges his conviction in New York Supreme Court, Bronx County. Upon a jury verdict, Petitioner was found guilty of two counts of Scheme To Defraud in the First Degree, in violation of N.Y. Penal L. § 190.65(1)(a), (b); four counts

2007 WL 2584775

of Grand Larceny in the Third Degree, in violation of N.Y. Penal L. § 155.35; four counts of Grand Larceny in the Fourth Degree, in violation of N.Y. Penal L. § 155.30(1); two counts of Attempted Grand Larceny in the Third Degree, in violation of N.Y. Penal L. §§ 110.00/155.35; and one count of Practicing or Appearing as an Attorney at Law Without Being Admitted and Registered, in violation of N.Y. Judiciary L. § 478. (*See* Respondent's Memorandum of Law in Opposition to Petition For a Writ of Habeas Corpus, dated November 7, 2003 ("Resp.Mem."), at 1.) Petitioner was sentenced to concurrent prison terms of one and one-third to four years on the two counts of Scheme To Defraud, to run consecutively to prison terms of two and one-third to seven years on each of the four counts of third degree Grand Larceny, and one and one-third to four years on each of the remaining counts of Grand Larceny and Attempted Grand Larceny. (*See id.* at 2.) Petitioner was also sentenced to a prison term of one year on the count of practicing as an attorney without a license, which merged with his other prison terms. (*Id.*) In accordance with N.Y. Penal L. § 70.30(1)(e)(i), Petitioner's sentence was reduced to an aggregate prison term of 10 to 20 years. (*Id.*) At the time he filed his habeas petition, Petitioner was incarcerated at the Attica Correctional Facility ("Attica"), in Attica, New York (*see* Pet .; Trav.), [1] but he is currently incarcerated at the Collins Correctional Facility ("Collins") in Collins, New York. [2]

[1]    "Pet." refers to Petitioner's petition under 28 U.S.C. § 2254, dated March 9, 2003. "Trav." refers to Petitioner's traverse, dated November 20, 2003.

[2]    Petitioner was transferred to Collins after he filed his petition, which names as respondent the Superintendent of Attica. Although under Rule 2(b) of Rules Governing Section 2254 Cases in the United States District Courts, the Superintendent of Collins would now be the appropriate respondent in this matter, the substitution would not affect the Court's analysis of Petitioner's claims.

In his petition, as amplified by his accompanying 233-page submission setting forth legal argument on his claims, Petitioner contends that he was deprived of the right to a constitutionally fair trial and state appellate process on the following 18 grounds:

(1) The trial court improperly exercised jurisdiction over Petitioner, as only federal court had proper jurisdiction;

(2) Petitioner's rights were violated based on the following misconduct by the prosecution:

a. The failure to turn over exculpatory evidence, which violated Petitioner's rights under *Brady v. Maryland,* 373 U.S. 83 (1963); and

b. The manufacturing and use at trial of false evidence, which violated Petitioner's due process rights;

(3) Petitioner's due process rights and rights under *People v. Rosario,* 9 N.Y.2d 286, 213 N.Y.S.2d 448 (1961), were violated when the prosecution withheld prior statements by witnesses;

(4) Petitioner's conviction was not supported by legally sufficient evidence, and the jury's verdict was against the weight of evidence;

**\*3** (5) Petitioner's 14th Amendment right to be free from unreasonable search and seizure was violated;

(6) Petitioner was denied his due process rights because of deficiencies in the grand jury process;

(7) Petitioner's right to effective assistance of counsel was violated because his stand-by counsel:

a. failed to investigate;

b. colluded with the District Attorney's Office to violate his rights under *Batson v. Kentucky,* 476 U.S. 79, 93-97 (1986);

c. violated Petitioner's rights under the Confrontation Clause and his right to compulsory process;

d. prevented defense witnesses from testifying;

e. prevented Petitioner from entering defense exhibits;

f. prevented Petitioner from accepting mistrial offers; and

g. acted under a conflict of interest;

(8) Petitioner was denied his right of compulsory process to subpoena witnesses because prosecutors intimidated witnesses;

(9) Petitioner was denied his constitutional right to confront the prosecution's witnesses;

(10) Petitioner's claims were sufficiently preserved for appellate review, and the Appellate Division violated his due process rights by holding that many of his claims were unpreserved or unreviewable;

(11) Petitioner's Fifth Amendment right not to testify was violated when the prosecution implied in summation that the jury could infer guilt from Petitioner's decision not to testify;

(12) Petitioner's rights under *Batson* were violated by the prosecution's exclusion of educated, white men from the jury;

(13) Petitioner's Sixth and 14th Amendment rights were violated as a result of "tampering" with the jury by the prosecution and the trial court;

(14) Petitioner's identification by witnesses at trial was improperly "bolstered" by the prosecution;

(15) The trial court erred by failing to give the jury an alibi charge;

(16) Petitioner has exhausted his claims in state court;

(17) Petitioner was prevented from presenting an effective appeal because the trial transcript provided to him was incomplete; and

(18) Petitioner was denied his rights to a speedy trial and speedy appeal, and was denied his due process rights because of a pre-indictment delay.

Respondent argues that the majority of Petitioner's claims are procedurally barred, but that all are, in any event, without merit. For the reasons discussed below, I recommend that the petition be dismissed in its entirety.

## FACTUAL BACKGROUND

A. *Petitioner, Who Was Not Authorized to Practice Law, Held Himself Out as an Immigration Attorney.*
From March 1997 to February 1998, Petitioner advertised his services as an immigration attorney in newspapers distributed in New York City and on a New York City radio station.[3] (Transcript of proceedings held on May 19, 1999 before the Honorable John Stackhouse ("Tr.Vol.I"), at 3-11, 27-33.) Specifically, from March 1997 to February 1998, Petitioner

purchased advertising space in Carribean Life, a newspaper distributed in New York City targeting readers of Caribbean descent. (*Id.* at 3,11.) Petitioner's advertisement read, in part: "If you have lived in the United States for ten years or more, you can file for your green card. You do not need a sponsor. You may be eligible to have your deportation suspended and become an alien lawfully admitted into the United States." (*Id.* at 22.) This advertisement directed readers to a supposed law firm named "Fox, Stewart, Van Stuyvesant, Harrison and Tate," which the advertisement described as "immigration lawyers" located at 93 Worth Street, Suite 803, New York, New York. (*Id.* at 16-17.)

[3]    Petitioner chose the content for each advertisement. (Tr. Vol. I at 160.)

**\*4** Petitioner also advertised on the Manhattan radio station WLIB, whose target audience included people of Carribean descent. (*Id.* at 27-33.) One advertisement stated: "If you need legal assistance with immigration problems, the law firm of Fox, Stewart, Van Stuyvesant, Harrison and Tate offers expert, honest services at a fair price. They can help with green cards, citizenship, reentry permits, family reunification, labor certifications, visa petitions and more." (*Id.* at 32.) That advertisement also directed listeners to the firm's telephone numbers. (*Id.*) Petitioner placed similar advertisements in radio "billboards," which are paragraphs read at the beginning and end of radio programs. (*Id.* at 33A.) Petitioner's "billboards" on the Caribbean American Morning Show directed listeners to call the "law firm" of Fox, Stewart, Van Stuyvesant, Harrison and Tate for "expert legal assistance" with immigration problems. (*Id.* at 33 A-B.) Finally, Petitioner placed a 60-second commercial on the radio for Fox, Stewart, Van Stuvesant, Harrison and Tate, which included this statement: "If you have lived in the U.S. for ten years or more, you can file for your green card without need of a sponsor. You may be able to have your cancellation or removal suspended and become an alien lawfully admitted to the United States for permanent residence ." (*Id.* at 33 B-C.)

According to the testimony at trial, at least some of Petitioner's advertisements incorrectly stated the requirements under immigration law for obtaining permanent residency status or relief from deportation proceedings. (*Id.* at 58-60.) Petitioner's May 20, 1997 advertisement in Carriben Life, for example, referred to a repealed law allowing for the suspension of deportation proceedings under certain circumstances; it did not mention a new, more stringent law already in effect. (*Id.*) Moreover, Petitioner's advertisements failed to mention certain requirements

for obtaining permanent residency status or relief from deportation proceedings, making it appear, for example, as though a person could qualify for relief solely by residing continuously in the United States for 10 years, without needing to be sponsored by a qualifying relative, as actually required for eligibility. (*Id.*)

At trial, an employee of the New York State Office of Court Administration, Tony Lynch, testified that New York State law required all attorneys admitted to practice law in New York State since 1920 to register with the New York State Office of Court Administration. (Transcript of proceedings held on May 24, 1999 before the Honorable John Stackhouse ("Tr.Vol.II"), at 313, 318, 321.) On May 5, 1999, Lynch searched the list of all attorney registration records through April 30, 1999, but did not find a record for Petitioner. (*Id.* at 314-15.) Nor did Lynch find any evidence that Petitioner was admitted *pro hoc vice* anywhere in New York State (*id.* at 357) or that a law firm named Fox, Stewart, Van Stuyvesant, Harrison and Tate existed (*id.* at 317-18).

**\*5** In addition, the evidence at trial showed that Petitioner was not authorized to practice law before an immigration judge as a non-attorney. Wen Cheng, an Assistant District Counsel with the Immigration and Naturalization Services ("I.N.S."), testifying as an expert in immigration law (Tr. Vol. I at 52), explained that only four categories of people were authorized to practice law before immigration judges: (1) licensed and admitted attorneys; (2) law students (or law graduates) in law school clinic programs or working with a Legal Aid-type service and not receiving pay; (3) individuals considered to be of good repute with the court, and pre-authorized by the immigration court; and (4) accredited representatives recognized by the Board of Immigration Appeals, who were typically individuals working with organizations like Legal Aid or Catholic Charities. (*Id.* at 37-39, 80.) Petitioner did not fall into any of these categories. (*Id.* at 38-40, 93, 120-121, 126; Tr. Vol. II at 314-15, 357.)

### B. *Petitioner Maintained a Law Office and Accepted Payments from Clients to Represent Them in Immigration Matters.*

Petitioner maintained an office in Manhattan at 93 Worth Street, and rented office space for limited use at 237 Park Avenue. (Tr. Vol. I at 147, 164, 178; Tr. Vol. II at 295, 297, 299-300.) In or around September or October 1997 to May 1998, Petitioner employed Antonio Fortune to work in the "law firm"-as Petitioner described it-of Fox, Stewart, Van Stuyvesant, Harrison and Tate, in which Petitioner claimed he

was a partner.[4] (Tr. Vol. I at 147, 156.) Fortune never met any of the other purported partners, and, when he asked about them, Petitioner would become evasive. (*Id.* at 148, 157, 160.) At his offices, Petitioner kept business cards in his name and in the name of "Kent Harrison," one of the purported partners. (*Id.* at 157-58.) Petitioner also had a stamp in the name of "Kent Harrison," which Fortune saw Petitioner use.[5] (*Id.* at 157-60.)

[4]    In or around February or March 1998, shortly before firing Fortune, Petitioner changed the firm's name to "Immigration Reform and Research Advocates." (Tr. Vol. I at 164.) He explained to Fortune that he had taken over the firm because the other partners had left, supposedly because they were upset that clients were not paying their bills. (*Id.*)

[5]    There is no record of anyone named Kent Harrison licensed to practice law in New York. (Tr. Vol. II. at 315.)

Fortune's responsibilities included reviewing clients' payment records and immigration documents, as well as meeting with clients and prospective clients. (*Id.* at 149-51, 173, 177, 181.) According to Fortune, Petitioner instructed him to ask prospective clients how long they had been in the United States, whether they or their family members had filed documents with the I.N.S., and questions concerning their employment status and income level. (*Id* . at 152.)

In addition, Petitioner instructed Fortune to tell clients that Petitioner was their "lawyer." (*Id.* at 155.) Indeed, Fortune testified that Petitioner required clients to sign a retainer agreement, agree to a fee schedule, and make an initial deposit. (*Id.* at 152-54.) According to Fortune, Petitioner accepted payments from clients by cash, check or money order made payable to his name. (*Id.* at 154-55.) Fortune deposited these payments into an account at Dime Savings Bank on a weekly basis. (*Id.* at 155.) When a client did not make a payment on time, Petitioner had Fortune call and send a letter to the client. This letter, written by Petitioner, warned that Petitioner would "pursue both criminal and civil" actions against the client. (*Id.* at 149, 162-63.) The letter also read: "[Petitioner] will make an appearance when your case is called and affirm before an immigration judge that this firm no longer represents you because you do not meet one of the basic requirements to seek immigration relief for which you

2007 WL 2584775

have applied because you are not a person of good moral character." (*Id.* at 163.)

**\*6** Between 1996 and June 1, 1998, Petitioner accepted payment from at least 19 people to be their attorney in immigration matters. Most of these former clients testified that they learned of Petitioner's services through his advertisements in newspapers and radio shows targeting Carribean audiences. (Tr. Vol. II at 366-367, 618-619, 641-42, 779-80, 827-28, 984; Transcript of proceedings held on June 8, 1999 before the Honorable John Stackhouse ("Tr.Vol.III"), at 1022, 1135-36, 1177, 1328, 1364-65, 1392-93.) While one former client testified that she presumed that Petitioner was a lawyer after seeing his advertisements (Tr. Vol. II at 604-05), many testified that Petitioner expressly told them that he was a lawyer (*see, e.g.,* Tr. Vol. I at 195; Tr. Vol. III at 1367).

Petitioner's clients ended up paying him thousands of dollars for his services.[6] (*See, e.g.,* Tr. Vol. I at 196, 200, 214; Tr. Vol. II at 984-86, 989-90.) In some cases, Petitioner made threatening calls to clients and sent them letters accusing them of failing to pay, even when clients had, in fact, already paid in full. (Tr. Vol. II at 617, 622.) Petitioner also filed civil court complaints against several clients for amounts that they allegedly had not paid. (Tr. Vol. II at 675-76, 837-38; Tr. Vol III at 1185-87 .)

[6]     The evidence used to support Petitioner's convictions showed that Petitioner received payments from clients ranging from $2,400 to over $6,000. (*See* Resp. Mem. at 62.)

In return for these payments, Petitioner promised his clients that he would improve their immigration status, sometimes telling them that they would receive green cards within months after hiring him. (*See, e.g.,* Tr. Vol. II at 617; Tr. Vol. III at 1397.) Yet many former clients testified that Petitioner had urged them to file (or filed on their behalf) paperwork that initiated deportation proceedings against them, thus leaving them worse off than before his representation. (*See, e.g.,* Tr. Vol. II at 987; Tr. Vol. III at 1066-67, 1075-76.) Petitioner, it seems, planned to pursue "last-resort" avenues of relief from deportation that are typically pursued only when someone is in deportation proceedings and has few or no other options. His clients, however, did not qualify for these forms of relief. On one occasion, for example, Petitioner told a client that she only needed character references to support her application for relief from deportation; the client later learned that, in fact, she needed a qualified relative-which she did not have-

to sponsor her. (Tr. Vol. III at 1379.) In other cases, it appears that Petitioner never actually filed the applications he had promised to file, essentially abandoning his clients. (Tr. Vol. I at 249-250; Tr. Vol. II at 518.) On forms that Petitioner did submit to the I.N.S., he often stamped "Kent Harrison" as the name of the attorney and included a stamp bearing the name "Fox, Stewart, Van Stuyvesant, Harrison and Tate." (*See, e.g.,* Tr. Vol. II at 883; Tr. Vol. III at 1334-36.)

A number of Petitioner's former clients testified at trial, describing how Petitioner had misrepresented his qualifications to them, accepted payments from them, and either neglected their cases or taken steps that worsened their immigration positions. For example, one former client, Elizabeth Idoko ("Idoko"), testified that Petitioner told her that he was an immigration lawyer with 18 years of experience and agreed to represent her until she obtained a green card. (Tr. Vol. I at 195, 202.) Petitioner initially told Idoko that his fee was $4,000, but in the end Idoko paid Petitioner a total of $5,580, making the payments at Petitioner's Worth Street office. (*Id.* at 196, 200, 202, 214.) When Petitioner represented Idoko in immigration court, he signed a notice of appearance on her and her children's behalf with the name, C. Elliot Van Stuyvesant. He also checked off a box on the form next to a statement that read, in part: "I am an attorney and a member in good standing of the bar of the Supreme Court of the United States or the highest court of the following states...." (Tr. Vol. II at 511-16; 573-74.) In the blank space next to that statement, Petitioner wrote "NYC, CT, NJ, DC," which according to the testimony at trial, the immigration judge understood to mean that Petitioner was admitted to practice in those jurisdictions. (*Id.* at 514.)

**\*7** At Idoko's hearing, the immigration judge told Petitioner that he would give him two to three months to enter an application to suspend deportation for each family member; the judge would then suspend the case for eight or nine months. (Tr. Vol. II at 517.) Despite agreeing to that arrangement (*id.*), and later telling Idoko that he had submitted her applications (Tr. Vol. I at 248-49), Petitioner, in fact, never filed Idoko's applications (*id* ). At the next hearing, Petitioner did not appear, and Idoko was instead represented by a woman who claimed she was a lawyer and Petitioner's associate. (*Id.* at 519.) The woman had no explanation for why the applications were not filed. (*Id.*) Idoko ultimately completed and filed them herself, with no help from Petitioner. (Tr. Vol. I at 248-49.)

*PROCEDURAL BACKGROUND*

A. *Indictment and Pre-Trial Proceedings*

After numerous complaints against Petitioner and an investigation by the District Attorney's Office (*see* Tr. Vol. III at 1717), Petitioner was indicted by a grand jury on or about July 28, 1998, [7] and charged with two counts of Scheme to Defraud in the First Degree, five counts of Grand Larceny in the Third Degree, five counts of Grand Larceny in the Fourth Degree, two counts of Attempted Grand Larceny in the Third Degree, and one count of Practicing or Appearing as an Attorney at Law Without Being Admitted and Registered. (*See* Respondent's appellate brief, dated August 2002 ("Resp.App.Br."), at 3, 59, attached to Declaration of Jennifer K. Danburg in Opposition to Petition for a Writ of Habeas Corpus, dated Nov. 7, 2003 ("Danburg Decl.") as Ex. G.)

[7]     *See* Resp. Mem. at 90 (noting July 28, 1998 as the date when the indictment was filed); Resp.App. Br. at 59 (same); *but see id* . at 3 (noting date as July 29, 1998).

Following the indictment, Petitioner, proceeding *pro se,* submitted several motions to dismiss the indictment. In motion papers dated August 29, 1998, Petitioner moved to dismiss the indictment on the ground that he had been denied his right to testify before the grand jury, pursuant to CPL Section 190.50. (*See* Resp.App. Br. at 60.) Specifically, Petitioner alleged that he had been precluded from serving statutory notice of his desire to testify by the "fraud and trickery of the District Attorney and by the inaction and ineffectiveness of assigned counsel ." (*See id.* (quoting Petitioner's August 29, 1998 motion papers) .) On September 28, 1998, Petitioner again moved to dismiss the indictment on the ground that he had been denied his right to testify, this time arguing that the People had been aware of, yet ignored, his request to testify. (*See id.*) Petitioner renewed his motion to dismiss in papers dated October 20, 1998, in which he alleged that the People had sent him a letter inviting him to testify before the grand jury, but that the letter had been "returned to sender." (*See id.* (quoting Petitioner's October 20, 1998 motion papers).) Petitioner also claimed that he had previously made oral and written requests to testify. (*See id.* at 60-61.) In addition, Petitioner argued in the October 20th motion papers that the prosecutor had forced several witnesses to make false statements before the grand jury. (*See id.* at 61.)

**\*8** In a December 17, 1998 proceeding, the Honorable Herbert Altman issued a written decision denying Petitioner's motions to dismiss the indictment, finding that Petitioner had never filed written notice of his desire to testify and that Petitioner's suggestion that the People had actual notice of his intention to testify was unsupported. (*See id.* at 61-62.) Justice Altman also found unsupported Petitioner's claims of prosecutorial misconduct. (*See id.* at 62.)

In this decision, Justice Altman also found that all of the property that the People sought to introduce had been seized pursuant to a search warrant. (*See* Resp. Mem. at 65.) Petitioner then informed the court that he had submitted a memorandum of law challenging the validity of the search warrant to Justice Sackett, a criminal court judge presiding over an unrelated case against Petitioner, and that Justice Sackett had said he would pass the memorandum on (presumably to Justice Altman). (*See id.* at 65; Transcript of proceedings held on December 17, 1998 before the Honorable Herbert Altman ("12/17/98 Tr.") at 4-6.) Both Justice Altman and the prosecutor said that they had never seen any such memorandum. (*Id.*) When Justice Altman offered Petitioner the option of submitting a written motion to controvert the search warrant, Petitioner responded only by asking the court to set a trial date. (12/17/98 Tr. at 10.) Explaining that he would not set a trial until he knew that motion practice was complete, Justice Altman specifically asked Petitioner whether he was "waiving further motions." (*Id.*) Petitioner replied that "there is no need for me to present any motions because I know you're not going to rule according to the C.P.L. So why waste the Court's time?" (*Id.* at 11.) Finding that Petitioner had waived making any further motions, Justice Altman then set a trial date. (*Id.* at 14.)

B. *Trial*

Petitioner's case proceeded to a pre-trial *voir dire* proceeding before New York Supreme Court Justice John Stackhouse on May 13, 1999 (*see* Transcript of proceedings held on May 13, 1999 before the Honorable John Stackhouse ("5/13/99 Tr.")) and then to trial, before Justice Stackhouse and a jury, on May 19, 1999 (Tr. Vol.I). [8] Petitioner represented himself with the assistance of stand-by counsel. (5/13/99 Tr. at 2-3.) At trial, the prosecution's witnesses included Tony Lynch (Tr. Vol. II at 313), Antonio Fortune (Tr. Vol. I at 145), Wen Cheng (*id.* at 34) and the Honorable Craig De Bernardis, an immigration judge who testified both as an expert in immigration law and as a fact witness (Tr. Vol II at 507, 534). [9] In addition to

these witnesses and the 19 former clients of Petitioner (all of whom testified that Petitioner had held himself out as an immigration attorney and that they had hired and paid him to represent them), the following witnesses also testified for the prosecution: Lydia Boothman, a senior account executive with Carribean Life newspaper, who identified Petitioner as the person who ran advertisements in the newspaper (Tr. Vol. I at 8); Maria Malave, an attorney admitted to practice law in New York State, who testified that she agreed to do "of counsel" work for Petitioner, and that Petitioner told her he was an immigration attorney (Tr. Vol. II at 686-88); and Lawrence Lo, a branch manager at Dime Savings Bank, who testified that Petitioner held accounts at his bank (Tr. Vol. III at 1214, 1220).

8    In the record, the transcript of the May 13, 1999 proceedings is bound to, and appears immediately before, the transcript of the May 19, 1999 proceedings (Tr. Vol.I). (Dkt 14.)

9    The relevant portions of the testimonies of Lynch, Cheng, and Fortune are summarized in the factual background section, *supra*. Judge De Bernardis was the immigration judge in Elizabeth Idoko's proceeding; among other things, he testified at trial about Petitioner's role in that proceeding.

*9 In his defense, Petitioner attempted to show that his prosecution was undertaken merely out of vindictiveness by the Office of the Manhattan District Attorney ("D.A."). To support his theory, Petitioner called Manhattan Assistant District Attorney ("A.D.A.") Elise Ruzow ("Ruzow"), who had prosecuted Petitioner for charges of Aggravated Harassment and Criminal Contempt in another matter. (Tr. Vol. III at 1491.) Ruzow testified that, although Petitioner had sent her a letter stating that she was a "dumb, stupid, lousy prosecutor," and "a sorry excuse for a human being," the District Attorney's office did not indict Petitioner in this case in retaliation for this letter. (*Id.* at 1536-37.) Indeed, Ruzow added that she did not handle this case at all, and that the state Attorney General's office and Special Prosecutions Bureau of the District Attorney's Office had instead investigated Petitioner. (*Id.* at 1537.) In addition, David Smith, a former Manhattan A.D.A. involved in the Special Prosecutions Bureau's investigation, testified that he did not conspire with Ruzow to prosecute Petitioner. (*Id.* at 1717, 1735.)

To further support his contention that Ruzow had orchestrated a vindictive prosecution against him, Petitioner called W. Charles Robinson, an attorney who rented out the Worth

Street office to Petitioner, and Dexter McKenzie, who had known Petitioner for four years. Both read excerpts from Petitioner's letter to the judge in Petitioner's harassment case. (*See* Resp. Mem. at 38; Tr. Vol. III at 1689-92; Transcript of proceedings held on June 17, 1999 before the Honorable John Stackhouse ("Tr.Vol.IV"), at 1933-41.) In the letter, Petitioner claimed, among other things, that the alleged victim had given the prosecution a false business card bearing Petitioner's name, and that Ruzow was waging a "personal vendetta" against him. (Tr. Vol. IV at 1939-40.)

Petitioner also attempted to refute the charges that he had fraudulently held himself out as an attorney. Upon Petitioner's request, McKenzie read aloud Petitioner's letter to the First Judicial Department Ethics Committee, in which Petitioner asserted that he was a "solicitor of law," and had never held himself out as an "attorney at law." (*Id.* at 1941-42.) Petitioner added in that letter that he was "responsible for a staff of one hundred and seventy-five employees, ten offices, over 400,000 immigration clients nationwide and the continuation of unsolicited clients from the Board of Immigration Appeals on the pro bono basis." (*Id.* at 1959.) McKenzie further testified that he believed Petitioner had never represented himself to be an attorney at law. (*Id.* at 2024 .)

Finally, Petitioner called Thomas Chung, an investigator with the District Attorney's Office who participated in the investigation of Petitioner and the search of his home. (Tr. Vol. III at 1751.) Petitioner asked Chung questions about the investigation and, in an apparent effort to show that the documents retrieved from Petitioner's office did not support the prosecution's case, Petitioner questioned Chung specifically about those documents. Petitioner also asked Chung to read an excerpt of the transcript of the criminal proceedings against Petitioner in the harassment case, in which Petitioner claimed that the business card alleged to be his was fake. (*Id.* at 1741.) As to Chung's search of Petitioner's home, Petitioner asked Chung whether he had a search warrant to enter the home; Chung replied that a man named Duane permitted investigators to enter. (Tr. Vol. III at 1750-51.) Petitioner also sought information from Chung about the role Ruzow played in the investigation. Indeed, throughout the examination, Petitioner returned to what appeared to be the main theme of his defense: that the investigation and prosecution of Petitioner stemmed from Rudow's "personal vendetta" against him. [10]

10    Petitioner also called the following witnesses: Zamir Iosepovici, an attorney who represented

Case 9:21-cv-00708-BKS-TWD   Document 14   Filed 11/03/23   Page 43 of 171
Van Stuyvesant v. Conway, Not Reported in F.Supp.2d (2007)
2007 WL 2584775

Petitioner in the harassment case and a Bronx County domestic violence case (*id.* at 1556-58); Harriet Boxer, an attorney who went to Petitioner's Worth Street office in April 1998 seeking a refund for a friend who had been one of Petitioner's clients (*id.* at 1652-53); Denise Holgate, an attorney who went to Petitioner's office to discuss the possibility of working together (Tr. Vol IV at 1795-99); and June Allyson-Gray, an accountant who prepared Petitioner's 1997 tax return (*id.* at 1907, 1917-19).

 **\*10**  On June 24, 1999, the jury returned a verdict, finding Petitioner guilty of all but one fourth-degree grand larceny charge, on which the jury deadlocked. [11] (*See* Resp. Mem. at 41.) On July 6, 1999, Petitioner was sentenced to an aggregate term of 10 to 20 years, as noted above.

[11]     At the conclusion of the government's case and upon the government's motion, the court dismissed the third-degree grand larceny charge concerning Allyson Little, allegedly a former client of Petitioner's, after the prosecutor informed the court that Ms. Little was deceased. In addition, the deadlocked count, which pertained to Amber Baptiste, who testified that she was a former client of Petitioner's, was also dismissed. (*See* Resp.App. Br. at 3.)

C. *Section 440.10 Motion*
On November 11, 1999, Petitioner, proceeding *pro se,* filed a motion to vacate the judgment of conviction under Section 440.10 of the New York Criminal Procedure Law. (*See* Danburg Decl., Ex. A.) In his Section 440.10 brief, Petitioner laid out the following 23 grounds for relief, some of which overlapped: (1) Petitioner was arrested despite a lack of probable cause; (2) Petitioner's conviction was based on legally insufficient evidence; (3) Petitioner received ineffective assistance of counsel because his standby counsel advised him to plead guilty, withheld exculpatory evidence, moved for a mistrial, and "removed and sanitized" trial transcripts; (4) Petitioner's conviction was against the "interest of justice"; (5) Petitioner's indictment was defective because of errors in the grand jury process; (6) Petitioner's Fourth Amendment right to be free from an illegal search and seizure was violated; (7) the trial court erred in admitting statements made by Petitioner; (8) Petitioner's was denied his right to a speedy trial; (9) Petitioner's due process rights were violated as a result of the prosecution's "witness tampering"; (10) Petitioner's conviction was obtained as a result of "jury

tampering"; (11) Petitioner's rights under *Batson v. Kentucky,* 476 U.S. 79 (1986) were violated based on the People's exclusion of white, college-educated males from the jury; (12) the trial court erred in refusing to grant Petitioner's motion to change venue; (13) Petitioner's conviction was obtained as a result of prosecutorial misconduct; (14) Petitioner's rights under *People v. Rosario,* 9 N.Y.2d 286, 213 N .Y.S.2d 448 (1961), were violated because the prosecution failed to turn over prior statements of witnesses called by the prosecution; (15) Petitioner's rights under *Brady v. Maryland,* 373 U.S. 83 (1963), were violated because the prosecution failed to turn over exculpatory evidence; (16) the trial court improperly exercised jurisdiction over Petitioner, as only the federal court had proper jurisdiction; (17) Petitioner was subjected to "post-arrest delays"; (18) the prosecution obtained Petitioner's conviction through "[f]orged and [a]ltered evidence"; (19) Petitioner's conviction was obtained as a result of "prosecutorial and judicial misconduct"; (20) Petitioner's stand-by counsel engaged in misconduct not on the record; (21) Petitioner's pre-indictment identification procedure was flawed; (22) the trial resulted in a "repugnant verdict"; and (23) the judgment was "vindictive." (*See* Danburg Decl., Ex. A.)

On January 12, 2000, the trial court summarily denied Petitioner's Section 440.10 motion. (Danburg Decl. at Ex. B.) By papers dated February 7, 2000, Petitioner sought leave from the New York Supreme Court, Appellate Division, First Department, to appeal the denial of his Section 440.10 motion. (*Id.* at Ex. C.) On October 10, 2000, leave was granted, and the trial court's denial of the Section 440.10 motion was consolidated with Petitioner's direct appeal. (*Id.* at Ex. E.)

D. *Direct Appeal*
 **\*11**  Proceeding *pro se,* Petitioner submitted a brief in the Appellate Division, First Department, in or around September of 2001 . [12] (*See* Appellant's Brief, dated Sept. 14, 2001 ("Pet.App.Br."), attached to Danburg Decl. as Ex. F.) In a handwritten brief that is often difficult to comprehend, Petitioner appears to have challenged his conviction on the following 10 grounds: (1) Petitioner's conviction was obtained through legally insufficient evidence, and the jury's verdict was against the weight of evidence; (2) Petitioner's Fourth Amendment rights were violated because the search warrant for Petitioner's office lacked probable cause, and because the government illegally entered and searched Petitioner's home without a search warrant; (3) the indictment

was defective because the People denied Petitioner his right to testify before the grand jury and committed errors that tainted the grand jury proceedings; (4) the People improperly withheld *Rosario* material from Petitioner; (5) the People improperly withheld *Brady* material from Petitioner; (6) Petitioner's stand-by attorneys were ineffective and acted under a conflict of interest; (7) Petitioner's appeal was unduly delayed; (8) the state court wrongly exercised jurisdiction over Petitioner; (9) Petitioner's rights under *Batson* were violated; and (10) Petitioner was prevented from presenting an effective appeal because the trial transcript provided to him was incomplete. [13] In addition, although not in his brief, in his application to the Appellate Division for leave to appeal the denial of his Section 440.10 motion, Petitioner asserted claims of jury and witness tampering. (*See* Danburg Decl., Ex. C.)

[12]    Although Respondent notes that Petitioner filed his Appellate Division brief in August of 2001 (*see* Resp. Mem. at 42), Petitioner's brief actually seems to be have been sent to the court in September of 2001 (*see* Danburg Decl., Ex. F) and accepted for filing in October 2001 (*see* Resp. Mem. at 92; *see* Danburg Decl., Ex. F). In any event, as noted in this Court's merits analysis of Petitioner's speedy appeal claim, *see infra* p. 75, Petitioner apparently had to submit his brief to the Appellate Division multiple times because of failures to comply with court's rules, before the court finally accepted it for filing. (*See* Resp. Mem. at 85.)

[13]    Respondent's brief in response to Petitioner's Appellate Division brief only addressed six of Petitioner's claims. (*See* Resp.App. Br.) Having thoroughly reviewed Petitioner's Appellate Division brief, however, the Court finds that Petitioner alleged four additional claims not accounted for by Respondent.

By opinion dated September 19, 2002, the Appellate Division unanimously affirmed the judgment of conviction and sentence. (*See People v. Van Stuyvesant,* 297 A.D.2d 559, 747 N.Y.S.2d 155 (1st Dep't 2002), attached to Danburg Decl. as Ex. H.) In that opinion, the court first held that the verdict was based on legally sufficient evidence and was not against the weight of evidence. (*Id.* at 559.) The court then held that Petitioner's motion to dismiss the indictment on the ground that he was deprived of his right to testify before the grand jury was properly denied by the trial court, as Petitioner had not served notice of intent to testify. (*Id.*

at 560.) In rejecting Petitioner's claim that his appeal had been unduly delayed, the court found that any delay had resulted from Petitioner's own actions. (*Id.*) As to Petitioner's challenge on appeal of the warrant to search his office, the court held that Petitioner had "affirmatively waived his right to submit a motion to controvert the warrant," and was thus precluded from challenging it on appeal. (*Id.*) Finally, the court held that Petitioner's remaining claims were "unpreserved or unreviewable" and "decline[d] to review them in the interest of justice." (*Id.*) The Appellate Division noted, however, that, "[w]ere we to review these claims, we would reject them." (*Id.*)

**\*12** On October 7, 2002, Petitioner, again proceeding *pro se,* sought leave to appeal to the New York Court of Appeals, asserting all of the claims raised to the Appellate Division. (*See* Danburg Decl., Ex. I.) In addition, Petitioner raised three new claims (claims 9, 14 and 15 in his habeas petition), not previously raised before the Appellate Division, claims that: (1) Petitioner was denied his constitutional right to confront the prosecution's witnesses; (2) Petitioner's identification by witnesses at trial was improperly "bolstered" by the prosecution; and (3) the trial court erred by failing to give the jury an alibi charge. (*Id.*)

On January 14, 2003, the Court of Appeals summarily denied leave to appeal. (*See People v. Van Stuyvesant,* 99 N.Y.2d 586, 755 N.Y .S.2d 722 (2003), attached to Danburg Decl. as Ex. K.)

### E. *The Habeas Petition*

Petitioner timely filed his federal petition for a writ of habeas corpus on April 21, 2003. (*See* Pet.) [14] On June 27, 2003, the Honorable Richard C. Casey referred the matter to me for a report and recommendation. (Dkt.3.) Respondent filed an opposition to the petition on November 12, 2003 (Dkt.12), and Petitioner submitted his reply (traverse) on December 1, 2003 (Dkt.23). On May 21, 2007, the case was reassigned to the Honorable Lewis A. Kaplan. (Dkt.22.)

[14]    Although the Court's docket reflects a filing date of May 29, 2003 (*see* Dkt. 2), a *pro se* prisoner's papers are deemed filed when they are handed over to prison officials for forwarding to the court, *see Houston v. Lack,* 487 U.S. 266, 270 (1988), this Court will therefore deem the petition to have been filed on April 21, 2003, the date upon which Petitioner signed an affidavit of service by mail,

swearing that he mailed his petition to the Court and Respondent. *See, e.g., Rhodes v. Senkowski,* 82 F.Supp.2d 160, 165 (S.D.N.Y.2000).

Although Petitioner has submitted copies of numerous motions, briefs, and other materials to this Court since the date he filed his petition, none of these materials adds, in any substantive way, to the arguments raised in his petition and traverse; in fact, at least some of the materials appear entirely unrelated to this matter.

*DISCUSSION*

I. *EXHAUSTION*

A. *Legal Standards*
A federal court may not consider a petition for habeas corpus unless the petitioner has exhausted all state judicial remedies. *See* 28 U.S.C. § 2254(b)(1)(A); *see also Picard v. Connor,* 404 U.S. 270, 275 (1971); *Dorsey v. Kelly,* 112 F.3d 50, 52 (2d Cir.1997). To satisfy the exhaustion requirement, a habeas petitioner must have "fairly presented" his claims to the state courts, thereby affording those courts the "initial opportunity to pass upon and correct alleged violations of ... [the] prisoners' federal rights." *Picard,* 404 U.S. at 275 (citation omitted).

The standards for presenting federal constitutional claims to state courts are not so stringent as to require the recitation of "book and verse on the federal constitution." *Id.* at 278 (citation omitted). The state courts, however, must be "apprised of 'both the factual and the legal premises of the claim [the petitioner] asserts in federal court." ' *Jones v. Vacco,* 126 F.3d 408, 413 (2d Cir.1997) (quoting *Daye v. Attorney Gen.,* 696 F.2d 186, 191 (2d Cir.1982) (*en banc* )) (alteration in original). Petitioners can ensure that state courts are "alerted to the fact that [they] are asserting claims under the United States Constitution," *Duncan v. Henry,* 513 U.S. 364, 365-66 (1995), by presenting their claims in a fashion demonstrating either

> **\*13** (a) reliance on pertinent federal cases employing constitutional analysis, (b) reliance on state cases employing constitutional analysis in like fact situations, (c) [an] assertion of the claim in terms so particular as to call

> to mind a specific right protected by the Constitution, [or] (d) [an] allegation of a pattern of facts that is well within the mainstream of constitutional litigation.

*Daye,* 696 F.2d at 194; *accord Jackson v. Edwards,* 404 F.3d 612, 618-19 (2d Cir.2005); *see also Petrucelli v. Coombe,* 735 F .2d 684, 688 (2d Cir.1984). Once the state courts are apprised of the constitutional nature of a petitioner's claims, the exhaustion requirement is fulfilled when those claims have been presented to "the highest court of the pertinent state." *Bossett v. Walker,* 41 F.3d 825, 828 (2d Cir.1994) (citing *Pesina v. Johnson,* 913 F .3d 53, 54 (2d Cir.1990)), *cert. denied,* 514 U.S. 1054 (1995).

B. *As "Exhaustion" Is Not Itself an Independent Basis for a Claim, Petitioner's 16th Claim Should Be Dismissed as Non-Cognizable* .
As noted above, Petitioner has itemized his habeas claims into 18 numbered sections of his petition and accompanying memorandum. For his 16th itemized claim, however, Petitioner merely asserts that his various claims have been "exhausted." As framed, this assertion does not itself state any independent, substantive claim; rather, Petitioner merely seems to be arguing that his claims, in general, are based on federal constitutional violations and are thus reviewable by this Court. (*See, e.g.,* Pet. at 209.) Accordingly, the Court will not treat Petitioner's 16th "claim" as a claim *per se,* but rather will consider any arguments articulated therein in connection with determining whether Petitioner has, in fact, exhausted his remaining claims.

C. *Four of Petitioner's Remaining Claims Are Unexhausted and Procedurally Barred.*
Respondent does not dispute that Petitioner "has fully exhausted the majority of the underlying grounds for relief," though Respondent does not identify which claims it believes have been exhausted. (*See* Resp. Mem. at 46.)[15] Having reviewing the record, the Court finds that Petitioner has exhausted 13 of the claims he raised in the petition, specifically, the claims numbered as 1-8, 10, 12-13, and 17-18. (*See* Danburg Decl., Exs. C, F, I.) Petitioner fairly apprised both the Appellate Division and the Court of Appeals of the purportedly constitutional nature of each of these claims.[16]

15    Respondent adds that, "[t]o the extent that any of the claims were not raised in state court, such as petitioner's claim about the propriety of the Appellate Division's opinion, it would be appropriate, given the meritlessness of all of petitioner's claims, for the Court ... to deny the claims on the merits." (*Id.*)

16    Petitioner's third claim alleges a *Rosario* violation, which, as discussed below, is not a federal constitutional claim. (*See infra* p. 36.) Petitioner, however, maintains that the *Rosario* violations in this case "must be analyzed in constitutional terms," specifically invoking the Sixth Amendment and 14th Amendment of the United States Constitution. (*See* Pet. at 45.)

This leaves four claims that Petitioner apparently did *not* exhaust in the state courts, specifically:

| Claim 9 | (alleging a violation of Petitioner's Confrontation Clause rights); |
| Claim 11 | (alleging a violation of Petitioner's Fifth Amendment right against self-incrimination); |
| Claim 14 | (alleging that the prosecution improperly "bolstered" the in-court identification of Petitioner by witnesses); and |
| Claim 15 | (alleging that the trial court erred by failing to give the jury an alibi charge). |

**\*14** Of these, Petitioner's 11th claim (alleging a Fifth Amendment violation) is plainly unexhausted, as Petitioner did not raise such a claim at any stage of the state court proceedings. Petitioner similarly did not raise his ninth, 14th, or 15th claims before the Appellate Division on either of his consolidated appeals, although he did seek to raise these claims subsequently, in his application for leave to appeal to the New York State Court of Appeals. (*See id.* at Ex. I.) While this was permissible under state law, [17] it was not sufficient to exhaust the claims for purposes of federal habeas review, as the Court of Appeals did not then consider the claims. *See Lurie v. Wittner,* 228 F.3d 113, 124 (2d Cir.2000) ("Presenting a claim for the first time to a state court of discretionary review is insufficient to exhaust the claim unless the court considers it.") (citing *Castille v. Peoples,* 489 U.S. 346, 351 (1989)); *see also Ellman v. Davis,* 42 F.3d 144, 148 (2d Cir.1994) ( "The submission of claims to the state court on discretionary review does not automatically constitute the fair presentation of petitioner's claims. Only where the state court exercised its discretion and ruled on the merits will the exhaustion requirement be satisfied.") (citation omitted); *People v. Byrne,* 77 N.Y.2d 460, 464-65, 568 N.Y.S.2d 717, 718 (1991) ("A denial of leave to appeal to the Court of Appeals by an individual Judge or Justice does not represent

a determination on the merits."). Moreover, Petitioner did not, in any state court, present his 14th claim (regarding "bolstering") in federal constitutional terms, so any federal claim that Petitioner may now be trying to assert in this regard is unexhausted for this reason as well. *See Daye,* 696 F.2d at 194.

17    *See* N.Y.Crim. Proc. § 470.35(1) (providing that "[u]pon appeal to the court of appeals from an order of an intermediate appellate court affirming a judgment ... of a criminal court, the court of appeals may consider and determine not only questions of law which were raised or considered upon the appeal to the intermediate appellate court, but also any question of law involving alleged error ... in the criminal court proceedings resulting in the original criminal court judgment ..., regardless of whether such question was raised ... upon the appeal to the intermediate appellate court").

Where federal habeas claims are unexhausted, but the petitioner no longer has any available avenue to pursue those claims in state court, this Court will "deem" the claims exhausted. *See Castille,* 489 U.S. at 351; *Bossett,* 41 F.3d at

828-29; *Grey v. Hoke,* 933 F.2d 117, 120-21 (2d Cir.1991). Here, it appears that Petitioner could have raised each of his unexhausted claims on his direct appeal to the Appellate Division, but he opted not to do so, and he is not now entitled to a second direct appeal. *See Jimenez v. Walker,* 458 F.3d 130, 149 (2d Cir.2006) (remedies in New York State courts no longer available because "[petitioner] has already taken his one direct appeal, and [his] claim is procedurally barred from consideration in a collateral attack on his conviction), *cert denied,* 166 L.Ed.2d 740 (2007). Petitioner is also foreclosed from raising the claims collaterally in another Section 440.10 motion. *See* N.Y.Crim. Proc. § 440.10(2)(c) (barring collateral review of claims that could have been raised on direct appeal). Nor can he seek state review of these claims pursuant to either a writ of error *coram nobis, see People v. Gordon,* 183 A.D.2d 915, 584 N.Y.S.2d 318 (2d Dep't 1992) (*coram nobis* relief only available for claims of ineffective assistance of appellate counsel) (citation omitted), or a state writ of habeas corpus, *see People ex rel. Allah v. Leonardo,* 170 A.D.2d 730, 565 N.Y.S.2d 331 (3d Dep't 1991) (state writ of habeas corpus unavailable where claim could have been raised on direct appeal) (citations omitted). Thus, Petitioner now has no procedural recourse to New York's courts to advance these unexhausted claims.

**\*15** Where, however, a claim is deemed exhausted because of a state procedural bar, "the procedural bar that gives rise to exhaustion provides an independent and adequate state-law ground for the conviction and sentence, and thus prevents federal habeas corpus review of the defaulted claim." *Gray v. Netherland,* 518 U.S. 152, 162 (1996); *see also Carmona v. United States Bureau of Prisons,* 243 F.3d 629, 633 (2d Cir.2001). Petitioner's unexhausted claims are therefore procedurally barred from habeas review by this Court, and cannot be reviewed unless Petitioner can overcome the procedural bar, by showing either (1) both cause for failing properly to raise the claim in state court and prejudice resulting from the alleged constitutional error, or (2) that the failure to address the claim on habeas would result in a "fundamental miscarriage of justice." *Coleman v. Thompson,* 501 U.S. 722, 750 (1991). In this instance, Petitioner has not satisfied either standard.

"Cause" for a procedural default is established when "some objective factor external to the defense" impeded the petitioner's efforts to comply with the state's procedural rule. *Murray v. Carrier,* 477 U.S. 478, 488 (1986); *see also Ayuso v. Artuz,* No. 99 Civ. 12015(AGS)(JCF), 2001 WL 246437, at *8 (S.D.N.Y. Mar. 7, 2001). Cause for a default exists

where a petitioner can show that (1) "the factual or legal basis for a claim was not reasonably available to counsel," (2) " 'some interference by state officials' made compliance [with the procedural rule] impracticable," or (3) "the procedural default is the result of ineffective assistance of counsel." *Bossett,* 41 F.3d at 829 (citation omitted). "Prejudice" requires Petitioner to demonstrate that the alleged constitutional error worked to Petitioner's *"actual* and substantial disadvantage." *United States v. Frady,* 456 U.S. 152, 170 (1982) (emphasis in original). In this case, Petitioner cannot demonstrate any "cause" for his procedural default. He has not shown-and cannot show-that the factual or legal basis for his defaulted claim was not reasonably available at the time of his direct appeal. Nor has Petitioner alleged, and there is no evidence suggesting, that his failure to raise the claim on direct appeal resulted from either interference by state officials or ineffective assistance of appellate counsel.[18]

18    As Petitioner cannot show cause for his procedural default, this Court need not reach the question of whether Petitioner can show prejudice. *See Stepney v. Lopes,* 760 F.2d 40, 45 (2d Cir.1985) ("Since a petitioner who has procedurally defaulted in state court must show both cause and prejudice in order to obtain federal habeas review, we need not, in light of our conclusion that there was no showing of cause, reach the question of whether or not [petitioner] showed prejudice.").

Petitioner has also not shown "a sufficient probability that our failure to review his federal claim will result in a fundamental miscarriage of justice." *Edwards v. Carpenter,* 529 U.S. 446, 451 (2000) (citing *Coleman,* 501 U.S. at 750). This second exception to the procedural bar is quite narrow; it is "concerned with actual as compared to legal innocence." *Sawyer v. Whitley,* 505 U.S. 333, 339 (1992). Thus, to meet this standard, a petitioner would have to show that "a constitutional violation has probably resulted in the conviction of one who is actually innocent." *Carrier,* 477 U.S. at 496. "To be credible, [a claim of actual innocence] requires petitioner to support his allegations of constitutional error with new reliable evidence-whether it be exculpatory scientific evidence, trustworthy eyewitness accounts, or critical physical evidence-that was not presented at trial." *Schlup v. Delo,* 513 U.S. 298, 324 (1995). Here, Petitioner has offered no evidence, scientific or otherwise, showing his actual innocence.

**\*16** For these reasons, Petitioner has not demonstrated that he can overcome the procedural bar to this Court's consideration of his four unexhausted claims (claims 9, 11, 14, and 15), and thus the Court should dismiss these claims as procedurally defaulted. Yet even if these claims were reviewable by this Court, they would be subject to dismissal on the merits, as discussed below.

## II. *PETITIONER'S CLAIMS SHOULD BE DISMISSED AS WITHOUT MERIT.*

### A. *Standard of Review*

In reviewing Petitioner's various claims on the merits, this Court must apply different standards of review, depending upon whether the state courts have previously adjudicated the claims on the merits. Where there is such a prior adjudication on the merits, this Court must accord substantial deference to the state court's decision under the standard of review dictated by the Antiterrorism and Effective Death Penalty Act ("AEDPA"). *See* 28 U.S.C. § 2254(d); *Sellan v. Kuhlman,* 261 F.3d 303, 311 (2d Cir.2001) (noting that "adjudicated on the merits" means "a decision finally resolving the parties' claims, with *res judicata* effect, that is based on the substance of the claim advanced, rather than on a procedural, or other, ground"). The relevant section of AEDPA provides that

> [a]n application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim-(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).

In *Williams v. Taylor,* 529 U.S. 362 (2000), the Supreme Court clarified the meaning of the "contrary to" and "unreasonable application" clauses of AEDPA Section 2254(d)(1). A state court decision is "contrary to" clearly established federal law where the state court either applies a rule that "contradicts the governing law" set forth in Supreme Court precedent, *id.* at 405, or "confronts a set of facts that are materially indistinguishable from a [Supreme Court] decision" and arrives at a different result, *id.* at 406. An "unreasonable application" of clearly established federal law occurs when the state court identifies the correct governing legal principle, but unreasonably applies that principle to "a set of facts different from those of the case in which the principle was announced." *Lockyer v. Andrade,* 538 U.S. 63, 73-76 (2003). "[T]he state court's decision must have been more than incorrect or erroneous"-rather, "[t]he state court's application must have been 'objectively unreasonable." ' *Wiggins v. Smith,* 539 U.S. 510, 520-21 (2003) (quoting *Williams,* 529 U.S. at 409).[19]

[19]   AEDPA also provides that, where not manifestly unreasonable, a state court's factual findings are presumed correct, and can only be rebutted by "clear and convincing evidence." 28 U.S.C. § 2254(e)(1). Further, a federal court reviewing a habeas petition may not revisit the state fact-finder's credibility determinations. *See Jackson v. Conway,* 448 F.Supp.2d 484, 451 (W.D.N.Y.2006) (citing *Marshall v. Lonberger,* 459 U.S. 422, 432-35 (1983)).

**\*17** By contrast, where this Court reaches the merits of a claim that has not been decided by the state court on substantive grounds, the pre-AEDPA *de novo* standard of review applies. *See Cotto v. Herbert,* 331 F.3d 217, 230 (2d Cir.2003).

In this case, the Appellate Division adjudicated only a few of Petitioner's claims on the merits, requiring a deferential review by this Court. With respect to Petitioner's fourth claim, in which he challenges the evidentiary support for the verdict, the Appellate Division explicitly found that the jury's verdict "was based on legally sufficient evidence and was not against the weight of evidence," and further held that "[i]ssues of credibility were properly considered by the jury and there [was] no basis upon which to disturb its determinations." *Van Stuyvesant,* 297 A.D.2d at 559, 747 N.Y.S.2d at 156.

With respect to Petitioner's sixth claim, in which Petitioner asserts that he was denied his due process rights because of multiple deficiencies in the grand jury process, the Appellate Division addressed one portion of the claim on the merits-specifically, that portion in which Petitioner alleged held that he was deprived of his right to testify before the grand jury. The Appellate Division held that Petitioner was "properly denied" that right because, as Petitioner conceded, "he had not served notice of intent to testify, and his claim that the People had been provided with actual notice of intent was unsupported." *Van Stuyvesant,* 297 A.D.2d at 559-60, 747 N.Y.S.2d at 156.

Finally, the Appellate Division ruled on the merits of one aspect of Petitioner's 18th claim, in which Petitioner alleges that he was denied both a speedy trial and a speedy appeal, as well as his due process rights, due to a pre-indictment delay. The Appellate Division specifically adjudicated Petitioner's speedy *appeal* claim on the merits, holding that "[w]hile defendant claims that his appeal has been unduly delayed, any such delay is attributable to his own actions." *Id.*

With the exception of these three claims (or portions of claims), which, if they are cognizable in this Court, must be reviewed under the AEDPA standard, the remainder of Petitioner's habeas claims were not decided on the merits by the state courts. Thus, if this Court reaches the substance of those remaining claims, it must review them *de novo.*

### B. *Petitioner's Claims*

#### 1. *Lack of Jurisdiction of the State Court*
Petitioner argues that the state court improperly exercised jurisdiction over him. (*See* Pet. 1.) Specifically, Petitioner appears to assert that because his crimes involved his appearances before federal immigration judges, the federal government had exclusive jurisdiction to prosecute this case.

Petitioner's argument is without merit. First, even if the federal government had jurisdiction over him, Petitioner's prosecution in state court would not have been necessarily foreclosed. *United States v. Sewell,* 252 F.3d 647, 651 (2d Cir.2001) ("According to the principle of dual sovereignty, 'a defendant in a criminal case may be prosecuted by more than one sovereign without violating principles of double jeopardy.' ") (citing *United States v. Arena,* 180 F.3d 380, 399 (2d Cir.1999)). Moreover, it appears that Petitioner is confusing immigration law matters, over which the federal

government retains exclusive jurisdiction, for the crimes he was convicted of in this case, all of which were crimes under New York State law. (*See* Resp. Mem. at 50.) And, as the record amply demonstrates, Petitioner committed at least one element of each of those crimes in New York State. (*Id.*) Thus, under New York State law, the New York County District Attorney was authorized to prosecute him. *See* New York Criminal Procedure Law §§ 20.20, 20.40. Contrary to Petitioner's claim, then, the state courts did not lack jurisdiction in this case.

**\*18** Accordingly, Petitioner's improper jurisdiction claim has no merit, and I recommend its dismissal.

#### 2. *Prosecutorial Misconduct*

##### a. *Failure to Disclose* Brady *Material*
Petitioner's first claim of prosecutorial misconduct is made pursuant to *Brady v. Maryland,* 373 U.S. 83 (1963). Under *Brady,* "the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." *Brady,* 373 U.S. at 87. Information falling within the scope of the *Brady* rule "includes not only evidence that is exculpatory, *i.e.,* going to the heart of the defendant's guilt or innocence, but also evidence that is useful for impeachment, *i.e.,* having the potential to alter the jury's assessment of the credibility of a significant prosecution witness." *United States v. Avellino,* 136 F.3d 249, 255 (2d Cir.1998) (citing *Giglio v. United States,* 405 U.S. 150, 154-55 (1972); *Napue v. Illinois,* 360 U.S. 264, 269 (1959)). The prosecution's obligation to make such disclosures, however, is limited to evidence that is "material." *Id.* at 256 (citing *United States v. Bagley,* 473 U.S. 667, 678 (1985)).

"[F]avorable evidence is material, and constitutional error results from its suppression by the government, 'if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different.' " *Kyles v. Whitley,* 514 U.S. 419, 433-34 (1995) (citation omitted). "In other words, evidence is material if it 'could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict.' " *United States v. Orena,* 145 F.3d 551, 557 (2d Cir.1998) (quoting *Kyles,* 514 U.S. at 435). Impeachment evidence is material "where the witness in question supplied the only evidence linking the defendant to the crime" or "where the witness supplied the only evidence of an essential element of

the offense. *Avellino*, 136 F.3d at 256-57 (citations omitted). Impeachment evidence is *not* material where it would "not likely ... have changed the verdict," even though the evidence might have been "useful to the defense." *Giglio*, 405 U.S. at 154. In other words, a showing of prejudice is an essential component of any "true *Brady* violation." *Strickler v. Green,* 527 U.S. 263, 281-82 (1999) (citations omitted).

In this case, Petitioner argues that the prosecution violated its *Brady* obligations by withholding various I.N.S. documents related to Petitioner's former clients, including notices to appear before the I.N.S. (*See* Pet. at 13.) Although Petitioner states that the prosecution invited him to the D.A.'s Office "presumably to identify the *Brady* material which was supposedly going to be released to [Petitioner]," (*id.*), he maintains that the prosecution never actually intended to release the material, and that the invitation was merely "a ploy to ... interrogate the defendant without counsel present." (*See id.* at 15.)

 **\*19** Despite these assertions, Petitioner has made no showing that any *Brady* material was in fact withheld or that any invitation to identify files at the District Attorney's Office was simply part of a "ploy" by the prosecution. Indeed, the prosecution noted on the record that he had provided Petitioner with certain I.N.S. files, and that Petitioner had come to the D.A.'s Office several times to review the prosecution's pertinent files. (5/13/99 Tr. at 15-16.) Moreover, at trial, Petitioner appears to have acknowledged that he *had* received *Brady* materials from the prosecution. During a colloquy, Petitioner noted that he had been given "a whole set of *Rosario* and *Brady* material." (Tr. Vol. III at 1116-17.) According to Petitioner, however, that material was taken from him (or lost) when he was moved from one correctional facility to another. Petitioner stated on the record that, because he was "moved from one jail to another jail, .... most discovery that the People have given to me, they'd taken away from me." (*Id.*) The prosecutor responded by noting on the record that he had provided Petitioner with extra copies of at least some of the documents previously disclosed, and that, in any event, the prosecution did not cause any loss of materials while Petitioner was being moved. (*Id.* at 1129-30.) Petitioner does not argue in his habeas submissions that any *loss* of *Brady* material provided by the prosecution, as a result of his move to a new correctional facility, amounted to a violation of the prosecution's *Brady* obligation.

In any case, even if Petitioner were able to show that the prosecution failed to disclose certain evidence (or that

certain evidence was removed from him while he was incarcerated), his argument that this evidence was "favorable" and "material" would fail. Petitioner's chief argument is that the documents at issue were exculpatory because they would have provided "proof" that his firm performed at least some work for his former clients. (*Id.*) This argument misses the mark. The prosecution did not establish Petitioner's guilt on the theory that he performed no work whatsoever. Rather, the principal theory of the prosecution's case was that Petitioner fraudulently held himself out to be a licensed attorney authorized to practice immigration law, and accepted payments from clients on those false pretenses. (*See* Resp. Mem. at 56.) Furthermore, even if Petitioner is correct that the allegedly undisclosed evidence would have established that he was not the attorney of record at certain immigration proceedings (*see* Trav. ¶¶ 1-2), the prosecution presented numerous witnesses who, as former "clients" of Petitioner, testified that Petitioner had expressly told them that he was an immigration attorney. And, to the extent Petitioner argues that this evidence would have disclosed the immigration status of his former clients, this information was already in evidence, and any additional evidence would have been cumulative. In sum, Petitioner has failed to establish that the prosecution withheld any evidence at all, much less to demonstrate that the evidence that was favorable and material to his case.

 **\*20** Accordingly, Petitioner's *Brady* claim has no merit and I recommend that it be dismissed.

### b. *False Evidence*

In order to prevail on his claim that the prosecution knowingly and willfully manufactured and used false evidence, Petitioner bears the burden of demonstrating that false evidence was in fact used to gain his conviction. *United States v. Helmsley,* 985 F.2d 1202, 1205-06 (2d Cir.1993) (prosecutorial misconduct claim based on allegedly false testimony requires defendant to demonstrate, *inter alia,* that "there was false testimony"). Petitioner must be able to show that the prosecution knowingly or deliberately used false evidence. *Clancy v. Comm'r of Corr. Servs., State of N.Y.,* 956 F.Supp. 490, 499 (S.D.N.Y.1997), *vacated on other grounds,* 141 F .3d 1151 (2d Cir.1998). Petitioner must also be able to demonstrate that (1) the false evidence could have affected the judgment of the jury, or (2) the evidence may have had an effect on the outcome of the trial. *Id.* (citing *Washington v. Vincent,* 525 F.2d 262, 267 (2d Cir.1975), and *Mills v. Scully,* 826 F.2d 1192, 1195 (2d Cir.1987)) ("Prosecutorial misconduct consisting of failure to correct false testimony does not rise to the level of fourteenth amendment violation

unless there is a reasonable likelihood that the testimony affected the judgment of the jury or that it may have had an effect on the outcome of the trial.")).

Petitioner here offers nothing but blanket assertions that the prosecution knowingly procured and used false evidence such as perjured testimony and fake documents. (*See* Pet. at 30.) As a threshold matter, Petitioner has failed to show that the evidence he complains of was in fact false. And, even assuming that it was, there is simply no support for his assertion that the prosecution deliberately presented it with the knowledge that it was false, much less took an active role in procuring it. Finally, notwithstanding his sweeping accusations, Petitioner fails to establish, or even adequately allege, how the allegedly false evidence could have affected the judgment of the jury or the outcome of the trial.

For these reasons, I recommend the dismissal of Petitioner's false evidence claim.

### 3. *Failure to Disclose* Rosario *Material*

Petitioner's third claim, made pursuant to *People v. Rosario,* 9 N.Y.2d 286, 213 N.Y.S.2d 448 (1961), derives from state law. In *Rosario,* the New York Court of Appeals established that a defendant is entitled to examine any prior statement of a witness called by the prosecution, where the prior statement relates to the subject matter of the witness' testimony. 9 N.Y.2d at 289-91, 213 N.Y.S.2d at 450-51. That rule was later codified as New York Criminal Procedure Law § 240.45(1) (a). If the prosecution fails to disclose so-called *Rosario* material, the defendant may be entitled to a reversal of the conviction or some other sanction, depending on the circumstances of the failure to disclose and the content of the material. *See People v. Martinez,* 71 N.Y.2d 937, 940, 528 N.Y.S.2d 813, 815 (1988); *see also* N.Y.Crim. Proc. § 240.70.

**\*21** It is clear, however, that a violation of this rule does not implicate a federal constitutional right. "To the extent that [Petitioner's] claim is based on a *Rosario* violation, it must fail, because a habeas petition can only be granted to remedy some violation of *federal* law; the obligation to turn over *Rosario* material arises under *state* law." *Landy v. Costello,* 141 F.3d 1151 (Table), No. 97-2433, 1998 WL 105768, at \*1 (2d Cir. Mar. 9, 1998) (emphasis in original); *see also Padro v. Strack,* 169 F.Supp.2d 177, 180-81 (S.D.N.Y.2001) ("[P]etitioner's claim that the prosecution's failure to provide defense counsel with the surveillance tapes was a violation of his *Rosario* rights is not cognizable under federal review"); *Bell v. Albaugh,* No. 00 Civ. 1582(DC), 2000 WL 1877103,

at \*6 (S.D.N.Y. Dec. 27, 2000) ("[P]etitioner's *Rosario* claim 'is purely a matter of state law,' and thus not cognizable on federal habeas review") (citations omitted); *Green v. Artuz,* 990 F.Supp. 267, 274 (S.D.N.Y.1998) ("[T]he failure to turn over *Rosario* material is not a basis for habeas relief.").

Here, Petitioner argues that because New York State provides for a right to *Rosario* materials, "it must conform the conditioning of that right to the requirements of the due process clause." (*See* Pet. at 45.) Yet, although Petitioner insists that his *Rosario* claim must be "analyzed in constitutional terms," (*id.*) the claim remains a state-based claim, and thus it should be dismissed as not cognizable on federal habeas review.

### 4. *Legal Sufficiency of the Evidence*

In his fourth claim, Petitioner asserts that the evidence at trial was insufficient to support his conviction beyond a reasonable doubt. [20] (*See* Pet. at 46.) Because this is one of the claims that the Appellate Division adjudicated on the merits, *Van Stuyvesant,* 297 A.D.2d at 559, 747 N.Y.S.2d at 156, the Court will apply the deferential standard of review set forth in AEDPA in considering the merits of the claim.

> [20] Under a liberal reading of the petition, this claim actually consists of two parts: Petitioner claims that the evidence was legally insufficient to support the verdict, and that the verdict was against the weight of the evidence. (Pet.46-50.) A "weight of the evidence" claim, however, is purely a matter of state law that does not implicate any violation of the United States Constitution. *See Douglas v. Portuondo,* 232 F.Supp.2d 106, 116 (S.D.N.Y.2002) ("A federal habeas court cannot address 'weight of the evidence' claims because ... the 'weight of the evidence' argument is a pure state law claim ... for which habeas review is not available.") (internal quotation marks and citations omitted). Accordingly, any such claim should be dismissed as not cognizable in this proceeding. *See id.*

On a claim challenging the legal sufficiency of the evidence supporting a guilty verdict, the petitioner "bears a 'heavy burden' because the government receives the benefit of having all permissible inferences drawn in its favor." *Dixon v. Miller,* 293 F.3d 74, 81 (2d Cir.2002) (internal citations omitted), *cert. denied,* 537 U.S. 955 (2002). "[T]he critical inquiry on review of the sufficiency of the evidence to

Case 9:21-cv-00708-BKS-TWD    Document 14    Filed 11/03/23    Page 52 of 171
Van Stuyvesant v. Conway, Not Reported in F.Supp.2d (2007)
2007 WL 2584775

support a criminal conviction must be not simply to determine whether the jury was properly instructed, but to determine whether the record evidence could reasonably support a finding of guilt beyond a reasonable doubt." *Jackson v. Virginia,* 443 U.S. 307, 318 (1979). Such an inquiry "does not require a court to 'ask itself whether *it* believes that the evidence at the trial established guilt beyond a reasonable doubt.' " *Id.* at 318-19 (emphasis in original) (citations omitted). Rather, "the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Id.* at 319; *see also United States v. Carson,* 702 F.2d 351, 361 (2d Cir.1983) (a court must determine "whether the jury, drawing reasonable inferences from the evidence, may fairly and logically have concluded that the defendant was guilty beyond a reasonable doubt ... view[ing] the evidence in the light most favorable to the government, and constru[ing] all permissible inferences in its favor") (internal citations omitted), *cert. denied sub nom. Mont v. United States,* 462 U.S. 1108 (1983). In making this determination, "pieces of evidence must be viewed in conjunction, not in isolation." *United States v. Podlog,* 35 F.3d 699, 705 (2d Cir.1994) (citation omitted), *cert. denied sub nom. Romano v. United States,* 513 U.S. 1135 (1995).

**\*22** Furthermore, the jury retains "exclusive[ ] responsib[ility] for determining a witness' credibility." *United States v. Strauss,* 999 F.2d 692, 696 (2d Cir.1993) (citation omitted). "Federal habeas courts are not free to reassess the fact[ ] specific credibility judgments by juries or to weigh conflicting testimony. On collateral review this Court must presume that the jury resolved any questions of credibility in favor of the prosecution." *Vera v.. Hanslmaier,* 928 F.Supp. 278, 284 (S.D.N.Y.1996) (quoting *Anderson v. Senkowski,* No. 92 Civ. 1007(CPS), 1992 WL 225576, at \*3 (E.D.N.Y. Sept. 3, 1992), *aff'd,* 992 F.2d 320 (2d Cir.1993)). A petitioner also cannot prevail on a claim that the evidence was legally insufficient to support the verdict merely by showing that the evidence had inconsistencies. *See, e.g., United States v. Vasquez,* 267 F.3d 79, 91 (2d Cir.2001) ("The jury chose to believe the witnesses' testimony despite any inconsistencies. We will defer to the jury's assessment of credibility."), *cert. denied,* 534 U.S. 1148 (2002); *Gruttola v. Hammock,* 639 F.2d 922, 928 (2d Cir.1981) (insufficiency claim rejected because jury was entitled to believe prosecution witnesses despite inconsistent testimony). In fact, "[t]he testimony of a single uncorroborated witness is sufficient to achieve a showing of guilt beyond a reasonable doubt even if that witness's

testimony is less than entirely consistent." *Means v. Barkley,* No. 98 Civ. 7603(DLC), 2000 WL 5020, at \*4 (S.D.N.Y. Jan. 4, 2000) (internal citations omitted).

Here, Petitioner was convicted of practicing as an attorney without a license (N.Y. Judiciary L. § 478), engaging in a scheme to defraud (N.Y. Penal L. § 190.65(1)(a), (b)), and various degrees of larceny (N.Y. Penal L. §§ 155.30(1), 155.35) and attempted larceny (N.Y. Penal L. §§ 110.00/155.35). In advancing his claim challenging the sufficiency of the evidence claim, Petitioner largely rehashes his argument that the prosecution knowingly introduced false evidence at trial. As explained below, however, the prosecution presented more than sufficient evidence to support each of Petitioner's convictions.

a. *Practicing as an Attorney Without a License (N.Y. Judiciary L. § 478)*

Under N.Y. Judiciary L. § 478, it is unlawful for a person not "regularly licensed and admitted to practice law in the courts of record in [New York State]" to "hold himself out to the public as being entitled to practice law," or "assume, use, or advertise the title of lawyer, or attorney ... in such manner as to convey the impression that he is a legal practitioner of law." It is also unlawful for a person, in any manner, to "advertise that he either alone or together with any other persons or person has, owns, conducts or maintains a law office...." *Id.* To establish Petitioner's guilt for this count, the prosecution presented evidence of Petitioner's advertisements for his supposed law firm (*see, e.g.,* Tr. Vol. I at 3-11, 27-33), testimony from Petitioner's former clients establishing that they believed Petitioner was an attorney based on his representations (*see, e.g., id.* at 195), and testimony establishing that there was no record of Petitioner being licensed to practice as an attorney in New York State (Tr. Vol. II at 314-15, 318, 357) or to appear before an immigration judge (*see, e.g.,* Tr. Vol. I at 38-40, 93, 120-121, 126; Tr. Vol. II at 314-15, 357). In addition, the prosecution presented evidence showing that Petitioner accepted payments from clients to represent them on immigration law matters. (*See, e.g.,* Tr. Vol. II at 617; Tr. Vol. III at 1397.)

**\*23** In an apparent challenge to the sufficiency of evidence for this conviction, Petitioner argues that every attorney employed by his firm was licensed to practice in New York State (*see* Pet. 56; *see* Trav. ¶ 25), and that "[e]very master calendar and individual hearing was handled by an attorney admitted to practice law." (*See* Trav. ¶ 44) This argument is

unavailing, as the question of whether Petitioner employed licensed attorneys does not address whether Petitioner held *himself* out to be an attorney, and there is abundant record evidence, as explained above, that he did. Accordingly, the evidence presented could more than reasonably support a finding of guilt beyond a reasonable doubt for this conviction.

b. *Scheme to Defraud (N.Y. Penal L. § 190.65(1))*
Under N.Y. Penal L. § 190.65(1), to prevail on the scheme to defraud count, the prosecution was required to establish that Petitioner:

> (a) engage[d] in a scheme constituting a systematic, ongoing course of conduct with the intent to defraud ten or more persons or to obtain property from ten or more persons by false or fraudulent pretenses, representations or promises, [and that he obtained] property from one or more of such persons; or (b) engage[d] in a scheme constituting a systematic ongoing course of conduct with intent to defraud more than one person or to obtain property from more than one person by false or fraudulent pretenses, representations or promises, and so obtain[ed] property with a value in excess of one thousand dollars from one or more such persons.

N.Y. Penal L. § 190.65(1). [21] In addition, under either subsection, the prosecution had to "prove the identity of at least one person from whom the defendant so obtained property." *Id.*

[21]    By suggesting that the prosecution had to establish the elements of *both* subsections (a) and (b) to prove Petitioner's guilt (*see* Resp. Mem. at 62), Respondent appears to overstate the requirements of N.Y. Penal L. § 190.65(1), which sets apart the subsections using the disjunctive "or," therefore permitting the prosecution to prove guilt by establishing the elements of *either* subsection.

Here, the prosecution presented more than sufficient evidence to support a finding of Petitioner's guilt beyond a reasonable doubt under both subsections (a) and (b) of the statute. First, the prosecution established that Petitioner had "engage[d] in a scheme" by presenting evidence that Petitioner advertised his supposed law firm's services on radio stations and in newspapers whose target audience included members of immigrant communities (*see, e.g.,* Tr. Vol. I at 3-11, 27-33), maintained offices in which he met with clients and prospective clients (*see, e.g., id.* at 147, 164, 178), and instructed at least one employee on how to deal with those clients (*see, e.g., id.* at 152). This same evidence could reasonably support the statute's "intent to defraud" element. As for establishing under subsection (a) that Petitioner intended to obtain property from 10 or more individuals, the prosecution presented more than 10 witnesses who testified that they had in fact paid Petitioner for his promises based on his representations of being an immigration attorney. [22] Finally, to establish under subsection (b) that Petitioner received over $1,000 from at least one person, the prosecution presented evidence showing that Petitioner's former clients paid him amounts ranging from $2,400 to over $6,000 (*see* Resp. Mem. at 62). Thus, the prosecution presented more than sufficient evidence to reasonably support a finding of guilt beyond a reasonable doubt for the scheme to defraud conviction.

[22]    Accordingly, the prosecution also met the statute's requirement to prove the identity of at least one victim from whom Petitioner had fraudulently obtained property.

c. *Larceny (N.Y. Penal L. §§ 155.05(1), (2)(a), 155.30(1), 155 .35) and Attempted Larceny (N.Y. Penal L. §§ 110.00/155.35)*
**\*24**  To prove Petitioner's guilt on the larceny charges, the prosecution had to establish that, "with intent to deprive another of property or to appropriate [that property for] himself," Petitioner obtained that property by false pretenses. N.Y. Penal L. § 155.05(1), (2)(a). Specifically, for the fourth degree grand larceny charges, the prosecution had to establish that, by false pretenses, Petitioner received over $1,000 in payments, N.Y. Penal L. § 155.30(1), and, for the third degree grand larceny charges, over $3,000, N.Y. Penal L. § 155.35. As for the attempted grand larceny charge, the prosecution was required to prove that Petitioner intended to commit larceny and "engage[d] in conduct which tend[ed] to effect the commission" of the larceny. N.Y. Penal L. §§ 110.00/155.35.

As to these charges, a rational jury could have credited the same evidence described above with respect to the scheme to defraud charge and, based on that evidence, found the essential elements of the crimes beyond a reasonable doubt.

In sum, viewing all of the evidence in the light most favorable to the prosecution, the Appellate Division's decision rejecting Petitioner's legal insufficiency claim as to each of the charges against him was neither contrary to, nor an unreasonable application of, clearly established federal law. *See* 28 U.S.C. § 2254(d). There is simply no basis in the record for this Court to disturb that determination, and I therefore recommend that this claim be dismissed.

5. *Violation of Fourth Amendment Rights*

Petitioner asserts that his Fourth Amendment rights were violated on two separate occasions: first, when investigators searched his offices with a warrant; and second, when investigators searched his home without a warrant. (*See* Pet. at 58.) Although it appears that the first portion of this claim-challenging the search of Petitioner's office-is procedurally barred from review by this Court, as the Appellate Division expressly rejected the claim as waived under state law,[23] both portions of the claim are in any event subject to dismissal because Petitioner had the opportunity for a "full and fair litigation" of these claims in state court. *Stone v. Powell,* 428 U.S. 465, 494 (1976).

[23]     Where the state-law basis for the Appellate Division's rejection of one of Petitioner's claims is clear from the face of the court's decision, and where that decision rests on a state procedural rule that is "firmly established and regularly followed" by the state, the decision will be said to rest on an "independent and adequate" state law ground, barring federal habeas review. *See Jones v. Vacco,* 126 F.3d 408, 415 (2d Cir.1997) (to preclude federal review, the state court "must 'clearly and expressly state[ ] that its judgment rest[ed] on a state procedural bar' ") (citation omitted); *Ford v. Georgia,* 498 U.S. 411, 423-24 (1991) (to be deemed *adequate,* the court's decision must have been based on a rule that is "firmly established and regularly followed" by the state in question). Here, the Appellate Division expressly found that Petitioner's claim regarding the legality of his office search had been "affirmatively waived," *Van Stuyvesant,* 297 A.D.2d at 560, 747 N.Y.S.2d at

156, and, in reaching this conclusion, it appears that the Appellate Division applied its regularly followed rules regarding waiver, *see, e.g., People v. Baez,* 290 A.D.2d 372, 737 N.Y.S.2d 338 (1st Dep't 2002); *People v. Conte,* 186 A.D.2d 579, 588 N.Y.S.2d 377 (2d Dep't 1992). Accordingly, it appears that Petitioner should now be barred from challenging the propriety of the search of his office in this proceeding. As Petitioner has not shown any basis for overcoming the procedural bar, this aspect of Petitioner's Fourth Amendment claim is subject to dismissal on this ground.

In *Stone,* the Supreme Court established that "where the state has provided an opportunity for full and fair litigation of a Fourth Amendment claim, a state prisoner may not be granted federal habeas corpus relief on the ground that evidence obtained in an unconstitutional search or seizure was introduced at his trial." *Id.* at 494; *Capellan v. Riley,* 975 F.2d 67, 70 (2d Cir.1992). A federal court "ha[s] no authority to review the state record and grant the writ simply because [it] disagree[s] with the result reached by the state courts" on a Fourth Amendment issue. *Gates v. Henderson,* 568 F.2d 830, 840 (2d Cir.1977); *see also Torres v. Irvin,* 33 F.Supp.2d 257, 264 (S.D.N.Y.1998) ("A petition for a writ of habeas corpus must be dismissed where it seeks simply to relitigate a Fourth Amendment claim."). The only time a federal court can review such a claim is where "the state has provided no corrective procedures at all," or the state has provided a corrective mechanism, but the defendant is precluded from using that mechanism "because of an unconscionable breakdown in the underlying process." *Capellan,* 975 F.2d at 70 (citing *Gates,* 568 F.2d at 840); *Torres,* 33 F.Supp.2d at 264.

**\*25** The Second Circuit has not precisely defined under what circumstances an "unconscionable breakdown" will be found, but it has noted that "a disruption or obstruction of a state proceeding" would be typical of such a breakdown. *Capellan,* 975 F.2d at 70 (citations omitted). Furthermore, district courts in this Circuit have held that an "unconscionable breakdown in the state's process must be one that calls into serious question whether a conviction is obtained pursuant to those fundamental notions of due process that are at the heart of a civilized society." *Cappiello v. Hoke,* 698 F.Supp. 1042, 1050 (E.D.N.Y.1988) (noting as examples the bribing of a state court judge, the government's knowing use of perjured testimony, and the use of torture to extract a guilty plea), *aff'd,* 852 F.2d 59 (2d Cir.1988) (per curiam); *accord Long v. Donnelly,* 335 F.Supp.2d 450, 459 (S.D.N.Y.2004).

2007 WL 2584775

Here, although Petitioner asserts that he was denied an opportunity to litigate his claims "fully and fairly" in state court (*see* Pet. at 71), the record suggests otherwise. During a proceeding in December 1998, Justice Altman offered Petitioner the chance to make any motions. (12/17/98 Tr. at 10.) Yet Petitioner declined this opportunity and, as a result, Justice Altman found Petitioner had waived his right to present any motions. (*Id.* at 10-11.) Thus, Petitioner certainly had an *opportunity* to litigate his Fourth Amendment claim. *Capellan,* 975 F.2d at 71 (the state court need only grant a petitioner "an *opportunity* for full and fair litigation of a fourth amendment claim") (citation omitted).

As Petitioner cannot demonstrate that the state failed to provide a corrective procedure, or that an "unconscionable breakdown" occurred in that corrective process, his Fourth Amendment claim is not reviewable by this Court, and I recommend its dismissal.

6. *Deficiencies in the Grand Jury Process and Indictment*
The "sufficiency of an indictment cannot form the basis for ... a writ of habeas corpus unless the indictment falls below basic constitutional standards." *Carroll v. Hoke,* 695 F.Supp. 1435, 1438 (E.D.N.Y.1988). An indictment is constitutionally sufficient when it charges a crime with sufficient detail to inform the defendant of the charges he must meet, and with enough detail that he may assert double jeopardy in a future prosecution based on the same events. *See De Vonish v. Keane,* 19 F.3d 107, 108 (2d Cir.1994) (citations omitted). Courts have specifically held each of the following types of claims challenging the sufficiency of an indictment to be not cognizable on habeas review: a claim that false testimony was presented before the grand jury, *Jones v. Artuz,* No. 97 Civ.2063(NG), 2002 U.S. Dist. LEXIS 16603, at *9-10 (E.D.N.Y. Aug. 30, 2002); *see also Lopez v. Riley,* 865 F.2d 30, 32 (2d Cir.1989); that the indictment was supported by insufficient evidence, *Barber v. Garvin,* No. 99 Civ. 88(JSM), 2000 WL 423639, at *1 (S.D.N.Y. Apr. 19, 2000); that the defendant was denied his right to testify before the grand jury, *Cates v. Senkowski,* No. 02 Civ. 5957(LAK), 2003 WL 1563777, at *2 (S.D.N.Y. Mar. 17, 2003); and that the prosecutor did not properly instruct the grand jury and did not present exculpatory evidence, *Lopez,* 865 F.2d at 32-33.

**\*26** In this case, Petitioner argues that he was arbitrarily denied his right to testify before the grand jury, and that his due process rights were therefore violated. (*See* Pet. at 74.) In particular, Petitioner maintains that once the State of New York created the right to testify before a grand jury, it could not arbitrarily deny him that right. (*Id.*) In addition, Petitioner contends that his due process rights were violated because the prosecution presented false evidence to the grand jury. (*Id.*) Nonetheless, despite Petitioner's efforts to frame these claims in constitutional terms, they are, at bottom, state law claims that are not cognizable on habeas review, *see, e.g., Cates,* 2003 WL 1563777, at *2; *Lopez,* 865 F.2d at 32, and I therefore recommend their dismissal.

7. *Ineffective Assistance of Standby Counsel*
The right to counsel in criminal prosecutions is grounded in the Sixth Amendment. Because the Constitution "envisions counsel's playing a role that is critical to the ability of the adversarial system to produce just results [,] ... 'the right to counsel is the right to the effective assistance of counsel.' " *Strickland v. Washington,* 466 U.S. 668, 685-86 (1984) (quoting *McMann v. Richardson,* 397 U.S. 759, 771 n. 14 (1970)). Counsel can deprive a criminal defendant of this right "simply by failing to render 'adequate legal assistance.' " *Id.* at 686 (citation omitted).

Despite the constitutional right to counsel, a defendant may waive this right and instead choose to represent himself during criminal proceedings. *Faretta v. California,* 422 U.S. 806, 836 (1975). In such a case, the trial court may appoint standby counsel to assist the *pro se* defendant. *Id.* at 834 n. 46. There is, however, "no constitutional right to hybrid representation," where the defendant "share[s] the duties of conducting the duties of conducting [his or] her defense with a lawyer." *United States v. Schmidt,* 105 F.3d 82, 90 (2d. Cir.1997) (citing *McKaskle v. Wiggins,* 465 U.S. 168, 183 (1984)), *cert. denied,* 522 U.S. 846 (1997). And "without a constitutional right to standby counsel, a defendant is not entitled to relief for the ineffectiveness of standby counsel." *United States v. Morrison,* 153 F.3d 34, 55 (2d Cir.1998) (citing *Schmidt,* 105 F.3d at 90).

"As might be expected, a standby counsel's duties are considerably more limited than the obligations of retained or appointed counsel." *Schmidt,* 105 F.3d at 90. Thus, even where standby counsel plays a role in the trial, such as by examining witnesses and/or delivering the defense summation, such counsel will typically "not play the same role that defense counsel normally would in preparing the strategy for a criminal defense." *Id.* Where a defendant elects to proceed *pro se,* he may not "assign blame for [his] conviction to standby counsel." *Id.* Only where "standby counsel [holds] that title in name only and, in fact, act[s] as

the defendant's lawyer throughout the proceedings," can a defendant arguably be entitled to press a claim for ineffective assistance of that counsel. *Id.*

**\*27** In this case, Petitioner waived his right to counsel and exercised his right to self-representation. Although his standby counsel may have played some limited role in providing Petitioner advice and occasionally speaking to the Court on Petitioner's behalf on discrete issues, it was Petitioner himself who largely conducted his representation. Petitioner, for example, made the pre-trial motions, conducted *voir dire,* conducted direct and cross-examination, entered objections, and read his own opening and closing statements. (*See* Resp. Mem. at 70.) Petitioner's standby counsel certainly did not hold the title of "stand-by" counsel "in name only," and thus Petitioner "may not now assign blame" blame for his conviction to such counsel. *Schmidt,* 105 F.3d at 90.

Under the circumstances, Petitioner has no constitutional basis to challenge the effectiveness of his standby counsel, and I therefore recommend that his ineffective assistance claim be dismissed. [24]

[24] To the extent Petitioner alleges that the trial court violated his right to self-representation by appointing standby counsel (*see* Pet. at 119; Trav. ¶¶ 49-51), Petitioner's claim is without merit. As noted above, the trial court has discretion to appoint standby counsel. The "primary focus" in determining whether a petitioner's right to self-representation was violated "must be on whether [the petitioner] had a fair chance to present his case in his own way." *McKaskle,* 465 U.S. at 177; *see also Rhagi El v. Artuz,* 105 F.Supp.2d 242, 253 (S.D.N.Y.2000). As explained above, standby counsel here held only a limited role in Petitioner's defense, and Petitioner had more than a "fair chance" to conduct his own defense. Accordingly, any such claim should be dismissed.

### 8. *Denial of Right to Compulsory Process*

The Sixth Amendment guarantees that, "[i]n all criminal prosecutions, the accused shall enjoy the right ... to have compulsory process for obtaining witnesses in his favor." U.S. Const. Amend VI. The Supreme Court has recognized that "criminal defendants have the right to the government's assistance in compelling the attendance of favorable witnesses at trial and the right to put before a jury

evidence that might influence the determination of guilt." *Taylor v. Illinois,* 484 U.S. 400, 408 (1988).

The right to compulsory process, however, is not absolute. Indeed, "the Sixth Amendment can give the right to compulsory process only where it is within the power of the ... government to provide it." *Petito v. Artuz,* No. 97 Civ. 8758(WHP)(KNF), 1999 U.S. Dist. LEXIS 19974, at \*15 (S.D.N.Y. Dec. 27, 1999) (quoting *United States v. Greco,* 298 F.2d 247, 251 (2d Cir.1962)). For example, if the prosecution or trial court does not have the ability or jurisdiction to secure the witness's testimony, the right to compulsory process is not violated. *Id.; Greco,* 298 F.2d at 251 (defendant not denied compulsory process where witness defendant sought to examine was in foreign country); *see also Jacobson v. Henderson,* 765 F.2d 12, 16 (2d Cir.1985) (no compulsory process violation where witness being sought was not in control of the state, and where the state fully cooperated with defendant in attempting to find witness).

Furthermore, a defendant who alleges a compulsory process violation because of a missing witness "must show the witness would have provided 'favorable evidence which was neither cumulative nor irrelevant.' " *United States v. Desena,* 287 F.3d 170, 176 (2d Cir.2002) (quoting *Singleton v. Lefkowitz,* 583 F.2d 618, 623 (2d Cir.1978)); *see also Moates v. Scully,* No. 83 Civ. 490-CSH, 1985 U.S. Dist. LEXIS 22327, at \*4 (S.D.N.Y. Feb. 25, 1985) (the "government's failure to compel the presence of witnesses whose testimony would be cumulative or 'not necessary to an adequate defense' does not violate Sixth Amendment rights" ') (quoting *United States v. Taylor,* 562 F.2d 1345 (2d Cir.1977)). The defendant's burden lessens if the unavailability of a witness is the prosecution's fault, "but [it] does not disappear altogether." *Desena,* 287 F.3d at 176.

**\*28** In this case, Petitioner generally asserts that the prosecution prevented potential witnesses from testifying at trial by intimidating them. (*See* Pet. at 126.) In particular, Petitioner maintains that two of these potential witnesses, Mary Lawson and Ruth Dowell, would have testified as alibi witnesses for him. [25] (*See id.* at 130.)

[25] Specifically, Petitioner says that Lawson and Dowell "could have placed [Petitioner] as far as Hawaii or the Carribean, at the time the fabricated crimes" were "said to have occurred...." (*See* Pet. at 130.)

In its brief to the Appellate Division, Respondent acknowledged that "there were various difficulties in bringing defense witnesses before the court." (*See* Resp.App. Br. at 81.) Yet based on a review of the trial transcript where this issue was raised (*see* Tr. Vol. III at 1468-85, 1586-1625, 1774-78; Tr. Vol. IV at 1779-88), it appears that the prosecution made good faith efforts to procure any requested witnesses. As for Petitioner's allegations of witness intimidation, the prosecutor specifically stated on the record that the People had "not told anyone not to come" to trial (*id.* at 1475), and Petitioner has not presented any evidence in admissible form, such as witness affidavits, to substantiate his allegations to the contrary. It also appears that, at least to some extent, Petitioner was himself responsible for the fact that certain witnesses did not appear at his trial. For example, for many of the witnesses he sought to examine, Petitioner apparently provided the court and prosecution with only last-minute notice of the witnesses' names. The prosecution pointed out at trial that it had "tried to help to get witnesses for defendant on a moment's notice," and had even produced one defense witness who was never included on Petitioner's witness list. (*Id.* at 1593.)

As for the particular "alibi" witnesses in question, the trial judge noted on the record that Mary Lawson had "fled to Aruba to avoid court process," adding that if Lawson appeared in court he would "have her arrested and charged with criminal contempt...." (Tr. Vol. IV at 1877.) If, as suggested by the record, Lawson was out of the country at the time of trial, then the trial court would not have had jurisdiction to compel her appearance in any event. *See Greco,* 298 F.2d at 251. Although no similar issue of unavailability was presented with respect to the other purported alibi witness, Ruth Dowell, the record reflects that the trial court instructed Petitioner at one point in the trial to "try to get her for tomorrow" (Tr. Vol. IV at 1783), and that, after that instruction, Petitioner raised no further objection about her failure to appear and sought no remedy from the court, such as a continuance of the trial to allow him more time to produce the witness, or an order enforcing a subpoena. *See Harvey v. Headley,* No. 98 Civ. 8660(MBM)(THK), 2000 U.S. Dist. LEXIS 21103, at *23 (S.D.N.Y. Aug. 31, 2000) (no violation of right to compulsory process where petitioner was "unable to show ... that he ever asked the trial court to enforce the subpoena").

Finally, in order to prevail on this claim, Petitioner would have to demonstrate that the witnesses who he claims were prevented from testifying would actually have provided

him with "favorable evidence." *Desena,* 287 F.3d at 176. Petitioner's contention that Lawson and Dowell would have provided alibi testimony is based on nothing more than Petitioner's own conclusory assertions to that effect. He has pointed to no evidence that he was in fact out of the country at the time of his crimes, and there is substantial evidence in the record to the contrary. Given that Petitioner's criminal conduct spanned at least a 15-month period (*see* Resp.App. Br. at 82), and given the numerous witnesses who testified at trial that they met with Petitioner during that time, there is no reasonable likelihood that the trial outcome would have changed had Lawson or Dowell testified.

**\*29** Under the circumstances, I recommend dismissal of Petitioner's compulsory process claim.

### 9. *Confrontation Clause Violation*

The Confrontation Clause of the Sixth Amendment to the Constitution provides that "in all criminal prosecutions, the accused shall enjoy the right ... to be confronted with the witnesses against him...." *U.S. Const. Amend. VI.* "The primary purpose of this guarantee is to secure for the defendant the opportunity of cross-examination." *Cotto v. Herbert,* 331 F.3d 217, 229 (2d Cir.2003) (citing *Davis v. Alaska,* 415 U.S. 308, 315-16 (1974)). The Supreme Court has clarified that, although "the Confrontation Clause guarantees an *opportunity* for effective cross-examination," it does not guarantee "cross-examination that is effective in whatever way, and to whatever extent, the defense might wish." *Delaware v. Fensterer,* 474 U.S. 15, 20 (1985) (emphasis in original). In general, Confrontation Clause claims "fall into two broad, albeit not exclusive, categories: 'cases involving the admission of out-of-court statements and cases involving restrictions imposed by law or by the trial court on the scope of the cross-examination.' " *Kentucky v. Stincer,* 482 U.S. 730, 737 (1987) (citation omitted).

Here, Petitioner does not appear to allege that his case falls into either of these two categories. Indeed, Petitioner has neither identified the admission of any out-of-court statements made by any witnesses he was unable to examine, nor has he alleged that he was barred from cross-examining any witness at trial. Rather, by arguing that he "was denied the right" to examine the "prosecution witnesses before they took the stand," and that the witnesses did not respond to his interrogatories (*see* Pet. at 149), Petitioner seems to be claiming, at most, that he was denied pre-trial discovery. Petitioner, however, is not entitled to federal habeas relief on such a claim, as "[t]here is no general constitutional right

to discovery in a criminal case." *Weatherford v. Bursey,* 429 U.S. 545, 559 (1977); *see also Moe v. Walker,* No. 97 Civ. 4702(DC), 1999 U.S. Dist. LEXIS 1099, at *9 (S.D.N.Y. Feb. 5, 1999).

To the extent Petitioner may be challenging any of the trial court's rulings regarding his cross-examination of witnesses, Petitioner has not identified the specific rulings at issue, and there is, in any event, no basis for finding that any such rulings by the court rose to the level of a constitutional violation. "[T]rial judges retain wide latitude insofar as the Confrontation Clause is concerned to impose reasonable limits on ... cross-examination based on concerns about, among other things, harassment, prejudice, confusion of the issues, the witness' safety, or interrogation that is repetitive or only marginally relevant." *Delaware v. Van Arsdall,* 475 U.S. 673, 679 (1986). In this case, there is nothing in the record to suggest that the trial court engaged in any undue restriction of Petitioner's cross-examination of witnesses.

 **\*30**  Accordingly, I recommend the dismissal of Petitioner's Confrontation Clause claim.

10. *Failure of State Appellate Court to Review Claims*
Liberally construed, Petitioner's 10th claim appears to allege that the Appellate Division's refusal to review many of Petitioner's claims on the merits, on the grounds that they were "unpreserved or unreviewable," amounted to a due process violation. Petitioner asserts vaguely that "state procedural rules" were "misinterpreted and specifically [tailored] to prevent[ ] the state court" from reviewing his claims on the merits. [26] (*See* Pet. at 159.) Petitioner also argues that these rules were not "firmly established and regularly followed." (*Id.*) Petitioner presents no specifics, however, as to how the Appellate Division actually applied any state procedural rules unfairly or arbitrarily, and I therefore recommend dismissal of this claim.

[26]    Presumably, Petitioner is referring to those procedural rules the Appellate Division relied upon to find his claims barred from appellate review.

11. *Denial of Fifth Amendment Right Not to Testify*
The Fifth Amendment prohibits a prosecutor from suggesting to the jury that " 'it may treat the defendant's silence as substantive evidence of guilt.' " *United States v. Robinson,* 485 U.S. 25, 32 (1988) (citing *Baxter v. Palmigiano,* 425 U.S. 308, 319 (1976)); *see also Griffin v. California,* 380 U.S. 609,

614 (1965); *Fox v. Mann,* 71 F.3d 66, 72 (2d Cir.1995) (Fifth Amendment "bars a prosecutor from inviting a jury to draw a negative inference from the defendant's failure to testify) (citing *Robinson,* 485 U.S. at 32; *Griffin,* 380 U.S. at 614). Not all comments about the failure to testify, however, violate the Fifth Amendment, and a particular comment must be viewed in the context in which it is said. *Robinson,* 485 U.S. at 33. "[T]o prove that a comment violates the rule, a petitioner must establish that the language used was 'manifestly intended ... or of such character that the jury would naturally and necessarily take it to be a comment on the failure of the accused to testify." ' *Bell v. Coughlin,* 778 F.Supp. 164, 176 (S.D.N.Y.1991) (quoting *United States v. Araujo,* 539 F.2d 287, 291 (2d Cir.1976), *cert. denied, Rivera v. United States,* 429 U.S. 983 (1976)). In addition, even where a remark is deemed improper, "a court must consider whether the remark was 'so prejudicial that it denied the defendant a fair, as opposed to a perfect, trial.' " *Pearson v. Greiner,* No. 02 Civ. 10244(RJH) (GWG), 2004 U.S. Dist. LEXIS 22122, at *38 (S.D.N.Y. Nov. 3, 2004) (quoting *United States v. Rosa,* 11 F.3d 315, 343 (2d Cir.1993); *see also Fox,* 71 F.3d at 72 (court must examine whether prosecutor's comment was " 'so prejudicial that [it] rendered the trial in question fundamentally unfair' ') (quoting *Floyd v. Meachum,* 907 F.2d 347, 353 (2d Cir.1990)).

Here, Petitioner argues that his Fifth Amendment rights were violated when, during summation, the prosecutor read to the jury a brief portion of a letter by Petitioner to the New York Supreme Court. [27] As reflected in the trial transcript, at the beginning of his summation, the prosecutor stated:

[27]    Although it is unclear from the transcript and Respondent's brief, it appears this letter was submitted to the trial judge presiding over Petitioner's criminal harassment case.

 **\*31**  I want to start my summations in sort of an unorthodox way. I'm going to read to you a paragraph from Defendant's 37 page letter that he didn't read to you for some reason, maybe you can figure it out. Right after he spends a couple pages attacking [A.D.A.] Elise Ruzow, saying for example, Ms. Ruzow would probably be ostracized by the legal community, if she has a[r]abbi-he goes on to say the woman's bank of Van Stuyvesant is now closed forever. I have intention of giving into any form of black mail. I do not give a damn if all the women in the world press charges against me. I will fight it and then sue their sorry assess. I have no intention of giving in to the women's court because each day the

situation continues to cost New York City three million dollars. I have always made my opinion known to this court. Any first year law student, I have an advantage in self representation, I'll make my killing in my opening statements and I will bury the People in my summations. I'll not take the case .....

(Tr. Vol. IV at 2183-84.) Immediately after reading this portion of the letter, the prosecutor added:

> This letter from Mr. Van Stuyvesant was written on April 10th, 1998, five months before he was arrested. Think about that, five months he thought to himself I'll write a nasty letter about the ADA that I know who's talking nasty about me or calling Mr. Morgenthau every time there is a prosecution brought against me I'll say conspiracy, conspiracy. I'll have self representation, I'll make a killing-self representation from me I'll not take the stand.

(*Id.* at 2184-85.) At this point, Petitioner objected, although it is unclear on what grounds, as he stated, "[o]bjection, I don't feel that like anybody would feel sorry for me, Mr. Kale, stick the straights." (*Id.* at 2185) The judge appears to have sustained this objection in stating, "[w]ell that is stricken, the jury will disregard it. Proceed." (*Id.*)

Despite Petitioner's assertion that reading the portion of the letter stating that he would "not take the stand" violated his Fifth Amendment right not to testify (*see* Pet. at 162, 167), Petitioner is not entitled to habeas relief on this claim. As an initial matter, Petitioner himself had introduced this letter as evidence at trial. (*See* Resp. Mem. at 75; Tr. Vol. IV at 1932.) Secondly, the particular statements that Petitioner will "not take the stand" must viewed in context of the remainder of the summation, which made no mention of Petitioner's failure to testify. [28] The point of reading part of the letter in summation, Respondent explains, was to respond to Petitioner's own summation, which had accused the D.A.'s office of a conspiracy, and to show that "shouting 'conspiracy' was

[P]etitioner's modus operandi." (*See* Resp. Mem. at 77.) It does appear that Petitioner accused the D.A.'s office of some sort of conspiracy. (Tr. Vol. IV. at 2160-61.) Moreover, in light of the prosecutor's summation comments characterizing the letter as having demonstrated that Petitioner had planned all along to declare "conspiracy" (*id.* at 2184-85), it further appears that the prosecutor may well have read this portion of the letter in order to show Petitioner's tendency to make broad accusations of conspiracy. Viewing the summation as a whole, this Court does not believe that a jury would "naturally and necessarily" interpret the remarks at issue-read from Petitioner's own letter-to be a comment on the failure of Petitioner to testify. *Bell,* 778 F.Supp. at 176. Certainly, this is not a case in which the "prosecutor's comments on [the defendant's] failure to testify was 'extensive [and] where an inference of guilt from silence [was] stressed to the jury as a basis of conviction....' " *Haberstroh v. Montanye,* 362 F.Supp. 838, 841 (W.D.N.Y.1973) (quoting *Anderson v. Nelson,* 390 U.S. 523, 524 (1968)), *aff'd,* 493 F.2d 483 (2d Cir.1974). And even if these isolated remarks were improper, Petitioner has not demonstrated that they were "so prejudicial" that he was denied a fair trial. *Fox,* 71 F.3d at 72. Accordingly, I recommend the dismissal of this claim.

[28]     The prosecution's entire summation is approximately 40 pages of trial transcript. (Tr. Vol. IV at 2183-2223.)

### 12. *Violation of* Batson

**\*32** Petitioner's 12th claim is made pursuant to *Batson v. Kentucky,* 476 U.S. 79, 84 (1986). In *Batson,* the Supreme Court reaffirmed the proposition that a state's purposeful exclusion of jurors on the basis of their race violates the Equal Protection Clause. The Court then established a three-part burden-shifting analysis for determining whether a prosecutor has impermissibly excluded jurors based on race. First, the defendant must "establish a prima facie case of purposeful discrimination in selection of the petit jury solely on evidence concerning the prosecutor's exercise of peremptory challenges at the defendant's trial." *Id.* at 96. To establish a *prima facie* case, the defendant must show that: (1) "he is a member of a cognizable racial group," (2) "the prosecutor has exercised peremptory challenges to remove from the venire members of the defendant's race," [29] and (3) "these facts and any other relevant circumstances raise an inference that the prosecutor used that practice to exclude the veniremen from the petit jury on account of their race." *Id.* Once the defendant has established a *prima facie* case, "the burden shifts to the State to come forward with a neutral

2007 WL 2584775

explanation for challenging [the] jurors." *Id.* at 97. Finally, the "trial court then will have the duty to determine if the defendant has established purposeful discrimination." *Id.* at 98.

29      In *Powers v. Ohio,* 499 U.S. 400, 415-16 (1991), the Supreme Court, eliminated the requirement that the challenged jurors be of the same race as the defendant. The Court stated:

> To bar petitioner's claim because his race differs from that of the excluded jurors would be to condone the arbitrary exclusion of citizens from the duty, honor, and privilege of jury service.
>
> ... Racial identity between the defendant and the excused person might in some cases be the explanation for the prosecution's adoption of the forbidden stereotype, and if the alleged race bias takes this form, it may provide one of the easier cases to establish both a prima facie case and a conclusive showing that wrongful discrimination has occurred. But to say that the race of the defendant may be relevant to discerning bias in some cases does not mean that it will be a factor in others, for race prejudice stems from various causes and may manifest itself in different forms.
>
> *Id.*

The Supreme Court stated in *Batson* that a party claiming unconstitutional discrimination in the exercise of peremptory challenges must object in a "timely" fashion, although "the [Supreme] Court has never defined timeliness for a *Batson* claim." *McCrory v. Henderson,* 82 F.3d 1243, 1249 (2d Cir.1996) (citing *Batson,* 476 U.S. at 99). 30 Under the Second Circuit's interpretation of *Batson,* however, a party forfeits a *Batson* challenge if he does not raise a specific objection, during jury selection, that peremptory challenges are being used in an unconstitutionally discriminatory manner. *See McCrory,* 82 F.3d at 1249 ("[W]e hold that the failure to object to the discriminatory use of peremptory challenges prior to the conclusion of jury selection waives the objection."); *see also Galarza v. Keane,* 252 F.3d at 638 (2d Cir.2001) ("[A] party must raise his or her *Batson* challenges in a manner that would allow a trial court to remedy the problem at trial ....") (citing *McCrory* ); *United States v. Franklyn,* 157 F.3d 90, 97 (2d Cir.1998) (holding that defendant waived his *Batson* challenge by not raising it at trial until the court had reconvened after the end of jury

selection and a lunch recess) (citing *McCrory* ); *Leslie v. Artuz,* 72 F.Supp.2d 267, 275-76 (S.D.N.Y.1999) (noting that, on habeas review of state conviction, a petitioner's failure to have objected at trial renders *Batson* claim "untimely under Federal law") (citing *McCrory* and *Franklyn* ).

30      *See also Ford v. Georgia,* 498 U.S. 411, 423 (1991) (noting that, in *Batson,* the Court "declined ... to decide when an objection must be made to be timely ... [,] recogniz[ing] [instead] that local practices would dictate proper deadlines in the contexts of the various procedures used to try criminal cases, and [leaving] it to the trial courts, with their wide 'variety of jury selection practices,' to implement *Batson* in the first instance" (quoting *Batson,* 476 U.S. at 99 n. 24)).

Although Petitioner here asserts that the prosecutor violated *Batson* by excluding educated, white men from the jury on the basis of their race, Petitioner never raised a *Batson* objection during the *voir dire* process or even before the completion of trial. 31 (*See* Resp. Mem. at 78.) Thus, the trial court had no opportunity to determine as a threshold matter whether Petitioner had established a prima facie case of discrimination in the prosecutor's exercise of peremptory challenges. 32

31      Although Petitioner contends that his standby counsel "aided and abetted" the prosecution in the *Batson* violation (*see* Pet. at 173), he offers nothing more than vague, conclusory statements in support of this allegation.

32      Petitioner asserts in his traverse that the "feared *Batson* violation was raised in his pretrial motions demanding a change of venue...." (*See* Trav. ¶ 56.) Yet it is difficult to imagine how Petitioner could have "timely" raised a *Batson* challenge *before* jury selection. Although Petitioner also notes that he raised a *Batson* challenge in his Section 440.10 motion (*id.*), he does not dispute that he did not raise it during *voir dire* or at any time during trial.

**\*33** Accordingly, Petitioner's *Batson* objection should be barred as untimely and waived, and I recommend the dismissal of this claim.

### 13. *Jury Tampering*

In his 13th claim, Petitioner alleges that the prosecution and trial judge tampered with the jury. (*See* Pet. at 175.)

2007 WL 2584775

In *Remmer v. United States,* 347 U.S. 227 (1954), the Supreme Court held that "in a criminal case, any private communication, contact, or tampering, directly or indirectly, with a juror during a trial about the matter pending before the jury is, for obvious reasons, deemed extremely prejudicial." *Remmer,* 347 U.S. at 229; *accord Sher v. Stoughton,* 666 F.2d 791, 793 (2d Cir.1981) ("[T]here is no doubt that an unauthorized, ex parte communication with jurors is regarded as 'presumptively prejudicial.' ") (quoting *Remmer* ). Indeed, a criminal defendant's Sixth Amendment right to a trial by an impartial jury and right to confront his accusers "are implicated when a jury considers incriminating evidence that was not admitted at trial." *Loliscio v. Goord,* 263 F.3d 178, 185 (2d Cir.2001); *see also Parker v. Gladden,* 385 U.S. 363, 364 (1966) (reversing conviction and holding that court bailiff's prejudicial statements to juror violated defendant's Sixth Amendment rights). Unauthorized *ex parte* communication "generally entails direct communications or meetings of which neither the defendant nor his counsel was informed or had an opportunity to participate or waive defendant's appearance." *Pellington v. Greiner,* 307 F.Supp.2d 601, 606 (S.D.N.Y.2004). Even assuming improper *ex parte* communication occurred, however, "it does not necessarily follow that a constitutional error occurred." *Bell v. Coughlin,* 778 F.Supp. 164, 170 (S.D.N.Y.1991). Constitutional error cannot be shown absent a petitioner's showing that "concrete prejudice" resulted from the conduct; without such prejudice, "there is no basis to disturb a trial verdict." *Id.; see also Clark v. Walker,* No. Civ. 5816(MBM), 1995 U.S. Dist. LEXIS 12249, at *7 (S . D.N.Y. Aug. 24, 1995) (on federal habeas review, a petitioner alleging *ex parte* communication must show "actual prejudice").

In this case, Petitioner's arguments of "jury tampering" and *"ex parte* communication," to the extent they are even comprehensible, are completely unsupported. In addition to his general claim that the prosecutor told the jury "sordid, uncorroborated" information about him (*see* Pet. at 176), Petitioner appears to identify several specific instances that he contends show improper conduct of some sort (*see* Pet. at 176-79; Trav. ¶ 57). For example, Petitioner alleges it was through *ex parte* communication that a "journalist ... was told that his service as a juror was no longer needed" because Petitioner had accepted a plea. (*See* Pet. at 177; *see* Trav. ¶ 57.) Petitioner also seems to suggest that the prosecutor's summation comments constituted an *ex parte* communication. (*See* Pet. at 178.) Yet, for all of the specific instances that he cites, Petitioner fails to assert that any particular communication was made outside his presence, or

that it constituted a direct or indirect "tampering" with the jury. *Remmer,* 347 U.S. at 229. In any event, Petitioner has scarcely alleged that the challenged conduct was prejudicial, much less demonstrated "concrete prejudice ." *Bell,* 778 F.Supp. at 170. Petitioner is not entitled to habeas relief on these bare allegations, and I therefore recommend dismissal of his jury tampering claim.

### 14. *Error by Trial Court in Permitting In-Court Identification Evidence*

**\*34** Petitioner alleges in his 14th claim that the trial court erred in allowing the admission of in-court identification testimony. (*See* Pet. at 181.) In general, where a petitioner merely challenges a state court's evidentiary rulings, this Court cannot consider the petitioner's claims. *See Estelle v. McGuire,* 502 U.S. 62, 67-68 (1991) ("[I]t is not the province of a federal habeas court to reexamine state-court determinations on state-law questions."); *Roberts v. Scully,* 875 F.Supp. 182, 189 (S.D.N.Y.1993) ( "[R]ulings by the state trial court on evidentiary questions are a matter of state law and pose no constitutional issue ."), *adopted by,* 875 F.Supp. 182 (S.D.N.Y.1995), *aff'd,* 71 F.3d 406 (2d Cir.1995). Even where a petitioner describes an evidentiary error as unduly prejudicial, it must be recognized that "not all erroneous admissions of [unfairly prejudicial] evidence are errors of constitutional dimension." *Dunnigan v. Keane,* 137 F.3d 117, 125 (2d Cir.1998). Indeed, to demonstrate that the admission of evidence by a state trial court constitutes a ground for federal habeas relief, a petitioner "must demonstrate that the alleged evidentiary error violated an identifiable constitutional right, and, in doing so, a petitioner bears a heavy burden because evidentiary errors generally do not rise to constitutional magnitude ." *Copes v. Schriver,* No. 97 Civ. 2284(JGK), 1997 U.S. Dist. LEXIS 16349, at *8 (S.D.N.Y. Oct. 22, 1997) (citation omitted).

In order for an evidentiary error to rise to the level of a constitutional violation warranting federal habeas relief, the petitioner has to show that the alleged error was so prejudicial that it deprived him of a *"fundamentally fair* trial." *Rosario v. Kuhlman,* 839 F.2d 918, 925 (2d Cir.1988) (quoting *Taylor v. Curry,* 708 F.2d 886, 891 (2d Cir.1983) (emphasis in original), *cert. denied,* 464 U.S. 1000 (1983)); *see also Collins v. Scully,* 755 F.2d 16, 19 (2d Cir.1985) ("We are not here simply being called upon to apply rules of evidence that might permit the state court in its discretion to grant a new trial but rather are dealing with a more fundamental constitutional concept of fairness."). For an "erroneous admission of ... unfairly prejudicial evidence to amount to a denial of due process,

Van Stuyvesant v. Conway, Not Reported in F.Supp.2d (2007)

2007 WL 2584775

the item must have been 'sufficiently material to provide the basis for conviction or to remove a reasonable doubt that would have existed on the record without it.' " *Dunnigan,* 137 F.3d at 125 (quoting *Johnson v. Ross,* 955 F.2d 178, 181 (2d Cir.1992)). In assessing materiality, the Court must view the evidence "objectively in light of the entire record before the jury." *Collins,* 755 F.2d at 19.

Here, Petitioner fails to meet his "heavy burden" of showing that any error of constitutional magnitude occurred. Petitioner's chief argument seems to be that the prosecution "bolstered" the identification testimony offered at trial by coaching witnesses to testify that they had previously made a similar identification (*see* Pet. at 185) from a photo array (*see id.* at 184). Such bolstering claims, however, have been specifically held to be purely state law claims "not cognizable on federal habeas review." *Diaz v. Greiner,* 110 F.Supp.2d 225, 234 (S.D.N.Y.2000) (citations omitted). Even assuming, *arguendo,* that the trial court erred in allowing bolstering testimony, Petitioner has made no showing that an erroneous evidentiary ruling deprived him of a "fundamentally fair trial" so as to implicate his constitutional rights, especially given the substantial evidence against him.

**\*35** Finally, insofar as Petitioner claims that a pre-trial hearing, held pursuant to *United States v. Wade,* 388 U.S. 218 (1967), determined that his pre-trial identification resulted from impermissibly suggestive procedures, he is incorrect. In fact, the record reflects that no such hearing was held. As Respondent correctly notes (*see* Resp. Mem. at 81), after the court confirmed with the prosecution that "there were no police-arranged confrontations" (12/17/98 Tr. at 4), the court declined to hold a *Wade* hearing (*id.*). Thus, to the extent Petitioner claims that the admission of in-court identification testimony violated a ruling made at a *Wade* hearing, Petitioner's argument is without merit.

For these reasons, I recommend dismissal of Petitioner's 14th claim.

15. *Failure to Give Alibi Charge*

In order to obtain a writ of habeas corpus based on an erroneous jury instruction, a petitioner must establish that the erroneous instruction violated a right guaranteed him by federal law. *See Sams v. Walker,* 18 F.3d 167, 171 (2d Cir.1994) (citations omitted). To do so, a petitioner bears the burden of establishing that the allegedly erroneous jury instruction "so infect [ed] the entire trial that the resulting conviction[ ] violated due process." *Henderson*

*v. Kibbe,* 431 U.S. 145, 154 (1977) (quotation marks and citation omitted). Moreover, a petitioner must establish "not merely that the instruction is undesirable, erroneous, or even 'universally condemned,' but that it violated some [constitutional] right." *Donnelly v. DeChristoforo,* 416 U.S. 637, 643 (1974) (quotation marks and citation omitted). In determining whether a petitioner has satisfied this burden, a court must be mindful that a single instruction, or lack thereof, cannot be viewed in isolation, but rather must be viewed in the context of the overall jury charge. *See Donnelly,* 416 U.S. at 645 (citation omitted); *Cupp v. Naughten,* 414 U.S. 141, 146-47 (1973) (citation omitted). As explained in *Donnelly:*

> While this does not mean that an instruction by itself may never rise to the level of constitutional error, it does recognize that a judgment of conviction is commonly the culmination of a trial which includes testimony of witnesses, argument of counsel, receipt of exhibits in evidence, and instruction of the jury by the judge. Thus not only is the challenged instruction but one of many such instructions, but the process of instruction itself is but one of several components of the trial which may result in the judgment of conviction.

416 U.S. at 645 (internal quotation marks and citations omitted). Notably, "[a]n omission, or an incomplete instruction, is less likely to be prejudicial than a misstatement of the law," and thus a petitioner's burden in demonstrating that he is entitled to relief as the result of the trial court's failure to give a particular jury charge "is especially heavy." *Kibbe,* 431 U.S. at 155.

**\*36** In this instance, Petitioner asserts that he was denied his due process rights because the trial court erred by failing to give the jury an alibi charge-which would have made it clear to the jury that Petitioner bore no burden in proving his alibi [33] -and that, by failing to give this charge, the court improperly shifted the burden of proof to Petitioner. (*See* Pet. at 189.) Specifically, Petitioner argues that the alibi charge should have been given because two witnesses who he maintains were prevented from testifying, Mary Lawson

and Ruth Dowell, would have testified that Petitioner was out of the country during the much of the time his crimes were alleged to have occurred. (See id. at 130.) Respondent, for its part, argues that Petitioner is not entitled to habeas relief on this claim for the very reason that there *was no evidence presented to the jury* that suggested that Petitioner had an alibi, and that an alibi charge would therefore have been inappropriate. (See Resp. Mem. at 84; see also, e.g., *People v. Pinkney,* 300 A.D.2d 79, 750 N.Y.S.2d 749 (1st Dep't 2002)("[T]he [trial] court properly declined defendant's request for an alibi instruction, since the evidence did not establish that he was elsewhere at the time that the crime was committed.")).

33    See *People v. Victor,* 62 N.Y.2d 374, 378, 477 N.Y.S.2d 97, 99 (1984) ("[T]he People have the burden of disproving an alibi beyond a reasonable doubt, and a Judge must unequivocally state that burden in the jury charge.").

Respondent further argues that, not only did the trial court commit no error in declining to give the requested charge, but that, viewed in the context of the jury charge as whole, any error in this regard would not have risen to the level of a constitutional violation. (See Resp. Mem. at 84-85.) On this point, Respondent refutes Petitioner's argument that the court's jury charge resulted in a shifting of the burden of proof, noting that the court specifically explained to the jury that "Mr. Van Stuyvesant has no burden to prove anything here. The burden of proof never shifts to him. It remains on the People." (Tr. Vol. IV at 2242.) Further, Respondent notes that the court instructed the jury that "the [Petitioner] is entitled to rest upon the presumption of innocence in his favor until that presumption is so far outweighed by the admissible, credible evidence against him that you're firmly convinced of his guilt beyond a reasonable doubt." (Id. at 2243 .)

Respondents arguments are persuasive. Petitioner has pointed to no evidence in the trial record that would have supported, much less required, an alibi charge. Not only did the supposed alibi witnesses not testify, but Petitioner presented no evidence, such as his passport, to demonstrate that he was traveling at the time that any of the charged crimes were allegedly committed. Moreover, taking the jury instructions as a whole, they do not demonstrate that the court shifted the burden of proof to Petitioner in any way. Thus, there is no basis to conclude that the trial court's failure to provide an alibi charge constituted error under state law, much less rendered Petitioner's trial so unfair that it violated some constitutional right. See *Donnelly,* 416 U.S. at 645

(considering overall jury charge); *Kibbe,* 431 U.S. at 154. Accordingly, Petitioner's claim is not even cognizable on federal habeas review, *see Estelle,* 502 U.S. at 71-72; *Blazic v. Henderson,* 900 F.2d 534, 540 (2d Cir.1990), and it should be dismissed.

16. *Petitioner's "Exhaustion" Claim*

**\*37** As explained in Section I(B), *supra,* Petitioner does not state an independent, cognizable claim in the section of his petition labeled "Exhaustion."

17. *Failure of Government to Provide a Complete and Accurate Trial Record for Appeal*

Once a state "has created appellate courts as 'an integral part of the ... system for finally adjudicating the guilt or innocence of a defendants,' ... the procedures used in deciding appeals must comport with the demands of the Due Process and Equal Protection Clauses of the Constitution." *Evitts v. Lucey,* 469 U.S. 387, 393 (1985) (quoting *Griffin v. Illinois,* 351 U.S. 12, 18 (1956)). Where, in a federal habeas proceeding, a petitioner contends that the record was inadequate to permit a constitutionally fair appeal, this Court should consider the extent of the State's fault in failing to preserve the record, the extent of any prejudice suffered by the petitioner, and whether the state provided the petitioner with an opportunity to reconstruct what was lost. *See, e.g., Laureano v. Sullivan,* No. 88 Civ. 5322(KMW), 1990 U.S. Dist. LEXIS 18454, at *60-61 (S.D.N.Y. Aug. 16, 1990) (finding no constitutional violation where the loss of a plea allocution transcript had not been shown to be anything "other than purely fortuitous," the petitioner's claim of prejudice was speculative, and the petitioner chose not to avail himself of a reconstruction hearing in state court), *adopted by* 1991 U.S. Dist. LEXIS 682 (S .D.N.Y. Jan 18, 1991).

Here, Petitioner claims that his due process rights were violated because he was unable to present an effective appeal to the appellate court without a full record of the trial. (See Pet. at 213.) Specifically, Petitioner complains that the court reporter, D.A.'s Office, trial court judge, and Presiding Justice of the Appellate Division all "withheld hundreds of pages" of trial transcripts from him. (See id. at 214.) These pages were "relevant," Petitioner contends, because they included portions of the trial where Petitioner "preserved issues for appellate review." (See id. at 215.) According to Petitioner, this withholding of pages "obstructed [his] ability to prosecute his intermediate appeal on the original records,"

which, he contends, "was not a harmless error." (*See id.* at 214.) [34]

[34]

> Petitioner does not seem to be arguing that the transcript was in any way inaccurate, as opposed to incomplete. Were he to make such an argument, he would have to overcome the "presumption of regularity that attaches" to state trial transcripts, *Bankhead v. LaVallee,* 430 F.Supp. 156, 159 n. 4 (E.D.N.Y.1977), as well as the certification made by the court reporter that the transcript was true and accurate (Tr. Vol. IV at 2443). Petitioner has not done so; indeed, he has made no showing that errors of any kind were made in the reporter's transcription of the state court proceedings.

Notwithstanding these broad allegations, Petitioner fails to demonstrate that transcript pages were in fact missing or withheld. Petitioner, who apparently concedes that he received some, if not most, of the trial transcript prior to his appeal (*see id.* at 215), fails to identify any specific pages that he believes were missing. Given Petitioner's wholly unsubstantiated assertions, the Court has no basis for finding that the transcript provided to Petitioner was actually incomplete, much less that the State acted in "bad faith" in any way. *See Laureano,* 1990 U.S. Dist. LEXIS 18454, at *59; *Brock v. Artuz,* No. 99 Civ.1903(AJP), 2000 WL 1611010, at *8 (S.D.N.Y. Oct. 27, 2000). In addition, Petitioner has failed to specify how any purportedly missing pages of the transcript would show that he, in fact, preserved certain issues for appellate review. As Petitioner's claim of prejudice is purely speculative, this Court cannot, on the record, find that he was deprived of an appeal that comported with constitutional due process. Accordingly, I recommend that this claim be dismissed.

18. *Denial of a Speedy Trial and Speedy Appeal; Pre-indictment Delay*

a. *Speedy Trial*

**\*38** The right of an accused to a speedy trial is guaranteed by the Sixth Amendment and is imposed upon the states by the Due Process Clause of the 14th Amendment. *See Klopfer v. North Carolina,* 386 U.S. 213, 22-23 (1967). Specifically, the Sixth Amendment provides that "[i]n all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial...." U.S. Const. Amend. VI. The speedy trial provision "has no application until the putative defendant in some way becomes an 'accused,' '*i.e.,*,

when the defendant has been indicted or actually detained. *United States v. Marion,* 404 U.S. 307, 313, 320 (1971). In determining whether a defendant has been deprived of his right to a speedy trial, the Court must balance four factors: (1) the length of the delay; (2) the reason for the delay; (3) the defendant's assertion of his right to a speedy trial; and (4) the prejudice to the defendant. *See Barker v. Wingo,* 407 U.S. 514, 530-33 (1972).

The first factor, length of the delay, is "actually a double enquiry." *Doggett v. United States,* 505 U.S. 647, 651 (1992). First, "[t]he length of the delay is to some extent a triggering mechanism. Until there is some delay which is presumptively prejudicial, there is no necessity for inquiry into the other factors that go into the balance." *Barker,* 407 U.S. at 530; *see also Doggett,* 505 U.S. at 651-52 ("Simply to trigger a speedy trial analysis, an accused must allege that the interval between accusation and trial has crossed the threshold dividing ordinary from 'presumptively prejudicial' delay.") (quoting *Barker,* 407 U.S. at 530-31); *Davis v. McLaughlin,* 122 F.Supp.2d 437, 442 (S.D.N.Y.2000) ("Ordinarily, an examination of the *Barker* factors is unnecessary unless the length of the delay is presumptively prejudicial.") (citations omitted). Although "[t]here is no precise amount of delay necessary to trigger an inquiry," *Davis,* 122 F.Supp.2d at 442, the Supreme Court has noted that, "[d]epending on the nature of the charges, the lower courts have generally found postaccusation delay 'presumptively prejudicial' at least as it approaches one year." *Doggett v. United States,* 505 U.S. 647, 652 n. 1 (1992) (citing Gregory P.N. Joseph, *Speedy Trial Rights in Application,* 48 Fordham L.Rev. 611, 623 n. 71 (1980) (collecting cases)). The Second Circuit, citing the same law review article as the Supreme Court cited in *Doggett,* has seemed to suggest that a delay of eight months might be a workable standard. *See United States v. Vassell,* 970 F.2d 1162, 1164 (2d Cir.1992) ( "One commentator discerns a general consensus that a delay of over eight months meets this standard, while a delay of less than five months does not.").

As for the second inquiry regarding the length of delay, if the defendant makes the threshold showing of presumptive prejudice, "the court must then consider, as one factor among several, the extent to which the delay stretches beyond the bare minimum needed to trigger judicial examination of the claim." *Doggett,* 505 U.S. at 652. This "latter enquiry is significant to the speedy trial analysis because ... the presumption that pretrial delay has prejudiced the accused intensifies over time." *Id.*

**\*39**  In this case, Petitioner was indicted on or about July 28, 1998, and arraigned in state Supreme Court on August 27, 1998. (*See* Resp. Mem. at 90.) His trial began in May 1999, approximately 10 months after the indictment. (*Id.*) In light of the standard suggested by *Vassel,* the 10-month delay here is sufficiently lengthy to be considered "presumptively prejudicial" and to require consideration of the other *Barker* factors. Nevertheless, the length of delay factor does not weigh in Petitioner's favor, as a 10-month delay has still been found to be "relatively short," *Wilson v. Goord,* No. 00 Civ. 4849(LTS), 2004 U.S. Dist. LEXIS 1513, at \*16 (S.D.N.Y. Feb. 9, 2004) (citing cases). In fact, this delay is far shorter than delays in other cases where courts have found no speedy trial violation. *See, e.g., Barker,* 407 U.S. 514 (five years); *Garcia Montalvo v. United States,* 862 F.2d 425 (2d Cir.1988) (more than eight years); *Rayborn v. Scully,* 858 F.2d 84 (2d Cir.1988) (more than seven years); *United States v. McGrath,* 622 F.2d 36 (2d Cir.1980) (24 months); *United States v.. Lane,* 561 F.2d 1075 (2d Cir.1977) (almost five years); *United States v. Cyphers,* 556 F.2d 630 (2d Cir.1977) (almost three years); *United States v. Mejias,* 552 F.2d 435 (2d Cir.1977) (21 months); *United States ex rel. Spina v. McQuillan,* 525 F.2d 813 (2d Cir.1975) (26 months); *United States v. Lasker,* 481 F.2d 229 (2d Cir.1973) (two years); *United States v. Infanti,* 474 F.2d 522 (2d Cir.1973) (28 months); *United States v. Fasanaro,* 471 F.2d 717 (2d Cir.1973) (more than four years); *United States v. Saglimbene,* 471 F.2d 16 (2d Cir.1973) (six years); *United States v. Schwartz,* 464 F.2d 499 (2d Cir.1972) (four and one-half years). Thus, although Petitioner has met the threshold requirement of showing that the pre-trial delay was "presumptively prejudicial," the length of delay factor actually weighs in favor of Respondent.

Next, the Court must consider the reason for the delay. The Supreme Court has stated that "different weights should be assigned to different reasons." *Barker,* 407 U.S. at 531. In particular,

> [a] deliberate attempt to delay the trial in order to hamper the defense should be weighted heavily against the government. A more neutral reason such as negligence or overcrowded courts should be weighted less heavily but nevertheless should be considered since the ultimate responsibility for

> such circumstances must rest with the government rather than with the defendant.

*Id.* (citations omitted). Thus, the speedy trial "standards recognize that pretrial delay is often both inevitable and wholly justifiable," such as where the government "need[s] time to collect witnesses against the accused, oppose his pretrial motions, or, if he goes into hiding, track him down." *Doggett,* 505 U.S. at 656. Petitioner here vaguely asserts, without offering any support, that the prosecution demanded that he undergo "unnecessary" medical examinations in order to delay the start of his trial. (*See* Pet. at 225.) Although Respondent correctly points out that there is no evidence that the delays were deliberately caused by the prosecution (*see* Resp. Mem. at 91), Respondent fails to come forward with any justification for the delay, as it is required to do. *See Georgiadis v. Superintendent, Eastern Corr. Facility,* 450 F.Supp. 975, 979-80 (S.D.N.Y.1978) ("[T]he responsibility for these unexplained delays should rest with the state."), *aff'd,* 591 F.2d 1330 (2d Cir.1978); *see also Jackson v. Ray,* 390 F.3d 1254, 1262, 1262 n. 3 (10th Cir.2004) (holding that the State, and not Petitioner, "has the burden to show that the delay is justifiable"; citing *Georgiadis,* 250 F.Supp. 975, and cases from various circuits in observing that "every circuit court to address the question has held that *Barker* places the burden to explain the delay on the State"). Thus, in light of the absence of an explanation for the delay, the Court finds that this factor weighs in favor of Petitioner.

**\*40**  The third factor for the Court to consider is when Petitioner first raised the issue of his right to a speedy trial. Respondent does not dispute that this factor weighs in Petitioner's favor, acknowledging that "Petitioner did file a motion seeking to dismiss his case based on a speedy trial violation." (*See* Resp. Mem. at 91.)

Finally, the fourth factor to consider is the prejudice suffered by Petitioner as a result of the delay in bringing him to trial. "The extent to which a defendant has been prejudiced 'frequently weighs the heaviest in considering a speedy trial challenge.' " *Warwick v. Kuhlmann,* No. 98 Civ. 6393(RCC)(HBP), 2002 U.S. Dist. LEXIS 26727, at \*51-52 (S.D.N.Y. June 18, 2002) (quoting *Morales v. Keane,* No. CV 94-2379(RR), 1995 U.S. Dist. LEXIS 22037, at \*11 (E.D.N.Y. Apr. 13, 1995)), *adopted by* 2003 U.S. Dist. LEXIS 15067 (S.D.N.Y. Aug. 29, 2003); *see also Quintana v. McCoy,* No. 03 Civ. 5747(KMK)(JCF), 2004 U.S. Dist. LEXIS 24684,

at \*16 (S.D.N.Y. Nov. 18, 2004) ("Prejudice is considered to be the most important of the four *Barker* factors."), *adopted by* 2006 U.S. Dist. LEXIS 7638 (S.D.N.Y. Feb. 6, 2006). "Although 'a showing of prejudice is not a prerequisite to finding a sixth amendment violation, courts generally have been reluctant to find a speedy trial violation in the absence of genuine prejudice." ' *United States v. Jones,* 129 F.3d 718, 724 (2d Cir.1997) (quoting *Rayborn v. Scully,* 858 F.2d 84, 94 (2d Cir.1988)).

As the Supreme Court has explained, prejudice "should be assessed in the light of the interests of defendants which the speedy trial right was designed to protect," including (1) "prevent[ing] oppressive pretrial incarceration"; (2) "minimiz[ing] anxiety and concern of the accused"; and (3) "limit[ing] the possibility that the defense will be impaired." *Barker,* 407 U.S. at 532 (citations omitted). The "most serious" of these interests is the last, "because the inability of a defendant adequately to prepare his case skews the fairness of the entire system." *Id.* For example, "[i]f witnesses die or disappear during a delay, the prejudice is obvious." *Id.*

"[A]ffirmative proof of particularized prejudice is not essential to every speedy trial claim." *Doggett,* 505 U.S. at 655 (citations omitted). Rather, "excessive delay presumptively compromises the reliability of a trial in ways that neither party can prove or, for that matter, identify." *Id.* While such presumptive prejudice alone is not sufficient to establish a violation of the Sixth Amendment right to a speedy trial without regard to the other *Barker* criteria, "it is part of the mix of relevant facts, and its importance increases with the length of delay." *Id.* at 655-56. In *Doggett,* the Supreme Court found no need for an affirmative showing of prejudice where the delay was more than eight years. *Id.* In contrast, the delay in this case of 10 months is relatively short-and certainly not extraordinary-and, therefore, the presumption of prejudice is comparatively weak. Thus, it appears that Petitioner must make an affirmative showing of prejudice for this factor to weigh in his favor. *See Vassell,* 970 F.2d at 1165 n. 1 (suggesting an affirmative showing of prejudice is necessary in absence of extraordinary delay and government negligence); *see also Davis,* 122 F.Supp.2d at 443; *Velez v. New York,* 941 F.Supp. 300, 319 (E.D.N.Y.1996).

 **\*41** Here, Petitioner's claims that he was prejudiced because the delay "disrupt[ed] his employment, drain[ed] his financial resources," and "create[d] anxiety in him, his family and friends" (*see* Pet. at 224) are vague and unsubstantiated.[35]

Such unspecific assertions are insufficient to constitute an affirmative showing of prejudice. *See Quintana,* 2004 U.S. Dist. LEXIS 24684, at \*17-18 (petitioner's assertion that "he demonstrated anxiety by consistently invoking his speedy trial rights" was not "sufficiently specific" and therefore petitioner's interest in "minimizing [his] anxiety and concern" was not impinged) (citing *United States v. McGrath,* 622 F.2d 36, 41 (2d Cir.1980) ("[A]ppellants can point to no specific and substantiated prejudice arising from the delay. The professions of anxiety and concern ... are ephemeral."); *see also Butti v. Goord,* No. 00 Civ. 6521(DLC)(JCF), 2004 U.S. Dist. LEXIS 21806, at \*13 (S.D.N.Y. Aug. 8, 2005) (finding assertions of prejudice "vague and general" where petitioner alleged that he "was forced ... to live under a cloud of additional suspicion and increased anxiety and humiliation," and that his "business and employment prospects were [ ] destroyed; his reputation decimated"). Besides these assertions, Petitioner fails to allege any other form of prejudice. Significantly, Petitioner does not allege that the delay impaired his defense in any way, such as through the loss of key witnesses or evidence. Nor does he allege that his interest in "prevent[ing] oppressive pretrial incarceration" was impinged. *See Barker,* 407 U.S. at 532. Based on the record, there is simply no evidence showing that the 10-month pre-trial delay resulted in these forms of prejudice. As Petitioner has failed to demonstrate any prejudice from the delay, the prejudice factor must be weighed in favor of Respondent.

35    Although Petitioner mentions that he was admitted to the hospital for "Post[-]Traumatic Stress Syndrome and stroke," (*id.*) he fails to provide any evidence, such as records of his hospital visit, to support this assertion.

In sum, while two of the four *Barker* factors-the assertion of right and reason for delay factors-favor Petitioner, the other two-the length of delay and prejudice factors-do not. Yet, given the particular importance of the prejudice factor, especially in a case with a relatively short pre-trial delay, as in this case, Petitioner's failure to demonstrate prejudice means that he is unable to sustain his speedy trial claim, and I therefore recommend that the claim be dismissed.

 b. *Speedy Appeal*
Petitioner also asserts that he was denied his right to a speedy appeal. (*See* Pet. 219.) By holding that any delay was attributable to Petitioner, *Van Stuyvesant,* 297 A.D.2d at 560, 747 N.Y.S.2d at 156, the Appellate Division addressed this

Case 9:21-cv-00708-BKS-TWD Document 14 Filed 11/03/23 Page 67 of 171
Van Stuyvesant v. Conway, Not Reported in F.Supp.2d (2007)
2007 WL 2584775

claim on the merits. Thus, the Court must apply AEDPA's deferential standard on review.

"[T]he right to a reasonably timely appeal is included among the protections afforded by the due process clause when a state does provide for an appeal." *Cody v. Henderson,* 936 F.2d 715, 719 (2d Cir.1991) (citing *Simmons v. Reynolds,* 898 F.2d 865, 868 (2d Cir.1990)). To determine whether the right to a timely appeal has been violated, courts apply the same factors developed by the *Barker* court in the speedy trial context. *Cody,* 936 F.2d at 719; *Brown v. Costello,* No. 00 Civ. 6421(RCC)(MHD), 2004 U.S. Dist. LEXIS 16159, at *5 (S.D.N.Y. Aug. 17, 2004). [36]

[36]     In applying the length of delay factor from *Barker* in the appellate context, "courts have found appellate delays excessive when the delay constitutes a substantial fraction of the minimum sentence imposed on the appellant." *Brown,* 2004 U.S. Dist. LEXIS 16159, at *6-7 (citing *Simmons v. Reynolds,* 709 F.Supp. 505, 509 (E.D.N.Y.1989) (finding appellate delay excessive where over six years had passed between petitioner's notice of appeal and the hearing, which constituted over two-thirds of his minimum sentence), *aff'd,* 898 F.2d 865 (2d Cir.1990)).

 *42 In this case, as detailed in Respondent's brief to the Appellate Division, Petitioner made a number of motions after his conviction became final in July 1999. (*See* Resp.App. Br. at 84-85.) In addition, it appears that Petitioner had difficulty complying with the Appellate Division's rules on the filing of appellate briefs, before the court finally accepted his brief for filing in October 2001. [37] (*See id.* at 85.) Even assuming the appellate process could be fairly characterized as substantially delayed, it is reasonable to conclude that, in light of the record presented, which Petitioner does not credibly dispute, Petitioner's own actions caused the delay. Accordingly, the Appellate Division's rejection of Petitioner's speedy appeal claim was neither contrary to, nor an unreasonable application of federal law, *see* 28 U.S.C. § 2254(d), and I recommend that the claim be dismissed.

[37]     The Appellate Division denied Petitioner's appeal in September 2002. *Van Stuyvesant,* 297 A.D.2d 559, 747 N.Y.S.2d 155.

c. *Pre-Indictment Delay*

The Supreme Court recognized in *United States v. Marion,* 404 U.S. 307, 324 (1971), that a pre-indictment delay may result in a violation of due process. *Georgison v. Donelli,* No. 04 Civ. 1444(DC), 2005 U.S. Dist. LEXIS 11363, at *20 (S.D.N.Y. June 9, 2005) (citing *Marion,* 404 U.S. at 324). "[T]o prevail on a claim of unconstitutional pre-indictment delay, a petitioner must show that he suffered actual prejudice as a result of the delay and that the delay was an intentional device to gain a tactical advantage." *Denis v. Upstate Corr. Facilty,* 361 F.3d 759, 760 (2d Cir.2004) (citing *Marion,* 404 U.S. at 324.) The petitioner bears a "heavy burden" in making such a claim. *United States v. Cornielle,* 171 F.3d 748, 752 (2d Cir.1999).

Here, Petitioner appears to argue that the government denied him his due process rights because it indicted him many years after he began representing clients on immigration matters. [38] (*See* Pet. at 229.) This argument has no merit because, as Respondent correctly points out, Petitioner was indicted in July 1998 for his conduct between March 1997 and July 1998, and not for any conduct that occurred many years prior to the indictment. (*See* Resp. Mem. at 88.) Respondent further notes that the indictment satisfied the statute of limitations (*id.*), which Petitioner apparently does not dispute. Where an indictment is brought within the statute of limitations, "there is a presumption that the [petitioner] was not prejudiced." *Georgison,* 2005 U.S. Dist. LEXIS 11363, at *21 (citing *Cornielle,* 171 F.3d at 752). Petitioner has not only failed to establish any delay, but he has also failed to demonstrate that he suffered "actual prejudice." *Denis,* 361 F.3d at 760. He has not shown any loss of evidence, or the unavailability of important witnesses or evidence as a result of the alleged delay. *Cornielle,* 171 F.3d at 752 ("[P]rejudice is commonly demonstrated by the loss of documentary evidence or the unavailability of a key witness.").

[38]     Petitioner is not entirely clear on the length of his alleged pre-indictment delay. At one point he complains of "unconstitutional pre-indictment delay from 1983-1995 and 1996-1998...." (*See* Pet. at 229.) At another point he contends there was an "18 years delay" in prosecuting the crimes. (*See* Trav. ¶ 61.)

 *43 Finally, in connection with this claim, Petitioner again broadly accuses the D.A.'s office of conspiring to prosecute him because of his "activism and advocacy." (*See* Pet. at 221.) Once again, however, Petitioner has offered no support for

these assertions. Under the circumstances, I recommend the dismissal of Petitioner's pre-indictment delay claim.

## CONCLUSION

For all of the foregoing reasons, I recommend that Petitioner's petition for a writ of habeas corpus be dismissed in its entirety. Further, I recommend that the Court decline to issue a certificate of appealability pursuant to 28 U.S.C. § 2253(c)(1)(A), because Petitioner has not "made a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2). Pursuant to 28 U.S.C. § 636(b)(1) and Rule 72(b) of the Federal Rules of Civil Procedure, the parties shall have ten (10) days from service of this Report to file written objections. *See also* Fed.R.Civ.P. 6. Such objections, and any responses to objections, shall be filed with the Clerk of Court, with courtesy copies delivered to the chambers of the Honorable Lewis A. Kaplan, United States Courthouse, 500 Pearl Street, Room 1310, New York, New York 10007, and to the chambers of the undersigned, United States Courthouse, 500 Pearl Street, Room 525, New York, New York, 10007. Any requests for an extension of time for filing objections must be directed to Judge Kaplan. FAILURE TO FILE OBJECTIONS WITHIN TEN (10) DAYS WILL RESULT IN A WAIVER OF OBJECTIONS AND WILL PRECLUDE APPELLATE REVIEW. *See Thomas v. Arn,* 474 U.S. 140, 155 (1985); *IUE AFL-CIO Pension Fund v. Herrmann,* 9 F.3d 1049, 1054 (2d Cir.1993); *Frank v. Johnson,* 968 F.2d 298, 300 (2d Cir.1992); *Wesolek v. Canadair Ltd.,* 838 F.2d 55, 58 (2d Cir.1988); *McCarthy v. Manson,* 714 F.2d 234, 237-38 (2d Cir.1983).

**All Citations**

Not Reported in F.Supp.2d, 2007 WL 2584775

---

**End of Document**

© 2023 Thomson Reuters. No claim to original U.S. Government Works.

2009 WL 2601106

2009 WL 2601106
Only the Westlaw citation is currently available.
United States District Court,
W.D. New York.

Alonzo MAYES, Plaintiff,

v.

E.R. DONNELLY, Defendant.

No. 03–CV–417.
|
Aug. 21, 2009.

**Attorneys and Law Firms**

Alonzo Mayes, Alden, NY, pro se.

Raymond C. Herman, Buffalo, NY, for Defendant.

ORDER

RICHARD J. ARCARA, Chief Judge.

**\*1** This case was referred to Magistrate Judge Victor E. Bianchini, pursuant to 28 U.S.C. § 636(b)(1). On May 28, 2003, plaintiff filed a petition for a writ of certiorari and on March 9, 2009 he filed a motion to amend the petition. On June 30, 2009, Magistrate Judge Bianchini filed a Report and Recommendation, recommending that petitioner's motion to amend be denied and that petitioner's original petition for a writ of habeas corpus be denied.

Plaintiff filed objections to the Report and Recommendation on July 10, 2009. Defendants filed a response thereto.

Pursuant to 28 U.S.C. § 636(b)(1), this Court must make a *de novo* determination of those portions of the Report and Recommendation to which objections have been made. Upon a *de novo* review of the Report and Recommendation, and after reviewing the submissions of the parties, the Court adopts the proposed findings of the Report and Recommendation.

Accordingly, for the reasons set forth in Magistrate Judge Bianchini's Report and Recommendation, petitioner's motion to amend is denied and petitioner's original petition for a writ of habeas corpus is denied. The Clerk of Court shall take all steps necessary to close the case.

SO ORDERED.

REPORT AND RECOMMENDATION

VICTOR E. BIANCHINI, United States Magistrate Judge.

**I. Background**

*Pro se* petitioner Alonzo Mayes ("Mayes" or "petitioner") has filed a petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254 challenging his conviction, following a guilty plea, on August 25, 1995, in Erie County Court of New York State Supreme Court, to second degree murder (N.Y. Penal Law § 125.25(1)) for the homicide of Anthony Turner ("Turner"), and first degree manslaughter (N.Y. Penal Law § 125.20(1)) for the homicide of Marvin Lloyd, Jr. ("Lloyd"). The homicides were charged in the same thirteen-count indictment, but arose out of separate incidents. The guilty plea was offered in satisfaction of that entire indictment and on the condition that Mayes waive his right to appeal. In addition, two other indictments involving unrelated criminal charges pending against Mayes were dismissed in their entirety. *See* Transcript of Plea Hearing ("Plea Tr.") at 2–3. [1] No sentencing commitment was extended to Mayes as part of the plea deal. With regard to the Turner murder, Mayes pled to the elements of the crime, but with regard to the manslaughter charge involving Lloyd, Mayes accepted guilt but elected to rely on the prosecutor's statement of what the proof to be introduced at trial. *See id.* at 3–4.

[1] The plea transcript is part of Exhibit D in Respondent's Appendix of Exhibits, submitted in connection with respondent's Answer to the Petition.

Mayes was sentenced on November 5, 1995, to consecutive terms of imprisonment (a determinate term of 21 years with regard to the Turner murder conviction, and an indeterminate term of 4 to 12 years on Lloyd manslaughter conviction).

On direct appeal, the Appellate Division, Fourth Department, unanimously affirmed the conviction in a decision and order entered May 10, 2000, rejecting his claims that the trial court erred in refusing to permit him to withdraw his plea and that the sentence was harsh and excessive. *People v. Mayes,* 27 A.D.2d 929, 708 N.Y.S.2d 662 (App.Div. 4th Dept.2000). [2] On August 11, 2000, the New York Court of

Appeals denied leave to appeal. *People v. Mayes,* 95 N.Y.2d 868, 715 N.Y.S.2d 223, 738 N.E.2d 371 (N.Y.2000).

2

"[T]he [trial] [c]ourt did not err in denying defendant's motion to withdraw the guilty plea. The contents of the newspaper article had no effect on the validity of the plea previously entered. Moreover, defendant's assertions in support of the motion establish that defendant, at the time of the plea, was aware of all facts necessary to support a claim of self-defense. Defendant was informed of the maximum possible sentence, and thus his challenge to the severity of the sentence is foreclosed by his waiver of the right to appeal[.]" *People v. Mayes,* 272 A.D.2d at 929, 708 N.Y.S.2d 662 (citations omitted).

 **\*2** Mayes filed three motions to vacate the judgment pursuant to New York Criminal Procedure Law § 440.10. Two of these were filed before Mayes filed his habeas corpus petition on May 28, 2003, with this Court. The second C.P.L. § 440.10 motion, filed on December 2001, and denied by the trial court on June 25, 2002, dealt only with the second degree murder conviction involving Turner. That motion presented a *Brady* [3] claim and perjury claim that Mayes has asserted as his first and second grounds for habeas relief in the original habeas petition. As his first ground for habeas relief, Mayes claims that "the prosecution withheld the original statements of Geno Haskins and David Lewis in which both witnesses describe the perpetrator as wearing a white T-shirt during the shooting, and star witness Raymond Anderson testified before the grand jury that petitioner wore a brown-hooded sweatshirt during the shooting. Petition at 7 (Docket # 18). Second, Mayes asserts that the prosecution knowingly used false testimony to convict him of second-degree murder by withholding the photographs of the interior of the victim's vehicle. Anderson testified that he observed petitioner in the passenger seat of the vehicle during the incident, but photos of the car, according to Mayes, contradicted Anderson's testimony.

3

 *Brady v. Maryland,* 373 U.S. 83, 87, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963) (holding that the prosecution's suppression of requested evidence favorable to the defendant violates due process, notwithstanding the prosecution's good faith).

While his habeas petition was pending, Mayes filed another motion with the trial court to vacate his judgment of conviction on June 4, 2008, pursuant to C.P.L. § 440.10(1)

(h). This motion sought to attack the manslaughter conviction, and presented alleged *Brady* material obtained through one of petitioner's F.O.I.L. requests granted on April 16, 2008. The trial court denied the motion on the merits on October 10, 2008, and permission to appeal was denied on January 20, 2009.

Mayes then filed a motion to amend his habeas petition and a proposed amended petition attempting to add two claims relating to the first degree manslaughter conviction involving Lloyd's homicide; these claims were exhausted by means of the 2008 C.P.L. § 440.10 motion. For his amended claims, Mayes asserts that the prosecution withheld favorable evidence, namely, the police narrative which consists of various phone calls to 911 allegedly proving that the vehicle used in the Lloyd shooting was recovered about four hours later and was a different car model than Anderson originally identified. Proposed Amended Petition ("Prop.Amend.Pet."), ¶ 22(C) at 8 (Docket # 18). Relatedly, Mayes contends that the prosecutor "knowingly used false testimony" to induce him to plead guilty to first degree manslaughter because "Anderson stated that Roosevelt Westbrook's gray Pontiac 600 was used in the shooting of Marvin L. Lloyd Jr. [w]hen in fact, the vehicle used in the shooting was recovered by police four hours in damaged condition. (1984 Buick Plate # EKV–338) recovered at 11 Hotaling Drive." Prop. Amend. Pet., ¶ 22(D) at 8 (Docket # 18) (citing Ex. A to Pet'r C.P.L. § 440.10 Motion).

 **\*3** In his Answer to the petition, respondent has asserted the defense of untimeliness. In the alternative, respondent argues that none of Mayes' claims warrant habeas relief. *See* Respondent's Memorandum of Law ("Resp't Mem.") at 3–5, 6–9 (Docket # 10). Additionally, respondent has opposed Mayes' motion to amend the petition. *See* Affidavit of Raymond Herman, Esq.

For the reasons that follow, the Court recommends denying Mayes' motion to amend. The Court also recommends finding that Mayes' original petition is timely but that none of the claims raised therein warrant habeas relief. Accordingly, the Court recommends that Mayes' habeas petition be dismissed.

## II. Discussion

### A. Timeliness

Whether Mayes' petition is timely depends upon which event counts as the date on which statute of limitations under 28

U.S.C. § 2244(d)(1)—the date on which his judgment of conviction became final, *see* 28 U.S.C. § 2244(d)(1)(A), or the date on which the factual predicate of the claims could have been discovered through the exercise of due diligence, *see id.,* § 2244(d)(1)(D). *See* Respondent's Memorandum of Law ("Resp't Mem.") at 3. Mayes did not file his original habeas petition until May 28, 2003, some two and one-half years after his conviction became final on November 9, 2000, for purposes of 28 U.S.C. § 2244(d)(1)(A). Mayes argued, however, that his petition was timely filed if the start-date set forth in § 2244(d)(1)(D) were utilized, inasmuch as he first received certain allegedly exculpatory evidence on June 19, 2001, pursuant to a Freedom of Information Law ("F.O.I.L.") request. Upon initial screening, the Court (Elfvin, D.J.) found that Mayes' petition would be timely under § 2244(d)(1)(D), if the date of June 19, 2001, were to be used as the statute-of-limitations start-date. The Court accordingly allowed the petition to go forward, and directed respondent to answer. *See* Order dated July 8, 2003 (Elfvin, D.J.) (Docket # 5).

Notwithstanding the Court's prior ruling, respondent has renewed his defense of untimeliness, arguing that the date that Mayes' conviction became final should be used as the statute-of-limitations start-date. *See* Resp't Mem. at 3–5. Respondent concedes that if one starts the limitations period on June 19, 2001, the date Mayes received documents pursuant to his F.O.I.L. request, the petition is timely. As Judge Elfvin found, the clock would have been tolled between December 24, 2001, and March 21, 2003, during the pendency of Mayes' second C.P.L. § 440.10 motion in which he sought to exhaust the *Brady* claim based the documents obtained via the June 19, 2001, F.O.I.L. request. *See* 28 U.S.C. § 2244(d)(2); Order at 3 (Docket # 5). Using June 19, 2001, as the start-date, and taking into account the statutory tolling occasioned by the second C.P.L. § 440.10 motion, Mayes had 109 days remaining on the limitations period when he filed his original habeas corpus petition. I agree with the analysis of timeliness conducted by Judge Elfvin, *see* Docket # 5, and recommend addressing the merits of the claims presented in Mayes' original habeas petition.

**B. Motion to Amend**

**\*4** Mayes has now moved to amend his petition to add the claims raised in his 2008 C.P.L. § 440.10 motion. These claims attack the constitutionality of Mayes' first degree manslaughter conviction involving the Lloyd shooting. Respondent argues that amendment of the petition to add these claims should not be permitted because they are

untimely and do not "relate back" to the claims in the original petition. *See* Resp't Mem. at 2–4 (Docket # 10) (citing *Mayle v. Felix,* 545 U.S. 644, 125 S.Ct. 2562, 162 L.Ed.2d 582 (2005); *Rhines v. Weber,* 544 U.S. 269, 125 S.Ct. 1528, 161 L.Ed.2d 440 (2005); FED. R. CIV. P. 15(c)(1)(B)).

As Mayes recognizes, the issues raised in the 2008 C.P.L. § 440.10 motion relate to the manslaughter charge involving Lloyd. Petitioner's Motion to Amend the Petition ("Pet'r Mot. to Amend.") at 1 (Docket # 18). Mayes alleges that "[t]he facts in support of these new claims became known through the exercise of due diligence for the first time on April 16, 2008." *Id.* Mayes states that "[i]n accordance to [sic] 2244(d)(1)(D) the limitations clock began to run again April 16, 2008." *Id.*

Although the Court has found Mayes' original petition timely, the statute of limitations nevertheless has long since expired. As noted above, when Mayes filed his original habeas petition in 2003, he had 109 days left of the one-year limitations period. However, he did not file any other post-conviction collateral motions in state court until five years later, in 2008. After receiving a response to a F.O.I.L. request on April 16, 2008, Mayes filed another C.P.L. § 440.10 motion, this time challenging the first degree manslaughter conviction. By that time, however, the statute of limitations had expired, and it could not be re-started by the filing of that C.P.L. § 440.10 motion.

Where, as here, a petitioner seeks to add new claims to a habeas petition after respondent has answered the petition, and after the statute of limitations set forth in 28 U.S.C. § 2244(d)(1) has expired, the new claims must "relate back" to the original petition. *See* Fed.R.Civ.P. Rule 15(c)(2) (providing that pleading amendments relate back to the date of the original pleading when the claim asserted in the amended plea "arose out of the conduct, transaction, or occurrence set forth or attempted to be set forth in the original pleading"); *Mayle v. Felix,* 45 U.S. 644, 656 (2005)). In *Mayle v. Felix,* the Supreme Court rejected a construction of Rule 15 that would define the "conduct, transaction, or occurrence" to mean the same "trial, conviction, or sentence" for purposes of Rule 15(c)(2), *id.* at 657, 664, holding that "relation back" would be in order where "the original and amended petitions state claims that are tied to a common core of operative facts," *id.* at 664 (holding that habeas petitioner's amended petition, filed after the one-year federal habeas limitations period and targeting his statements in a pretrial interrogation, did not arise out of the "conduct, transaction, or occurrence" set forth in his original timely filed petition,

and thus did not "relate back" to the date of the original petition, which challenged admission into evidence in his murder trial of videotaped testimony of a witness for the prosecution; the amended petition asserted a new ground for relief supported by facts that differed in both time and type from those the original pleading set forth). The Supreme Court held that "[a]n amended habeas petition ... does not relate back (and thereby escape [the] one-year time limit [of 28 U.S.C. § 2244(d) (1) ] ) when it asserts a new ground for relief supported by facts that differ in both time and type from those the original pleading set forth." *Id.* at 650.

 **\*5** Under the Supreme Court's narrow construction of "conduct, transaction, or occurrence," claims do not necessarily arise out of the same common core of operative facts even when they arise from the same trial, conviction, or sentence. Here, although the claims in the proposed amended petition and original petition stemmed from the same guilty plea, they stem from two different convictions for two separate crimes. (Indeed, Mayes received consecutive sentences for the two convictions, which is not possible under New York state law if the convictions arose out of the same criminal occurrence.) The proposed amended claims are based upon Mayes' first degree manslaughter conviction for the shooting of Lloyd, while the claims in the original petition were based upon a wholly separate incident, the homicide of Turner. Because the proposed amended claims set forth news ground for relief supported by facts that differ in both time and type from those in the original petition, they do not "relate back" to the original petition. *See Mayle,* 545 U.S. at 650. Because the statute of limitations has expired, and because "relation back" of the proposed new claims is not in order, permission to amend the petition should be denied. *See id.*

## C. Merits of the Claims in the Original Petition

### 1. Ground One: Violation of *Brady v. Maryland*

Mayes asserts that "[t]he prosecution withheld the original statements of Geno Haskins and David Lewis in which both witnesses describe the perpetrator as wearing a white T-shirt during the shooting, and star witness Raymond Anderson testified before the grand jury that petitioner wore a brown-hooded sweatshirt during the shooting." Petition at 7, ¶ 22(A) (Docket # 1). Mayes asserted this *Brady* claim after one of his F.O.I.L. requests was granted on June 19, 2001, by means of his second motion to vacate filed December 24, 2001, pursuant to C.P.L. § 440.10(1)(h). Mayes offered the following documents received via the F.O.I.L. request: (1)

four photographs of what was alleged to be Turner's vehicle, three of which depict an infant car-seat in the front seat; (2) sworn statements of David Lewis and Gino Haskins given to the Buffalo Police Department on July 21, 1994; (3) a "P–73" form from Detective Stanly Suszek to Chief Fieramusca; and (4) the second page of a memo from Detectives Harold Frank and Carl Lipinczyk. Mayes contended that all of the foregoing documents were *Brady* material, and submitted an affidavit from his trial counsel purporting to substantiate his allegation that none of the items were disclosed to the defense. *See* Order Denying C.P.L. § 440.10 Motion dated June 25, 2002 ("2002 C.P.L. § 440.10 Order") at 2–3.

The United States Supreme Court has held that it is a violation of the accused's constitutional right to due process for the Government, in good faith or bad in bad faith, to withhold any material, exculpatory evidence whether or not the defendant explicitly requests this evidence. *See Brady,* 373 U.S. at 87. "There are three components to a true *Brady* violation: The evidence at issue must be favorable to the accused, either because it is exculpatory, or because it is impeaching; that evidence must have been suppressed by the State, either willfully or inadvertently; and prejudice must have ensued." *Strickler v. Greene,* 527 U.S. 263, 281–82, 119 S.Ct. 1936, 144 L.Ed.2d 286 (1999).

 **\*6** With regard to the statements of Haskins and Lewis saying that the shooter was wearing a white t-shirt, I concur with Mayes that they were favorable to the defense within the meaning of *Brady* since one witness, Anderson, testified at the grand jury that Mayes was wearing a brown hooded sweatshirt on the night of the shooting. Related to these statements is the final item of alleged *Brady* information, the second page of the memo from Det. Suszek. It is *Brady* material to the extent that it indicates a "signed statement was taken froma [sic] possible witness, Gino Demark Haskins Jr."

Mayes argues that the failure of the prosecution to disclose these documents foreclosed his ability to make a knowing and intelligent decision about whether to plead guilty. "The longstanding test for determining the validity of a guilty plea is 'whether the plea represents a voluntary and intelligent choice among the alternative courses of action open to the defendant.' " *Hill v. Lockhart,* 474 U.S. 52, 56, 106 S.Ct. 366, 88 L.Ed.2d 203 (1985) (quoting *North Carolina v. Alford,* 400 U.S. 25, 31, 91 S.Ct. 160, 27 L.Ed.2d 162 (1970)); *see also Boykin v. Alabama,* 395 U.S. at 242–43; *Parke v. Raley,* 506 U.S. 20, 29, 113 S.Ct. 517, 121 L.Ed.2d 391 (1992). In *Tollett v. Henderson,* 411 U.S. 258, 93 S.Ct. 1602, 36 L.Ed.2d 235

(1973), the Supreme Court explained that "[w]hen a criminal defendant has solemnly admitted in open court that he is in fact guilty of the offense with which he is charged, he may not thereafter raise independent claims relating to the deprivation of constitutional rights that occurred prior to the entry of the guilty plea." *Tollett,* 411 U.S. at 267. Thus, "a defendant who knowingly and voluntarily enters a guilty plea waives all non-jurisdictional defects in the prior proceedings." *United States v. Garcia,* 339 F.3d 116, 117 (2d Cir.2003).

The Supreme Court has held that the Constitution does not require the Government to disclose, pursuant to *Brady,* material *impeachment* information prior to entering into a plea agreement with a criminal defendant. *United States v. Ruiz,* 536 U.S. 622, 631, 122 S.Ct. 2450, 153 L.Ed.2d 586 (2002) (distinguishing between material exculpatory information and material "impeachment information[, which] is special in relation to the *fairness of a trial,* not in respect to whether a plea is *voluntary* ('knowing,' 'intelligent,' and 'sufficient[ly] aware').") (emphases and alteration in original). The Supreme Court in *Ruiz* reversed the Ninth Circuit, which had in effect held that a guilty plea is not "voluntary" (and that the defendant could not, by pleading guilty, waive her right to a fair trial), unless the prosecutor first made the same disclosure of material impeachment information that they would have been required to make under *Brady* had the defendant proceeded to trial. *Id.*

In denying Mayes' C.P.L. § 440. 10 motion, the trial court noted that as a matter of New York state law, it appears that the intermediate appellate courts differ as to whether a defendant who pleads guilty forfeits the right to obtain appellate review of *Brady. See* 2002 C.P.L. § 440.10 Order at 4 (citations omitted). The trial court analyzed Mayes' claim by following the decisions from those appellate courts finding that "the failure to disclose 'truly exculpatory evidence' brings into question the voluntariness of a guilty plea, and that *vacatur* should be granted if the withheld evidence materially affected the defendant's decision to plead guilty rather than proceed to trial." 2002 C.P.L. § 440.10 Order at 4 (citations omitted). The trial court found that the "appropriate measure of exculpatory value or materiality in this context is an extension of the *[People v.] Vilardi[,* 76 N.Y.2d 67, 73, 556 N.Y.S.2d 518, 555 N.E.2d 915 (N.Y.1990) ] standard." *Id.* at 4, 556 N.Y.S.2d 518, 555 N.E.2d 915.

**\*7** In *People v. Vilardi,* the New York Court of Appeals held that where a *specific* request for exculpatory material was made, a new trial should be granted if there is a

"reasonable possibility" that disclosure would have led to a different result. 76 N.Y.2d at73. Under the materiality standard enunciated by the Supreme Court and applied to *Brady* claims, undisclosed evidence is considered to be "material only if there is a reasonable *probability* that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." *United States v. Bagley,* 473 U.S. 667, 682, 105 S.Ct. 3375, 87 L.Ed.2d 481 (1985) (emphasis supplied) (holding that prosecution's failure to disclose evidence, which, if admitted, would have had a reasonable probability of resulting in a different verdict, is grounds for granting a petition under 28 U.S.C. § 2255); *accord, e.g., Kyles v. Whitley,* 514 U.S. 419, 434–35, 115 S.Ct. 1555, 131 L.Ed.2d 490 (1995). The Supreme Court has explained that a " 'reasonable probability' of a different result is accordingly shown when the government's evidentiary suppression 'undermines the confidence in the outcome of the trial.' " *Kyles v. Whitley,* 514 U.S. at 434 (quoting *United States v. Bagley,* 473 U.S. at 678). Thus, a defendant successfully establishes a Brady violation by "showing that the favorable evidence could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict." *Id.* at 435 (footnote omitted).

Under the *Vilardi* standard, the New York courts apply a more defendant-favorable standard when the defense has made a specific discovery request to the prosecution; the federal standard set forth in *Bagley,* by contrast, does not set forth a special standard when there has been specific request by the defense for certain *Brady* material. [4] *Vilardi* states that "where the prosecutor was made aware by a specific discovery request that defendant considered the material important to the defense," a defendant need only show a " 'reasonable *possibility'* that the failure to disclose the exculpatory [information] contributed to the verdict ..." *People v. Vilardi,* 76 N.Y.2d at 77, 556 N.Y.S.2d 518, 555 N.E.2d 915 (emphasis supplied). Regardless of whether there has been a specific defense request for certain *Brady* information, *Bagley* requires a defendant to show a "reasonable *probability"* of a different result, had the suppressed material been disclosed, *see Kyles,* 514 U.S. at 434 (citation omitted; emphasis supplied).

4

    *Accord Berger v. Stinson,* 97 F.Supp.2d at 368 (citing *People v. Washington,* 180 Misc.2d 838, 842, 694 N.Y.S.2d 296 (N.Y.Sup.Ct.1999) ("Vilardi represented a decision by the New York Court of Appeals to depart from the Federal standard of 'reasonable probability' to afford

State defendants the increased protection of the 'reasonable possibility' test in situations where Brady material was specifically requested[.]").

Mayes argues that because the statements of Haskins and Lewis were not disclosed "he could not have made an informed decision to plead guilty to the murder of Turner." 2002 C.P.L. § 440.10 Order at 3. As the state court noted, the statements of Lewis and Haskins did create a discrepancy in the descriptions of the perpetrator's clothing; Lewis and Haskins stated that the shooter was wearing a white t-shirt and shorts or blue jeans, while Anderson testified at the grand jury that petitioner was wearing a brown hooded sweatshirt at the time of the shooting. C.P.L. § 440.10 Order at 3, 4. To the extent that this evidence constitutes favorable impeachment evidence, the prosecution did not run afoul of Brady by failing to disclose it prior to petitioner entering his guilty plea. *See United States v. Ruiz,* 536 U.S. at 626.

**\*8** To the extent that the statements of Lewis and Haskins can be considered exculpatory, I agree with the state court that the prosecution's failure to disclose these documents did not result in a violation of due process under Brady. This is because the documents, had they been disclosed, would not have materially affected petitioner's decision to plead guilty to shooting Turner, rather than proceed to trial. *See* 2002 C.P.L. § 440.10 Order at 4. In other words, I agree with the state court that there is "no reasonable possibility that [petitioner] would have rejected the plea had he been privy to documents alleged to have been withheld." 2002 C.P.L. § 440.10 Order 5. As the trial court found, there was ample evidence establishing that Mayes shot and killed Turner: "three witnesses identified the defendant as the perpetrator, and ... following a *Wade* hearing, the court ruled that Lewis and Haskins would be permitted to identify the defendant at trial." 2002 C.P.L. § 440.10 Order at 4. The state court also found it significant that Mayes' "admissions [regarding the Turner homicide] made to an [sic] jail-house informant were ruled admissible following a *Cardona*[5] hearing...." *Id.* Finally, the state court took into account that Mayes, "during the plea colloquy, unequivocally admitted to shooting Turner" and when he moved to set aside the verdict, he "did not deny that he was the shooter, but suggested his act was justified because Turner was armed." *Id.*

[5]   A *Cardona* hearing, *see People v. Cardona,* 41 N.Y.2d 333, 335, 392 N.Y.S.2d 606, 360 N.E.2d 1306 (N.Y.1977), is held to determine whether an inmate informant who testifies that a confession was made by a defendant while in

jail was an agent of the government; where the informer "works independently of the prosecution, provides information on his own initiative, and the government's role is limited to the passive receipt of such information, the informer is not, as a matter of law" an agent of the government. *See also Massiah v. United States,* 377 U.S. 201, 203–04, 84 S.Ct. 1199, 12 L.Ed.2d 246 (1964).

Given the compelling evidence of Mayes' culpability with regard to the shooting of Turner, I cannot credit Mayes' contention that the withheld *Brady* "information was 'material' and disclosure of th[at] information in a timely manner would have resulted in the defendant proceeding to trial, in stead of pleading guilty to murder in the Second Degree, which the defendant had informed the court on September 29, 1995[,] that he was not guilty of." Pet'r C.P.L. § 440.10 Motion at 5. Beyond his after-the-fact, conclusory assertions, Mayes has come forward with nothing that gives rise to even a possibility that he would have instead chosen to face trial on the Turner murder if the items of *Brady* information allegedly had not been withheld from him prior to the entry of his guilty plea. *See Panuccio v. Kelly,* 927 F.2d 106, 109 (2d Cir.1991) (stating that the "prejudice" prong of the inquiry required under *Hill v. Lockhart,* 474 U.S. at 56–59, "is not satisfied merely by [petitioner's] testimony that he would have gone to trial" and not pleaded guilty "since a defendant's testimony after the fact 'suffers from obvious credibility problems' ") (quoting *Hooper v. Garraghy,* 845 F.2d 471, 475 (4th Cir.), *cert. denied,* 488 U.S. 843, 109 S.Ct. 117, 102 L.Ed.2d 91 (1988)). At the plea hearing, Mayes acknowledged "that if he went to trial trial [he] would be exposed to more serious and severe punishment on the murder count and it is for those reasons that we [sic] are entering into the disposition on the Marvin Lloyd homicide." Plea Tr. at 4. When the trial court asked him if "[a]nybody [was] forcing him to" plead guilty, Mayes responded, "No. I feel that because I was wrong that's the best thing to do." Plea Tr. at 17. Mayes then entered a plea of guilty to second degree murder and first degree manslaughter. *Id.* The trial was entitled to rely upon the defendant's sworn statements, made in open court, that he understood the consequences of his plea, had discussed the plea with his attorney, knew that he could not withdraw the plea, understood that he was waiving his right to appeal, had been made no promises except those contained in the plea agreement, and was pleading guilty of his own accord. *United States v. Hernandez,* 242 F.3d 110, 112 (2d Cir.2001) (citing, *inter alia, Blackledge v. Allison,* 431 U.S. 63, 74, 97 S.Ct. 1621, 52 L.Ed.2d 136 (1977) ("The subsequent presentation of conclusory allegations unsupported by specifics is subject

to summary dismissal, as are contentions that in the face of the record are wholly incredible."); *United States v. Torres,* 129 F.3d 710, 715 (2d Cir.1997) ("A defendant's bald statements that simply contradict what he said at his plea allocution are not sufficient grounds to withdraw the guilty plea.")).

 **\*9** Mayes has failed to demonstrate that any of the alleged *Brady* information was "material" to his decision to plead guilty in this case. Moreover, to the extent that some of the *Brady* information was impeaching rather than exculpatory, the Constitution did not require its disclosure prior to Mayes' guilty plea. For the foregoing reasons, I recommend dismissal of Ground One of the Petition asserting that Mayes' due process rights under *Brady v. Maryland* were violated.

## 2. Ground Two: Knowing use of perjured testimony by the prosecutor

According to Mayes, "[t]he prosecution knowingly used false testimony (count 8 murder in the 2nd degree)" because it "withheld photos of the interior of the victim's vehicle. Raymond Anderson placed petitioner in the passenger seat of the vehicle during the incident. The photos contradict his testimony. It is also noteworthy that Haskins and Lewis never placed the perpatrator [sic] in the victim's vehicle." Petition at 8, ¶ 22(B).

With regard to the photographs of Turner's vehicle, Mayes asserted that these constituted *Brady* material in connection with his C.P.L. § 440.10 motion. The trial court agreed that they could be considered favorable to the defense since prosecution witness Richard Anderson ("Anderson") testified at the grand jury that immediately prior to Turner being shot, he observed petitioner in the front passenger-seat of Turner's car. 2002 C.P.L. § 440.10 Order at 3. Petitioner claimed the photographs were material because the placement of the infant car-seat, "as depicted in the photographs, rendered it unlikely or impossible for him to have occupied the front passenger seat." *Id.* Related to the photographs is an item of police correspondence that Mayes contended is *Brady* material; it refers to a "bay [sic] seat" being found in the front passenger's seat of Turner's car. [6]

[6]   Given the existence of the photographs showing an infant car-seat in Turner's vehicle, the reference to "bay" presumably is a typographical error and should read "baby."

Mayes is claiming that the photographs refute Anderson's grand jury testimony that he observed Mayes in the front seat of Turner's car prior to the shooting. To the extent that Mayes is attempting to assert a claim that Anderson perjured himself when he testified before the grand jury, habeas relief is not warranted because the claim is not cognizable in this federal habeas proceeding and, in any event, the claim is without merit.

In *Lopez v. Riley,* 865 F.2d 30, 32 (2d Cir.1989), the Second Circuit considered whether claims of error in a state grand jury proceeding, including insufficiency of evidence and the prosecutor's failure to present exculpatory evidence, are cognizable in a habeas corpus proceeding. The *Lopez* court held that such challenges to a state grand jury proceeding do not state a basis for habeas relief, relying upon the Supreme Court's holding of *United States v. Mechanik,* 475 U.S. 66, 106 S.Ct. 938, 89 L.Ed.2d 50 (1986). *Mechanik* dealt with a constitutional attack upon a federal grand jury proceeding. The Supreme Court held in *Mechanik* that

> [T]he petit jury's subsequent guilty verdict means not only that there was probable cause to believe that the defendants were guilty as charged, but also that they are in fact guilty as charged beyond a reasonable doubt. Measured by the petit jury's verdict, then, any error in the grand jury proceeding connected with the charging decision was harmless beyond a reasonable doubt.

**\*10** 475 U.S. at 70 (footnote omitted). District courts in this circuit have held that *Lopez* 's and *Mechanik* 's "reasoning applies equally to a conviction achieved by a plea of guilty." *Alston v. Ricks,* No. 01 Civ. 9862(GWG), 2003 WL 42144, at \*7 (S.D.N.Y. Jan.7, 2003) (citing, *inter alia, Lloyd v. Walker,* 771 F.Supp. 570, 576–77 (E.D.N.Y.1991) ("Having admitted to the factual basis of the charges against him upon entering a plea of guilty, any error in the proceeding which led to his indictment is ... rendered harmless, and is not a cognizable claim in a federal habeas proceeding.") (internal citation omitted); *Ballard v. Costello,* No. 01–CV–1000, 2001 WL 1388297, at \*2 (E.D.N.Y. Nov. 2, 2001) (holding that "[petitioner's] guilty pleas cured any possible deficiencies in the grand

jury proceeding") (citations omitted)); *see also Hutchings v. Herbert,* 260 F.Supp.2d 571, 577 (W.D.N.Y.2003) (Larimer, D.J.) Petitioner's guilty plea cured any possible deficiency in the grand jury proceeding caused by his failure to testify there); *Jordan v. Dufrain,* No. 98 Civ. 4166(MBM), 2003 WL 1740439, at *3 (S.D.N.Y.Apr.2, 2003) (concluding that the petitioner had "admitted his guilt when he entered his guilty plea, and thus any errors in the grand jury proceedings were rendered harmless")

Furthermore, Mayes has not established that any prosecution witness committed perjury. *See United States v. Monteleone,* 257 F.3d 210, 219 (2d Cir.2001) (in the context of a motion for a new trial based upon newly discovered evidence of trial perjury, the defendant "In order to grant a new trial based on newly discovered evidence of trial perjury, the appellants must first demonstrate that the witness in fact committed perjury") (citing *United States v. Torres,* 128 F.3d 38, 49 (2d Cir.1997)). "A witness commits perjury if he gives false testimony concerning a material matter with the willful intent to provide false testimony, as distinguished from incorrect testimony resulting from confusion, mistake, or faulty memory." *Id.* (citing *United States v. Dunnigan,* 507 U.S. 87, 94, 113 S.Ct. 1111, 122 L.Ed.2d 445 (1993)). "Simple inaccuracies or inconsistencies in testimony do not rise to the level of perjury." *Id.* (citing *United States v. Sanchez,* 969 F.2d 1409, 1414–15 (2d Cir.1992)); *see also Mason v. Phillips,* 548 F.Supp. 674, 675 (S.D.N.Y.1982) (finding that petitioner failed to establish perjury was committed where "the trial record simply establishes that a police officer's trial testimony was inconsistent with a previous unsworn statement, which discrepancy merely raised an issue of credibility"). Whether "the introduction of perjured testimony requires a new trial depends on the materiality of the perjury to the jury's verdict and the extent to which the prosecution was aware of the perjury." *Id.* (quoting *United States v. Wallach,* 935 F.2d 445, 457 (2d Cir.1991)). If the prosecution was unaware of the perjury at the time of trial, the defendant must "show that the jury probably would have acquitted in the absence of the false testimony" to prevail on his motion for a new trial. *Torres,* 128 F.3d at 49. If the prosecution knew or should have known of the perjury, a new trial is warranted "if there is any reasonable likelihood that the false testimony could have affected the judgment of the jury." *Id.* (internal quotation marks and citation omitted).

**\*11**  The most Mayes has created here is a credibility issue between the witnesses which properly would be resolved by the finder of fact; he has not come close to establishing

that Anderson wilfully provided false and material testimony. Even if he could demonstrate that Anderson perjured himself in the grand jury, which I expressly do not find to be the case, Mayes cannot demonstrate that it affected his decision about whether to plead guilty to the Turner murder. As respondent argued and the trial court found, the issue of whether there was a baby carseat in the front seat of the car was not material for, it "it cannot be said that this information refuted Raymond Anderson's [grand jury] testimony." People's Opposition Affidavit dated June 6, 2002 at 5 ("Anderson never testified that the defendant sat in the passenger seat. Morever, ... the photographs reveal[ ] that petitioner could have sat in the passenger seat with the ba[b]y seat, which was tipped on its side. In addition, the ba[b]y seat could have been moved without any difficulty."); 2002 C.P.L. § 440.10 Order at 4 ("[D]espite the position of the infant seat, an individual, especially one attempting to remove the car radio, could have managed to occupy the front passenger seat of Turner's vehicle."). Furthermore, the prosecution had a substantial case against Mayes, as discussed above in this Report and Recommendation. *See Wong,* 78 F.3d at 82 (However, even if the prosecution knew of the perjury, "the subsequent discovery that a witness's testimony at trial was perjured will not warrant a new trial" if "independent evidence supports a defendant's conviction[.]") (citing *United States v. Reyes,* 49 F.3d 63, 68 (2d Cir.1995)). Accordingly, I recommend that Mayes' claims of perjury be dismissed.

### III. Conclusion

For the reasons set forth above, the Court recommends that petitioner's motion to amend be **denied** and that petitioner's original petition for a writ of habeas corpus be **denied.** Furthermore, the Court finds that petitioner has not made a "substantial showing of the denial of a constitutional right" pursuant to 28 U.S.C. § 2253(c)(2) ("A certificate of appealability may issue ... only if the applicant has made a substantial showing of the denial of a constitutional right."); *see also Lucidore v. New York State Div. of Parole,* 209 F.3d 107, 112 (2d Cir.2000). Therefore, the Court recommends that no certificate of appealability should issue with respect to any of petitioner's claims.

### ORDER

Pursuant to 28 U.S.C. § 636(b)(1), it is hereby **ORDERED,** that this Report and Recommendation be filed with the Clerk of the Court.

**ANY OBJECTIONS** to this Report and Recommendation must be filed with the Clerk of this Court within ten (10) days after receipt of a copy of this Report and Recommendation in accordance with the above statute, Fed.R.Civ.P. 72(b) and Local Rule 72.3(a) (3).

The District Court ordinarily will refuse to consider on *de novo* review arguments, case law and evidentiary material which could have been, but was not, presented to the Magistrate Judge in the first instance. *See, e.g., Patterson– Leitch Co., Inc. v. Massachusetts Municipal Wholesale Electric Co.,* 840 F.2d 985, 990–91 (1st Cir.1988).

 **\*12 Failure to file objections within the specified time or to request an extension of such time waives the right to appeal the District Court's Order.** *Thomas v. Arn,* 474 U.S. 140, 106 S.Ct. 466, 88 L.Ed.2d 435 (1985); *Wesolek v. Canadair Ltd.,* 838 F.2d 55 (2d Cir.1988); 28 U.S.C. § 636(b) (1); Fed.R.Civ.P. 72, 6(a), 6(e).

The parties are reminded that, pursuant to Rule 72.3(a)(3) of the Local Rules for the Western District of New York, "written objections shall specifically identify the portions of the proposed findings and recommendations to which objection is made and the basis for such objection and shall be supported by legal authority." **Failure to comply with the provisions of Rule 72.3(a)(3), or with the similar provisions of Rule 72.3(a)(2) (concerning objections to a Magistrate Judge's Decision and Order), may result in the District Court's refusal to consider the objection.**

Let the Clerk send a copy of this Order and a copy of the Report and Recommendation to petitioner and respondent.

**IT IS SO ORDERED.**

**All Citations**

Not Reported in F.Supp.2d, 2009 WL 2601106

---

**End of Document**

© 2023 Thomson Reuters. No claim to original U.S. Government Works.

Evans v. Poole, Not Reported in F.Supp.2d (2005)

2005 WL 2847769

2005 WL 2847769
Only the Westlaw citation is currently available.
United States District Court,
S.D. New York.

Sean EVANS, Petitioner,
v.
T. POOLE, Superintendent of Five
Points Correctional Facility, Respondent.

No. 05 Civ. 5951(LAK).
|
Oct. 31, 2005.

ORDER

KAPLAN, J.

*1  Petitioner was convicted in New York Supreme Court, Bronx County, on his plea of guilty of criminal sale of a controlled substance in the third degree and sentenced, as a second felony offender, to an indeterminate term of four to nine and one-half years' imprisonment. He appealed on the ground that the sentencing court improvidently refused to exercise its discretion when it refused to allow him a second chance at a drug treatment program before imposing the sentence of imprisonment, but the Appellate Division unanimously affirmed the judgment. *People v. Evans,* 294 A.D.2d 223 (1st Dept .), *leave to appeal denied,* 98 N.Y.2d 696 (2002).

Petitioner then moved *pro se,* pursuant to N.Y.Crim. Proc. L. § 440.10, to vacate his conviction, principally on the ground that the People had been guilty of prosecutorial misconduct in that one of the officers who had arrested him had testified before the grand jury that the substance recovered on one of the dates in question had field tested positive for heroin when, in fact, the field test was negative. The motion was denied by the Honorable Phyliss Skloot Bamberger in a careful decision. Darpino Aff., Ex. 9. Leave to appeal to the Appellate Division was denied. *Id.* Ex. 13. Petitioner now seeks a writ habeas corpus on the same ground raised in his Section 440.10 motion.

Federal habeas review is limited to claims that a prisoner's conviction violated the Constitution, laws or treaties of the United States. 28 U.S.C. § 2254(a); *see, e.g., Estelle v. McGuire,* 502 U.S. 62, 67-68 (1991). As there is no federal constitutional right to a grand jury in a state criminal prosecution, *e.g., Fields v. Soloff,* 920 F.2d 1114, 1118 (2d Cir.1990), alleged defects in state grand jury proceedings are not cognizable on a petition for federal habeas relief. *E.g., United States v. Mechanik,* 475 U.S. 66 (1986); *Lopez v. Riley,* 865 F.2d 30, 31-32 (2d Cir.1989). In any case, petitioner's claim is entirely without merit for the reasons set forth in Justice Bamberger's decision. Darpino Aff. Ex. 9, at 4.

Accordingly, the petition is denied and the proceeding dismissed. The Clerk shall close the case. A certificate of appealability is denied, and the Court certifies that any appeal herefrom would not be taken in good faith within the meaning of 28 U.S.C. § 1915(a)(3).

SO ORDERED.

**All Citations**

Not Reported in F.Supp.2d, 2005 WL 2847769

---

End of Document                    © 2023 Thomson Reuters. No claim to original U.S. Government Works.

2006 WL 3746739

2006 WL 3746739
Only the Westlaw citation is currently available.
United States District Court,
S.D. New York.

Chad SIMMONS, Petitioner,
v.
R. MCGINNIS, Superintendent, Southport
Correctional Facility, Respondent.

No. 04 Civ. 6150 PACDF.
|
Dec. 19, 2006.

*OPINION & ORDER*

CROTTY, J.

**\*1** Petitioner Chad Simmons ("Simmons") seeks a writ of habeas corpus pursuant to 28 U.S.C. § 2254, challenging his October 1998 conviction and March 1999 sentence, following a jury trial, for four counts of Robbery in the First Degree and two counts of Robbery in the Second Degree. Simmons asserts two claims for relief from his conviction: (1) that his identity as one of the perpetrators of the robbery was not proven beyond a reasonable doubt; and (2) that the sentence imposed is excessive in comparison to that of his co-defendant.

This case was referred to United States Magistrate Judge Debra Freeman, who issued her Report and Recommendation ("R & R") on November 22, 2006, recommending the denial of Simmons's Petition. The Magistrate Judge provided ten days for written objections, pursuant to Federal Rule of Civil Procedure 72(b), and specifically advised that the failure to file objections "will result in a waiver of objections and will preclude appellate review" (R & R 24). No objections have been filed.

DISCUSSION

"To accept the report and recommendation of a magistrate, to which no timely objection has been made, a district court need only satisfy itself that there is no clear error on the face of the record." *Wilds v. United Parcel Serv.,* 262 F.Supp.2d 163, 169 (S.D.N.Y.2003). As described more completely in

the R & R, Simmons has not shown that his conviction and sentence were contrary to, or an unreasonable application of, clearly established federal law. *See* 28 U.S.C. § 2254(d). The Court agrees with Magistrate Judge Freeman's determination that neither Simmons's conviction nor his sentence violated the Constitution or laws of the United States, and finds no error in Magistrate Judge Freeman's report. Accordingly, the Court accepts and adopts the Report and Recommendation as its opinion, and denies Simmons's petition for a writ of habeas corpus.

I decline to issue a certificate of appealability pursuant to 28 U.S.C. § 2253(c)(2). The petitioner has not made a substantial showing of a denial of a federal right, and appellate review is therefore not warranted. Further, Simmons did not file objections to the Report and Recommendation, as he was required to do in order to preserve his right to appeal. Pursuant to 28 U.S.C. § 1915(a), I also find that any appeal from this order would not be taken in good faith. The Clerk of the Court is directed to close out this case.

SO ORDERED

REPORT AND RECOMMENDATION

FREEMAN, Magistrate J.

*Pro se* petitioner Chad Simmons ("Petitioner") seeks a writ of habeas corpus under 28 U.S.C. § 2254, challenging his conviction in New York State Supreme Court, Bronx County. Upon a jury verdict, Petitioner was found guilty of four counts of robbery in the first degree, in violation of N.Y. Penal L. §§ 160.15[2] and 160.15[4], and two counts of robbery in the second degree, in violation of Section 160.10[1]. (*See* Affidavit of Alexis Pimentel in Opposition, sworn to January 14, 2005 ("Pimentel Aff.") (Dkt.3) ¶ 3.) Petitioner was sentenced as a second violent felony offender (Sentencing Tr. at 4, 12)[1] to concurrent, determinate terms of 12 and one-half years on the first-degree robbery counts, and seven years on the second-degree robbery counts (*see* Pimental Aff. ¶ 3). Petitioner is currently incarcerated at Southport Correctional Facility. (*See id.*)

1    The transcript of Petitioner's trial is comprised of three parts, referred to herein as follows: "Pre-Trial Tr." refers to the transcript of Petitioner's pre-trial *Mapp/Wade/Dunaway* hearing, conducted from October 1 to November 6, 1997; "Tr." refers to

the transcript of Petitioner's trial and the re-opened *Wade* hearing, which includes proceedings from September 24 to October 2, 1998; "Sentencing Tr." refers to the transcript of Petitioner's sentencing, conducted on March 30, 1999.

**\*2** The petition alleges two grounds for habeas relief: first, that Petitioner's identity as one of the robbers was not established beyond a reasonable doubt, and, second, that Petitioner's sentence was excessive in comparison to the sentence of his co-defendant. (*See* Pet. at ¶¶ 13(A)-(B).) [2] Respondent argues that the petition should be dismissed because Petitioner's first claim is without merit and his second claim is not cognizable on habeas review. (*See* Respondent's Memorandum of Law, dated January 2005 ("Resp.Mem.") at 3-8.) For the reasons set forth below, I recommend that the petition be dismissed.

[2] "Pet." refers to Petitioner's petition for a writ of habeas corpus under 28 U.S.C. § 2254, dated April 5, 2004.

*FACTUAL BACKGROUND*

A. *The Robbery*

The robbery at issue occurred on February 20, 1997. (Tr. 254, 428 .) According to the testimony presented at trial by the victims of that robbery, Frederico Morales ("Frederico") and his brother, Juan Morales ("Juan"), the brothers were robbed at gunpoint in the elevator of the building where their third brother, Miguel Morales ("Miguel") lived. (*Id.* at 254, 263-64, 428, 432-33.) At the time, Frederico had been staying with Miguel, in Miguel's second-floor apartment at 700 Westchester Avenue, and Juan had been "visiting." (*Id.* at 254-55, 285-87, 428-29.) Miguel asked his brothers to get him a cigarette from a neighbor on the eighth floor. (*Id.* at 255-56, 429.) As the building elevator was not accessible from the second floor, Frederico and Juan first walked downstairs, to the lobby of the building, to access the elevator from there. (*Id.* at 256, 429-30.)

Although the brothers were able to enter the elevator from the lobby, the elevator failed to move, and, at some point, two other men (later identified as Petitioner and Allen Washington ("Washington")) entered the elevator, as well. (*Id.* at 256, 259-60, 430-31.) Both Frederico and Juan testified at trial that the elevator was well-lit, and that they could see both of the intruders clearly. (*Id.* at 266-67, 437-38.) Frederico testified at trial that Petitioner was wearing a "bubble jacket" and a hat,

and that Washington was bald and was wearing "green with some boots." (*Id* . at 315; *see also id.* at 283.)

Once Petitioner and Washington had entered the elevator with Frederico and Juan, the elevator door closed, but again the elevator did not move. (*Id.* at 262, 430.) Petitioner and Washington then opened the elevator door and exited. (*Id.* at 263, 430.) The brothers shut the elevator door a third time, but the elevator still did not move. (*Id.* at 263, 430.)

When the elevator doors opened again, Petitioner and Washington pushed Juan and Frederico towards the back of the elevator and caused the elevator door to shut. (*Id.* at 263; *see also id.* at 430.) While Washington then held a gun first to Juan's head and then to Frederico's, Petitioner and Washington quickly searched the brothers. (*Id.* at 263, 430, 432.) Washington "yanked" off Juan's earring and chain, and also took an imitation gun that Juan had in his pocket, [3] and Petitioner took Frederico's watch. (*Id* . at 263-64, 432-33.) Finally, after telling the brothers to face the rear of the elevator, Petitioner and Washington fled. (*Id.* at 264; *see also id.* at 433.) According to Juan, the entire incident in the elevator with Petitioner and Washington took place in "a quick minute." (*Id.* at 437.)

[3] According to Juan, he had an imitation gun in his pocket because he was wearing a gold chain and was afraid that he would be robbed. (*Id.* at 439-40.)

B. *The Victims' Initial Identification of Petitioner and Washington*

**\*3** Following the robbery, Frederico and Juan ran upstairs to Miguel's apartment, where, through a window, they saw Petitioner and Washington on the street below. (*Id.* at 264, 433-34.) They then ran back downstairs, and, upon seeing a police car outside the building, informed two police officers, Officer Angel Rosa ("Rosa") and Officer Hector Santiago ("Santiago"), that they had just been robbed. (*See id.* at 5, 265, 355, 434.) At the officers' request, the brothers joined the officers in the patrol car to help search for the robbers. (*See id.* at 5-6, 265, 434.) The officers immediately drove about two blocks to Trinity Avenue (*id.* at 6, 267-68, 434), where street lights enabled both police officers to observe clearly two men fitting the Morales brothers' initial description of the robbers (*see id.* at 10-11, 360; *see also id.* at 268, 438). As the patrol car approached the two men, the brothers pointed and said, "That's them." (*Id.* at 434-35; *see also id.* at 265.)

2006 WL 3746739

### C. *Petitioner's Arrest*

The officers turned onto Trinity Avenue and positioned the police car in a "tactical position," pointing the vehicle straight at Petitioner and Washington, and opening the car doors to use as cover for potential gun fire. (*Id.* at 7-8; *see also id.* at 356.) Both officers pointed their guns at the men and yelled for them to "get on the ground." (*Id.* at 8; *see also id.* at 357.) Rosa testified that, before lying down, Washington, threw a gun (later recovered and identified as a loaded .357 handgun) under the car. (*Id.* at 10, 357, 363, 381-82, 435, 470-72.) Santiago testified that Petitioner, for his part, entirely refused the direct order to get down. (*See id.* at 8.) Instead, Petitioner "reached into his waist area," pulled out an object, threw "the object on the ground" (*id.* at 8, 126), and fled toward Cauldwell Avenue (*id* . at 8). Santiago immediately pursued him on foot. (*See id.* at 8, 357.)

Santiago testified that, while in pursuit of Petitioner, he observed Petitioner turn left onto another street. (*Id.* at 8.) Briefly losing sight of him at that point, Santiago called for back-up, believing that Petitioner "was hiding in one of those alleyways." (*See id.* at 8-9.) While Santiago was waiting for back-up to arrive, Petitioner left his hiding spot and approached Santiago, who handcuffed and arrested him. (*Id.* at 9, 11.) Once additional officers arrived on the scene, the police searched the alley and found a bubble jacket, which matched the brothers' description of the clothes that Petitioner had been wearing at the time of the crime. (*Id.* at 10; *see also id.* at 321-22.) The police also found, in the alley, an earring and a watch (*id.* at 10, 135-36), which were later identified as Juan's earring and Frederico's watch (*id.* at 329-30, 493).

After Petitioner was arrested, Frederico was brought by police to the scene of the arrest. (*Id.* at 265, 271-72.) Frederico, who saw Petitioner in handcuffs and, by that time, surrounded by eight or ten officers, identified Petitioner as one of the men who had robbed him. (*Id.* at 132, 135, 265, 269, 271.) Later, at the police precinct, Juan similarly identified Petitioner as one of the robbers. (*Id.* at 499-500.) It appears, however, that Juan's identification was made only after Frederico had told him that Petitioner had been arrested (*see id.* at 583, 626-27 (Juan knew that Simmons had been "caught" because his brother had told him), and after Juan had seen Petitioner in a holding cell at the precinct (*see id.* at 570-71, 585 (while sitting in the precinct, Juan saw Petitioner being held "where they keep people at the jail")).

**\*4** At trial, Juan again identified Petitioner as one of the robbers. (*Id.* at 431.) When Frederico, however, was asked at trial whether he saw the robbers in the courtroom, he initially answered, "No." (*Id.* at 257.) Frederico later explained that he did not recognize Petitioner in court because Petitioner had much longer hair at the time of the robbery; Frederico also noted that he had difficulty seeing "from far," and thus had trouble recognizing Petitioner from the witness stand. (*Id.* at 259, 283.)

### D. *Washington's Arrest*

After Officer Rosa saw Santiago run after Petitioner, Rosa picked up the object (later identified as Juan's imitation gun) that Petitioner had thrown on the ground (*id.* at 27-28, 357, 360-61), and also began to chase Petitioner (*id.* at 357, 435). This, however, left Washington, who was not handcuffed, momentarily unguarded, giving him the chance to jump to his feet and attempt to flee in the opposite direction, toward Westchester Avenue. (*See id* . at 357-58, 384, 392-93, 435.) Seeing this, Juan left the patrol car and ran after Washington (*id.* at 435), although he quickly halted his pursuit because he "couldn't really reach up to him" (*id.* at 435). Rosa, too, quickly reversed direction to chase Washington, instead of Petitioner. (*Id.* at 358.) Rosa initially started to chase Washington on foot, but then returned to his patrol car (with Frederico still in the back seat), to pursue Washington by car. (*Id.* at 265, 358.)

Rosa pursued Washington as far as the housing projects across Westchester Avenue, but, when Washington ran into the projects, Rosa was unable to follow him further. (*Id.* at 358.) Eventually, Washington was caught and apprehended by other officers. Police Officer David Lepore ("Lepore") testified that, while on patrol on Washington Avenue, he heard a transmission that officers needed assistance in apprehending Washington. (*Id.* at 177.) He then observed a black man run in front of his patrol car and into the projects. (*Id.* at 177-78.) A livery cab driver pulled up and told Lepore that "that was the individual the police were chasing." (*Id.*) Because Lepore "couldn't get [the] car up over the curb" (*id.* at 178), Lepore exited his car and pursued Washington on foot, calling for back-up (*id.*). After chasing Washington on foot for eight to ten blocks (*id.*), Lepore was picked up by another patrol car at the intersection of Kelly Street and Leggett Avenue (*id.* at 179). That car quickly caught up to Washington, who was then apprehended by Lepore and others. (*Id.*)

Meanwhile, Juan, who had initially tried to chase Washington himself, had been picked up by yet another patrol car, and was brought to the scene of Washington's apprehension. (*Id.* at 180, 229, 436.) Officer Robert O'Brien ("O'Brien") pulled

Simmons v. McGinnis, Not Reported in F.Supp.2d (2006)
Case 9:21-cv-00708-BKS-TWD Document 14 Filed 11/03/23 Page 82 of 171
2006 WL 3746739

Washington to the side to search him, so that Juan's view of Washington was blocked. (*Id.* at 230, 247.) In Washington's pocket, O'Brien found a medallion with a red stone, on a chain. (*Id.* at 231.) O'Brien then approached Juan, and without showing him the medallion, asked him to describe the jewelry that had been taken in the robbery. (*Id.* at 231-32, 436, 438; *see also id.* at 181-82.) Juan's description matched the medallion that O'Brien had found in Washington's pocket. (*Id.* at 436, 438.)

**\*5** Both of the Morales brothers identified Washington at trial as the man who had held the gun during the robbery. (*Id.* at 263, 432, 454.)

### PROCEDURAL HISTORY

A. *Pre-Trial Hearings*

Beginning on October 1, 1997, a pre-trial combined *Mapp/ Wade/Dunaway* hearing was held before the Honorable Phylis Skloot Bamberger, Justice of the New York State Supreme Court, Bronx County. [4] At that hearing, Petitioner's counsel sought to suppress physical evidence, identification testimony, and statements obtained as a result of Petitioner's allegedly unlawful arrest. The trial court denied Petitioner's motion to suppress in all respects. (Pre-Trial Tr. at 180-82.)

[4] This hearing was held pursuant to: (1) *Mapp v. Ohio,* 367 U.S. 643 (1961), to determine whether evidence was obtained in violation of Petitioner's Fourth Amendment right to be free from unreasonable search and seizure; (2) *United States v. Wade,* 388 U.S. 218 (1967), to determine whether Petitioner's pretrial identification was the result of impermissibly suggestive procedures; and (3) *Dunaway v. New York,* 442 U.S. 200 (1979), to determine whether there was probable cause for Petitioner's arrest.

B. *Trial*

Petitioner's jury trial began September 24, 1998. At trial, the prosecution offered the testimony of both Frederico and Juan Morales, who both described in detail the events of February 20, 1997. (Tr. at 254-333, 426-500, 615-33.) The prosecution also called Police Officers Santiago (*id.* at 2-160), Lepore (*id.* at 175-223), and O'Brien (*id.* at 227-49), as well as Officer Rosa, who described the physical evidence linking Petitioner to those events as well as the circumstances surrounding

Petitioner's arrest (*id.* at 340-410), and a ballistics expert, who testified that Washington's firearm was loaded and operable (*id.* at 646-81). Petitioner presented no witnesses and did not testify on his own behalf. (*See* Pimentel Aff., Ex. 2 (Respondent's Brief, dated April 2003) at 10.)

On October 1, 1998, the court held a re-opened *Wade* hearing. (*Id.* at 529-603.) Petitioner argued that, to the extent Juan had identified him as one of the robbers, any such identification (including Juan's in-court identification of Petitioner) should be suppressed because certain "suggestive" circumstances had made the identification suspect. In particular, Petitioner argued that Juan's identification of Petitioner at the police precinct could not be considered reliable, given that the identification was made after Juan had already been told by his brother that Petitioner had been arrested and after Juan had seen Petitioner in a holding cell. (*See id.* at 595-98.) The prosecution argued that these circumstances were inadvertent and accidental, that Juan's identification of Petitioner was confirmatory in nature, and that Juan-who had previously observed Petitioner at close range in the elevator, and then observed him again through Miguel's window and finally at the scene of Petitioner's arrest-had an independent source for the in-court identification. (*Id.* at 598-601.) The court accepted the prosecution's arguments and denied Petitioner's motion to suppress (*id.* at 603), as well as Petitioner's related motion for a mistrial based, in part, on an alleged bad faith failure by the prosecution to disclose information about what had transpired at the precinct (*id.* at 604-08.)

Upon completion of the trial, the jury found Petitioner guilty on four counts of robbery in the first degree and two counts of robbery in the second degree. (*See supra* at 1.) On March 30, 1999, Petitioner was sentenced to prison as set forth above. (*See id.*)

C. *Direct Appeal*

**\*6** Petitioner appealed his conviction to the Appellate Division, First Department. (*See* Pimentel Aff., Ex. 1 (Brief for Appellant-Defendant, dated August 2002); Pet. ¶¶ 9(a)-(d).) On appeal, Petitioner raised each of the two claims that he now asserts in his habeas petition, *i.e.,* that the evidence of his identity was insufficient to support the verdict and that his sentence was excessive. (*See* Pimentel Aff., Ex. 1 at 13, 19; Pet. ¶ 9(d).) On June 5, 2003, the Appellate Division unanimously affirmed Petitioner's conviction. *See People v. Simmons,* 759 N.Y.S.2d 672, 672 (1st Dep't 2003). With respect to the sufficiency of the evidence as to Petitioner's identity, the Appellate Division stated that it saw "no basis for

Simmons v. McGinnis, Not Reported in F.Supp.2d (2006)

2006 WL 3746739

disturbing the jury's determinations concerning identification and credibility," given the "reliable identifications by the two victims, each of whom had an adequate opportunity to observe [Petitioner]" and the "extensive circumstantial evidence linking defendant to the crime." (*Id.*) In addition, the Appellate Division "perceive[d] no basis for reducing defendant's sentence." (*Id.*)

On July 16, 2003, Petitioner sought leave to appeal the affirmance of his conviction to the New York Court of Appeals. (*See* Pimenel Aff., Ex. 4 (letter to Judge Judith S. Kaye, Court of Appeals, dated July 16, 2003).) In his letter seeking leave to appeal, Petitioner raised the same claims he had raised before the Appellate Division. (*See id.*) On September 4, 2003, the Court of Appeals denied Petitioner's leave to appeal. *See People v. Simmons,* 100 N.Y.2d 624, 624 (2003) (Table).

Petitioner timely filed the instant petition on April 5, 2004, in the United States District Court for the Northern District of New York, which is where Petitioner was in custody. (*See* Pet.) [5] The matter was transferred to this Court by the Northern District on May 13, 2004 (*see* Order (Peebles, J.)), and venue is appropriate in this Court under 28 U.S.C. § 2241(d), as Petitioner was convicted and sentenced in Bronx County. *See* 28 U.S.C. § 2241(d) (habeas application may be filed either in the district court for the district where the petitioner is in custody, or in the district where the petitioner was convicted and sentenced); *see also, e.g., Groark v. Phillips,* No. 04 Civ. 7152(LAP)(AJP), 2004 WL 2359831, at *1 (S.D.N.Y. Oct. 19, 2004) (transferring habeas petition from Southern to Eastern District of New York, because petitioner was convicted and sentenced by state court located within Eastern District).

[5]    Although the petition bears a stamp indicating that it was filed in the Northern District of New York on April 12, 2004, a *pro se* prisoner's papers are deemed filed when they are handed over to prison officials for forwarding to the Court. *See Houston v. Lack,* 487 U.S. 266, 270 (1988). Thus, in the absence of evidence to the contrary, the Court will deem the petition to have been filed on April 5, 2004, the date Petitioner signed it. *See, e .g., Rhodes v. Senkowski,* 82 F.Supp.2d 160, 165 (S.D.N.Y.2000).

*DISCUSSION*

I. *APPLICABLE LEGAL PRINCIPLES*

A. *Exhaustion*
A federal court may not consider a petition for a writ of habeas corpus unless the petitioner has exhausted all state judicial remedies. 28 U.S.C. § 2254(b)(1)(A); *see also Picard v. Connor,* 404 U.S. 270, 275 (1971); *Dorsey v. Kelly,* 112 F.3d 50, 52 (2d Cir.1997). To satisfy the exhaustion requirement, a habeas petitioner must have "fairly presented" his claims to the state courts, thereby affording those courts the "initial 'opportunity to pass upon and correct' alleged violations of ... prisoners' federal rights." *Picard,* 404 U.S. at 275 (quoting *Wilwording v. Swenson,* 404 U.S. 249, 250 (1971)).

 *7  Petitioners can ensure that state courts are "alerted to the fact that [they] are asserting claims under the United States Constitution," *Duncan v. Henry,* 513 U.S. 364, 365-66 (1995), by presenting their claims in a manner demonstrating one or more of the following:

> (a) reliance on pertinent federal cases employing constitutional analysis, (b) reliance on state cases employing constitutional analysis in like fact situations, (c) [an] assertion of the claim in terms so particular as to call to mind a specific right protected by the Constitution, [or] (d) [an] allegation of a pattern of facts that is well within the mainstream of constitutional litigation.

*See Daye v. Atty. Gen. of New York,* 696 F.2d 186, 194 (2d .Cir.1982); *see also Petrucelli v. Coombe,* 735 F.2d 684, 688 (2d Cir.1984). Once the state courts are apprised of the constitutional nature of a petitioner's claims, the exhaustion requirement is fulfilled when those claims have been presented to "the highest court of the pertinent state." *Bossett v. Walker,* 41 F.3d 825, 828 (2d Cir.1994) (citing *Pesina v. Johnson,* 913 F.3d 53, 54 (2d Cir.1990)).

B. *Standard of Review*
Where a federal constitutional claim has been adjudicated on the merits by the state court, this Court must accord

substantial deference to the state court's decision under the standard of review dictated by the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"). *See* 28 U.S.C. § 2254(d); *see also Sellan v. Kuhlman,* 261 F.3d 303, 311 (2d Cir.2001) (noting that "adjudicated on the merits" means "a decision finally resolving the parties' claims, with *res judicata* effect, that is based on the substance of the claim advanced, rather than on a procedural, or other, ground"). The relevant section of AEDPA provides that

> [a]n application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim-(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).

Under AEDPA, a state court decision is "contrary to" clearly established federal law where the state court either applies a rule that "contradicts the governing law" set forth in Supreme Court precedent or "confronts a set of facts that are materially indistinguishable from a [Supreme Court] decision" and arrives at a different result. *Williams v. Taylor,* 529 U.S. 362, 405-06 (2000). An "unreasonable application" of clearly established federal law occurs when the state court identifies the correct governing legal principle, but unreasonably applies that principle to "a set of facts different from those of the case in which the principle was announced." *Lockyer v. Andrade,* 538 U.S. 63, 73-76 (2003). In other words, "the state court's decision must have been more than incorrect or erroneous"-rather, "[t]he state court's application must have been 'objectively unreasonable.' " *Wiggins v. Smith,* 539 U.S. 510, 520-21 (2003) (quoting *Williams,* 529 U.S. at 409).

## II. *PETITIONER'S CLAIMS*

A. *Insufficiency of the Evidence of Petitioner's Identity*

**\*8** As his first claim for habeas relief, Petitioner asserts that his "identity as one of the [r]obbers was not established beyond a reasonable doubt." (Pet.¶ 12(A).) Petitioner raised this claim before the Appellate Division in federal terms, by citing the United States Constitution and Supreme Court precedent in his appellate brief (*see, e.g.,* Pimentel Aff., Ex. 1 at 13-15), and he specifically sought leave to appeal the Appellate Division's rejection of this claim to the New York Court of Appeals (*see* Pimentel Aff., Ex. 4). Thus, the claim is fully exhausted for purposes of habeas review. *See McKethan v. Mantello,* 292 F.3d 119, 122 (2d Cir.2002). Further, because the Appellate Division adjudicated this claim on the merits, finding that "[t]he verdict was based on sufficient evidence," *Simmons,* 759 N.Y.S.2d at 672, this Court must now review the claim under the deferential standard of review set forth in AEDPA, *see* 28 U.S.C. § 2254(d). Based on that standard, there is no reason for this Court to disturb the decision of the state court, upholding Petitioner's conviction.

The Due Process Clause of the Fourteenth Amendment prohibits conviction "except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which [the defendant] is charged." *In re Winship,* 397 U.S. 358, 364 (1970). "In challenging the sufficiency of the evidence to support his conviction," however, "a defendant bears a heavy burden." *United States v. Giraldo,* 80 F.3d 667, 673 (2d Cir.1996), *abrogated on other grounds by Muscarello v. United States,* 524 U .S. 125 (1998). "[T]he critical inquiry on review of the sufficiency of the evidence to support a criminal conviction must be not simply to determine whether the jury was properly instructed, but to determine whether the record evidence could reasonably support a finding of guilt beyond a reasonable doubt." *Jackson v. Virginia,* 443 U.S. 307, 318 (1979). Such an inquiry "does not require a court to 'ask itself whether *it* believes that the evidence at the trial established guilt beyond a reasonable doubt,' ' rather "the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Id.* at 318-19 (emphasis in original) (citations omitted); *see also United States v. Kwong,* 14 F.3d 189, 193 (2d Cir.1994) (a court "must view the evidence, whether direct or circumstantial, in the light most favorable to the government, crediting every inference that could have been drawn in its favor"). In making

Case 9:21-cv-00708-BKS-TWD    Document 14    Filed 11/03/23    Page 85 of 171
Simmons v. McGinnis, Not Reported in F.Supp.2d (2006)
2006 WL 3746739

this determination, "pieces of evidence must be viewed in conjunction, not in isolation ." *United States v. Podlog,* 35 F.3d 699, 705 (2d Cir.1994) (citation omitted).

Furthermore, the jury retains "exclusive[ ] responsib[ility] for determining a witness' credibility." *United States v. Strauss,* 999 F.2d 692, 696 (2d Cir.1993) (citation omitted). "The role of this Court is clear: '[f]ederal habeas courts are not free to reassess the facts[-]specific credibility judgments by juries or to weigh conflicting testimony. On collateral review this Court must presume that the jury resolved any questions of credibility in favor of the prosecution." ' *Vera v. Hanslmaier,* 928 F.Supp. 278, 284 (S.D.N.Y.1996) (quoting *Anderson v. Senkowski,* No. 92 Civ. 1007(CPS), 1992 WL 225576, at *3 (E.D.N.Y. Sept. 3, 1992), *aff'd,* 992 F.2d 320 (2d Cir.1993)). A petitioner also cannot prevail on a claim that the evidence was legally insufficient to support the verdict merely by showing that there were inconsistencies in the evidence. *See, e.g., United States v. Vasquez,* 267 F.3d 79, 91 (2d Cir.2001) ("The jury chose to believe the witnesses' testimony despite any inconsistencies. We will defer to the jury's assessment of credibility."), *cert. denied,* 534 U.S. 1148 (2002); *Gruttola v. Hammock,* 639 F.2d 922, 928 (2d Cir.1981) (insufficiency claim rejected because jury was entitled to believe prosecution witnesses despite inconsistent testimony).

 **\*9** In this case, Petitioner's only challenge to the sufficiency of the evidence focuses on the evidence of his "identity," which is properly considered an element of the crime. *See People v. Warren,* 76 N.Y.2d 773, 775 (1990) (holding that "the identity of defendant as the person who had committed the crime" is an element that "must be established by the People beyond a reasonable doubt"); *see also Benloss v. Miller,* No. 04 Civ. 4780(SJF)(MLO), 2005 WL 1311847, at *5 (E.D.N.Y. May 5, 2005) (finding that "[the evidence] was legally sufficient to establish beyond a reasonable doubt ... defendant's identity"); *Simmons v. Dalsheim,* 543 F.Supp. 729, 735 n. 2 (S.D.N.Y.1982) (rejecting "petitioner's contention that the evidence adduced at his trial was constitutionally insufficient to establish his identity as the perpetrator of the crime").

Petitioner does not dispute that his co-defendant, Washington, was involved in robbing the Morales brothers. Moreover, Petitioner appears to admit that he was the man who was with Washington on Trinity Avenue, when the brothers first identified them to the police as the robbers. (*See* Pimentel Aff., Ex. 1 at 13 (in arguing that identification was suggestive,

Petitioner concedes that he "was seen with the codefendant, who was obviously one of the culprits since [Juan's] chain was recovered from him").) Petitioner does, however, challenge the sufficiency of the evidence that he was actually present in the elevator and participated in the robbery in concert with Washington.

In particular, Petitioner points out in his petition that Frederico was unable to identify him in court. (Pet. ¶ 12 (noting that "[w]hen asked in Court did victim recognize the accused robbers, victim clearly stated 'No' ").) Petitioner also challenges the reliability of the identifications made by both Morales brothers before trial, given "the quickness of the incident," the fact that Petitioner was initially identified by Frederico "at a 'show-up' when [Petitioner] was already handcuffed and surrounded by police," and "the highly suggestive circumstances" of Juan's subsequent identification of Petitioner at the police precinct. (*Id.*) Further, based on Petitioner's brief to the Appellate Division, where these points are developed more fully, Petitioner argues that inaccuracies and inconsistencies in the brothers' testimony demonstrate that their identifications of Petitioner were inherently unreliable.

As to Frederico, Petitioner argues in his state brief not only that the circumstances of the "show-up" identification were suggestive, but also that Frederico showed himself at trial to be suggestible, when he testified to facts of which he could not have had personal knowledge, and which therefore must have been suggested to him by the police. (*See* Pimentel Aff., Ex. 1 at 13-14, 17-18 (arguing that Frederico's testimony that he saw Petitioner hiding in the alley showed that Frederico was "particularly susceptible to suggestion," as Frederico did not actually arrive at the scene of Petitioner's arrest until after Petitioner had already come out of the alley and had surrendered to police).) Petitioner also argues that Frederico's explanation at trial as to why he could not identify Petitioner in the courtroom (*i.e.,* the change in the length of Petitioner's hair) was "nonsensical," given that, at the time of the robbery, Petitioner was supposedly wearing a hat that prevented Frederico from seeing his hair. (*See id.* at 16-17.)

 **\*10** As to Juan, Petitioner's state brief highlights inconsistencies in Juan's testimony regarding the clothes that Petitioner was supposedly wearing at the time of the robbery. At one point, Juan testified that, during the robbery Petitioner was wearing a "bubble jacket"; yet, at another point, Juan testified that Petitioner was wearing the same clothing as was shown in his arrest photograph-which did not

include such a jacket. (*See id.* at 17.) Petitioner additionally suggests that Juan may have had difficulty making an accurate identification of Petitioner because Juan, who had been on medication since childhood to control "hallucinations," had failed to take his medication in the week prior to the robbery. (*See id.* at 3; *see also id.* at 18 (highlighting Juan's testimony that counsel should ask Frederico about what transpired at the precinct, because he "ain't crazy like me").) Finally, Petitioner argues that Juan's in-court identification of Petitioner should not be considered credible because Juan's information about Petitioner's purported involvement in the crime had come from Frederico at the precinct (*see id.* at 17 (contending that "it was apparent that Juan Morales depended on his brother Frederico rather than his independent observations in his testimony"), and Frederico's own identification of Petitioner was suspect for the reasons outlined above (*see id.* at 18 ("Juan Morales ... may well have adopted Fredrico's identification of appellant which was itself based on suggestive circumstances."))).

Despite these arguments, however, there was sufficient evidence in the record to support the verdict against Petitioner. First, there was, as the Appellate Division noted, substantial circumstantial evidence connecting Petitioner to the crime. Petitioner himself apparently concedes that he was found with Washington shortly after the crime, in close proximity to the building where the robbery took place. Petitioner was then observed throwing on the ground an object that Juan later identified as his imitation gun. After Petitioner tried to flee, the police apprehended him emerging from an alley. In that alley, the police then found a bubble jacket that matched the Morales brothers' initial description of the clothing worn by one of the robbers, as well as an earring and a watch later identified as belonging to Juan and Frederico, respectively. Even without direct eyewitness testimony, this evidence-placing Petitioner near the scene of the crime, in the company of the other robber, and further placing Petitioner in the two locations where proceeds of the crime were recovered by the police-would be sufficient to support the verdict. *See Kwong,* 14 F.3d at 193 (noting that "identity can be inferred through circumstantial evidence") (citing *United States v. Capozzi,* 883 F.2d 608, 617 (8th Cir.1989)); *see also, e.g., Maldonado v. Scully,* 86 F.3d 32, 36 (2d Cir.1996) (upholding the validity of a conviction despite a lack of direct evidence, because "[v]iewed in its totality, the circumstantial evidence" was sufficient for a jury to find petitioner guilty and "a lack of direct evidence does not preclude a conviction on circumstantial evidence"); *Bossett,* 41 F.3d at 830 (noting that "a conviction may be based upon circumstantial evidence

and inferences based upon the evidence") (internal quotation marks and citation omitted).

**\*11** Second, the identification testimony provided by both of the Morales brothers, at least regarding their initial identifications of Petitioner, was far from inherently suspect. Both brothers saw the robbers at close range, in a well-lit elevator. They saw them again, virtually immediately, through a window of the building. They identified them again, quickly and spontaneously when the police first located two suspects, within minutes after the robbery took place and within two blocks from the robbery scene, on a well-lit street corner. The fact that Juan may have later been influenced by information provided by his brother at the precinct, or that Frederico may have had difficulty identifying Petitioner again at the time of trial, does not detract from the potency of either brother's initial identification of Petitioner, made soon after the crime was committed. This is especially true given that the brothers' initial identification testimony was corroborated, not only by the generally consistent testimony of Officers Rosa, Santiago, Lepore, and O'Brien, but also by the physical evidence that was recovered after both men were apprehended, including the .357 handgun, the imitation gun, Juan's jewelry, and Frederico's watch.

Finally, the fact that the jury may have chosen to credit less reliable aspects of the testimony of the Morales brothers, or to resolve inconsistencies in their testimony in favor of the prosecution, does not undermine the reliability of the jury's verdict. *See Bossett,* 41 F.3d at 830 ("the jury is exclusively responsible for determining a witness' credibility") (internal quotation marks and citation omitted); *accord Vasquez,* 267 F.3d at 91; *Means v. Barkley,* No. 98 Civ. 7603(DLC), 2000 WL 5020, at \*4 (S.D.N.Y. Jan. 4, 2000) (in rejecting habeas petition, court found that alleged inconsistencies in testimony of single, uncorroborated witness in describing petitioner were insufficient to undermine conviction). "The role of this Court is clear: '[f]ederal habeas courts are not free to reassess the facts specific to credibility judgments by juries or to weigh conflicting testimony. On collateral review, this Court must presume that the jury resolved any questions of credibility in favor of the prosecution." *Vera,* 928 F.Supp. at 284 (quoting *Anderson v. Senkowski,* No. 92 Civ. 1007(CPS), 1992 WL 225576, at \*3 (E.D.N.Y. Sept. 3, 1992)). Thus, even if there were aspects of the brothers' testimony that may have been less credible than their initial accounts of the robbery and initial descriptions of the robbers, the jury was nonetheless free, especially in light of all of the other supporting evidence

**Simmons v. McGinnis, Not Reported in F.Supp.2d (2006)**

2006 WL 3746739

of record, to credit that testimony, without interference from this Court.

In sum, based on all the evidence presented at trial, a rational jury could well have found the essential elements of the crime-including the element of "identity"-beyond a reasonable doubt. Viewing all of the evidence in the light most favorable to the prosecution, it cannot be said that the Appellate Division unreasonably applied, or acted contrary to, clearly established federal law in concluding that the verdict against Petitioner was based upon legally sufficient evidence. Accordingly, I recommend that Petitioner's claim challenging the legal sufficiency of the evidence be dismissed. [6]

[6]    In his direct appeal, Petitioner also argued that the verdict in his case was against the "weight of the evidence." (*See* Pimentel Aff., Ex. 1 at 19 (arguing that "[a]t the very least, the verdict was against the weight of the evidence").) Although Petitioner does not appear to be attempting to raise such a claim here, the Court notes that such a state law claim would not, in any event, be cognizable on federal habeas review. *See, e.g., Kearse v. Artuz,* No. 99 Civ. 2428(TPG), 2000 WL 1253205, at *1 (S.D.N.Y. Sept. 5, 2000) (summarily dismissing challenge to verdict against the weight of the evidence on the ground that "[d]isagreement with a jury verdict about the weight of the evidence is not grounds for federal habeas corpus relief"); *see also Barnard v. Burbary,* No. 03 Civ. 0362(VEB), 2006 WL 2640650, at *8 (W.D.N.Y. Sept. 14, 2006) (explaining that, while a claim challenging the legal sufficiency of the evidence is based on federal due process principles, a "weight of the evidence" argument is a pure state law claim) (citing *People v. Bleakley,* 69 N.Y.2d 490, 495 (1987)).

### B. *Excessive Sentence*

 **\*12**  For his second claim, Petitioner asserts that his 12 and one-half year sentence was excessive "where, assuming his guilt, he was less culpable than the co-defendant who received a lesser term." (Pet.¶ 12(B).) In support of this claim, Petitioner states that "none of the proceeds from the robbery were recovered from [him] as they were all recovered from the co-defendant." (*Id.*) Even if this were true, however, this Court would not be able to review Petitioner's excessive sentence claim.

To the extent Petitioner is claiming that the trial court abused its discretion in sentencing him to a particular prison term, such a claim is not reviewable. *See Fielding v. LeFevre,* 548 F.2d 1102, 1108 n. 12 (2d Cir.1977) ("The Eighth Amendment is not a general grant to the federal courts of power to review sentences. Rather, it allows the review of the punishment specified by statute.... [Federal courts] are to review legislative choices, not abuses of judicial discretion.") (citation omitted); *accord Alvarez v. Scully,* No. 91 Civ. 6651(PKL), 1993 WL 15455, at *11 (S.D.N.Y. Jan. 11, 1993), *aff'd,* 23 F.3d 397 (2d Cir.1994); *see also Price v. Kelly,* No. 87 Civ. 4066(RWS), 1987 WL 19959, at *1 (S.D.N.Y. Nov. 10, 1987) ("A prisoner's complaint that he received a longer sentence tha[n] his codefendants does not alone warrant habeas corpus relief on the grounds of excessiveness.").

Moreover, even if Petitioner's claim were liberally construed to allege cruel and unusual punishment in violation of the Eighth Amendment, [7] the claim would fail. It is well settled that an excessive sentence claim under the Eighth Amendment is not cognizable on habeas review where the sentence imposed complies with state law. *See White v. Keane,* 969 F.2d 1381, 1383 (2d Cir.1992) ("[n]o federal constitutional issue is presented where ... the sentence is within the range prescribed by state law") (citation omitted); *accord McCalvin v. Senkowski,* 160 F.Supp.2d 586, at 588-89 (S.D.N.Y.2001) (citation omitted). In this case, Petitioner was convicted of four counts of robbery in the first degree (Sentencing Tr. at 13), a class B felony, *see* N.Y. Penal L. § 70.02(1)(a), and two counts of robbery in the second degree (Sentencing Tr. at 13), a class C felony, *see* N.Y. Penal L. § 70 .02(1)(b). The Court found that Petitioner was a second violent felony offender, *see* N.Y. Penal L. § 70.04(1)(a). (Sentencing Tr. at 4.) The statutorily-authorized sentence for a second violent felony offender, convicted of a class B violent felony is a determinate term of imprisonment, *see* N.Y. Penal L. § 70.04(2), the minimum term of which is no less than 10 years and the maximum term of which is 25 years, *see id.* § 70.04(3)(a). The statutorily-authorized sentence for a class C violent felony is an determinate term of imprisonment, the minimum term of which is no less than seven years and the maximum term of which is 15 years. *See id.* § 70.04(3)(b). Here, Petitioner received concurrent determinate sentences of twelve and one-half years on the four counts of first-degree robbery and seven years on the two counts of second-degree robbery. (Sentencing Tr. at 13.) Each of those sentences, individually, is well within the range set by law.

7     See *Simmons v. Abruzzo,* 49 F.3d 83, 87 (2d
      Cir.1995) ("[t]he complaint of a *pro se* litigant
      is to be liberally construed in his favor") (citing
      *Haines v. Kerner,* 404 U.S. 519, 520 (1972));
      *Williams v. Kullman,* 722 F.2d 1048, 1050 (2d
      Cir.1983) (where a petitioner is proceeding *pro se*
      and "lack[s] expertise," the Court "should review
      [his] habeas petition[ ] with a lenient eye").

 **\*13**  In order to state an excessive sentence claim under
the Eighth Amendment that is cognizable on habeas review, a
petitioner must allege that the statute under which he
was sentenced is itself unconstitutional. *See United States
v. Dawson,* 400 F.2d 194, 200 (2d Cir.1968) ("when a
statute provides for punishment thought to be violative of the
[Eighth] amendment the constitutionality of the statute itself
must be attacked"). In this case, Petitioner has made no such
attack on the validity of the relevant statutes. Even if he had,
however, such claim would be without merit.

"[R]eviewing courts ... should grant substantial deference
to the broad authority that [state] legislatures necessarily
possess in determining the types and limits of punishments
for crimes." *Solem v. Helm,* 463 U.S. 277, 290 (1983); *see
Bellavia v. Fogg,* 613 F.2d 369, 373 (2d Cir.1979) (the Court
will not substitute its judgment for that of a legislature in
addressing an Eighth Amendment claim). Further, "finding
a sentence as violative of the Eighth Amendment is strictly
limited to only the most extenuating of circumstances."
*Alvarez,* 1993 WL 15455, at *12 (citing *Solem,* 463 U.S. at
290). As the Supreme Court has explained, "a punishment is
'excessive' and unconstitutional if it (1) makes no measurable
contribution to acceptable goals of punishment and hence is
nothing more than the purposeless and needless imposition
of pain and suffering; or (2) is grossly out of proportion
to the severity of the crime." *Coker v. Georgia,* 433 U.S.
584, 592 (1977). "The Eighth Amendment condemns only
punishment that shocks the collective conscience of society."
*United States v. Gonzalez,* 922 F.2d 1044, 1053 (2d Cir.1991).
Here, the New York statutes under which Petitioner was
sentenced do not shock the conscience or impose punishment
that is grossly out of proportion to the severity of the crimes.

Because the sentence imposed was clearly within the range
prescribed by New York law, Petitioner's claim is not
cognizable in a federal habeas proceeding. Furthermore,
Petitioner has not argued and, in any event, cannot
establish that the statute under which he was sentenced
is unconstitutional. Accordingly, Petitioner's claim that his
sentence is excessive must fail, and I recommend that it be
dismissed.

*CONCLUSION*

For all of the foregoing reasons, I recommend that Petitioner's
petition for a writ of habeas corpus be dismissed in its
entirety. Further, I recommend that the Court decline to issue a
certificate of appealability pursuant to 28 U.S.C. § 2253(c)(1)
(A), because Petitioner has not "made a substantial showing
of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2).

Pursuant to 28 U.S.C. § 636(b)(1) and Rule 72(b) of the
Federal Rules of Civil Procedure, the parties shall have ten
(10) days from service of this Report to file written objections.
*See also* Fed.R.Civ.P. 6. Such objections, and any responses
to objections, shall be filed with the Clerk of Court, with
courtesy copies delivered to the chambers of the Honorable
Paul A. Crotty, United States Courthouse, 500 Pearl Street,
Room 735, New York, New York 10007, and to the chambers
of the undersigned, United States Courthouse, 500 Pearl
Street, Room 525, New York, New York, 10007. Any requests
for an extension of time for filing objections must be
directed to Judge Crotty. FAILURE TO FILE OBJECTIONS
WITHIN TEN (10) DAYS WILL RESULT IN A WAIVER
OF OBJECTIONS AND WILL PRECLUDE APPELLATE
REVIEW. *See Thomas v. Arn,* 474 U.S. 140, 155 (1985); *IUE
AFL-CIO Pension Fund v. Herrmann,* 9 F.3d 1049, 1054 (2d
Cir.1993); *Frank v. Johnson,* 968 F.2d 298, 300 (2d Cir.1992);
*Wesolek v. Canadair Ltd.,* 838 F.2d 55, 58 (2d Cir.1988);
*McCarthy v. Manson,* 714 F.2d 234, 237-38 (2d Cir.1983).

**All Citations**

Not Reported in F.Supp.2d, 2006 WL 3746739

---

**End of Document** © 2023 Thomson Reuters. No claim to original U.S. Government Works.

2023 WL 4936942
Only the Westlaw citation is currently available.
United States District Court, W.D. New York.

Brian SMITH, Petitioner,
v.
Joseph NOETH, Superintendent, Attica
Correctional Facility, Respondent.

1:18-CV-00883 - JLS-MJR
|
Signed June 27, 2023

**Attorneys and Law Firms**

Brian Smith, Alden, NY, Pro Se.

James Foster Gibbons, Michelle E. Maerov, Office of New
York State Attorney General, New York, NY, for Respondent.

REPORT, RECOMMENDATION and ORDER

MICHAEL J. ROEMER, United States Magistrate Judge

**INTRODUCTION**

*1 Brian Smith ("Petitioner") has filed a *pro se* petition
for a writ of habeas corpus pursuant to 28 U.S.C. § 2254.
(Dkt. No. 1). He challenges the constitutionality of the
November 2, 2007 judgment entered in Monroe County
Court, New York, following a jury verdict convicting him of
first-degree manslaughter (New York Penal Law ("P.L.") §
125.15) and second-degree criminal possession of a weapon
(P.L. § 265.03). For the reasons discussed below, the Court
recommends dismissing the petition.

**BACKGROUND**

**I. The Crime, the Indictment, and Pre-Trial Matters**
Petitioner's conviction stems from the shooting death of
Triston "Munch" Harris ("Harris") on October 2, 2005,
outside a convenience store at the corner of Clifford
Avenue and Miller Street in the City of Rochester, New
York. Although the store's surveillance cameras captured
the shooting on videotape, the Rochester Police Department
("RPD") made no arrests at the time. In fact, the RPD initially
suspected that the shooter was Petitioner's associate, Danny

Gayden ("Gayden"). But after Gayden spoke to police in
January of 2006, the focus of the RPD's investigation turned
to Petitioner.

On December 12, 2006, a Monroe County grand jury indicted
Petitioner in connection with Harris's death, charging him
with second-degree (intentional) murder (P.L. § 125.25(1))
and second-degree criminal possession of a weapon (P.L.
§ 265.03). At Petitioner's arraignment on March 1, 2007,
the Monroe County Court (Connell, J.) (the "trial court")
granted the prosecution's request to unseal the indictment.
(*See* 3/01/07 Transcript ("Tr.") (Dkt. No. 33-3) at 2-3).

Defense counsel filed a motion to suppress the identifications
made by five witnesses as the product of unduly suggestive
photographic arrays, and the trial court ordered a hearing
pursuant *United States v. Wade*, 388 U.S. 218 (1967). (*See*
5/17/07 Tr. (Dkt. No. 33-3) at 2). [1] (6/21/07 Tr. (Dkt. No.
33-3) at 3). On June 21, 2007, RPD Investigator James
May ("Investigator May") testified that on various dates
in January and March of 2006, he conducted identification
procedures with Witness Numbers 2, 3, and 4 (6/21/07 Tr. at
8-9, 12-16, 23-27) and with Monroe County Jail employee
Corporal Jason Tripoli (*id.* at 17-21). Corporal Tripoli and the
three civilian witnesses positively identified Petitioner from
the photographic arrays they viewed. (*Id.* at 9, 15, 21, 27).
Witness Number 2 said, "he's the one that said he shot the
guy at Clifford and Miller." (*Id.* at 9). Witness Number 3
stated, "That's 'B' ... 'the one on the bike on the sidewalk
shooting.... He rode right past me and almost shot me.' " (*Id.* at
15). Witness Number 4 pointed to Petitioner's photo and said,
"[T]hat's 'B' right there.... He did the dude ... [at] ... Clifford
and Miller.' " (*Id.* at 27).

[1]  The hearing commenced on June 4, 2007, but that
transcript is not in the volume of transcripts (Dkt.
No. 33-3) submitted by Respondent. Prior to the
first hearing date, the prosecutor obtained an *ex
parte* protective order due to concerns about the
witnesses' safety. (*See* 6/21/07 Tr. (Dkt. No. 33-3)
at 45-46). Accordingly, the parties referred to the
four civilian witnesses as Witness Numbers 2, 3,
4, and 5 instead of by name. It appears, based on
the prosecutor's statements at the continuation of
the hearing on June 21, 2007, that RPD Sergeant
Mark Mariano ("Sergeant Mariano") was the only
witness on June 4, 2007, and he testified that he
conducted a photo array with Witness Number
5. There is, however, no other information in

the transcripts about that identification procedure. A week prior to trial, the prosecutor provided to defense counsel unredacted copies of all the identification witnesses' depositions and other discovery material. (See 9/04/07 Tr. (Dkt. No. 33-3) at 2-5). Again, this information is not in the state court records provided by Respondent.

**\*2** On cross-examination, defense counsel elicited from Investigator May that Witness Number 3 had identified someone else as the shooter at a photo array conducted three days after the shooting. (*See id.* at 37-45, 47-48, 50-51). Witness Number 3 told Investigator May that she had not been completely truthful during the first photo array because she was afraid of retaliation from members a gang that sold drugs out of a house in the area of the shooting. (*Id.* at 54-55, 70-71). Defense counsel elicited from Witness Number 3 that Gayden was one of the gang members. (*Id.* at 72). The *Wade* hearing concluded on June 21, 2007. [2]

[2]   The trial court's disposition on Petitioner's motion to suppress is not in the record. Presumably, it was denied.

On September 10, 2007, prior to jury selection, the trial court held a *Sandoval/Molineux* hearing [3] concerning the prosecution's request to offer (1) evidence regarding Petitioner's prior convictions involving stolen property, drug-possession, and armed robbery; and (2) testimony from Danny Gayden that he and Petitioner, prior to the shooting, had both fired the gun used to shoot Harris at a futon in the basement of Gayden's drug house on Clifford Avenue. (Trial Transcript ("TT") (Dkt. 33-3): 7-11).

[3]   A "*Sandoval/Molineux* hearing" is a short-hand reference to the procedure used by New York State courts to make an advance ruling as to whether a testifying defendant's prior crimes are admissible for impeachment purposes, *see People v. Sandoval,* 34 N.Y.2d 371, 376-77 (1974); and whether a defendant's prior crimes or uncharged criminal conduct is probative for the purpose of showing, e.g., motive, intent, absence of mistake or accident, common scheme or plan, or identity; and whether the probative value of that evidence outweighs its prejudicial effect, *see People v. Molineux,* 168 N.Y. 264, 293-94 (1901).

The trial court partially granted the prosecution's *Sandoval* application, ruling that if Petitioner testified, the prosecutor

could cross-examine him about the conviction for possession of stolen property. (TT: 11-12). However, with regard to the drug-possession and robbery convictions, the trial court restricted the prosecutor to simply asking Petitioner if he had been convicted of a felony. (TT: 12-13).

As far as Gayden's proposed testimony about Petitioner firing the alleged murder weapon at the futon, defense counsel argued that it should not be admitted under *Molineux* because it was unreliable and uncorroborated. (TT: 8). After the prosecutor explained that he anticipated presenting ballistics evidence linking the gun used in the futon incident with the Harris shooting (TT: 9-10), the trial court granted the *Molineux* application as to Gayden's testimony. (TT: 14).

## II. The Trial Evidence

### A. The Prosecution's Case

Gayden and Petitioner, or "B." as he was known, had been friends for about five years and saw each other every day. (TT: 206-07). A week or two before the night of October 1, 2005, Gayden saw Petitioner with a .380-caliber handgun at 1336 Clifford Avenue, a house out of which Gayden sold drugs. (TT: 245-47). Petitioner told Gayden that he bought the gun from a crack addict. (TT: 247). Gayden admitted that both he and Petitioner fired the gun into a futon mattress in the basement of 1336 Clifford Avenue to see if the gun worked. (TT. 247-49).

On October 1, 2005, at about 11 p.m., Gayden was walking to a house party on Hollister Street with his cousin, Alphonso Snow ("Snow"), and someone named "BB" (a different individual than Petitioner, a/k/a "B."). (TT: 207-08). A maroon car pulled up closely next to Gayden, Snow, and BB, almost hitting them. (TT: 209, 269-70). The car's occupants started yelling at them and then jumped out and started chasing them. (TT: 209, 270-73).

**\*3** Pursued by several of the car's occupants, Gayden and Snow ran into a cell phone store on Portland Avenue. (TT: 209-10). One of the men from the maroon car started shooting a gun during the chase. (TT: 273-74). Just as Gayden was running into the store, he heard someone say, "yo, that's the shooter right there," pointing at Gayden. (TT: 282). Gayden said, "no, it is not me," and "lift[ed] up [his] shirt." (TT: 281-82). Then a fight erupted and somebody hit Gayden on the head with a forty-ounce bottle of beer. (TT: 210-11, 282-83).

Gayden and the rest the crowd dispersed when the store owner yelled that he had called the police. (TT: 210, 283). Gayden and Snow got a ride with BB, who was pulled over by police responding to a report of "shots fired" in the area. (TT: 211, 278). The police searched them and let them go on their way. (T: 212). Gayden eventually ended up back at his drug house on Clifford Avenue. (TT: 212-13, 265).

Later that night, Petitioner stopped by the Clifford Avenue drug house and asked Gayden what had happened to his face. (TT: 213). When Gayden told Petitioner someone had hit him with a bottle, Petitioner became angry and demanded to know "[w]ho the fuck did this?" (TT: 213-14). Petitioner kept "going on about what happened" and "was like, man, fuck that, man." (TT: 214).

Later that night, Gayden and Petitioner rode their bikes to the store located at the corner of Clifford Avenue and Miller Street to buy beer. (TT: 214-15). Gayden spotted the maroon car from earlier that night parked in front of the store on Clifford Avenue, but there was nobody in it. (TT: 215-16). Scanning the small crowd outside the store, Gayden saw a man (Harris) using a pay phone about ten feet away from the maroon car. (TT: 216-17). He told Petitioner that the maroon car looked like the one from the fight that occurred earlier (TT: 216) and that the person using the pay phone "looks like one of the dudes [from the fight] right there." (TT: 216-17).

After Gayden made that observation, Harris started running towards the maroon car. (TT: 217). Gayden testified that Petitioner "just rood up and started shooting" at the car. (TT: 218, 220). Specifically, Gayden said, Petitioner had ridden up near the entrance of the corner store but he turned his bike around and rode towards Harris, who was running behind the maroon car. (TT: 293-94). As Harris was getting into the driver's seat of the maroon car (TT: 218-19), Petitioner stopped his bike on the sidewalk but did not get off it, pointed his gun at the car, and started shooting. (TT: 219, 293-94). Gayden said that Petitioner was using the same .380-caliber automatic handgun he had bought from the crack addict, and he fired more than two shots in Harris's direction. (TT: 219, 245-48). During the shooting, Gayden remained on his bike in the street behind the maroon car. (TT: 220, 234, 290).

The prosecutor showed Gayden still photographs taken from the surveillance videotape outside the store. Gayden testified that they depicted the scene of the shooting. (TT: 236-38, 242-43). He identified where he, Petitioner, and Harris were located in the photographs based on his recollection, though he admitted he could not discern anyone's facial features. (TT: 239-41).

Gayden testified that after the shooting Petitioner rode his bike to 1550 Clifford Avenue. (TT: 220-21). Gayden went back to 1336 Clifford Avenue. (TT: 221, 223, 294). Later that night, Gayden met up with Petitioner and Snow over at 45 Kohlman Street (TT: 223, 294), the residence of Octavia Allen ("Allen"), Gayden's girlfriend and the mother of his young child. (T: 223). Allen testified that while Gayden and Snow were recounting how they had had gotten into a fight earlier in the evening, Petitioner did not say anything and was "just staring." (TT: 379-81). Gayden testified that he did not mention the shooting at first but after Petitioner left, he eventually told Allen, "I got in a fight and B, uhm, shot the dude who was at the fight." (TT: 224).

**\*4** Around 10 a.m. or 11 a.m. on October 2, 2005, Petitioner called Gayden and said he was coming over to talk to him. (TT: 224). When Petitioner arrived at Allen's apartment a short while later, Allen asked him if he was all right. Petitioner replied that "he made a mistake last night; that he didn't mean to shoot the boy." (TT: 382-83). Petitioner told Allen that "he was going to get out of town before somebody told on him." (TT: 383, 415). Petitioner spoke separately to Gayden, who asked what he did with the gun. (TT: 224). Petitioner said he wrapped it in a sock and threw it in the river. (TT: 224-25). Petitioner also told Gayden he was going to get out of town and needed money. (TT: 226).

On the night of October 2, 2005, Gayden and Petitioner were together at the apartment complex where Gayden lived. They were smoking, drinking, and rapping. (TT: 226-27). Gayden testified that Petitioner rapped that "he was a killer, and [he] did it on Miller." (TT: 227). Allen testified that Petitioner and Snow approached her that night at the same apartment complex and asked if she knew anything about what happened the previous night. (TT: 384). When Allen replied "no," Petitioner started to laugh. (TT: 384-85, 386). Petitioner then told Allen that he "shot the boy," that his "cool points went way up," and that he was going to get on a train to Atlanta that night. (TT: 385-86).

At some point before the night of October 3, 2005, Gayden told Petitioner he had noticed a surveillance camera outside the corner store. (TT: 316). At Petitioner's suggestion, Gayden and Snow accompanied him to the corner store on the night of October 3, 2005, so he could retrieve it. (TT: 227-28, 316-17). Gayden saw Petitioner go inside and talk to the store

2023 WL 4936942

employees but did not see him obtain the videotape. (TT: 229). Gayden testified that when Petitioner left the store, he kicked over a collection of teddy bears and candles that had been set up on the sidewalk as a memorial to Harris, and then spat and urinated on the memorial. (TT: 230-31, 318).

About a week later, on October 8, 2005, members of the RPD arrested Gayden, Petitioner, and Snow in connection with an unrelated armed robbery.[4] (TT: 243-44). While they were in the booking area of the Monroe County Jail, Gayden told Petitioner that the police had the surveillance videotape and had sent an investigator to see him. (TT: 244). Petitioner responded that he was going to "own up to it." (*Id.*).

[4] Gayden admitted that he resolved the October 2005 robbery charge by pleading guilty to attempted second-degree robbery in March of 2006. (TT: 205-06, 331). In exchange for Gayden testifying truthfully at Petitioner's trial, the prosecution promised Gayden a sentence of six months in the Monroe County Jail plus five years' probation. (TT: 205-06, 330). The prosecutor also said that he would not charge Gayden in connection with the Harris shooting. (TT: 334). Gayden also admitted that in December of 2006, he had been arrested by federal authorities for possessing crack cocaine and a stolen firearm. (TT: 337-38). At the time of Petitioner's trial, he had resolved the federal court charges by pleading guilty to possessing a weapon with intent to further a drug conspiracy and possessing crack cocaine with the intent to distribute (TT: 339). In exchange for giving truthful testimony in Petitioner's case, the state prosecutor agreed to recommend to federal authorities that Gayden's state and federal sentences run concurrently. (TT: 206-07, 340).

Gayden testified that once he realized he was a suspect in the Harris shooting, he decided to meet with the police to clear his name. (TT: 245). In January of 2006, he and his attorney met with members of the RPD and Gayden told them what he had seen. (TT: 244-45, 328-30). Gayden also told the police that a couple of weeks before the shooting, he had seen Petitioner fire the .380-caliber handgun at a futon located in the basement of 1336 Clifford Avenue. (TT: 247-48). Gayden called Allen from the meeting and directed her to talk to the police about the Harris shooting. (TT: 418-19).

**\*5** Scott LaPoint, M.D. ("Dr. LaPoint"), the Monroe County Medical Examiner, conducted the autopsy on Harris. (TT: 430). Dr. LaPoint testified that Harris had sustained two gunshot wounds on the right side of his back, one near the shoulder and one lower down. (TT: 431-33, 435). Dr. LaPoint removed two bullets from the front side of Harris's left chest. (TT: 434). The bullets had traveled through the right lung, and one had passed through the edge of the heart. (TT: 435-36). The gunshot wounds caused internal bleeding, which in turn caused Harris's death. (TT: 437-38).

Steven Rice ("Rice"), an evidence technician with the RPD, found that Harris's vehicle, a 1997 maroon Mercury Sable, had a broken passenger's-side rear window and a bullet hole in the passenger's-side rear door. (TT: 454-56). Evidence technician Richard Martin ("Martin") collected a projectile from the door of the Mercury Sable. (TT: 495). On the sidewalk and the roadway underneath the car, Martin observed five spent .380-caliber casings and one live .380-caliber bullet. (TT: 458). He also collected a VHS tape from the store's surveillance cameras. (TT: 466-67).

David Williams ("William"), an evidence technician with the RPD, analyzed the VHS tape. (TT: 479-80). After making a digital copy of the tape, he extracted five video clips showing the view from the different surveillance cameras at the time of the shooting. (TT: 480-81, 483-84). The jury viewed those video clips. (TT: 483, 486).[5]

[5] The DVD of the surveillance camera footage shown to the jury is not part of the state court records submitted by Respondent. There is no dispute that the video footage showed a man on a bicycle using his left hand to fire a gun in the direction of Harris's car. (*See, e.g.*, State Court Record ("SR"): 370 (Petitioner's Counseled Appellate Brief)). Gayden testified that he is right-handed. (TT: 215). Corporal Jason Tripoli, an employee at the Monroe County Jail, identified Petitioner in court and testified that on January 12, 2006, he observed Petitioner sign a document with his left hand at the Monroe County Jail. (TT: 449-51).

Investigator May executed a search warrant at Gayden's drug house at 1336 Clifford Avenue on January 27, 2006. (TT: 501-02). He and evidence technician Mark Walker ("Walker") found a projectile inside a futon mattress in the basement.

(TT: 503-04, 509-10). Walker also found a .380-caliber casing inside a cabinet next to the futon. (TT: 509-10).

John Clark ("Clark"), a firearms examiner for Monroe County, analyzed the ballistics evidence. (TT: 522-35). He testified that, to a reasonable degree of scientific certainty, the projectiles recovered from the crime scene, Harris's body, and 1336 Clifford Avenue all were fired by the same semi-automatic .380-caliber pistol. (TT: 536).

On August 23, 2006, Sergeant Mariano and RPD Investigator Glenn Weather visited Petitioner, who was in state custody on an unrelated offense. (TT: 547-49). Petitioner waived his rights and agreed to speak with them about Harris. (TT: 549-50). Petitioner denied any involvement in the shooting and said he had not been on Clifford Avenue on October 2, 2005. (TT: 553). Petitioner viewed a DVD of the corner store's surveillance camera footage and admitted to the officers he is left-handed. (TT: 553-54).

Petitioner said he knew of Harris but did not know he was dead and had nothing to do with his death. (TT: 554). At that point, Sergeant Mariano read aloud from the witnesses' depositions concerning the shooting. (*Id.*). Petitioner continued to deny his involvement and began "sucking his teeth and shaking his head." (TT: 554-55). When Sergeant Mariano told Petitioner that they knew he had asked the store owners for the surveillance camera videotape and had "kicked over the candles and actually urinated on the shrine," Petitioner "leaned forward in his chair and started to shake his head up and down." (TT: 555-56). At that point, a prison employee abruptly entered the room and said Petitioner had to change his clothing. (TT: 556). The interview ended moments later. (TT: 556, 560).

### B. Defense Case

**\*6** Ora Conley ("Conley") testified that she lived at 1330 Clifford Avenue, next door to Gayden's drug house at 1336 Clifford Avenue. (TT: 569-70). At around midnight on October 2, 2005, Gayden came up onto Conley's porch and said, "Ma, somebody hit me with a beer bottle; I'm going to get him." (TT: 571-72, 574). Conley recalled that Gayden was upset, but he did not say who he was going to "get." (TT: 572, 574-75). While Conley was inside getting ice for the visible welt on Gayden's head, he left. (TT: 572). Just minutes later, Conley heard "firecracker" noises coming from the area of the corner store on Miller Street. (TT: 573, 575). Conley agreed on cross-examination that Gayden did not have any weapons on him when she talked to him. (TT: 574-75).

### C. Verdict and Sentence

Over the prosecutor's objection, the trial court instructed the jury on the lesser-included offenses of first-degree and second-degree manslaughter. (TT: 578-80). The jury acquitted Petitioner of second-degree murder and convicted him of first-degree manslaughter and second-degree criminal possession of a weapon. (TT: 683-86).

At sentencing, the prosecution requested the maximum sentence on both convictions and requested that they run consecutively to the sentence for robbery Petitioner was already serving. (Sentencing Transcript ("ST") (Dkt. No. 33-3): 9-10). The trial court imposed consecutive sentences of twenty-five years on the manslaughter conviction and fifteen years on the weapons-possession conviction and also imposed five years of post-release supervision on each conviction. (ST: 19).

## III. Post-Conviction Proceedings

### A. Direct Appeal

Represented by new counsel, Petitioner pursued a direct appeal of his conviction. Appellate counsel filed a brief on Petitioner's behalf. (SR: 374-89). [6] Petitioner filed a *pro se* supplemental appellate brief. (SR: 396-418). On March 23, 2012, the Appellate Division, Fourth Department, New York State Supreme Court ("Fourth Department"), determined that, as a matter of law, the manslaughter and weapons-possession sentences must run concurrently with each other, and it modified the judgment accordingly. *People v. Smith*, 93 A.D.3d 1345, 1346 (4th Dep't 2012). The Fourth Department otherwise affirmed the judgment. *Id.* Petitioner sought leave to appeal as to all claims raised in his counseled and *pro se* briefs (SR: 489-90), and the New York Court of Appeals denied leave on June 29, 2012. *People v. Smith*, 19 N.Y.3d 967 (2012).

[6]    The page citations refer to the Bates-stamped page numbers at the bottom of the pages of the state court records filed by Respondent at Dkt. 33-1 (SR: 1-1629) and Dkt. 33-2 (SR: 1630-2082).

### B. First Motion to Vacate

On January 19, 2011, while his direct appeal was pending, Petitioner filed a *pro se* motion to vacate the judgment and set aside the sentence pursuant to New York Criminal Procedure

2023 WL 4936942

Law ("C.P.L.") §§ 440.10 and 440.20 [7] ("first 440 motion"). (SR: 493-926). Petitioner argued that the prosecutor violated *Brady v. Maryland*, 373 U.S. 83 (1963), by failing to disclose that Allen had worked as a paid informant for the RPD.

[7]    The sentencing claims asserted under C.P.L. § 440.20 were held in abeyance during the pendency of Petitioner's direct appeal. The Fourth Department resolved the sentencing claims in Petitioner's favor. Thus, after the direct appeal, the only remaining claim in the first 440 motion was the *Brady* claim.

In support of this claim, Petitioner submitted an affidavit from Investigator Jennifer Morales of the RPD Special Investigations Section sworn to on April 15, 2010. (SR: 687-98). Investigator Morales stated that between September 2006, and September 2007, Allen was employed as a paid informant for the RPD in connection with an unrelated homicide. (SR: 689-97). [8]

[8]    Petitioner obtained the affidavit from fellow inmate Raheen Gayden, who is Danny Gayden's first cousin and the person convicted of killing Andre Knox ("Knox"). (SR: 521, 617, 683). Raheen Gayden apparently submitted the affidavit from Investigator Morales in support of his motion to vacate based on the prosecution's failure to disclose that Allen had worked for the RPD as a paid informant in connection with their investigation of the Knox case.

**\*7** In opposition to Petitioner's motion, the prosecution submitted an affidavit from Allen, a new affidavit from Investigator Morales, and an affirmation from Assistant District Attorney Patrick Farrell ("ADA Farrell"), the prosecutor in Petitioner's case. Investigator Morales stated that in March 2007, the RPD paid Allen $20 in exchange for information about death threats received by witnesses in Petitioner's case. (SR: 951). In September 2007, before she testified at Petitioner's trial, Allen reported receiving death threats, so Investigator Morales gave her $100 to relocate temporarily. (SR: 959). Once the trial was over, Investigator Morales gave Allen $300 for travel expenses. (SR: 960).

In her affidavit, Allen stated that she had not been paid for her statement to the RPD about the Harris shooting or her testimony at Petitioner's trial. However, she had received money from the RPD for relocation expenses because she feared reprisals for testifying against Petitioner. (SR: 953).

ADA Farrell stated in his affirmation that he was unaware that Allen was a paid informant for the RPD's Special Investigations Section. (SR: 948). He did not know that Investigator Morales had paid Allen $20 in March of 2007 for information about witness-intimidation efforts in Petitioner's case. (*Id.*) He noted, however, that no evidence regarding witness-intimidation was introduced at Petitioner's trial. (*Id.*). ADA Farrell did not know of Investigator Morales's other payments to Allen. (*Id.*). Since Allen was still receiving death threats a month after Petitioner's trial ended, the Monroe County District Attorney's Office gave her $260 to leave Rochester. (*Id.*). ADA Farrell indicated that he had not promised this assistance to Allen before she testified at Petitioner's trial. (*Id.*).

In a decision and order entered October 3, 2012, the New York State Supreme Court, Monroe County (Geraci, J.) (the "first 440 court") denied the motion without a hearing. (SR: 954-67). The first 440 court rejected the *Brady* claim, finding that "[n]othing offered by [Petitioner] indicates any agreement or inducement provided by the prosecutor or the police in exchange for Ms. Allen's testimony at [Petitioner]'s trial." (SR: 966). It further concluded that Petitioner failed to demonstrate that any of the undisclosed evidence "contributed to the verdict in this case." (SR: 967).

Petitioner sought leave to appeal (SR: 969-1012), which the Fourth Department granted on January 9, 2013 (SR: 1018). Petitioner's appointed counsel filed an appellate brief arguing that the first 440 court abused its discretion by denying the motion to vacate without a hearing and that the nondisclosure of Allen's role as a paid informant violated *Brady*. (SR: 1023-55). In its opposition brief, the prosecution conceded that it should have disclosed Allen's status as a paid informant but maintained that relief under *Brady* was unwarranted because the information was merely cumulative to the other impeachment evidence elicited about Allen. (SR: 1067-70).

The Fourth Department affirmed the first 440 court's judgment on April 29, 2016, finding that Allen's status as a paid informant was not material to the verdict. *People v. Smith*, 138 A.D.3d 1418, 1418 (4th Dep't 2016). The New York Court of Appeals denied leave to appeal. *People v. Smith*, 28 N.Y.3d 937 (2016).

**C. *Coram Nobis* Petition**

Petitioner filed a *pro se* petition for a writ of error *coram nobis* alleging that appellate counsel was ineffective for failing to brief various trial court errors, deficiencies in trial counsel's performance, and instances of prosecutorial misconduct. (SR: 1097-1138). The prosecution submitted an affirmation in opposition (SR: 1139-47), and Petitioner filed a reply. (SR: 1148-60). On November 9, 2017, the Fourth Department denied *coram nobis* relief. *People v. Smith*, 155 A.D.3d 1609 (4th Dep't 2017); (SR: 1161-62). Petitioner sought leave to appeal (SR.1163-71), which the prosecution opposed (SR: 1172). The New York Court of Appeals denied leave on February 13, 2018. *People v. Smith*, 30 N.Y.3d 1120 (2018).

### D. Second Motion to Vacate

**\*8** By papers dated March 22, 2018, Petitioner filed a *pro se* motion to vacate the judgment pursuant to C.P.L. § 440.10 (the "second 440 motion"). (SR: 1174-1653). Petitioner asserted claims of ineffective assistance of trial counsel, actual innocence, and newly discovered evidence. To support the actual innocence and newly discovered evidence claims, Petitioner relied on a handwritten "General Affidavit" from Gayden purporting to recant his trial testimony. (SR: 1600). The statement reads as follows:

> My name [is] Danny S. Gayden[.] I was present on 2007 in Monroe County Court during Brian Smith['s] trial and I was pressured into giving false testimony and I would like to clear an inno[c]ent man of his charges because I did not witness him with a gun or have any knowledge of him killing anyone.

(*Id.*). A notary had signed, dated, and stamped the General Affidavit, but Gayden had not signed it. (*Id.*).

The Monroe County Court (Randall, J.) (the "second 440 court") appointed counsel for Petitioner and held an evidentiary hearing on October 3, 2018. (SR: 1968-2027 (Transcript of Second 440 Hearing)). The defense called Gayden; the prosecution called Monroe County District Attorney's Office's Investigator Samuel Soprano, Jr. ("Soprano").

Gayden testified that he was 32 years-old and was serving a term of supervised release until 2020 on a federal drug conviction. (SR: 1975). He acknowledged testifying at Petitioner's trial that he saw Petitioner shoot Harris. (SR: 1977). However, he did not see Petitioner commit the shooting. (SR: 1982). With regard to his February 5, 2018 statement, Gayden testified that he appeared before a notary public at the Rochester public library on that date. (SR: 1979). He said he did not remember seeing a line for his signature on the affidavit form; if he had, he would have signed it. (SR: 1986-87).

When asked how he had been "pressured" into testifying, Gayden replied that he was "a lot younger" then, "didn't really know anything about the criminal justice system," and "investigators and DA's were ... promising [him] certain things." (SR: 1980). When asked who "pressured" him, Gayden could only recall Investigator Morales's name. (SR: 1981). Gayden said that Investigator Morales told him, "if [I] say this about a murder that [I] didn't even witness, you know, [Petitioner] having a gun or anything of that nature, all this would disappear and [I] will come out like a flower." (SR: 1980-81). Gayden did not want to go to prison so he testified that he saw Petitioner shoot Harris. (SR: 1981-82). Gayden said that he had come forward with the affidavit because, "after growing up" and realizing "right is right and wrong is wrong," he "wanted to right [his] wrongs" and "pretty much clear an innocent man." (SR: 1982-83).

Soprano testified for the prosecution that he met with Gayden at the Monroe County Jail on September 12, 2018, and asked him about his recantation. (SR: 2016). At first, Gayden said he could not remember what was in his affidavit. (SR: 2017). After reviewing it, Gayden affirmed that he had, in fact, written it. (*Id.*). Gayden said to Soprano, "I never signed that so it doesn't really mean anything anyways." (SR: 2018). When Soprano asked why he wrote the affidavit, Gayden said that "mutual friends" asked him to "help get [Petitioner] a new trial." (SR: 2017-18). Gayden told Soprano that the recantation affidavit was not true. (SR: 2017).

In a written decision and order dated December 11, 2018, the second 440 court denied the motion in its entirety. (SR: 2043-50). With regard to all of Petitioner's claims not based on Gayden's recantation—that is, the ineffective assistance claims—the second 440 court denied them because Petitioner could have raised them adequately in the first 440 motion. (SR: 2047 (citing N.Y. Crim. Proc. Law § 440.10(3)(c)). To the extent some of those claims were based on the

trial record, the second 440 court determined that it must deny them because they could have been raised on direct appeal. (*Id.* (citing N.Y. Crim. Proc. Law § 440.10(2)(c)). With regard to the off-the-record allegations concerning trial counsel, the second 440 court determined that Petitioner received meaningful representation under the New York State constitutional standard. He also failed to show that trial counsel's performance was objectively unreasonable or resulted in prejudice to the defense; therefore, he failed to satisfy the federal constitutional standard. (SR: 2048-49).

**\*9** The second 440 court summarily concluded Petitioner had not adduced "sufficient evidence" to prove he was actually innocent of killing Harris. (SR: 2049).

Finally, as to the newly discovered evidence claim, the second 440 court found that Gayden's "lone statement" that "he lied at trial and is now telling the truth is completely unreliable and is insufficient to support a determination to vacate the defendant's judgment." (SR: 2050). Petitioner sought leave to appeal (SR: 2051-75), which the prosecution opposed (SR: 2076-80). The Fourth Department denied leave on March 29, 2019. (SR: 2081-82).

### IV. Federal Habeas Petition

In his timely filed petition (Dkt. No. 1), Petitioner asserts fifteen enumerated grounds for relief: the prosecution violated its *Brady* obligations by failing to disclose Allen's status as paid informant (*id.* at 7, Ground One); the first 440 court erroneously denied the first 440 motion without an evidentiary hearing (*id.*, Ground Two); appellate counsel was ineffective (*id.* at 7-8, Grounds Three, Four, and Five); trial counsel was ineffective (*id.* at 9, Grounds Six; *id.* at 11, Grounds Thirteen, and Fourteen); Gayden's recantation is newly discovered evidence that would have resulted in a different verdict (*id.* at 10, Ground Seven); Petitioner is actually innocent (*id.*, Ground Eight); the verdict was against the weight of the credible evidence (*id.*, Ground Nine; *id.* at 11, Ground Twelve); the trial court erroneously allowed the introduction of prejudicial evidence in violation of the *Molineux* rule (*id.* at 10, Ground Ten); the protective order issued in connection with the *Wade* hearing deprived him of the right to challenge the identifications as unduly suggestive (*id.* at 11, Ground Eleven); and pre-indictment and post-indictment delays violated Petitioner's speedy trial rights under the Due Process Clause and the Sixth Amendment (*id.* at 12, Ground Fifteen).

Prior to Respondent answering the petition, Petitioner sought a stay-and-abeyance in connection with the claims raised in the then-pending second 440 motion. (Dkt. No. 3). The Court (Vilardo, D.J.) denied the motion without prejudice. (Dkt. No. 9). After Petitioner filed a renewed motion to stay (Dkt. No. 11), the case was reassigned to United States District Judge John L. Sinatra, Jr. (Dkt. No. 12), who referred the matter to the undersigned pursuant to 28 U.S.C. § 636(b)(1)(B) and (C). (Dkt. No. 15). Respondent opposed the motion to stay. (Dkt. No. 18).

This Court issued a report and recommendation recommending that the motion for a stay-and-abeyance be denied as moot because the second 440 motion had been resolved; denying the motion to amend as moot, to the extent it sought to add the grounds raised in the renewed motion to stay, because those claims were already raised in the original petition; and denying the motion to amend, to the extent it requested permission to add "additional" claims that might have arisen in the state court proceeding because Petitioner had not identified any additional grounds for relief he wished to add. (Dkt. No. 27). Judge Sinatra adopted the report and recommendation and ordered Respondent to answer the petition. (Dkt. No. 28).

**\*10** Respondent filed a response (Dkt. No. 33, 36 (amended)), attaching two volumes of state court records (Dkt. Nos. 33-1 & 33-2) and one volume of state court transcripts (Dkt. No. 33-3). Respondent also filed a memorandum of law (Dkt. No. 37). Petitioner filed a traverse (Dkt. No. 29) and subsequently filed a reply (Dkt. No. 38) to Respondent's memorandum of law.

### STANDARD OF REVIEW

The petition post-dates the April 24, 1996 enactment of the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), Pub. L. No. 104-132, 110 Stat. 1214. Therefore, AEDPA's amendments to 28 U.S.C. § 2254 govern the Court's disposition of the petition. AEDPA "revised the conditions under which federal courts may grant habeas relief to a person in state custody." *Kruelski v. Connecticut Superior Ct. for Jud. Dist. of Danbury*, 316 F.3d 103, 106 (2d Cir. 2003). Now, federal courts may not grant the writ with respect to claims subject to 28 U.S.C. § 2254(d) unless the petitioner shows that the state court's decision "was contrary to" federal law as established by the holdings of the Supreme Court, *see id.* § 2254(d)(1); or that it "involved an unreasonable application

2023 WL 4936942

of" such law, *id.* § 2254(d)(1); or that it "was based on an unreasonable determination of the facts" in light of the record before the state court, *id.* § 2254(d)(2).

"Under [AEDPA's] standard, a federal court may not issue a writ of habeas corpus simply because it thinks the state court 'applied clearly established federal law erroneously or incorrectly.' " *McCray v. Capra*, 45 F.4th 634, 640 (2d Cir. 2022), *cert. denied*, 214 L. Ed. 2d 369, 143 S. Ct. 624 (2023) (quoting *Williams v. Taylor*, 529 U.S. 362, 411 (2000)). "Instead, relief is warranted under section 2254 only 'where there is no possibility fair[-]minded jurists could disagree that the state court's decision conflicts with [the Supreme] Court's precedents.' " *Id.* (quoting *Harrington v. Richter*, 562 U.S. 100, 102 (2011)) (alterations in original).

### DISCUSSION

**I. *Brady* Violation (Ground One)**
Petitioner asserts that the prosecution violated its due process obligations under *Brady* by failing to disclose evidence that Allen was a paid informant for the RPD. (Dkt. No. 1 at 7 ¶ 22(A)). The Fourth Department concluded that although the withheld information "may have provided the defense with additional impeachment material, it cannot be said that there is a reasonable possibility that the result at trial would have been different had the information been disclosed." *Smith*, 138 A.D.3d at 1419-20. Respondent argues that the Fourth Department's decision was neither contrary to, nor an unreasonable application of, *Brady* and its progeny. (*See* Dkt. No. 37 at 19-22). This Court agrees and recommends that habeas relief be denied on Ground One.

*Brady* held that the suppression of evidence favorable to an accused "violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." 373 U.S. at 87. "[T]he duty to disclose such evidence is applicable even though there has been no request by the accused, and that ... duty encompasses impeachment evidence as well as exculpatory evidence." *Strickler v. Greene*, 527 U.S. 263, 280 (1999) (citations omitted). Since the prosecution conceded on appeal of the first 440 motion that the undisclosed impeachment evidence concerning Allen was favorable to the defense and had been suppressed (*see* SR: 1067), the only disputed *Brady* component is materiality. Because the state court adjudicated the *Brady* claim on the merits, the "only question that matters under § 2254(d)(1)," *Harrington*, 562 U.S. at 102

(internal quotation marks omitted), is "whether it is possible fair[-]minded jurists could disagree," *id.*, that the state court's ruling on the lack of materiality is "inconsistent with the holding in a prior decision of th[e] [Supreme] Court." *Id.*

**\*11** "The materiality of the undisclosed evidence is evaluated 'in the context of the entire record.' " *McCray*, 45 F.4th at 641 (quoting *Turner v. United States*, 582 U.S. 313, 325 (2017)). "[I]f the omitted evidence creates a reasonable doubt that did not otherwise exist, constitutional error has been committed." *United States v. Agurs*, 427 U.S. 97, 112 (1976). Stated another way, "the materiality standard for *Brady* claims is met when 'the favorable evidence could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict.' " *Banks v. Dretke*, 540 U.S. 668, 698 (2004) (quoting *Kyles v. Whitley*, 514 U.S. 419, 435 (1995)).

"In general, impeachment evidence has been found to be material where the witness at issue 'supplied the only evidence linking the defendant(s) to the crime,' " *United States v. Payne*, 63 F.3d 1200, 1210 (2d Cir. 1995) (quoting *United States v. Petrillo*, 821 F.2d 85, 90 (2d Cir. 1987)); *see also Giglio v. United States*, 405 U.S. 150, 154-55 (1974) (finding that a promise not to prosecute a cooperating witness was material under *Brady* where "the Government's case depended almost entirely on [his] testimony; without it there could have been no indictment and no evidence to carry the case to the jury"); *Banks*, 540 U.S. at 700 (holding that impeachment evidence was material where it pertained to a witness whose testimony was "crucial to the prosecution" and who was, in the prosecution's own judgment, "of the utmost significance" to its case).

"In contrast, a new trial is generally not required when the testimony of the witness is 'corroborated by other testimony,' " *Payne*, 63 F.3d at 1210 (quoting *Petrillo*, 821 F.2d at 89), or when the suppressed impeachment evidence merely furnishes an additional basis on which to impeach a witness whose credibility has already been shown to be questionable," *id.* (citing *Petrillo*, 821 F.2d at 90 (holding that withheld impeachment evidence was not material where "ample evidence was introduced to show [witness]'s propensity and motive to lie")); *see also Giglio*, 405 U.S. at 154 (impeachment evidence not material where it is " 'possibly useful to the defense but not likely to have changed the verdict' ") (quoting *United States v. Keogh*, 391 F.2d 138, 148 (2d Cir. 1968)).

The Court disagrees with Petitioner's contention that Allen's testimony was the "linchpin of the prosecution's case." (SR: 1039). To the contrary, as the Fourth Department observed, "the verdict did not turn solely or predominantly on [Allen]'s testimony inasmuch as other evidence established defendant's responsibility for the shooting," *Smith*, 138 A.D.3d at 1420. Gayden provided eyewitness testimony of the shooting, and the jury viewed the surveillance camera footage of the shooting. There was no dispute that the shooter depicted in the videotape fired the gun with his left hand. (*See* TT: 607-08 (defense counsel stated that "[t]he shooter in the video ... fires the gun with his left hand"); *see also* TT: 639 (prosecutor stated it was "clear from both the photographs in [sic] the video, again, that the shooter, Brian Smith, is extending his left hand"). Petitioner admitted to Sergeant Mariano he is left-handed, and Gayden testified that he is right-handed. In addition, Petitioner told Gayden he bought a .380-caliber gun from a crack addict, Gayden saw Petitioner test-fire the same .380-caliber gun at a futon in the basement of Gayden's drug house, and the ballistics evidence established that the .380-caliber gun used to shoot Harris also was used to shoot the futon at the drug house.

 **\*12** The Fourth Department stated that "[e]ven assuming, *arguendo*, that [Allen]'s testimony was important," *Smith*, 138 A.D.3d at 1420, "her credibility was strongly impeached on far more critical issues, including her ongoing relationship with [Gayden,] the only other suspect who reasonably could have been implicated in the shooting." *Id.* The trial record amply supports this finding. Allen testified that she had known Gayden for about ten years, that she loved him, and that they had a young son together. (TT: 377, 419). Allen testified that she pleaded guilty, as a youthful offender, to criminal possession of a controlled substance in June of 2005 and received a probation-only sentence. (TT: 376-77, 389). Even after her guilty plea, Allen continued to sell drugs to help Gayden raise bail money. (TT: 391-92). Allen testified that Gayden called her almost every day from jail, sometimes numerous times a day. (TT: 417-18).

Allen also admitted that on November 25, 2005, RPD officers executed a search warrant at her apartment looking for a gun; however, at Gayden's request, she had already sold it to raise bail money for him. (TT: 393). During the search, the police found bags of marijuana, but Allen was not charged with violating her probation or with any new crimes. (TT: 393-94). Further, at Gayden's direction, Allen talked to the police about the Harris shooting. (TT: 418-19).

The Fourth Department reasonably determined that this evidence illustrated Allen's motive to fabricate since it showed that she benefited in two significant ways through her cooperation. First, by implicating Petitioner, she cleared Gayden's name and secured his freedom. Second, Allen herself avoided incarceration or other criminal penalties in connection with the drugs found at her residence. With Allen's veracity already shown to be questionable, the Fourth Department reasonably concluded that the undisclosed impeachment evidence diminished greatly in value and would not have changed the verdict.

Petitioner has not established that the Fourth Department's rejection of the *Brady* claim "was so lacking in justification that there was an error ... beyond any possibility for fair[-]minded disagreement." *Harrington*, 562 U.S. at 102. Because the Fourth Department did not unreasonably apply, or rule in a manner contrary to, *Brady*, the Court recommends denying Ground One.

## II. Denial of Evidentiary Hearing on First 440 Motion (Ground Two)

In Ground Two, Petitioner asserts that the failure to hold a hearing before denying the second 440 motion was an abuse of discretion. (*See* Dkt. No. 1 at 7 ¶ 22(B)). Petitioner raised this claim on his appeal of the first 440 motion. (SR: 1075-80). The Fourth Department, in affirming the first 440 court's order, did not explicitly discuss the claim regarding the hearing. *See Smith*, 138 A.D.3d at 1419. However, by affirming the first 440 court's rejection of the *Brady* claim, the Fourth Department implicitly rejected the claim that an evidentiary hearing was necessary. In any event, as Respondent argues, Ground Two does not present a cognizable constitutional issue.

"[E]ach State has created mechanisms for both direct appeal and state postconviction review, even though there is no constitutional mandate that they do so." *Lackawanna Cnty. Dist. Attorney v. Coss*, 532 U.S. 394, 402 (2001). Accordingly, "alleged errors in a postconviction proceeding are not grounds for § 2254 review because federal law does not require states to provide a post-conviction mechanism for seeking relief." *Word v. Lord*, 648 F.3d 129, 131 (2d Cir. 2011) (per curiam). Since the first 440 court's refusal to hold an evidentiary hearing does not present a federal constitutional issue, the Court recommends dismissing Ground Two as not cognizable in this habeas proceeding. *See, e.g., Diaz v. Greiner*, 110 F. Supp. 2d 225, 235 (S.D.N.Y. 2000) ("Petitioner's unsupported assertion that the trial court denied

his (third) CPL § 440.10 motion without a hearing violated due process is not cognizable on federal habeas review.").

### III. Ineffective Assistance of Appellate Counsel
### (Grounds Three, Four, and Five)

**\*13** In the petition, Petitioner groups the allegations regarding appellate counsel's ineffectiveness under Ground Three (Dkt. No. 1 at 7-8 ¶ 22(C)); Ground Four (*id.* at 8 ¶ 22(D)); and Ground Five (*id.* at 8 ¶ 22(E)). Petitioner previously raised these allegations in the *coram nobis* application (*see* SR: 1107-37), which the Fourth Department rejected in a one-word opinion—"denied." *Smith*, 155 A.D.3d at 1609. This unexplained disposition constitutes an adjudication on the merits for purposes of 28 U.S.C. § 2254(d). *See Sellan v. Kuhlman*, 261 F.3d 303, 314 (2d Cir. 2001). Because the Fourth Department did not articulate its reasoning, this Court must "determine what arguments or theories ... could have supported" its decision and "then must ask whether it is possible fair[-]minded jurists could disagree that that those arguments or theories are inconsistent with the holding in a prior decision of th[e] [Supreme] Court." *Harrington*, 562 U.S. at 102.

#### A. Legal Standard

The test set forth in *Strickland v. Washington*, 466 U.S. 668 (1984), for evaluating trial counsel's performance "applies equally to claims of ineffective assistance of appellate counsel on a defendant's first appeal as of right." *Aparicio v. Artuz*, 269 F.3d 78, 95 (2d Cir. 2001) (citing *Evitts v. Lucey*, 469 U.S. 387, 396-97 (1985)). "As to the first prong of the *Strickland* test —deficient performance—it is not sufficient for the habeas petitioner to show merely that [appellate] counsel omitted a nonfrivolous argument." *Id.* (citing *Evitts*, 469 U.S. at 394). Appellate counsel "does not have a duty to advance every nonfrivolous argument that could be made." *Mayo v. Henderson*, 13 F.3d 528, 533 (2d Cir. 1994).

"To satisfy the second, prejudice prong, the defendant must show that there is a 'reasonable probability' that, but for the deficiency, 'the result of the proceeding would have been different.' " *Aparicio*, 269 F.3d at 95 (quoting *Strickland*, 466 U.S. at 694); *see also Lynch v. Dolce*, 789 F.3d 303, 311 (2d Cir. 2015) ("[A] petitioner must show that, had his claim been raised on appeal, there is a reasonable probability that it would have succeeded before the state's highest court.").

Failure to fulfill both the performance and prejudice prongs is fatal to a *Strickland* claim. *See* 466 U.S. at 697 ("[T]here is

no reason for a court deciding an ineffective assistance claim to approach the inquiry in the same order or even to address both components of the inquiry if the defendant makes an insufficient showing on one."). "[W]hile in some instances 'even an isolated error' can support an ineffective-assistance claim if it is 'sufficiently egregious and prejudicial,' it is difficult to establish ineffective assistance when counsel's overall performance indicates active and capable advocacy." *Harrington*, 562 U.S. at 111 (quoting *Murray v. Carrier*, 477 U.S. 478, 496 (1986)). On habeas review, "[t]he pivotal question is whether the state court's application of the *Strickland* standard was unreasonable." *Id.* at 101.

#### B. Application

Respondent argues that the Fourth Department reasonably determined that appellate counsel was not ineffective for declining to raise the arguments set forth in Grounds Three, Four, and Five of the petition. (Dkt. No. 37 at 23-36). The Court agrees and recommends dismissing Grounds Three, Four, and Five as meritless.

### 1. Appellate Counsel's Failure to
### Raise Trial Errors (Ground Three)

Ground Three in the petition corresponds to Ground I in the *coram nobis* application (SR: 1109-16), which asserted that appellate counsel failed to raise the following "egregious" trial errors: (a) the prosecution's evidence did not satisfy the corroboration rule for accomplice testimony set forth in C.P.L. § 60.22 (SR: 1110-12); and (b) the trial court's *Molineux* ruling was erroneous and highly prejudicial (SR: 1112-16).

#### a. Insufficiency of Corroborating Evidence

**\*14** Petitioner asserts that appellate counsel should have challenged the sufficiency of the evidence corroborating Gayden's accomplice testimony as required by C.P.L. § 60.22. (*See* Dkt. No. 1 at 7-8, ¶ 22(C); SR: 1110-12). Respondent counters that Gayden was not an accomplice as a matter of state law and therefore the argument had no chance of succeeding on appeal. (*See* Dkt. No. 37 at 28-29).

The Court notes, however, that the trial court issued a jury charge stating that Gayden *was* an accomplice as a matter of law. (TT: 580). Such a charge is required in New York where the trial court "determines on the evidence that a

witness comes within the meaning of CPL 60.22(2)," *People v. Sage*, 23 N.Y.3d 16, 23 (2014), i.e., that the witness "may reasonably be considered to have participated in: (a) [t]he offense charged; or (b) [a]n offense based upon the same or some of the same facts or conduct which constitute the offense charged," *id.* (quoting N.Y. Crim. Proc. Law § 60.22(2) (alterations in original)). Therefore, contrary to Respondent's assertion, C.P.L. § 60.22(1)'s corroboration rule is relevant to Petitioner's case.

Under C.P.L. § 60.22(1), "[t]he quantum of evidence necessary to satisfy the statutory corroboration requirement is enough if it tends to connect the defendant with the commission of the crime in such a way as may reasonably satisfy the jury that the accomplice is telling the truth ...." *Sage*, 23 N.Y.3d at 27 (internal quotation marks and citations omitted). *Id.* "The required corroboration need not prove the defendant's guilt, and it may be based on evidence that sufficiently harmonizes with the accomplice testimony so as to furnish the necessary connection between defendant and the crime." *Id.* Evidence "may be considered corroborative even though it simply supports the accomplice testimony, and does not independently incriminate the defendant." *People v. Reome*, 15 N.Y.3d 188, 190 (2010).

The prosecutor adduced evidence that reasonably could have satisfied the jury that Gayden was telling the truth about the manner in which the shooting was committed and Petitioner's involvement in it. For instance, the jury viewed the surveillance videotape showing that the shooting was committed by a man on a bicycle firing a gun with left hand; Corporal Tripoli testified that he observed Petitioner signing a document with his left hand (TT: 449-51); Petitioner admitted to Sergeant Mariano that he is left-handed (TT: 553-54); and Petitioner twice admitted to Allen that he "shot the boy." (TT: 382-83, 385-86). This "corroborative evidence [was] such that when read with [Gayden]'s testimony, makes it more likely that [Petitioner] committed the offense, and thus tends to connect him to it." *Sage*, 23 N.Y.3d at 27 (internal quotation marks and citation omitted).

Petitioner challenges the use of the videotape as corroboration, noting it was grainy and did not show the facial features of the shooter. He also argues that Allen could not supply corroborating evidence due to her credibility issues and certain inconsistencies between her and Gayden's testimony. The jury, however, was exclusively responsible for assessing witness credibility, weighing the evidence, and determining the evidentiary inferences to be drawn from it.

*See Maldonado v. Scully*, 86 F.3d 32, 35 (2d Cir. 1996) (stating that "assessments of the weight of the evidence or the credibility of witnesses are for the jury and not grounds for reversal on appeal."). Because Petitioner has not demonstrated that this argument was likely to be successful on appeal, he has not shown either that appellate counsel unreasonably omitted it or that he was prejudiced by the omission.

### b. Erroneous *Molineux* Ruling

**\*15** Petitioner contends that appellate counsel failed to challenge the trial court's *Molineux* ruling permitting Gayden to testify about seeing Petitioner fire the .380-caliber gun at the futon a few weeks before the shooting. (Dkt. No. 1 at 8, ¶ 22(C), SR: 1113-15). Petitioner asserts that although the prosecutor assured the trial court at the *Molineux* hearing that he would supply additional evidence connecting Gayden's testimony to Petitioner (*see* TT: 9-10), he never did so. Petitioner is incorrect. Through the testimony of the two officers who recovered the projectiles at Gayden's drug house (TT: 501-04, 509-10); and the expert testimony of the firearms examiner who analyzed the projectiles (TT: 522-36), the prosecutor supplied the connecting evidence he had promised at the *Molineux* hearing. Because this argument was factually unsupported, appellate counsel reasonably decided not to include it. And because there is no reasonable probably it would have altered the outcome of the appeal, Petitioner was not prejudiced.

### 2. Appellate Counsel's Failure to Raise Trial Counsel's Ineffectiveness (Ground Four)

Ground Four in the petition corresponds to Ground II in the *coram nobis* application (SR: 1117-31), which asserted that appellate counsel erroneously omitted the following examples of trial counsel's ineffectiveness: (a) failing to object to Gayden's testimony about Petitioner's rap lyrics (SR: 1117-18); (b) eliciting testimony from Gayden that he took a polygraph test (SR: 1118-20); (c) failing to object to Investigator May's bolstering of Gayden's testimony (SR:1120-21); (d) failing to object to, and request a limiting instruction for, Gayden's and Sergeant Mariano's testimony about Petitioner's attempt to retrieve the surveillance camera footage and his defilement of the sidewalk memorial (SR: 1121-29); and (e) failing to request a missing witness

instruction as to grand jury witness Anthony White (SR: 1129-31).

### a. Failure to Object to Rap Lyrics

Petitioner claims that trial counsel should have objected to Gayden's testimony that the night after the shooting, he saw and heard Petitioner rapping that he was a "killer" and "did it on Miller." (TT: 227). "[D]ecisions such as when to object and on what grounds are primarily matters of trial strategy and tactics, and thus are virtually unchallengeable absent exceptional grounds for doing so." *United States v. Cohen*, 427 F. 3d 164, 170 (2d Cir. 2005) (internal quotation marks and citations omitted). Petitioner has not set forth any grounds, let alone exceptional ones, for overcoming the presumption of reasonableness afforded to trial counsel's strategic decision not to object.

As a matter of New York State evidentiary law, a party's admissions to a material fact are competent evidence against him or her, regardless of where, when, or to whom the party makes the admissions. *People v. Chico*, 90 N.Y.2d 585, 589 (1997). Although Petitioner did not explicitly say, "I killed Harris on Miller Street," the undisputed proof at trial was that Harris was killed at the corner of Miller Street and Clifford Avenue. Trial counsel reasonably could have determined that the rap lyric contained at least an implied admission of responsibility for Harris's death and was therefore admissible. *See, e.g., People v. McPhillips*, 21 N.Y.S.3d 134, 135 (2d Dep't 2015) (statement to victim by defendant, " 'I'm not going back to prison' ... constituted an implicit acknowledgment by the defendant that he had engaged in conduct that would result in him 'going back to prison' " and thus the "statement contained an 'implied admission of guilt' ") (citations omitted).

Because Petitioner has not demonstrated that there was a winning objection to make to Gayden's testimony, this ineffective assistance of trial counsel claim was weak, and appellate counsel reasonably declined to include it. And since the argument had no reasonable probability of succeeding on appeal, its omission did not result in prejudice.

### b. Eliciting Testimony Regarding Polygraph Test

*16 While cross-examining Gayden, trial counsel elicited that he underwent a polygraph examination as a condition

of his cooperation agreement. (TT: 332). When that portion of his cross-examination concluded, trial counsel sought a colloquy outside the jury's presence. (TT: 342). He explained that since the discovery turned over by the prosecutor contained no polygraph results, he believed that Gayden had not taken a polygraph test and therefore expected him to testify accordingly. (TT: 347-48). Trial counsel asked the trial court to strike the question and Gayden's answer but not instruct the jury that the evidence had been stricken unless the jury later requested a readback of the testimony. (TT: 348-49). Counsel explained that he did not "want to bring attention to [the testimony]." (TT: 348).

Petitioner correctly notes that polygraph results are inadmissible under New York State law; however, the results of Gayden's test were not revealed at trial. Nonetheless, Petitioner argues, the only possible inference was that Gayden must have passed the polygraph examination because he was allowed to plead guilty under the cooperation agreement.

"The decision whether to object, to avoid calling any additional attention to potentially damaging statements, is encompassed within the category of strategic legal decision-making." *Gilmore v. Lewin*, No. 9:05-CV-1378, 2007 WL 3274863, at *3 (N.D.N.Y. Nov. 5, 2007) (citing *Gatto v. Hoke*, 809 F. Supp. 1030, 1039 (E.D.N.Y. 1992) ("[C]ounsel's failure to object to the prosecutor's summation represents his tactical decision to avoid underscoring the prosecutor's statements so as to draw the jury's attention to them.")). The decision whether to request a limiting instruction likewise is a matter of trial strategy. *See Conteh v. United States*, 226 F. Supp. 2d 514, 518-19 (S.D.N.Y. 2002) (finding that counsel's failure to seek limiting instruction as to inadmissible hearsay was reasonable tactical decision where instruction would have risked drawing jury's attention to potentially damaging evidence). The record reflects that trial counsel made a considered decision not to object to Gayden's testimony in the presence of the jury and to decline an immediate curative instruction. Petitioner has not overcome the presumption of reasonableness accorded to this strategic choice. Therefore, this ineffectiveness claim was not a strong candidate to include on appeal, and appellate counsel's decision to omit it was reasonable.

### c. Failure to Prevent Bolstering by Investigator May

Petitioner faults trial counsel for failing to establish the lack of independent proof connecting him to the projectiles recovered

in the basement of Gayden's drug house. Petitioner concedes that trial counsel objected to Investigator May's testimony that, during the execution of the search warrant, he and the officers "went into the basement where he had been directed to by Danny Gayden." (TT: 502-03). Although the trial court sustained the objection as to the latter part of the answer, i.e., the reference to what Gayden had told Investigator May (TT: 503), Petitioner claims that trial counsel should have done more.

First, Petitioner says that counsel should have cross-examined Investigator May to show that the police investigation did not support Gayden's testimony that Petitioner had fired the gun at the futon. "An attorney's decision not to impeach a witness may fall within the range of objectively reasonable trial strategies at counsel's disposal." *Lewis v. United States*, No. 10-CV-00718 ENV, 2012 WL 2394810, at *4 (E.D.N.Y. June 25, 2012) (citing *Dunham v. Travis*, 313 F.3d 724, 732 (2d Cir. 2002)). As discussed above, because the ballistics evidence recovered from the drug house *did* support Gayden's testimony, there is no reasonable probability that any cross-examination of Investigator May would have yielded the desired result. In fact, it might have done the defense more harm than good.

**\*17** Second, Petitioner claims that trial counsel should have requested a "specific curative instruction" after the trial court sustained his objection to Investigator May's testimony about what Gayden had told him. Whether to object to allegedly improper evidence or request a curative instruction are matters of trial strategy that reviewing courts generally will not second-guess. *See, e.g., Smith v. Keane*, 101 F.3d 1392, 1996 WL 364539, at *3 (Table) (2d Cir. 1996) ("Trial counsel's conscious choice to decline to request a curative instruction or to move for a mistrial immediately after the prosecutor made the statement can be justified as a tactical decision."); *Evans v. Bennett*, No. 98CV1706 (LEK/DRH), 2001 WL 36006042, at *8 (N.D.N.Y. Nov. 20, 2001) ("Counsel's failure to request curative instructions or move for a mistrial were purely questions of strategy.").

Trial counsel reasonably could have decided that asking for a curative instruction might have emphasized Investigator May's testimony that Gayden provided information that led to the officers' discovery of the projectiles in and around the futon, and thereby indirectly bolstered the credibility of Gayden's testimony that Petitioner fired the .380-caliber gun into the futon. Trial counsel's decision not to request a curative instruction cannot be deemed ineffective assistance where, as

here, the " 'strategy of silence on defense counsel's part [is] quite appropriate.' " *Robinson v. Keane*, No. 92 Civ. 6090, 1999 WL 459811, at *2 (S.D.N.Y. June 29, 1999) (alteration in original) (quoting *United States v. Sanchez*, 790 F.2d 245, 253 (2d Cir. 1986)); *see also Smith v. Walsh*, No. 02 CIV. 5755(WHP[])(JCF[]), 2003 WL 21649485, at *6 (S.D.N.Y. July 14, 2003) (finding that defense counsel's failure to request a curative instruction was "appropriate trial strategy," where counsel informed the trial judge "that a curative jury instruction would only serve to highlight the statement in the juror's minds").

Petitioner has not overcome the presumption of reasonableness accorded to appellate counsel's strategic choice not to include this weak claim of trial counsel's ineffectiveness. Because there is no reasonable probability that the underlying ineffectiveness claim would have succeeded on appeal, Petitioner cannot show he prejudice resulting from appellate counsel's decision to omit it.

### d. Failure to Object to *Molineux* Testimony by Gayden and Sergeant Mariano

Petitioner claims that appellate counsel should have argued that trial counsel was ineffective for failing to object on *Molineux* grounds to Gayden's and Sergeant Mariano's testimony concerning Petitioner's defilement of the sidewalk memorial. Courts in New York State have viewed the "failure to object to alleged *Molineux* evidence and to request a limiting instruction '[as] a tactical decision' " which does not "constitute ineffective assistance [of counsel]." *People v. Smith (Labradford)*, 118 A.D.3d 1492, 1493 (4th Dep't 2014) (quoting *People v. Taylor*, 2 A.D.3d 1306, 1308 (4th Dep't 2003)); *see also People v. Motayne*, 128 A.D.3d 732, 733 (2d Dep't 2015) ("Unsuccessful trial strategies and tactics do not constitute ineffective assistance of counsel."). Given this precedent, appellate counsel reasonably could have determined that an ineffective assistance argument predicated on trial counsel's failure to object to alleged *Molineux* evidence was unlikely to succeed.

The Court notes that appellate counsel did challenge Gayden's and Sergeant Mariano's testimony as unduly prejudicial and argued that, despite the lack of preservation, the claim warranted review under the Fourth Department's "interest of justice" jurisdiction. (SR: 380-83). This was not an unreasonable approach, since intermediate appellate courts in New York State can, and do, entertain even unpreserved

issues "as a matter of discretion in the interest of justice." C.P.L. § 470.15(6). *See, e.g., People v. Hilton*, 166 A.D.3d 1316, 1321 (3d Dep't 2018) ("Even if defendant had preserved his claims with respect to the *Molineux* ruling and charge, they are without merit."). Petitioner has not overcome the presumption of reasonableness accorded to appellate counsel's strategic decision to raise the *Molineux* issue as a stand-alone evidentiary claim instead of as a predicate for an ineffective assistance claim. Moreover, because he has not demonstrated a reasonable probability that it would have succeeded, he has not shown that appellate counsel's decision not to include it prejudiced the outcome of his appeal.

### e. Failure to Request Missing Witness Charge for Anthony White

**\*18** Petitioner asserts that trial counsel should have requested a missing witness charge for Anthony White ("White"), who allegedly "testified before the Grand Jury that he was standing on the corner of Clifford and Miller in front of the store[ ] when he saw appellant Smith shoot the victim." (SR: 1129 (citing "GJM [9] 8-10")). At a pre-trial appearance, trial counsel noted that White, who was on the prosecution's witness list, was in prison. (9/04/07 Tr. (Dkt. No. 33-3) at 8). The prosecutor accordingly agreed to provide a copy of White's rap sheet. (*Id.*). The prosecutor did not call White as a witness, and defense counsel did not request a missing witness charge.

[9] "GJM" presumably refers to the grand jury minutes which are not in the state court records provided by Respondent. The Court therefore cannot verify the substance of White's expected testimony. The Court will assume for the sake of argument that he would have testified as described by Petitioner.

"A party seeking a missing witness charge must demonstrate, among other things, that the witness would provide non-cumulative testimony." *Davis v. Mantello*, 42 F. App'x 488, 491 (2d Cir. 2002) (unpublished opn.) (citing *People v. Gonzalez*, 68 N.Y.2d 424, 427 (1986)). "A missing witness charge is not appropriate when the witness's testimony would merely corroborate the testimony of other witnesses." *Id.* (citing *People v. Keen*, 94 N.Y.2d 533, 539 (2000)); *see also People v. Williams*, 10 A.D.3d 213, 217 (1st Dep't 2005) ("A party is not entitled to a missing witness charge if the testimony of the uncalled witness would be merely cumulative, even if the opposing party has called only one

witness to testify on a given material issue." (internal citations omitted)).

Petitioner has not demonstrated he was entitled to a missing witness charge as to White, since his proposed testimony arguably would have been cumulative to Gayden's eyewitness account of the shooting. Moreover, in his *pro se* supplemental appellate brief, Petitioner raised a claim that trial counsel erroneously failed to request a missing witness charge for White. (SR: 396, 413-15). The Fourth Department summarily rejected it as meritless. *Smith*, 93 A.D.3d at 1346 (rejecting ineffective assistance claim because "defendant failed to establish the absence of a strategic or other legitimate explanation for defense counsel's alleged shortcomings"). Petitioner has not explained how appellate counsel could have briefed the issue differently so as to persuade the Fourth Department it had merit.

Petitioner has not overcome the presumption of reasonableness accorded both to trial counsel's strategic decision as to whether to request a missing charge and appellate counsel's strategic decision as to which issues to include on appeal. Because Petitioner raised the same claim in his *pro se* brief and the Fourth Department rejected it, he cannot show prejudice as a result of appellate counsel's decision not to assert it.

### 3. Appellate Counsel's Failure to Raise Prosecutorial Misconduct (Ground Five)

In Ground Five, Petitioner asserts that appellate counsel should have argued that the prosecutor committed misconduct during his summation. First, Petitioner faults the prosecutor for misstating the facts and referring to facts not in evidence when he told the jury:

> At that point, the Defendant, Brian Smith, said, fuck this, turned his bicycle around, pulled up on the sidewalk and fired at least five shots into the vehicle of Triston Harris as Triston Harris was getting in the driver's seat.

(TT: 620; *see also* TT: 635 ("[W]hat did [Gayden] tell you? Brian Smith said, fuck this, turned his bicycle around....").

According to Petitioner, Gayden did not testify either that Petitioner said "fuck this" just prior to the shooting or that Petitioner turned his bike around before firing the gun.

**\*19**  Contrary to Petitioner's contention, Gayden *did* testify on cross-examination that Petitioner turned his bicycle around before shooting at Harris's car:

> Q: Well, how far had [Petitioner] gone up Clifford Avenue before this occurred, before he is going towards [Harris]?
>
> A: Uhm, he had rode up in the front entrance by the store, and had to turn his bike around.
>
> Q: And then it is your testimony that [Petitioner] started shooting at the car; is that correct?
>
> A: Yes.

(TT: 293-94).

"[R]eversal is warranted only if the [prosecutorial] misconduct has caused such substantial prejudice to defendant that he was denied due process." *People v. Griffin*, 151 A.D.3d 1824, 1825 (4th Dep't 2017) (collecting cases). Although Petitioner correctly notes that Gayden did not testify that Petitioner said, "fuck this" before turning his bicycle around, he fails to explain how this particular comment prejudiced the defense. Due to the absence of prejudice, this prosecutorial misconduct claim was a weak prospect for appeal. Thus, it was reasonable for appellate counsel to omit it.

Second, Petitioner contends that appellate counsel overlooked a meritorious claim based on the prosecutor's alleged vouching for Gayden's credibility. More specifically, Petitioner points to the prosecutor's argument that the surveillance video footage "fits perfectly with what Danny Gayden told us...." (TT: 621). He also faults the prosecutor for asking the jury rhetorically, "How else do we know that Danny Gayden was telling us the truth and that Brian Smith was the shooter[?]" (TT: 625); (*see also* TT: 627 ("How else do we know that Danny Gayden was telling us the truth when he told us that Brian Smith was the shooter?")).

"Attorney statements vouching for the credibility of witnesses are generally improper because they 'impl[y] the existence of extraneous proof.' " *United States v. Perez*, 144 F.3d 204, 210 (2d Cir. 1998) (quoting *United States v. Rivera*, 22 F.3d 430, 438 (2d Cir. 1994) (alteration in original)). Here, the prosecutor did not imply that he had "special knowledge of

facts not before the jury." *Id.* Instead, he pointed to different items of evidence and argued how each one corroborated Gayden's testimony. (*See*, *e.g.*, TT: 625-28 (discussing the ballistics and forensic medical evidence)). Courts have held that this does not constitute improper vouching for a witness's credibility. *See*, *e.g.*, *Perez*, 144 F.3d at 210 (no improper vouching where the prosecutor stated in regard to the law enforcement witnesses, " 'I submit to you that they are reliable, you can trust their testimony. You can count on them. And there's some reasons why I say that to you[,]' " and "then discussed particular items of evidence in detail and argued that the evidence supported the officers' credibility"). Because the prosecutorial misconduct argument was quite weak, appellate counsel reasonably decided to omit. And since it had no reasonable probability of succeeding, appellate counsel's strategic decision to omit it did not prejudice Petitioner.

## IV. Ineffective Assistance of Trial Counsel (Grounds Six, Thirteen, and Fourteen)

Grounds Six, Thirteen, and Fourteen assert various claims concerning trial counsel's performance. Ground Six (Dkt. No. 1 at 9) includes the allegations raised in the second 440 motion (SR: 1174-1653)—that trial counsel (a) failed to use the recordings of Allen and Gayden's jail phone calls for impeachment; (b) failed to investigate an unidentified witness's statement that Allen was trying to a sell a gun that was used in a homicide; (c) failed to cross-examine Allen using a cell phone bill showing calls between her phone and a phone number linked to Harris; and (d) failed to prevent the admission of prejudicial testimony from Gayden and Sergeant Mariano. The second 440 court rejected the ineffective assistance claims on procedural grounds and on the merits. (SR: 2047-49).

**\*20**  The ineffective assistance of counsel allegations in Ground Thirteen (failure to request a missing witness charge for Witness Number 3) and Ground Fourteen (opening the door to questioning about Petitioner's prior robbery) were raised on direct appeal in Petitioner's *pro se* supplemental appellate brief (SR: 413-16), and the Fourth Department denied them on the merits. *Smith*, 93 A.D.3d at 1346 ("We reject th[e] contention [of ineffective assistance of counsel] inasmuch as defendant failed to establish the absence of a strategic or other legitimate explanation for defense counsel's alleged shortcomings.").

Respondent has raised the affirmative defense of procedural default as to the allegations in Ground Six. (Dkt. No. 37 at

43-44). Alternatively, Respondent argues that the state courts reasonably applied *Strickland* in rejecting the ineffectiveness allegations in Grounds Six, Thirteen, and Fourteen. (*Id.* at 44-48). The Court agrees and recommends dismissing Grounds Six, Thirteen, and Fourteen as meritless.

### A. Procedural Default

Where a state prisoner "has defaulted his federal claims in state court pursuant to an independent and adequate state procedural rule," *Coleman v. Thompson*, 501 U.S. 722, 750 (1991), a federal habeas review of the claims is barred." *Id.* When presented with a procedural default argument based on the adequate and independent state ground doctrine, the federal habeas court is responsible for first determining the "adequacy" of the state procedural bar. *Garvey v. Duncan*, 485 F.3d 709, 714 (2d Cir. 2007) (citing *Lee v. Kemna*, 534 U.S. 362, 375 (2002)). That is, the federal court must "ascertain whether the state rule at issue is firmly established and regularly followed, and further whether application of that rule in [a particular] case would be exorbitant." *Id.*

Respondent asserts that the claims in Ground Six challenging trial counsel's performance are procedurally defaulted because the second 440 court relied on two adequate and independent state grounds—C.P.L. §§ 440.10(2)(c) and 440.10(3)(c)—to reject them. (Dkt. No. 37 at 36-37, 43-44 (referring to SR: 2047)). Respondent further contends that Petitioner cannot overcome the procedural bar. (*Id.*).

The Supreme Court has observed that it is appropriate to bypass procedural questions to reach the merits of a habeas petition if the underlying issues "are easily resolvable against the habeas petitioner, whereas the procedural-bar issue involve[s] complicated issues of state law." *Lambrix v. Singletary*, 520 U.S. 518, 525 (1997). The ineffective assistance allegations in Ground Six are clearly meritless, while Respondent's assertion of procedural default presents a potentially complicated issue of state law. The Court therefore will proceed directly to the substance of Ground Six. *See*, *e.g.*, *Anderson v. Graham*, No. 6:15-cv-06687-MAT, 2018 WL 1428249, at *2 (W.D.N.Y. Mar. 22, 2018) (declining to "resolve the issues raised by [the r]espondent's assertion of the defenses of non-exhaustion and procedural default" and proceeding to decide the claims on the merits). Because the state courts did not unreasonably apply *Strickland* in rejecting the allegations of ineffective assistance of trial counsel, the Court recommends dismissing Grounds Six, Thirteen, and Fourteen as meritless.

### B. Merits

#### 1. Legal Standard

Under *Strickland*'s two-pronged test for evaluating claims of ineffective assistance of trial counsel, the petitioner first must show that counsel's performance "fell below an objective standard of reasonableness" in light of "prevailing professional norms." 466 U.S. at 688. The Supreme Court has "often explained that [counsel's strategic decisions ... are entitled to a 'strong presumption' of reasonableness." *Dunn v. Reeves*, 141 S. Ct. 2405, 2410 (2021) (per curiam) (citing *Harrington*, 562 U.S. at 104). A reviewing court is "required not simply to 'give [the] attorneys the benefit of the doubt,' but to affirmatively entertain the range of possible 'reasons [the petitioner's] counsel may have had for proceeding as they did,' " *Cullen v. Pinholster*, 563 U.S. 170, 196 (2011) (first alteration in original; citations omitted). "[T]he burden to 'show that counsel's performance was deficient' rests squarely on the [petitioner]," *Burt v. Titlow*, 571 U.S. 12, 22-23 (2013) (quoting *Strickland*, 466 U.S. at 687). "[T]he absence of evidence cannot overcome the 'strong presumption that counsel's conduct [fell] within the wide range of reasonable professional assistance.' " *Id.* at 23 (quoting *Strickland*, 466 U.S. at 689 (second alteration in original))

**\*21** Second, the petitioner must show prejudice, meaning "that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694. "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* "That requires a 'substantial,' not just 'conceivable,' likelihood of a different result." *Cullen*, 563 U.S. at 189 (quoting *Harrington*, 562 U.S. at 112).

#### 2. Trial Counsel's Alleged Errors

##### a. Failure to Use Jail Phone Calls for Impeachment (Ground Six)

Petitioner faults trial counsel's approach to cross-examining Gayden and Allen, arguing that he should have impeached them with recordings of their telephone calls while Gayden was detained at the Monroe County Jail. According to Petitioner, the calls would have proven that when Gayden

2023 WL 4936942

and Allen discussed having Allen sell a "thing," they were referring to the weapon used to shoot Harris. (SR: 1204-05).

"[T]he conduct of examination and cross-examination is entrusted to the judgment of the lawyer, and [a] [reviewing] court on a cold record should not second-guess such decisions unless there is no strategic or tactical justification for the course taken." *United States v. Luciano*, 158 F.3d 655, 660 (2d Cir. 1998). Petitioner here simply disagrees with trial counsel's strategic approach to cross-examining Gayden and Allen about this topic. The Court notes that trial counsel specifically asked Gayden if the gun he and Allen discussed selling was the gun used to shoot Harris, but Gayden denied it. (TT: 326). Gayden said that the weapon he had Allen sell was a .44-caliber gun (TT: 368), but the proof at trial established that the gun used to shoot Harris was a .380-caliber pistol. (TT: 536).

Moreover, Petitioner has not shown how the actual phone call recordings would have established that the "thing" Gayden and Allen discussed actually was the .380-caliber gun used to shoot Harris. Therefore, he has not shown how the outcome of the cross-examination would have been different had trial counsel used the call recordings and accordingly cannot demonstrate prejudice as a result of trial counsel's decision.

**b. Failure to Investigate Witness Statement (Ground Six)**

Petitioner contends that trial counsel should have hired an investigator to pursue a potential lead about a witness who was mentioned in an investigative action report authored by Investigator May:

> On the morning of Tuesday, November 8, I received a phone call from (V[ictim]) Harris'[s] mother, Emma Gibson. She advised me that she and her family had gone out on Saturday, November 5 to hang reward posters for information from the murder. She said she was on Miller St. at Bay St. and a young female black approached her. She described this girl as being approximately 5'5" – 5'6", medium complected, approx. 18-20 years old, with weaved hair in a pony tail [sic]. This female identified herself

> as T and said she stays with Octavia Allen, the girlfriend of Danny Gayden. According to Gibson, this girl told her that Octavia is attempting to sell the gun for bail money to get Danny Gayden out of jail. She is having difficulty selling it though because the gun "has a body on it." Gibson said she tried to get the girl[']s name or at least a phone number but the girl refused.

(SR: 1456).

Petitioner assumes, without any factual support, trial counsel did not investigate the lead about "T." Even assuming that trial counsel did not investigate this notation about "T.," "a petitioner does not show that he was prejudiced by trial counsel's alleged deficient performance merely by asserting that certain witnesses might have supplied relevant testimony; rather, he must state exactly what testimony they would have supplied and how such testimony would have changed the result." *Carr v. Senkowski*, No. 01-CV-689, 2007 WL 3124624, at \*20 (W.D.N.Y. Oct. 23, 2007) (citing, *inter alia*, *Alexander v. McCotter*, 775 F.2d 595, 602 (5th Cir. 1985)). "[I]n order for the [petitioner] to demonstrate the requisite *Strickland* prejudice, the [petitioner] must show not only that this testimony would have been favorable, but also that the witness would have testified at trial." *Id.* at \*22 (citing *Alexander*, 775 F.2d at 602).

 \*22  As the second 440 court observed in denying this "conclusory" claim, "[t]here [were] no affidavits from any potential witnesses submitted" in support of the motion. (SR: 2048). Petitioner therefore has not shown that "T.," in fact, would have testified at trial and would have provided testimony favorable to the defense. Accordingly, even assuming that trial counsel did not investigate "T.," Petitioner cannot show any prejudice to his defense as a result of trial counsel's failure to call her as a witness. *See Carr*, 2007 WL 3124624, at \*22; *see also Sturdivant v. Barkley*, No. 04-CV-5659 (DLI), 2007 WL 2126093, at \*7 (E.D.N.Y. July 24, 2007) ("[P]etitioner gives no indication as to which witnesses counsel should have presented, much less how any of these unidentified individuals would have changed the result of the proceeding. As such, petitioner's self-serving and conclusory allegation that defense counsel failed to present witnesses is insufficient to establish ineffective assistance of counsel.").

### c. Failure to Cross-Examine Allen
### Using Cell Phone Bill (Ground Six)

Petitioner asserts that trial counsel erred by failing to cross-examine Allen about a phone bill seized during the execution of a search warrant on Gayden's drug house. The phone bill in question revealed eleven calls between a landline in Allen's household and a telephone number that had been "reported to [Investigator May] as being (V) Harris' cell phone number." (SR: 1462, 1592-96). The date-range for the phone calls begins September 30, 2005, the day before Harris's death; it ends on October 6, 2005, four days after his death. (SR: 1595-96). The calls, in total, lasted fourteen billed minutes. Only five minutes of the calls occurred prior to Harris's death (SR: 1595), and the two longest calls (two and three minutes, respectively) post-date Harris's time of death. (SR: 1596).

Petitioner argues that the phone bill was "crucial" to his defense because it "corroborated [his] assertion to trial counsel as it related to Gayden and Allen's motive to frame [him]" for Harris's death. (SR: 1210). Petitioner explains that he informed counsel that he had told Gayden that Allen was rumored to be "sleeping with someone that hangs out around the Saratoga area," that "Harris was alleged to be from that area," and that "presumably after [Gayden] confront[ed] [Allen] about that, she accused [Petitioner] of sleeping with her, or trying to sleep with her; which created animosity between [Petitioner] and Gayden." (SR: 1210). According to Petitioner, this explains why Gayden inculpated him in the shooting. (*See id.*).

Petitioner's argument regarding the probative value of the phone bill rests on nothing more than speculative assertions and improbable inferences. "[F]ederal district courts cannot grant habeas relief based upon unsubstantiated surmise, opinion or speculation." *Gillis v. Edwards*, 445 F. Supp. 2d 221, 235 (N.D.N.Y. 2006) (citing *Wood v. Bartholomew*, 516 U.S. 1, 8 (1995) (stating that federal courts may not grant "habeas relief on the basis of little more than speculation with slight support")). Petitioner has not established that the phone bill would have had any conceivable effect on the verdict, and therefore cannot show that trial counsel's failure to introduce it prejudiced the defense.

### d. Failure to Prevent Admission of
### Improper Evidence (Ground Six)

Petitioner faults trial counsel for failing to prevent admission of the testimony from Gayden and Sergeant Mariano regarding his unsuccessful attempt to obtain the surveillance camera footage and his destruction of the sidewalk memorial to Harris. Petitioner contends that the allegations could have been "unquestionably refuted" by having a defense investigator retrieve the surveillance camera video footage from the day in question. (SR: 1211-12).

Failure to conduct an adequate pre-trial investigation may serve as the basis for a claim of ineffective assistance of counsel, *see Strickland*, 466 U.S. at 690-91, but "a petitioner must do more than make vague, conclusory, or speculative claims as to what evidence could have been produced by further investigation." *Taylor v. Poole*, No. 07 CIV 6318 RJH GWG, 2009 WL 2634724, at *14 (S.D.N.Y. Aug. 27, 2009), *report and recommendation adopted*, No. 07 CIV. 6318 RJH GWG, 2011 WL 3809887 (S.D.N.Y. Aug. 26, 2011) (collecting cases). Petitioner has not substantiated his complaint about the purportedly inadequate investigation with, for instance, an affidavit from trial counsel indicating that he did not attempt to retrieve the footage or an affidavit from the store employees saying that no one from the defense team inquired about the footage. It is entirely possible that defense counsel tried to obtain the footage but was unable to do so. Petitioner's claim thus rests on mere speculation, which is insufficient to show deficient performance or prejudice. *See*, *e.g.*, *Rosario v. Bennett*, No. 01 CIV. 7142(RMB)(AJ[P]), 2002 WL 31852827, at *33 (S.D.N.Y. Dec. 20, 2002) (rejecting failure-to-investigate claim where petitioner did "nothing but assert than investigation might have revealed witnesses who might have supplied relevant testimony that might have been exculpatory"); *McPherson v. Greiner*, No. 02 CIV.2726 DLC AJP, 2003 WL 22405449, at *25 (S.D.N.Y. Oct. 22, 2003) (rejecting failure-to-investigate claim as speculative where there was "no way to know that trial counsel did not consider investigating these claims [of exculpatory evidence] but simply rejected them as being unpromising").

**\*23** Petitioner also contends that trial counsel should have objected to the evidence or sought an advance ruling to have it precluded under the *Molineux* rule. "In considering the reasonableness of counsel's failure to object, [courts] 'indulge a strong presumption that counsel's conduct falls

within the wide range of reasonable professional assistance,' " *Cox v. Donnelly*, 387 F,3d 193, 198 (2d Cir. 2004) (quoting *Strickland*, 466 U.S. at 689), and " 'might be considered sound strategy.' " *Id.* (quoting *Strickland*, 466 U.S. at 689). With regard to trial counsel's failure to "prevent" the admission of the testimony from Gayden and Sergeant Mariano, Petitioner has not demonstrated that there was a meritorious objection that counsel could have made.

The *Molineux* rule states that "evidence of a defendant's uncharged crimes or prior misconduct is not admissible if it cannot logically be connected to some specific material issue in the case, and tends *only to demonstrate the defendant's propensity to commit the crime charged*." *People v. Cass*, 18 N.Y.3d 553, 559 (2012) (emphasis supplied). Although the *Molineux* rule generally encompasses only *prior* crimes and *prior* bad acts, the Court will assume for the sake of argument that the testimony at issue here potentially could fall within the rule's ambit.

Trial counsel reasonably could have determined that Gayden's testimony regarding Petitioner's attempt to retrieve the surveillance video was relevant to show consciousness of guilt and thus admissible. *See People v. Person*, 26 A.D.3d 292, 294 (1st Dep't 2006) (holding that the trial court "properly admitted testimony that defendant directed the accomplice to remove traces of evidence from the victim's apartment, and to kill a doorman who had seen him, since this evinced defendant's consciousness of guilt," and "properly balanced the probative value of the evidence against the potential for undue prejudice"); *People v. Cotton*, 184 A.D.3d 1145, 1146 (4th Dep't 2020) (stating that "evidence that defendant may have damaged the victim's electronic devices to prevent her from preserving a record of defendant's conduct is probative of his consciousness of guilt inasmuch as it is akin to evidence of tampering or witness intimidation"). "Consciousness of guilt has been found to be a valid exception to the *Molineux* rule." *People v. C.H.*, 51 Misc. 3d 1230(A) (N.Y. Sup. Ct. 2016) (citing *People v. Brown*, 239 A.D.2d 429 (2d Dep't 1997)).

Similarly, trial counsel reasonably could have determined that Gayden's testimony was relevant to the issue of "identity," the most critical issue in the case. It would be reasonable to infer that only the person responsible for Harris's death would be motivated to destroy a memorial to him, particularly after that person had unsuccessfully attempted to obtain the videotape potentially identifying him as the shooter. "Identity" is one of the enumerated *Molineux* exceptions.

*See Molineux*, 168 N.Y. at 293. Moreover, the evidence fell within the *Molineux* exception stating that "evidence may be admissible as 'necessary background material when relevant to a contested issue in the case ... or to complete the narrative of the events.' " *People v. Woody*, 214 A.D.3d 157, 161 (1st Dep't 2023) (quoting *People v. Foster*, 295 A.D.2d 110, 112 (1st Dep't 2002) (ellipsis in original; internal citations omitted in original)). "This exception is generally applicable where there is ... some need to flesh out the narrative so that there are no gaps in the story line provided to the jury." *People v. Leonard*, 29 N.Y.3d 1, 8 (2017).

Sergeant Mariano's testimony about Petitioner's head-nod upon hearing that the police knew about this conduct arguably could be characterized as an adoptive admission. *See People v. Vining*, 28 N.Y.3d 686, 690 (2017) ("An adoptive admission occurs 'when a party acknowledges and assents to something "already uttered by another person, which thus becomes effectively the party's own admission." ' ") (emphasis and citation omitted); *see also People v. Speller*, 121 Misc. 2d 354, 355 (N.Y. Sup. Ct. 1983) ("An admission, in addition to being oral, may take the form of any act on defendant's part which tends to convey his thought processes." (citing *Schmerber v. California*, 384 U.S. 757, 761 n.5 (1966) ("A nod or headshake is as much a 'testimonial' or 'communicative' act in this sense as are spoken words.")).

**\*24** It is well settled that "[f]ailure to make a meritless argument does not amount to ineffective assistance." *United States v. Arena*, 180 F.3d 380, 396 (2d Cir. 1999). Given this legal backdrop, trial counsel reasonably could have concluded that any objection to Gayden's or Sergeant Mariano's testimony on *Molineux* or other grounds was unlikely to be successful. Petitioner has not overcome the presumption that counsel's decision not to object reasonable; nor has he demonstrated that he was prejudiced thereby.

### e. Failure to Request a Missing Witness Charge for Witness Number 3 (Ground Thirteen)

Petitioner asserts that trial counsel was ineffective for failing to request a missing witness charge as to the individual identified as Witness Number 3 at the *Wade* hearing. During his opening, trial counsel referred to this witness as Charlene Beasley ("Beasley"), telling the jury that they might hear she identified Petitioner as the shooter. (TT: 180.) He cautioned the jury to view any testimony from Beasley with suspicion because she earlier had identified Gayden as the shooter and

because she was a drug-addicted prostitute with a lengthy criminal record. (TT: 180-81). The prosecution did not call Beasley, and trial counsel did not request a missing witness charge or mention her absence during his closing.

After preemptively arguing that the jurors should reject anything Beasley said as unreliable and incredible, trial counsel reasonably could have decided that the prosecution's decision not to call her was a boon to the defense. Furthermore, requesting a missing witness charge would have allowed the prosecution to call her as a rebuttal witness. *See Arena v. Kaplan*, 952 F. Supp. 2d 468, 489–90 (E.D.N.Y. 2013) (finding trial counsel's decision not to request a missing witness charge as to Caramelli was reasonable where, if trial counsel had done so, the prosecution might have called Caramelli, and his "testimony would have buttressed" another prosecution witness's testimony and the petitioner's confession to the murder (citing *People v. Peake*, 14 A.D.3d 936, 936 (3d Dep't 2005)) ("[I]f defense counsel had made a timely request for ... a [missing witness] charge [as to Berger], then the prosecution might have offered Berger as a limited rebuttal witness to buttress the prosecution's earlier, effective cross-examination of Severinghaus.")). As noted above, Investigator May testified at the *Wade* hearing that Witness Number 3 explained her initial failure to identify Petitioner was due to fear of retaliation by members of a drug gang. Since requesting a missing witness charge carried a degree of risk, Petitioner has not overcome the presumption that declining to request a missing witness charge as to Beasley was a reasonable strategic decision.

### f. "Opening the Door" to a Prior Crime (Ground Fourteen)

Petitioner faults trial counsel for telling the jury during his opening argument that Petitioner had committed a robbery:

> Danny Gayden, you will find from the testimony, was a friend of Brian Smith, an associate. They did some things together. They sold drugs together, and they, on at least one occasion, committed a robbery together.
>
> ...
>
> As that case was pending, and as Danny Gayden faced up to twenty-five years in prison, several months after this homicide, Danny Gayden decided, if I offer Brian Smith to be the shooter in this case and they go for it, I, number one, don't get charged with it. You will find from the proof in

this case that Danny was the prime suspect in this shooting from October 2nd until sometime in January when he came forward with his attorney to the District Attorney's Office to say, you know what, Brian Smith did this. In exchange for that, rather than go to prison for a minimum of five years to a maximum of twenty-five years, they gave him a free pass, a get out of jail, virtually a [sic] free card on that robbery, and no prosecution on the homicide.

**\*25**  (TT: 178-79). Trial counsel's remark about the robbery, viewed in context, clearly was part of a coherent strategy to undermine Gayden's credibility by showing he had a strong motive to lie—avoiding prosecution for Harris's death and reducing his sentencing exposure in other matters. Petitioner has not overcome the presumption that this was a sound strategy.

To show prejudice, Petitioner asserts that trial counsel's comments about the robbery caused him not to exercise his right to testify. He suggests that but for counsel's blunder, he would have taken the stand and convinced the jury of his innocence. However, the trial court's *Sandoval* ruling ensured that if Petitioner testified, the jury would learn he had two felony convictions of an unspecified nature and a conviction for possessing stolen property. Petitioner has not demonstrated that trial counsel's mention of the robbery had an effect on his decision whether to testify or on the outcome of the trial.

### V. Newly Discovered Evidence (Ground Seven)

Petitioner asserts that Gayden's recantation is newly discovered evidence that would have changed the outcome of his trial. (Dkt. No. 1 at 10 ¶ 22(G)). In state court, Petitioner brought his newly discovered evidence under C.P.L. § 440.10(1)(g). This section provides, in pertinent part, that a trial court may vacate a defendant's conviction when

> [n]ew evidence has been [1] discovered since the entry of a judgment based upon a verdict of guilty after trial, [2] which could not have been produced by the defendant at the trial even with due diligence on his part and [3] which is of such character as to create a probability that had such evidence been received at the

trial the verdict would have been more favorable to the defendant.

N.Y. Crim. Proc. Law § 440.10(1)(g). In addition to the three elements identified in the statute itself, the newly discovered evidence also "must be material to the issue, ... it must not be cumulative to the former issue, and ... it must not be merely impeaching or contradicting the former evidence." *People v. Salemi*, 309 N.Y. 208, 216 (1955).

As a matter of New York state law, "[t]he authority to an order for a new trial on the ground of newly discovered evidence is *purely statutory* and may be exercised only when the requirements of that statute have been satisfied to the determination of the trial court." *People v. Turner*, No. 396/2018, 2023 WL 2721707, at *10 (N.Y. Sup. Ct. Mar. 30, 2023) (emphasis supplied) (citing *Salemi*, 309 N.Y. at 215). Thus, as interpreted by the New York Court of Appeals, C.P.L. § 440.10(1)(g) does not require a defendant to prove that a constitutional violation occurred at his trial in order to obtain relief based on newly discovered evidence.

In federal court, however, " ' 'newly discovered evidence only warrants habeas relief where it bears on the constitutionality of the applicant's detention; the existence merely of newly discovered evidence relevant to the guilt of a state petitioner is not a ground for relief on federal habeas corpus.' " *Balkman v. Poole*, 725 F. Supp. 2d 370, 375 (W.D.N.Y. 2010) (quoting *Mapp v. Clement*, 451 F. Supp. 505, 511 (S.D.N.Y. 1978)). Thus, to the extent Petitioner contends that the second 440 court erroneously applied New York state law interpreting in denying his newly discovered evidence claim, such a claim is not cognizable on federal habeas review, and the Court recommends denying it on this basis.

**\*26** Mindful of the obligation to construe the *pro se* petition leniently, *see Erickson v. Pardus*, 551 U.S. 89, 94 (2007), the Court has considered whether a due process violation occurred at Petitioner's trial relative to the newly discovered evidence. The prosecution's use of perjured testimony can violate due process, but only where " 'the prosecution knew, or should have known, of the perjury,' and 'there is any reasonable likelihood that the false testimony could have affected the judgment of the jury.' " *Drake v. Portuondo*, 321 F.3d 338, 345 (2d Cir. 2003) (quoting *United States v. Agurs*, 427 U.S. 97, 103 (1976) (footnote omitted in original)).

Because Gayden did not write his recantation until over a decade after Petitioner's trial, there is no evidence that the prosecutor knew or should have known that Gayden testified falsely at trial. The prosecution's lack of actual or constructive knowledge "alone is sufficient reason to reject [a perjury] claim." *Dansby v. United States*, 291 F. Supp. 790, 793-94 & n.11 (S.D.N.Y. 1968) (citing *Beavers v. United States*, 351 F.2d 507, 508 (9th Cir. 1965); *United States v. Mauriello*, 289 F.2d 725, 725 (2d Cir. 1961) (per curiam)).

Moreover, Petitioner has not carried his burden of establishing that Gayden actually committed perjury. *See, e.g.*, *United States v. Mangano*, No. 16-CR-540 (JMA), 2022 WL 65775, at *60 (E.D.N.Y. Jan. 6, 2022) ("[T]o establish that the [recanting] witness testified falsely at trial, a defendant has the burden to establish, based on all the relevant evidence, that the witness gave false testimony at trial." (citing, *inter alia, United States v. Lespier*, 266 F. App'x 5, 7 (2d Cir. 2008)) (unpublished opn.); *see also Dansby*, 291 F. Supp. at 793 (stating that the petitioner "has the burden of establishing that the testimony was perjured"). In determining whether perjury occurred, a court must "weigh all the evidence of perjury before it." *See Ortega v. Duncan*, 333 F.3d 102, 106-07 (2d Cir. 2003).

Petitioner's chief evidence of perjury is Gayden's recantation and Gayden's hearing testimony stating he lied at trial about seeing Petitioner shoot Harris. The second 440 court roundly dismissed both as unreliable. (SR: 2050). It is well settled that "[c]redibility determinations are properly within the province of the state court that presided over the trial and evidentiary hearing." *Shabazz v. Artuz*, 336 F.3d 154, 163 (2d Cir. 2003). The presumption of correctness in 28 U.S.C. § 2254(e)(1) "is particularly important when reviewing the trial court's assessment of witness credibility." *Cotto v. Herbert*, 331 F.3d 217, 233 (2d Cir. 2003).

The second 440 court considered several factors in assessing Gayden's credibility, including the "inherent believability" of his hearing testimony, his demeanor, his reasons for testifying at trial and later recanting, his relationship with Petitioner, and his motive to lie. (SR: 2050). After considering those factors, the second 440 court did "not credit the testimony provided by Danny Gayden at the hearing." (*Id.*). Significantly, the second 440 court noted, Gayden had been a "lifelong friend" of Petitioner. Gayden also was "unable to recall who were the mutual friends he discussed signing the recantation affidavit for or where it occurred or when." (*Id.*). Finding Gayden's " 'explanation' that he wanted to wait until he was out of prison

before bringing this to anyone's attention [to be] specious," the second 440 court also questioned why he "wait[ed] for over two years before he produced this document after being released [from prison]." (*Id.*). The second 440 court found that Gayden's "lone statement" that "he lied at trial and is now telling the truth is completely unreliable." (*Id.*).

**\*27** Petitioner has not come forward with any evidence, let alone clear and convincing evidence, to rebut the presumption of correctness owed to the second 440 court's factual findings. Further, the record amply supports its determination of unreliability. At the second 440 hearing, Gayden admitted that he testified truthfully about going to the corner store on Miller Street with Petitioner on the night of the shooting. (SR: 1993-94). [10] Inexplicably, however, Gayden's hearing testimony and recantation offer no clue about what he actually observed. Contrary to Petitioner's contention that "much of the recantation" is "either support[ed] by common sense, or independently verifiable" (SR: 1234), the complete lack of *any* details from Gayden makes independent verification of his affidavit impossible.

[10]     At the hearing, Gayden confirmed that he and Petitioner had gone to the corner store on October 2, 2005, but he recalled walking there and did not remember testifying that either of them was riding a bike. (SR: 1993-94, 1995). He acknowledged his testimony about seeking Harris but claimed he did not remember seeing Harris at the store and did not even know who Harris was. (SR: 1993).

Similarly, Gayden's hearing testimony about how he came to write the recantation was exceptionally vague. Indeed, none of his testimony on that topic is independently verifiable, as demonstrated by the following colloquy at the hearing:

THE COURT: You told [the prosecutor] that at some point you had told mutual friends that you were going to sign this affidavit. These are mutual friends of who?

[GAYDEN]: Well, it's more my friends that, you know, knew about the situation.

THE COURT: You said mutual friends, so mutual friends of who?

[GAYDEN]: Everyone that grew up with us in our neighborhood.

THE COURT: You grew up with Mr. Smith in that same neighborhood?

[GAYDEN]: Yes.

THE COURT: So who exactly was it that you told that you were going to sign this affidavit?

[GAYDEN]: I don't remember everyone individually.

THE COURT: Give me as many names as you do remember.

[GAYDEN]: I don't remember them. I just remember pulling up and letting everybody know I'm --

COURT: Pulling up where?

[GAYDEN]: In our neighborhood.

THE COURT: No specific address?

[GAYDEN]: No, there isn't a specific address.

THE COURT: What time of day was this, day, night, did you check the time?

[GAYDEN]: Day. I didn't check the time.

(SR: 2008-09). Petitioner has not come forward with any evidence to rebut the presumption of correctness accorded to the second 440 court's decision not to credit Gayden's recantation and hearing testimony. Furthermore, "[g]iven the extremely narrow scope of [habeas] review," *Cotto,* 331 F.3d at 217, the Court cannot find that the second 440 court's rejection of Gayden's recantation as unreliable was an "unreasonable determination of the facts in light of the evidence presented." 28 U.S.C. § 2254(d)(2).

As Petitioner points out, the Second Circuit has stated that a recantation's "lack of veracity cannot, in and of itself, establish whether testimony given at trial was in fact truthful." *Ortega,* 333 F.3d at 107. The second 440 court did not explicitly determine whether Gayden perjured himself at trial. It did, however, reject all of Gayden's hearing testimony, including his statement that he lied at trial about seeing Petitioner shoot Harris. Arguably, the second 440 court made an implicit finding that Gayden did not commit perjury. But even assuming that there is no factual determination by the second 440 court to which this Court owes deference under 28 U.S.C. § 2254(d)(2) and (e)(1), Petitioner has failed to establish that Gayden perjured himself.

Apart from the recantation, which the second 440 court justifiably found was unreliable, Petitioner offers no

evidence showing that Gayden was lying when he testified at Petitioner's trial. He simply rehashes the arguments challenging the credibility of the prosecution's witnesses; however, the jury considered these arguments and rejected them. Moreover, the inconsistencies between Gayden and Allen's trial testimony do not establish that Gayden testified falsely. Courts have repeatedly held that "even a direct conflict in testimony does not in itself constitute perjury." *United States v. Gambino*, 59 F.3d 353, 365 (2d Cir. 1995); *see also United States v. Monteleone*, 257 F.3d 210, 219 (2d Cir. 2001) ("A witness commits perjury if he gives false testimony concerning a material matter with the willful intent to provide false testimony, as distinguished from incorrect testimony resulting from confusion, mistake, or faulty memory. Simple inaccuracies or inconsistencies in testimony do not rise to the level of perjury." (internal citations omitted)). The inconsistencies here concerned minor matters, such as whether Petitioner walked or drove to Allen's house on the morning after the shooting. (TT: 601-02). Defense counsel highlighted those inconsistencies during his closing argument and argued that the jury could not believe both Allen and Gayden. (TT: 602). But, as the prosecutor argued to the jury during his summation, Gayden consistently told the same story on direct and cross-examination about the material questions in the case—"what led up to the shooting and the shooting itself and who did the shooting." (TT: 622).

*\*28* Petitioner has not overcome the presumption of correctness owed to the second 440 court's factual findings or shown that the second 440 court unreasonably determined the facts in concluding that Gayden's recantation was unreliable. Nor has Petitioner established that Gayden committed perjury at trial, and therefore he has not shown that a constitutional error occurred in connection with his newly discovered evidence claim. Accordingly, the Court recommends denying relief on Ground Seven.

## VI. Actual Innocence (Ground Eight)

Petitioner contends that he is entitled to habeas relief because "[a]ll the evidence" he presented to the state courts establishes his actual innocence. (Dkt. No. 1 at ¶ 22(H)). Respondent asserts that a freestanding claim of actual innocence is not cognizable as a basis for substantive relief in a federal habeas proceeding. (Dkt. No. 37 at 49). The Court agrees, and further concludes that even if such a claim were cognizable, Petitioner's allegations do not show he is actually, factually innocent.

Although the Supreme Court has determined that a federal habeas petitioner may assert a "gateway claim" of actual innocence to overcome the procedural default of a constitutional claim, *McQuiggin v. Perkins*, 569 U.S. 383, 386 (2013); or to equitably toll AEDPA's statute of limitations, *id.*, it has not resolved whether a non-capital prisoner may be entitled to habeas relief based on a freestanding claim of actual innocence, *id.* at 392.

Assuming for the sake of argument that a freestanding actual innocence claim is cognizable in a 28 U.S.C. § 2254 proceeding brought by a non-capital prisoner, the Supreme Court has suggested that the required showing would be even higher than the demanding standard in *Schlup v. Delo*, 513 U.S. 298 (1995), for gateway actual innocence claims. *See House v. Bell*, 547 U.S. 518, 555 (2006) ("The sequence of the [Supreme] Court's decisions in *Herrera* and *Schlup*—first leaving unresolved the status of freestanding claims and then establishing the gateway standard—implies at the least that *Herrera* requires more convincing proof of innocence than *Schlup*.").

To meet the *Schlup* gateway standard, an actual innocence claim must be "credible," meaning that the petitioner has supported it by "new reliable evidence—whether it be exculpatory scientific evidence, trustworthy eyewitness accounts, or critical physical evidence—that was not presented at trial." 513 U.S. at 324. The claim also must be "compelling," which requires the petitioner to demonstrate that "more likely than not, in light of the new evidence, no reasonable juror would find him guilty beyond a reasonable doubt—or to remove the double negative, that more likely than not any reasonable juror would have reasonable doubt." *House*, 547 U.S. at 538. "The fact that new evidence is credible does not necessarily make it compelling under the *Schlup* standard for actual innocence." *Hyman v. Brown*, 927 F.3d 639, 662 (2d Cir. 2019).

Petitioner's chief evidence of actual innocence is Gayden's recantation (SR: 1600). Since the jury did not hear this evidence, it is "new" for purposes of the *Schlup* analysis. Nevertheless, as discussed above in connection with Ground Seven, Petitioner has not established that it is also "reliable" and therefore sufficiently "credible" to meet the first prong of the *Schlup* standard.

Next, Petitioner argues that he is actually innocent because of inconsistencies in some of the testimony offered by Allen and Gayden. Such evidence cannot be considered "new" because

the jury already heard and evaluated the alleged testimonial inconsistencies. *See Rivas v. Fischer*, 687 F.3d 514, 543 (2d Cir. 2012) (explaining that "new" reliable evidence under *Schlup* is "evidence not heard by the jury"). Moreover, the jury is exclusively responsible for determining the credibility of the witnesses and resolving any inconsistencies in their testimony. *See, e.g., Bossett v. Walker*, 41 F.3d 825, 830 (2d Cir. 1994) ("[A] conviction may be based upon circumstantial evidence and inferences based upon the evidence, and the jury is exclusively responsible for determining a witness'[s] credibility." (quoting *United States v. Strauss*, 999 F.2d 692, 696 (2d Cir. 1993)). "[T]he fact that the jury may have chosen to credit less reliable aspects of the testimony of [Gayden and Allen], or to resolve inconsistencies in their testimony in favor of the prosecution, does not undermine the reliability of the jury's verdict." *Simmons v. McGinnis*, No. 04 CIV. 6150 PACDF, 2006 WL 3746739, at *11 (S.D.N.Y. Dec. 19, 2006) (citing *Bossett*, 41 F.3d at 830). Moreover, even assuming *arguendo* that the alleged testimonial inconsistencies could be construed as a due process claim of legally insufficient evidence, that still would be inadequate. The Supreme Court has clearly stated that actual innocence means "factual innocence, not mere legal insufficiency." *Bousley v. United States*, 523 U.S. 614, 624 (1998).

**\*29** Petitioner also points to Allen's status as a paid informant as evidence of actual innocence. Such evidence is "new," as it did not become known until after the verdict. Even assuming it meets the "credible" prong of *Schlup*, it is not "compelling." As discussed above in connection with the *Brady* claim, two state courts and now this Court have concluded that Allen's status as a paid informant was not "material." It necessarily follows that this impeachment evidence does not indicate Petitioner's actual, factual innocence, much less do so compellingly. *See Holley v. Uhler*, No. 16-CV-215 (JMA), 2018 WL 9539157, at *12 (E.D.N.Y. Aug. 1, 2018) (finding that habeas petitioner's actual innocence claim "fail[ed] as the *Schlup* standard is undoubtedly higher than the materiality standard for *Brady* claims," and the district court had "already concluded that the *Brady* claim [was] not viable"); *cf. Hyman*, 927 F.3d at 664-65 (new evidence establishing that a witness did not see shootout and "thus, lied in identifying Hyman as a participant[,]" was "credible" but not "compelling" because the witness's "failure to see the shootout means she cannot inculpate [Hyman] (or anyone else), but neither can she exonerate him").

Lastly, Petitioner relies on three items of "documentary evidence" that trial counsel failed to use, i.e., a phone bill allegedly showing calls between Allen's house and a cell phone allegedly belonging to Harris, jail recordings of phone calls between Allen and Gayden in which they discussed selling a "thing," and an RPD investigative action report saying that a women identified only as "T." told Harris's mother that Allen was trying to sell a gun that had been used in a homicide. None of these items of evidence, even viewed in the light most favorable to Petitioner, compellingly indicate his innocence.

As to the phone bill, even assuming Harris was in contact with Allen, that does not mean Petitioner did not shoot or could not have shot Harris. With regard to the jail phone calls, Petitioner has supplied no proof that the "thing" referenced by Allen and Gayden during their conversations was the gun used to shoot Harris. Petitioner similarly has not established that the gun which "T." said Allen was trying to sell was the same gun used to shoot Harris. But even assuming Gayden and Allen or "T." were talking about the murder weapon, that does not mean that Petitioner did not shoot, or could not have shot, Harris. Therefore, none of the items of so-called "documentary evidence" is "compelling" under *Schlup. See Hyman*, 927 F.3d at 665 (finding that new evidence was not compelling, even though it left the trial record with no eyewitness identification of the petitioner as the gun-man; explaining that "the absence of such evidence does not mean that Hyman did not, or could not, have participated in the shootout" but "means only that Ellis does not know who, if anyone, did"). Because Petitioner cannot meet the demanding *Schlup* standard for a gateway claim of actual innocence, he necessarily cannot meet the more demanding hypothetical standard that the Supreme Court has said a freestanding claim of actual innocence would entail. Accordingly, the Court recommends denying relief on Ground Eight.

## VII. Weight of the Evidence (Grounds Nine and Twelve)

Petitioner asserts that manslaughter verdict was against the weight of the evidence. (*See* Dkt. No. 1 at 10 ¶ 22(I); *id.* at 11 ¶ 22(L). More specifically, Petitioner urges that the jury should have determined that Gayden was the shooter because Gayden had gotten into a fight with Harris and his friends earlier that night and because defense witness Conley testified that Gayden told her that he was going to "get" the person who hit him with a bottle. (*Id.* at 10 ¶ 22(I)). He also asserts that Allen and Gayden were not credible witnesses due to the inconsistencies in their testimony. (*Id.* at 11 ¶ 22(L). The Appellate Division held that "affording appropriate deference to the jury's credibility determinations, ... the verdict is not against the weight of the evidence." *Smith*, 93 A.D.3d at 1346.

**\*30** A claim that a verdict is against the weight of the evidence derives solely from a statutory provision, C.P.L. § 470.15(5), which invests intermediate appellate courts with a unique factual review power to "weigh the relative probative force of conflicting testimony and the relative strength of conflicting inferences that may be drawn from the testimony[.]" *People v. Bleakley*, 69 N.Y.2d 490, 495 (1987) (internal quotation marks and citations omitted). Since "federal habeas corpus relief does not lie for errors of state law," *Lewis v. Jeffers*, 497 U.S. 764, 780 (1990), courts in this Circuit routinely have dismissed "weight of the evidence" arguments as not cognizable on habeas corpus review. *See, e.g., Correa v. Duncan*, 172 F. Supp. 2d 378, 381 (E.D.N.Y. 2001) (cited with approval in *McKinnon v. Sup't, Great Meadow Corr. Facility*, 422 F. App'x 69, 75 (2d Cir. 2011)). The Court accordingly recommends dismissing Grounds Nine and Twelve on this basis.

## VIII. Erroneous Admission of *Molineux* Evidence (Ground Ten)

Petitioner asserts that the trial court erroneously admitted testimony concerning his defilement of the sidewalk memorial. (Dkt. No. 1 at 10 ¶ 22(J)). On appeal, the Fourth Department found that the contention was unpreserved for appellate review and declined to review it as a matter of discretion in the interest of justice. *Smith*, 93 A.D.3d at 1346.

### A. Exhaustion and Procedural Default

Respondent contends that the *Molineux* claim is unexhausted because appellate counsel framed it solely as a violation of state evidentiary. (Dkt. No. 37 at 50-51). Respondent also asserts that state procedural rules bar Petitioner from exhausting the claim and therefore the Court must deem the claim exhausted but procedurally defaulted. (*Id.* at 51). Respondent further argues that Petitioner cannot demonstrate cause for, or prejudice from, the procedural default, or that there will be a fundamental miscarriage of justice if this Court declines to consider the claim. (*Id.*). Alternatively, Respondent contends, Ground Ten presents only an issue of state law that is not cognizable on habeas review and that is, in any event, meritless. (*Id.* at 51-52).

Because the Court readily may deny this evidentiary claim, it will bypass the issues of exhaustion and procedural default. *See, e.g., Lendof-Gonzalez v. Johnson*, No. 20-CV-06924-FPG, 2021 WL 1373930, at \*6 (W.D.N.Y. Apr. 12, 2021) (exercising discretion to bypass the issues of exhaustion and

procedural default where claims could be "readily dismissed on alternative grounds").

"A decision to admit evidence of a criminal defendant's uncharged crimes or bad acts under *Molineux* constitutes an evidentiary ruling based on state law." *Jones v. Conway*, No. 09–CV–6045 (MAT), 2011 WL 1356751, at \*2 (W.D.N.Y. Apr. 4, 2011). In general, however, habeas courts refrain from "reexamin[ing] state-court determinations on state-law questions." *Estelle v. McGuire*, 502 U.S. 62, 67-68 (1991); *see also* 28 U.S.C. § 2254(a). To be cognizable on federal habeas review, a "claim asserting a right to relief on *Molineux* grounds must rise to the level of constitutional violation." *Roldan v. Artuz*, 78 F. Supp. 2d 260, 276 (S.D.N.Y. 2000) (collecting cases). That is, the erroneously admitted evidence "must have been 'sufficiently material to provide the basis for conviction or to remove a reasonable doubt that would have existed on the record without it.'" *Dunnigan v. Keane*, 137 F.3d 117, 125 (2d Cir. 1998) (quoting *Johnson v. Ross*, 955 F.2d 178, 181 (2d Cir. 1992)).

Even assuming the evidence regarding Petitioner's behavior at the memorial was admitted in error, it was not sufficiently material to have provided an independent basis to convict him. The fact that Petitioner vandalized the memorial to Harris did not demonstrate that Petitioner had a propensity to shoot people, let alone directly attribute the shooting to Petitioner. Furthermore, that evidence did not remove a reasonable doubt regarding his guilt that otherwise would have existed. The jury had before it ample evidence on which to find that the prosecution satisfied its burden of proving, beyond a reasonable doubt, that Petitioner shot Harris. As discussed above, Gayden's eyewitness testimony was corroborated by other, properly admitted evidence, including the surveillance camera videotape and the ballistics evidence. Thus, even if the evidence was erroneously admitted under *Molineux*, it did not amount to a due process violation. *See Johnson v. Ross*, 955 F.2d 178, 181 (2d Cir. 1992) (finding that erroneously admitted evidence was not sufficiently material to violate due process where "apart from the challenged evidence ..., the prosecution presented highly probative evidence of [the defendant's] guilt"); *Collins*, 755 F.2d at 19 (finding that the erroneously admitted evidence was not sufficiently material to violate due process where it "did not directly attribute to [the defendant] the commission of the crime charged" and where other "properly admitted evidence against [the defendant] was very strong"). Because Petitioner has not shown that an evidentiary error of constitutional

magnitude occurred at his trial, the Court recommends dismissing Ground Ten.

## IX. Impairment of Right to Challenge Identifications (Ground Eleven)

**\*31** In Ground Eleven, Petitioner asserts that the trial court's grant of the prosecutor's *ex parte* request for a protective order deprived him of his right to demonstrate the undue suggestiveness of the identification procedures involving Witness Number 3. More specifically, Petitioner argues, as he did on direct appeal, that he was deprived of his right to fully cross-examine Investigator May at the *Wade* hearing and "to demonstrate that Danny Gayden was positively identified as the shooter three (3) days after the crime took place by 'Witness #3' (Ms. Charlene Beasley)." (SR: 407). The Fourth Department held that the claim was "moot because that witness never testified at trial." *Smith*, 93 A.D.3d at 1346.

Respondent argues that Petitioner is not entitled to habeas relief because the Fourth Department correctly concluded that the claim was moot. (Dkt. No. 37 at 53-54). As a matter of New York State law, the remedy for a defendant who successfully argues that prospective in-court testimony should have been suppressed is reversal of the trial court's suppression ruling. *See, e.g., People v. Townsley*, 240 A.D.2d 955, 957 (3d Dep't 1997), *rev'd on other grounds, People v. Smith*, 33 N.Y.3d 454 (2019). Where, as here, the identifying witness does not make an in-court identification of the defendant, any *Wade* violation is mooted. *See id.* (rejecting as moot defendant's contention that the trial court erred by failing to suppress a witness's prospective in-court identification testimony; the prosecution's decision not to call the witness at trial meant that reversal of the suppression ruling would have no effect on defendant's rights). "The hallmark of a moot case or controversy is that the relief sought can no longer be given or is no longer needed." *Martin-Trigona v. Shiff*, 702 F.2d 380, 386 (2d Cir. 1983). Thus, as Respondent argues, this claim is moot.

Moreover, Petitioner has not demonstrated a violation of his federal constitutional rights. "On a petition for a writ of federal habeas corpus, the petitioner bears the burden of proving by a preponderance of the evidence that his constitutional rights have been violated." *Jones v. Vacco*, 126 F.3d 408, 415 (2d Cir. 1997) (citing *Machado v. Commanding Officer*, 860 F.2d 542, 544 (2d Cir. 1988)). Unduly suggestive pre-trial identification procedures, standing alone, do not violate a defendant's constitutional rights. *See Brisco v. Ercole*, 565 F.3d 80, 89 (2d Cir. 2009) ("Even if an

identification procedure is unduly suggestive, the out-of-court identification may nonetheless be admissible if other factors indicate that the identification is independently reliable."); (citing *Manson v. Brathwaite*, 432 U.S. 98, 114 (1977)).

Thus, even if Petitioner had demonstrated undue suggestiveness *and* lack of independent reliability at the *Wade* hearing, the most expansive remedy he could have received was preclusion of Witness Number 3's in-court identification. The functional equivalent of preclusion occurred here, since Witness Number 3 did not testify at trial. Since the jury heard no identification testimony from Witness Number 3, Petitioner cannot state a due process claim. *See Manson*, 432 U.S. at 112 ("*Wade* and its companion cases reflect the concern that the jury not hear eyewitness testimony unless that evidence has aspects of reliability."). For all the foregoing reasons, the Court recommends denying relief on Ground Eleven.

## X. Speedy Trial (Ground Fifteen)

Petitioner asserts that his Sixth Amendment and due process rights were violated as a result of the delay between the shooting on October 2, 2005, and the start of trial on September 11, 2007. (Dkt. No. 1 at 12 ¶ 22(O)). The Fourth Department summarily rejected this claim when he raised in his *pro se* supplemental appellate brief. *Smith*, 93 A.D.3d at 1346 (stating that "defendant's remaining contention in his *pro se* supplemental brief ... is lacking in merit"). Respondent argues that the Fourth Department reasonably applied clearly established Supreme Court precedent in rejecting the speedy trial claim. (*See* Dkt. No. 37 at 55-62). The Court agrees and recommends dismissing Ground Fifteen.

**\*32** The Sixth Amendment guarantee that all criminal defendants "shall enjoy the right to a speedy and public trial," U.S. Const. amend. VI, is "triggered by arrest, indictment, or other official accusation," *Doggett v. United States*, 505 U.S. 647, 655 (1992), or "by the unsealing of a sealed indictment," *United States v. Moreno*, 789 F.3d 72, 78 (2d Cir. 2015) (citing *United States v. Watson*, 599 F.2d 1149, 1156 (2d Cir. 1979)). There was no "official accusation" against Petitioner in connection with the Harris shooting until, at the latest, March 1, 2007, the date his indictment was unsealed. The period of time between October 2, 2005, and March 1, 2007, represents pre-indictment delay, during which time Petitioner's Sixth Amendment speedy trial right had not yet attached. *See, e.g., United States v. Elsbery*, 602 F.2d 1054, 1058 (2d Cir. 1979) ("It is indisputable that the Sixth Amendment speedy trial right does not apply to pre-

indictment delay."). Instead, claims of pre-indictment delay are based on due process principles. *Id.* at 1059 (citing *United States v. Lovasco*, 431 U.S. 783, 789 (1977)).

To establish a due process claim based on pre-indictment delay, Petitioner bears the burden of demonstrating that the delay "caused substantial prejudice to [his] rights to a fair trial and ... was an intentional device to gain tactical advantage over the accused." *United States v. Marion*, 404 U.S. 307, 324 (1971). Petitioner has not adduced any facts suggesting that the RPD or the Monroe County District Attorney's Office intentionally delayed his prosecution to secure an advantage over the defense. His inability to show unjustifiable conduct by law enforcement or the prosecutor is fatal to his due process claim. *See Elsbery*, 602 F.2d at 1059 ("Under *Lovasco* and *Marion*, pre-indictment delay transgresses due process limits only when there is a showing of actual prejudice to the defendant's right to a fair trial [a]nd unjustifiable Government conduct.").

Even if he could show unjustifiable conduct, Petitioner he has failed to come forward with definite and non-speculative proof of prejudice. Petitioner argues that the delay allowed Gayden and Allen more time to concoct a story framing him for the shooting. (SR: 417). This is pure speculation, as Petitioner has not established that either Gayden or Allen fabricated their testimony. He also claims that the delay prejudiced his ability to assert an alibi because he experienced a "lack of memory as to where [he] was on the night in question." (*Id.*). The fact that "memories will dim, witnesses become [in]accessible, and evidence be lost ... are not in themselves enough to demonstrate that [a defendant] cannot receive a fair trial." *Marion*, 404 U.S. at 326.

Petitioner's assertion that he "lost" a witness who would have exonerated him (Beasley, Witness Number 3 at the *Wade* hearing), does not accurately reflect the record. Although Beasley did identify Gayden as the shooter during the initial photo array procedure, she later told Investigator May that Petitioner actually was the shooter. Beasley explained that she had not identified Petitioner earlier because she was afraid of retaliation. Petitioner by no means has established that Beasley was an exculpatory witness. Because Petitioner has not shown substantial, actual prejudice to his ability to defend himself as a result of the pre-indictment delay, his due process claim fails. *See United States v. Birney*, 686 F.2d 102, 106 (2d Cir. 1982) ("Without definite proof as to this essential element no due process claim has been stated.").

The claim of post-indictment delay in violation of the Sixth Amendment is governed by the four-factor test set forth in *Barker v. Wingo*, 407 U.S. 514 (1972). The relevant factors are: (1) the length of the delay, (2) the reason for the delay, (3) the defendant's assertion of his Sixth Amendment right, and (4) the prejudice to the defense from the delay. *Id.* at 521. The Court assumes that Petitioner has established "presumptively prejudicial" delay based on the time between official accusation and trial and will analyze the remaining *Barker* factors. *See United States v. Black*, 918 F.3d 243, 254 (2d Cir. 2019) ("The first factor, the length of delay, serves as a 'triggering mechanism' that places a speedy trial violation on the table and requires us to balance the other factors." (quoting *Barker*, 407 U.S. at 530)).

**\*33** The second and fourth *Barker* factors—the reason for the delay and the prejudice to the defense—overlap with the factors relevant to the due process claim. As discussed above, the Court already has found that proof of either factor is absent on this record. And because Petitioner waited until after his conviction and sentence to assert his speedy trial rights, the third *Barker* factor likewise does not weigh in his favor. *See, e.g., Garcia v. Annetts*, No. CIV. 9:08-CV-0736, 2011 WL 4810012, at \*8 (N.D.N.Y. Sept. 1, 2011), *report and recommendation adopted*, No. 9:08-CV-0736 LEK/RFT, 2011 WL 4814913 (N.D.N.Y. Oct. 11, 2011) (finding that the petitioner's "failure to assert his speedy trial rights until after his trial was conducted weighs against a finding that his constitutional rights were violated"); *cf. United States ex rel. Eccleston v. Henderson*, 534 F. Supp. 813, 816 (E.D.N.Y. 1982) (finding that defendant, who filed a motion to dismiss the indictment based on delay nine months after arrest and nine and one-half months before trial did not assert speedy trial rights "aggressively enough to warrant [ ] relief" on Sixth Amendment claim). Because the Fourth Department's rejection of Petitioner's speedy trial claim was not contrary to, or an unreasonable application of, clearly established Supreme Court precedent, the Court recommends dismissing Ground Fifteen.

## XI. Consecutive Sentences (Ground Sixteen)

Petitioner asserts that the trial court violated his due process rights by imposing consecutive sentences. (Dkt. No. 1 at 12 ¶ 22(P)). As noted above, appellate counsel raised this claim on direct appeal, and the Fourth Department modified the judgment by ordering the sentences to run concurrently with each other. *Smith*, 93 A.D.3d at 1346. Respondent argues that Petitioner has already received all the relief to which he is entitled on his sentencing claim. (Dkt. No. 37 at 58).

The Court agrees and, accordingly, recommends dismissing this claim as moot. *See*, *e.g.*, *Bomasuto v. Perlman*, 680 F. Supp. 2d 449, 457-58 (W.D.N.Y. 2010) (district court could not grant any effective relief, rendering habeas petition moot, where petitioner sought only specific performance of trial court's original sentence promise and he had already served his sentence).

### CONCLUSION

For the foregoing reasons, the Court recommends that Petitioner's request for a writ of habeas corpus be denied and that the petition (Dkt No. 1) be dismissed. The Court further recommends denying a certificate of appealability pursuant to 28 U.S.C. § 2253(c)(1)(A) because Petitioner has failed to make a "substantial showing of the denial of a constitutional right," 28 U.S.C. § 2253(c)(2).

Pursuant to 28 U.S.C. § 636(b)(1), it is hereby ORDERED that this Report, Recommendation and Order be filed with the Clerk of Court.

Unless otherwise ordered by Judge Sinatra, any objections to this Report, Recommendation and Order must be filed with the Clerk of Court within fourteen days of service of this Report, Recommendation and Order in accordance with the above statute; Rules 72(b), 6(a), and 6(d) of the Federal Rules of Civil Procedure; and Local Rule of Civil Procedure 72.

Any requests for an extension of this deadline must be made to Judge Sinatra.

***Failure to file objections or to request an extension of time to file objections within fourteen days of service of this Report, Recommendation and Order WAIVES THE RIGHT TO APPEAL THE DISTRICT COURT'S ORDER.*** See *Small v. Sec'y of Health & Human Servs.*, 892 F.2d 15 (2d Cir. 1989).

The District Court will ordinarily refuse to consider *de novo* arguments, case law and/or evidentiary material which could have been, but were not, presented to the Magistrate Judge in the first instance. *See Paterson-Leitch Co. v. Mass. Mun. Wholesale Elec. Co.*, 840 F.2d 985, 990-91 (1st Cir. 1988).

Pursuant to Local Rule of Civil Procedure 72(b), written objections "shall specifically identify the portions of the proposed findings and recommendations to which objection is made and the basis for each objection, and shall be supported by legal authority." ***Failure to comply with these provisions may result in the District Court's refusal to consider the objection.***

**\*34  SO ORDERED.**

### All Citations

Slip Copy, 2023 WL 4936942

---

**End of Document**                    © 2023 Thomson Reuters. No claim to original U.S. Government Works.

2023 WL 4933981
Only the Westlaw citation is currently available.
United States District Court, W.D. New York.

Brian SMITH, Petitioner,
v.
Joseph NOETH, Superintendent, Attica
Correctional Facility, Respondent.

18-CV-883 (JLS) (MJR)
|
Signed August 1, 2023

**Attorneys and Law Firms**

Brian Smith, Alden, NY, Pro Se.

James Foster Gibbons, Michelle E. Maerov, Office of New York State Attorney General, New York, NY, for Respondent.

**DECISION AND ORDER**

JOHN L. SINATRA, JR., UNITED STATES DISTRICT JUDGE

 **\*1** Petitioner Brian Smith commenced this action pursuant to 28 U.S.C. § 2254 seeking a Writ of Habeas Corpus by a Person in State Custody based on a judgment entered against him in Monroe County Court on November 2, 2007. Dkt. 1. In particular, a jury convicted him of first-degree manslaughter and second-degree criminal possession of a weapon in violation of New York law. *See id.* Petitioner challenges the constitutionality of those convictions on numerous grounds—including that the prosecution violated its *Brady* obligations, that Petitioner was improperly denied an evidentiary hearing, and that Petitioner's counsel was ineffective. *Id.*

This Court [1] ultimately referred the case to United States Magistrate Judge Michael J. Roemer for all proceedings under 28 U.S.C. §§ 636(b)(1)(A), (B), and (C). Dkt. 15. Petitioner filed a memorandum in support of his petition, Dkt. 23, and then filed a "Traverse of Law in Support of Habeas Corpus Reply." Dkt. 29. Respondent filed an Answer and a memorandum in opposition. Dkt. 33, 37. Petitioner replied. Dkt. 38.

[1]    The case was originally assigned to Hon. Lawrence J. Vilardo. It was reassigned to the undersigned on February 14, 2020. *See* Dkt. 12.

On June 27, 2023, Judge Roemer issued a Report, Recommendation, and Order ("R&R") recommending that this Court dismiss the petition. Dkt. 39. He further recommended that this Court deny a "certificate of appealability pursuant to 28 U.S.C. § 2253(c)(1)(A) because Petitioner failed to make a 'substantial showing of the denial of a constitutional right.' " *Id.* at 73 (quoting 28 U.S.C. § 2253(c)(2)). Neither party filed objections, and the time to do so has expired.

A district court may accept, reject, or modify the findings or recommendations of a magistrate judge. 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b)(3). A district court must conduct a *de novo* review of those portions of a magistrate judge's recommendation to which a party objects. See 28 U.S.C. § 636(b)(1)(C); Fed. R. Civ. P. 72(b)(3). But neither 28 U.S.C. § 636 nor Federal Rule of Civil Procedure 72 requires a district court to review the recommendation of a magistrate judge to which no objections are raised. *See Thomas v. Arn*, 474 U.S. 140, 149–50 (1985).

This Court carefully reviewed the comprehensive R&R and the relevant record. Based on that review, the Court accepts and adopts Judge Roomers recommendation. Thus, for the reasons stated above and in the R&R, the relief sought in the petition is DENIED and the petition is DISMISSED. Further, because Petitioner failed to make a substantial showing of the denial of a constitutional right, *see* 28 U.S.C. § 2253(c)(2), the Court DENIES a certificate of appealability.

SO ORDERED.

**All Citations**

Slip Copy, 2023 WL 4933981

---

End of Document                    © 2023 Thomson Reuters. No claim to original U.S. Government Works.

Case 9:21-cv-00708-BKS-TWD   Document 14   Filed 11/03/23   Page 119 of 171

2011 WL 1303924
Only the Westlaw citation is currently available.
United States District Court,
E.D. New York.

Efraim DIAZ, Petitioner,
v.
Harold D. GRAHAM, Defendants.

No. CV–07–5379(SJF).
|
March 31, 2011.

**Attorneys and Law Firms**

Efraim Diaz, Auburn, NY, pro se.

Sharon Yaffa Brodt, Queens County District Attorney, Kew Gardens, NY, for Defendants.

**ORDER**

FEUERSTEIN, District Judge.

**\*1** On July 28, 2003, a judgment of conviction was entered against petitioner Efraim Diaz ("petitioner") in the Supreme Court of the State of New York, County of Queens ("the trial court"), upon a jury verdict finding him guilty of murder in the second degree (N.Y. Penal Law § 125.25(1)), attempted murder in the second degree (N.Y. Penal Law §§ 110.00; 125.25(1)) and criminal possession of a weapon in the second degree (N.Y. Penal Law § 265.03(1)), and imposition of sentence. By order dated June 8, 2004, the trial court denied petitioner's subsequent motion pursuant to New York Criminal Procedure Law § 440.10 to vacate the judgment of conviction ("the 440.10 motion"). By order dated June 6, 2006, the Supreme Court of the State of New York, Appellate Division, Second Judicial Department ("the Appellate Division"), affirmed the judgment of conviction and June 8, 2004 order. People v. Diaz, 30 A.D.3d 436, 818 N.Y.S.2d 112 (2d Dept.2006). On August 31, 2006, the New York State Court of Appeals denied petitioner's request for leave to appeal the June 6, 2006 order of the Appellate Division. People v. Diaz, 7 N.Y.3d 812, 822 N.Y.S.2d 487, 855 N.E.2d 803 (2006).

On November 20, 2007, petitioner filed the instant petition pursuant to 28 U.S.C. § 2254 for a writ of habeas corpus. On May 27, 2008, petitioner filed an amended petition for a writ of habeas corpus. By Report and Recommendation dated July 12, 2010 ("the Report"), United States Magistrate Judge Lois Bloom recommended, *inter alia,* that the petition be denied.

Subsequent to the Report, by order dated February 15, 2011, the Appellate Division denied petitioner's application for a writ of error coram nobis to vacate, on the ground of ineffective assistance of appellate counsel, the June 6, 2006 order. People v. Diaz, 81 A.D.3d 848, 916 N.Y.S.2d 809 (2011).

Pending before the Court are petitioner's objections to the Report. For the reasons stated herein, the objections are overruled and the Report is accepted in its entirety.

**I. Discussion**

**A. Standard of Review**

Rule 72 of the Federal Rules of Civil Procedure permits magistrate judges to conduct proceedings on dispositive pretrial matters without the consent of the parties. Fed.R.Civ.P. 72(b). Any portion of a report and recommendation on dispositive matters, to which a timely objection has been made, is reviewed *de novo.* 28 U.S.C. § 636(b)(1); Fed.R.Civ.P. 72(b). The court, however, is not required to review the factual findings or legal conclusions of the magistrate judge as to which no proper objections are interposed. *See,* Thomas v. Arn, 474 U.S. 140, 150, 106 S.Ct. 466, 88 L.Ed.2d 435 (1985). To accept the report and recommendation of a magistrate judge to which no timely objection has been made, the district judge need only be satisfied that there is no clear error on the face of the record. *See* Fed.R.Civ.P. 72(b); Johnson v. Goord, 487 F.Supp.2d 377, 379 (S.D.N.Y.2007), *aff'd,* 305 Fed. Appx. 815 (2d Cir. Jan.1, 2009); Baptichon v. Nevada State Bank, 304 F.Supp.2d 451, 453 (E.D.N.Y.2004), *aff'd,* 125 Fed.Appx. 374 (2d Cir.2005). Whether or not proper objections have been filed, the district judge may, after review, accept, reject, or modify any of the magistrate judge's findings or recommendations. 28 U.S.C. § 636(b)(1); Fed.R.Civ.P. 72(b).

**B. Petitioner's Objections**

**\*2** Petitioner contends that Magistrate Judge Bloom erred, *inter alia:* (1) in finding that he failed to establish that his trial counsel's failure to obtain the criminal complaint filed by the decedent against her ex-husband prior to trial had any effect on the outcome of the trial; (2) in finding

2011 WL 1303924

that there was "no reason to conclude that [his] presence at the sidebar conferences would have had any 'reasonably substantial' relation to his opportunity to defend against the charges," (Report, p. 17); (3) in finding that the evidence was legally sufficient to convict him of the crimes charged beyond a reasonable doubt; and (4) in issuing the Report when his application to stay this proceeding pending the Appellate Division's determination of his petition for a writ of error coram nobis was *sub judice.*

Magistrate Judge Bloom did not err in issuing the Report while petitioner's application to stay this proceeding was pending, since petitioner was not entitled to a stay of the proceedings. In *Rhines v. Weber,* 544 U.S. 269, 274, 125 S.Ct. 1528, 161 L.Ed.2d 440 (2005), the Supreme Court held that the "stay and abeyance" option should be available only in limited circumstances, i.e. "when the district court determines there was good cause for the petitioner's failure to exhaust his claims first in state court." 544 U.S. at 277, 125 S.Ct. 1528, 161 L.Ed.2d 440. Even when the petitioner has demonstrated good cause for his or her failure to exhaust, the district court should not grant a stay when the unexhausted claims are plainly meritless. *Id.*

Petitioner provides no explanation for why he did not file his petition for a writ of error coram nobis until May 25, 2010, almost two (2) years after the Appellate Division affirmed his judgment of conviction. Thus, petitioner has not demonstrated good cause for his failure to exhaust his ineffective assistance of appellate counsel claim. [1] Moreover, petitioner's ineffective assistance of appellate counsel claim is time-barred pursuant to the one (1)-year statute of limitations imposed under the Anti–Terrorism and Effective Death Penalty Act (AEDPA), 28 U.S.C. § 2244(d)(1). Pursuant to the AEDPA, the limitations period runs

[1]    Petitioner's ineffective assistance of appellate counsel claim remains unexhausted, insofar as he has not sought leave to appeal to the New York State Court of Appeals from the February 15, 2011 order of the Appellate Division pursuant to New York Criminal Procedure Law § 460.10(5), and there is no indication that he has sought an extension of time to do so.

"from the latest of—(A) the date on which the judgment became final by the conclusion of direct review or the expiration of the time for seeking such review; (B) the date on which the impediment to filing an application created by

State action in violation of the Constitution or laws of the United States is removed, if the applicant was prevented from filing by such State action; (C) the date on which the constitutional right asserted was initially recognized by the Supreme Court, if the right has been newly recognized by the Supreme Court and made retroactively applicable to cases on collateral review; or (D) the date on which the factual predicate of the claim or claims presented could have been discovered through the exercise of due diligence."

The limitations period is tolled during the pendency of "a properly filed application for State post-conviction or other collateral review." 28 U.S.C. § 2244(d)(2).

**\*3** Petitioner's judgment of conviction became final on November 29, 2006, when the ninety (90)-day period within which he could seek a writ of certiorari expired. Moreover, the factual predicate of petitioner's ineffective assistance of appellate counsel claim could clearly have been discovered as of the date counsel filed his appellate brief, since petitioner's claim is based upon his appellate counsel's failure to raise a claim that petitioner was denied his right to confrontation. The other two (2) provisions of Section 2244(d)(1) are inapplicable. Thus, pursuant to the AEDPA, petitioner was required to file his ineffective assistance of appellate counsel claim on or before November 29, 2007. As petitioner did not have any application for collateral review pending in the state court, and indeed had not yet filed his petition for a writ of error coram nobis until May 2010, the limitation period was never statutorily tolled before it expired.

Nor was the AEDPA limitation period equitably tolled. Equitable tolling is available only in "rare and exceptional circumstance[s]," *Smith v. McGinnis,* 208 F.3d 13, 17 (2d Cir.2000), where the petitioner is prevented from timely filing by circumstances beyond his or her control, and only upon a showing that he or she acted with reasonable diligence throughout the period he or she seeks to toll. *See, Smaldone v. Senkowski,* 273 F.3d 133, 138 (2d Cir.2001). Petitioner has made no such showing.

An amendment made after the statute of limitations has run relates back to the date of the original pleading if, *inter alia,* the amendment "asserts a claim or defense that arose out of the conduct, transaction, or occurrence set out—or attempted to be set out—in the original pleading." Fed.R.Civ.P. 15(c)(1)(B). In federal habeas proceedings, "relation back depends on the existence of a common core of operative facts uniting the original and newly asserted claims," *Mayle v. Felix,* 545

2011 WL 1303924

U.S. 644, 659, 664, 125 S.Ct. 2562, 162 L.Ed.2d 582 (2005) (quotations omitted), and is unavailable merely because the proposed claims relate to the same trial, conviction, or sentence as the original petition. *See Id.* at 662–664. Since petitioner's ineffective assistance of appellate counsel claim is not tied to a "common core of operative facts," but rather is a discrete claim based upon discrete facts, *i.e.,* the contents of the appellate brief filed by appellate counsel, which are irrelevant to the claims included in the original petition relating to acts or omissions during the trial, any ineffective assistance of appellate counsel claim does not relate back to the original petition. Accordingly, petitioner's ineffective assistance of appellate counsel claim is time-barred under the AEDPA.

In any event, petitioner's ineffective assistance of appellate counsel claim is without merit, since the Appellate Division's determination that petitioner "failed to establish that he was denied the effective assistance of appellate counsel" *People v. Diaz,* 81 A.D.3d at 848, 916 N.Y.S.2d 809, was not "contrary to, or * * * an unreasonable application of, clearly established Federal law," 28 U.S.C. § 2254(d)(1), and was not "based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding," 28 U.S.C. § 2254(d)(2). Appellate counsel is not required to "press nonfrivolous points, * * * if counsel, as a matter of professional judgment, decides not to present those points." *Jones v. Barnes,* 463 U.S. 745, 751, 103 S.Ct. 3308, 77 L.Ed.2d 987 (1983). Moreover, petitioner filed a supplemental *pro se* brief on his appeal and, thus, could have raised the omitted claim himself.

**\*4** Since petitioner's ineffective assistance of appellate counsel claim is time-barred and plainly meritless and petitioner has not demonstrated good cause for his failure to exhaust that claim, Magistrate Judge Bloom did not err in issuing the Report while petitioner's application to stay this proceeding was pending and petitioner's application to stay this proceeding and to amend his amended petition to assert a claim for ineffective assistance of appellate counsel is denied.

Upon *de novo* review of the Report and consideration of petitioner's remaining objections thereto, petitioner's objections are overruled and the Report is accepted in its entirety.

II. Conclusion

Upon *de novo* review of the Report, petitioner's objections are overruled and the Report is accepted in its entirety. Petitioner's amended petition is denied for the reasons set forth in the Report, petitioner's application for a stay of this proceeding and for leave to amend his amended petition is denied and this proceeding is dismissed. Since petitioner has failed to make a substantial showing of a denial of a constitutional right, a certificate of appealability will not issue. *See* 28 U.S.C. § 2253; *see also Miller–El v. Cockrell,* 537 U.S. 322, 336, 123 S.Ct. 1029, 154 L.Ed.2d 931 (2003); *Luciadore v. New York State Div. of Parole,* 209 F.3d 107, 112 (2d Cir.2000); *Kellogg v. Strack,* 269 F.3d 100, 102 (2d Cir.2001). Petitioner has a right to seek a certificate of appealability from the Court of Appeals for the Second Circuit. *See,* 28 U.S.C. § 2253. Pursuant to 28 U.S.C. § 1915(a), any appeal from a judgment denying this petition will not be taken in good faith. *Coppedge v. United States,* 369 U.S. 438, 82 S.Ct. 917, 8 L.Ed.2d 21 (1962).

The Clerk of the Court is directed to enter judgment in favor of respondent, to close this case and to serve notice of entry of this Order in accordance with Rule 77(d)(1) of the Federal Rules of Civil Procedure, including mailing a copy of the Order to the *pro se* petitioner at his last known address, *see* Fed.R.Civ.P. 5(b)(2)(C).

SO ORDERED.

**All Citations**

Not Reported in F.Supp.2d, 2011 WL 1303924

---

**End of Document**

© 2023 Thomson Reuters. No claim to original U.S. Government Works.

Case 9:21-cv-00708-BKS-TWD    Document 14    Filed 11/03/23    Page 122 of 171

Fulcher v. Graham, Not Reported in Fed. Supp. (2022)

2022 WL 523555

2022 WL 523555
Only the Westlaw citation is currently available.
United States District Court, E.D. New York.

Sidor FULCHER, Petitioner,
v.
Harold GRAHAM, Respondent.

14-cv-3910 (LDH)
|
Signed 02/22/2022

**Attorneys and Law Firms**

Sidor Fulcher, Elmira, NY, Pro Se.

Alla Ageyeva, Kings County District Attorney's Office, Brooklyn, NY, Kings County District Attorneys Office, New York State Attorney Generals Office, for Respondent.

**MEMORANDUM AND ORDER**

LaSHANN DeARCY HALL, United States District Judge:

*1 Petitioner Sidor Fulcher brings a habeas corpus petition pursuant to 28 U.S.C. § 2254, challenging his conviction in New York Supreme Court, Kings County, for murder in the second degree on the following grounds: (1) ineffective assistance of trial counsel; (2) ineffective assistance of appellate counsel; (3) violation of his Sixth Amendment right to confront his accusers; (4) violation of his Fourteenth Amendment right to present a defense; (5) prosecutorial misconduct; (6) violation of his right to be present during jury selection; and (7) imposition of an excessive sentence in light of his minimal criminal history.

**BACKGROUND**

**I. INCIDENT AND ARREST**

On August 11, 2006, Igol Isaacs Jr., known as A.J., was shot in Brownsville, Brooklyn. (Resp't's Aff. in Opp'n to Pet. For Habeas Corpus ("Resp't's Opp'n"), Ex. W at 100–09, ECF No. 8-7; Resp't's Opp'n, Ex. Y at 71–81, ECF No. 8-9.) Captain Brian McGee, an NYPD officer, arrived on the scene before the arrival of any emergency medical personnel. (Rep't's Opp'n, Ex. W at 37–39.) Upon arrival, McGee attempted to speak with A.J., who was gasping and

having trouble breathing. (Id. at 40.) McGee told A.J. that A.J. "might not make it" and asked A.J. for the name of the person who had shot him. (Id. at 41.) A.J. responded with what sounded to McGee as, "Todd shot me." (Id.) When McGee repeated the name "Todd" back to A.J., A.J. responded, "Tom shot me." (Id.) A.J. succumbed to his injuries and died on the scene. (Id.)

Petitioner and Thomas Clay were identified as A.J.'s shooters by two eyewitnesses: Troy Harris and Yvette Clay, Mr. Clay's wife. (Id. at 100-09; Resp't's Opp'n, Ex. Y at 75–78.) Mrs. Clay provided the police with cell phone numbers for Petitioner and Mr. Clay. (Resp't's Opp'n, Ex. W at 116.) The police tracked the physical movements of the cell phones associated with those numbers and determined that both Petitioner and Mr. Clay had left Brooklyn in the hours after the shooting, and traveled to North Carolina, where they remained for approximately one month. (Resp't's Opp'n, Ex. Y at 26–33.)

Both Petitioner and Mr. Clay were arrested upon their return to New York: Mr. Clay on September 10, 2006; and, Petitioner on November 27, 2006. (Resp't's Opp'n, Ex. T at 10–14, 65, ECF No. 8-4.) Mr. Clay was arrested while driving a white Ford Expedition owned by a woman named Tia Lawston. (Id. at 66.) Following Mr. Clay's arrest, the vehicle was taken into police custody, and subsequently searched with Lawston's consent. (Id. at 66–67.) Three cell phones were retrieved from the vehicle during the search. (Id. at 67.)

Petitioner was charged with murder in the second degree, manslaughter in the first degree, criminal possession of a weapon in the second degree, and criminal possession of a weapon in the third degree. (Resp't's Opp'n, Ex. Z, at 80–81, ECF No. 8-10.) Mr. Clay was charged with murder in the second degree, manslaughter in the first degree, and criminal possession of a weapon in the second degree. (Id. at 80.) Petitioner and Mr. Clay were tried jointly. (Resp't's Opp'n, Ex. W at 2.)

**II. SUPPRESSION HEARING IN PETITIONER'S CO-DEFENDANT'S CASE**

*2 Before trial, Mr. Clay moved to suppress the cell phones obtained during the search of Lawston's car arguing that the cell phones were illegally obtained because the police did not obtain a warrant or Mr. Clay's consent before searching the vehicle. (Resp't's Opp'n, Ex. T at 88–90.) Specifically, Mr. Clay argued that the cell phones should be suppressed because, at the time he was arrested, he was driving the

Fulcher v. Graham, Not Reported in Fed. Supp. (2022)

2022 WL 523555

Case 9:21-cv-00708-BKS-TWD    Document 14    Filed 11/03/23    Page 123 of 171

vehicle with Lawston's permission and thus "what [was] in the car belong[ed] to him." (*Id.* at 89.) The prosecution argued that neither a warrant nor Mr. Clay's consent was required because Lawston had consented to the search. (*Id.* at 90–91.) The court ultimately denied Mr. Clay's motion to suppress, finding that the cell phones were obtained during a search that was legally conducted with the consent of the vehicle's owner. (*Id.* at 92.)

### III. TRIAL AND SENTENCING

#### A. Cell-Phone Evidence

At trial, the People sought to connect Petitioner to one of the three cell phones retrieved from Lawston's car. (Resp't's Opp'n, Ex. Z at 10–11.) Specifically, relying on the testimony of Mrs. Clay and Detective Erick Parks, the People attempted to demonstrate that the cell phone associated with a phone number registered to Marcus Karrby belonged to Petitioner. (Resp't's Opp'n, Ex. Y at 51–52; Resp't's Opp'n, Ex. Z at 9–10.) Mrs. Clay testified that she had received a phone call from the Marcus Karrby number approximately two months prior to A.J.'s shooting. (Resp't's Opp'n, Ex. W at 116–18.) Mrs. Clay further stated that the individual on the phone, who did not identify himself, directed her to come to the hospital because Mr. Clay had been injured. (*Id.* at 116.) Upon arriving at the hospital, Mrs. Clay met Petitioner, whom she believed to be the person who had called from the Marcus Karrby number. (*Id.* at 116–18.) Detective Parks testified that, during his investigation into Mr. Clay's shooting, he had interviewed an individual who was with Mr. Clay at the hospital. (Resp't's Opp'n, Ex. X at 60–61, ECF No. 8-8.) Although Detective Parks was unable to conclusively identify that person as Petitioner, he recalled that the person had identified himself as Marcus Kirby, mentioned that he was Mr. Clay's cousin, provided a date of birth that matched Petitioner's, and provided a personal cell phone number that matched the Marcus Karrby number.[1] (*Id.*) The court found that the People had a "good faith basis" to argue that Petitioner used the alias Marcus Kirby. (Resp't's Opp'n, Ex. T at 110.)

[1]    The Court notes that there are two different spellings of this name in the record.

#### B. A.J.'s Dying Declaration

On October 25, 2007, the court held a hearing outside of the presence of the jury to determine whether Captain McGee's testimony regarding A.J.'s statement, "Tom shot me," was admissible. (Resp't's Opp'n, Ex. W at 34, 51–52.) Mr. Clay made several arguments in an attempt to exclude A.J.'s statement. (*Id.* at 51–52.) Petitioner's counsel did not make any separate arguments but stated that he concurred with Mr. Clay. (*Id.*) Ultimately the court found that A.J.'s statement was a dying declaration and admitted it. (*Id.* at 54–55.)

#### C. Eyewitness Testimony

At trial, the People called Mrs. Clay and Troy Harris. Mrs. Clay testified that she was speaking with a friend on her cell phone while sitting on a bench in a courtyard where A.J. was standing and talking to a group of friends, including Elease Monk, and Mrs. Clay's nephew, Naquan Telfair. (Resp't's Opp'n, Ex. W at 102–03.) Mrs. Clay then saw two men walk toward A.J. and begin shooting at him. (*Id.* at 106.) A.J. fell to the ground, at which time Mrs. Clay ran toward him. (*Id.*) As she ran, Mrs. Clay recognized the shooters as Mr. Clay and Petitioner. (*Id.* at 109–10.) Mrs. Clay also testified that she later identified Petitioner in a police lineup. (*Id.* at 119.)

**\*3** In contrast to Mrs. Clay's testimony, Mr. Harris testified that he was the only person speaking with A.J. in the minutes leading up to the shooting. (Resp't's Opp'n, Ex. Y at 71–72.) According to Mr. Harris, he was sitting on a beach chair in front of A.J., who was standing, when he noticed two men approaching from behind A.J. (*Id.* at 71, 75–76.) Mr. Harris testified that he recognized Mr. Clay as "Bop," someone who had recently been shot in the neighborhood and may have been seeking revenge. (*Id.* at 76–77.) As the two men came closer, one of them said to A.J., "You think I am fucking playing?" to which A.J. replied, "What I do?" (*Id.* at 77.) The two men then started shooting at A.J. (*Id.*) As A.J. fell to the ground, the two men ran away, at which point Mr. Harris saw Petitioner's face for a "split second." (*Id.* at 80.) One week after the shooting, Mr. Harris saw Mr. Clay and Petitioner driving around the same neighborhood together. (*Id.* at 82.)

#### D. Petitioner's Decision Not to Testify

Petitioner declined to testify at trial. (*See* Resp't's Opp'n, Ex. Y at 127.) Upon inquiry from the court, Petitioner's counsel informed the judge that he had been "talking to [Petitioner] from the day th[e] trial began about the possibility

of testifying in th[e] case," but that Petitioner "d[id] not wish to testify." (*Id.*) The trial judge asked Petitioner whether his decision not to testify was voluntary, to which Petitioner replied, "Yes." (*Id.* at 126.)

\* \* \*

On November 7, 2007, the jury found Petitioner guilty of murder in the second degree. [2] (*See* Pet. Habeas Corpus ("Pet.") at 1, ECF No. 1; Resp't's Opp'n, Ex. Z at 96–97.) On November 21, 2007, Petitioner was sentenced to twenty-five years to life imprisonment. (Resp't's Opp'n, Ex. Z at 134.)

[2]     Although Petitioner's habeas petition states that Petitioner was convicted of murder in the second degree, criminal possession of a weapon in the second degree, and criminal possession of a weapon in the third degree (*see* Pet. at 1, ECF No. 1) both the trial and sentencing transcripts reflect that Petitioner was convicted and sentenced on the sole count of murder in the second degree. (*See* Resp't's Opp'n, Ex. Z at 96, 134, ECF No. 8-10.)

### IV. PROCEDURAL HISTORY

#### A. Direct Appeal

Petitioner filed a timely notice of appeal following his conviction. (Resp't's Opp'n, Ex. A, ECF No. 8-1.) On September 29, 2008, the Appellate Division, Second Department, granted Petitioner's appeal. (*Id.*) On appeal, Petitioner argued that: (1) he was deprived of his Sixth Amendment right to confront witnesses; (2) he was deprived of his constitutional right to present a defense because he was precluded from eliciting that the People's main witness had a motive to fabricate her testimony; and, (3) his sentence of twenty-five years to life imprisonment was excessive in light of his minimal criminal history. (*Id.* at 17–30.) On June 28, 2011, the Second Department affirmed Petitioner's conviction, finding that the sentence imposed was not excessive and that the remainder of Petitioner's claims were without merit. (*See* Resp't's Opp'n, Ex. D at 100, ECF No. 8-1.) On August 18, 2011, Petitioner's appellate counsel sought leave to appeal to the New York State Court of Appeals. (Resp't's Opp'n, Ex. F at 112–14, ECF No. 8-1.) In the leave application, Petitioner's appellate counsel argued only that Petitioner was deprived of his Sixth Amendment right to confront witnesses against him when the

state court admitted A.J's statement identifying his shooter at trial. (*Id.*) On November 28, 2011, the Court of Appeals denied Petitioner's application. (Pet. at 3.) On May 14, 2012, the Supreme Court of the United States denied Petitioner's request for a writ of certiorari. (*Id.* at 3–4.)

#### B. Post-Conviction Collateral Relief and Instant Habeas Petition

On February 18, 2013, pursuant to N.Y. Crim. Proc. Law § 440.10(1)(h), Petitioner filed a motion to vacate his judgment of conviction in the Supreme Court, Kings County, on the following grounds: (1) ineffective assistance of counsel; (2) removal of jurors during trial without his consent or presence in the courtroom; (3) use of an unduly suggestive pre-trial line-up identification procedure; and, (4) prosecutorial misconduct. (*Id.* at 4, 17.) Petitioner's motion to vacate his judgment of conviction was denied on July 23, 2013. (*Id.* at 8.) On December 2, 2013, the Appellate Division denied Petitioner's application for a certificate to appeal the lower court's decision. (*Id.* at 14.) On December 3, 2013, Petitioner filed an appeal to the Appellate Division for a writ of error *coram nobis* on the ground of ineffective assistance of appellate counsel, which was denied on May 28, 2014. (*Id.* at 14, 18.) On June 23, 2014, Petitioner filed the instant petition. (*Id.* at 15.)

#### STANDARD OF REVIEW

**\*4**  As amended by the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), 28 U.S.C. § 2254 permits a federal court to entertain only those habeas petitions which allege that a person is in state custody "in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a). Section 2254(b)(1) imposes the additional requirement that a petitioner must have exhausted all state remedies for his claims. *See id.* § 2254(b)(1).

For claims which were "adjudicated on the merits in [s]tate court proceedings," the federal habeas court may not grant the application unless the adjudication: (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding. *Id.* § 2254(d). "A state court adjudicates

2022 WL 523555

a petitioner's federal constitutional claims on the merits when it (1) disposes of the claim on the merits, and (2) reduces its disposition to judgment." *Norde v. Keane,* 294 F.3d 401, 410 (2d Cir. 2002) (quotation marks and citation omitted). "Clearly established federal law refers to the holdings, as opposed to the dicta, of the Supreme Court's decisions as of the time of the relevant state-court decision." *Howard v. Walker,* 406 F.3d 114, 122 (2d Cir. 2005) (internal quotation marks and citation omitted). A state court decision is "contrary to" clearly established federal law if "the state court reached a conclusion of law that directly contradicts a holding of the Supreme Court" or, "when presented with 'facts that are materially indistinguishable from a relevant Supreme Court precedent,' " the state court arrived at a different result. *Evans v. Fischer,* 712 F.3d 125, 132 (2d Cir. 2013) (quoting *Williams v. Taylor,* 529 U.S. 362, 405 (2000)). A state court decision is an "unreasonable application" of clearly established federal law if "the state court identifies the correct governing legal principle from [Supreme Court] decisions but unreasonably applies that principle to the facts of the prisoner's case." *Williams,* 529 U.S. at 413.

## DISCUSSION

## I. INEFFECTIVE ASSISTANCE OF TRIAL COUNSEL

To prevail on a claim for ineffective assistance of trial counsel, Petitioner must satisfy the two-pronged test set out in *Strickland v. Washington,* 466 U.S. 668 (1984). *First,* Petitioner must demonstrate that his counsel's performance was "deficient" by showing that "counsel's representation fell below an objective standard of reasonableness" such that he or she "was not functioning as 'counsel' as guaranteed by the Sixth Amendment." *Id.* at 687–88. *Second,* Petitioner must establish that "the deficient performance prejudiced the defense" by showing that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 687, 694. "A reasonable probability is a probability sufficient to undermine confidence in the outcome" of the proceedings. *Id.* at 694. "An error by counsel, even if professionally unreasonable, does not warrant setting aside the judgment of a criminal proceeding if the error had no effect on the judgment." *Id.* at 691.

As a general matter, "[j]udicial scrutiny of counsel's performance must be highly deferential." *Id.* at 689. "Because of the difficulties inherent in [evaluating counsel's

performance], a court must indulge a strong presumption that counsel's conduct [fell] within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action 'might be considered sound trial strategy.' " *Id.* "Even serious errors by counsel do not warrant granting habeas relief where the conviction is supported by overwhelming evidence of guilt." *Lindstadt v. Keane,* 239 F.3d 191, 204 (2d Cir. 2001).

## A. Counsel's Failure to Present An Alibi Defense

**\*5** Petitioner argues that his counsel was ineffective because he neglected to call Petitioner's wife to testify at trial, although she "was available to testify at trial that [Petitioner] was home in a different section of Brooklyn" at the time of the shooting. (Pet'r's Mem. Supp. Habeas Pet. ("Pet'r's Mem.") at 10, ECF No. 12.) This contention, even if true, does not establish ineffective assistance of counsel.

It is well established that "[t]he decision whether to call any witnesses on behalf of the defendant, and if so which witnesses to call, is a tactical decision of the sort engaged in by defense attorneys in almost every trial ... [and] will not constitute a basis for an ineffective assistance claim." *United States v. Nersesian,* 824 F.2d 1294, 1321 (2d Cir. 1987). In *Zimmerman v. Burge,* the court held that a defendant did not receive ineffective assistance of counsel despite counsel's failure to call alibi witnesses, where "[t]he record [was] ... not entirely clear as to why, having listed [the alibi witnesses] on the notice of alibi, counsel failed to produce them." 492 F.Supp.2d 170, 187 (E.D.N.Y. 2007). The same logic applies in this case.

Here, it is unclear why Petitioner's counsel failed to present Petitioner's wife as a witness despite listing her on the alibi notice. The Court notes, however, that at sentencing, Petitioner claimed that he was at his girlfriend's house (not with his wife) at the time of the shooting. (Resp't's Opp'n, Ex. Z at 132.) Perhaps counsel's awareness of this inconsistency provided the basis for the decision not to call Petitioner's wife. In any event, the record is devoid of evidence on which the Court could rely to conclude that the decision not to call Petitioner's wife was anything other than a tactical decision. Therefore, Petitioner's claim for ineffective assistance of counsel on this ground must fail.

Fulcher v. Graham, Not Reported in Fed. Supp. (2022)

Case 9:21-cv-00708-BKS-TWD    Document 14    Filed 11/03/23    Page 126 of 171

2022 WL 523555

## B. Counsel's Failure to Interview Potential Witnesses

Petitioner claims that his counsel was ineffective for failing to call Poppy, an alleged eyewitness to A.J.'s shooting, and TaKeya Dorsey, Mr. Clay's then girlfriend, as trial witnesses. On a habeas petition, "a petitioner may not merely allege that certain witnesses might have supplied relevant testimony." *Montalvo v. Annetts*, 2003 WL 22962504, at *26 (S.D.N.Y. Dec. 17, 2003). Rather, "[a petitioner] must state exactly what testimony they would have supplied and how such testimony would have changed the result." *Id.* at *26; *see also Greenidge v. U.S.*, 2002 WL 720677, at *2 (E.D.N.Y. Mar. 27, 2002) (denying habeas relief on a petitioner's claim for ineffective assistance of counsel for failure to call certain witnesses where the petitioner failed to specify "how the testimony of those witnesses would have been helpful to his defense").

Here, Petitioner failed to explain how either Poppy's or Dorsey's testimony would have changed the result of his trial or in any way aided in his defense. In fact, Petitioner makes no mention of the potential substance of Poppy's testimony. As to Dorsey, Petitioner states only that she "could have shed some light on why Yvette Clay would fabricate her story and implicate[ ] [him] and his co-defendant in the crime." (Pet'r's Mem. at 15–16.) This is not enough. Because Petitioner has failed to identify how testimony from either Poppy or Dorsey would have changed the result of his trial, Petitioner's claims must fail.

## C. Counsel's Failure to Interview Potential Eyewitnesses

**\*6** Petitioner argues that his counsel was ineffective in failing to interview and present the testimony of other eyewitnesses to the shooting, including Telfair, Monk, Poppy, and Dorsey. (Pet'r's Mem. at 11.) Petitioner claims that Telfair "testified in court," outside the presence of the jury, that he was not present when A.J. was shot. (*Id.*) According to the record, it was the prosecution that informed the Court that both Telfair and Monk disputed Mrs. Clay's account of A.J.'s shooting. (Resp't's Opp'n, Ex. X at 120.) In any event, upon learning of the potential witness testimony, Defendants were each given the opportunity to interview Telfair and Monk before continuing with the proceedings. (*See id.* at 121.) After interviewing the two potential witnesses, counsel for both Mr. Clay and Petitioner informed the court that they preferred to call Telfair and Monk at a later date for strategic reasons. (*Id.* at 121–122.) Specifically, Petitioner's counsel stated,

> We had a brief conference about calling [Telfair and Monk] out of order. I know both of them are here. [Monk] is going to be sent home and ordered to come back tomorrow. I prefer not to call Naquan Telfair until the other people are called. I understand the People are to call him as a witness in this case and I don't want to put my case on or put a witness on out of order without having that testimony out. I feel uncomfortable about it and I don't think it's proper strategy and I ask the People be directed to bring him back as well with [Monk] after the witnesses have testified.

(*Id.*) Petitioner's counsel subsequently declined to call either witness to testify. (Resp't's Opp'n, Ex. Y at 125.) Notably, on this issue, Petitioner's counsel stated, "I also discussed with my client, Mr. Fulcher. He agrees with me not to call the two witnesses that were here. We discussed their testimony and heard what they were going to say. He said he doesn't want to call them at all." (*Id.*) Not only was the decision not to call Monk and Telfair a strategic one, it was also one with which Petitioner apparently agreed. (*Id.* at 126.) And, as noted, "[c]ourts applying *Strickland* are especially deferential to defense attorneys' decisions concerning which witnesses to put before the jury." *Greiner v. Wells*, 417 F.3d 305, 323 (2d Cir. 2005); *see also Eze v. Senkowski*, 321 F.3d 110, 129 (2d Cir. 2003) ("A defense counsel's decision not to call a particular witness usually falls under the realm of trial strategy that we are reluctant to disturb."). Accordingly, Petitioner's claims based on his counsel's failure to interview and present the testimony of other eyewitnesses to the shooting also fail.

## D. Counsel's Failure to Highlight Inconsistent Testimony

Petitioner argues that trial counsel's failure to cross-examine the police witnesses and Mrs. Clay regarding the inconsistencies in their testimonies was also ineffective. (Pet'r's Mem. at 12.) Here again, "[d]ecisions about 'whether to engage in cross-examination, and if so to what extent and in what manner, are ... strategic in nature' and generally will not support an ineffective assistance claim." *Dunham*

Case 9:21-cv-00708-BKS-TWD    Document 14    Filed 11/03/23    Page 127 of 171

Fulcher v. Graham, Not Reported in Fed. Supp. (2022)

2022 WL 523555

*v. Travis*, 313 F.3d 724, 732 (2d Cir. 2002) (quoting *United States v. Nersesian*, 824 F.2d 1294, 1321 (2d Cir. 1987)). Indeed, the Second Circuit has held that an attorney's failure to elicit inconsistencies in a witness's testimony that would have been of "enormous value" to the defendant did not constitute ineffective assistance of counsel where the counsel conducted an otherwise adequate cross-examination that "[brought] forth several inconsistencies" in the witness's testimony. *Eze*, 321 F.3d at 133.

At trial, Captain McGee and Officer Elmore testified that they arrived at the scene of the shooting in separate cars, but both claimed that Deputy Inspector Jeffery Maddrey had ridden in their car. (Resp't's Opp'n, Ex. W at 77; Resp't's Opp'n, Ex. X at 47–48.) Petitioner has failed, however, to explain how the inconsistencies surrounding how Deputy Inspector Maddrey arrived at the scene would have affected the jury's judgment regarding the police officers' credibility or Petitioner's guilt. The timing or manner of Deputy Inspector Maddrey's arrival at the scene had no bearing on the eyewitness testimony or cell-phone evidence which, together, formed the basis of the People's case. In other words, even if this inconsistency caused the jury to question the credibility of two police officers, the record reflects ample evidence on which the jury could have relied in reaching their guilty verdict. Moreover, although counsel failed to mention the inconsistency regarding the occupants of the officers' respective vehicles, he nonetheless conducted an adequate cross-examination of both officers and identified other inconsistencies in their testimonies. (Resp't's Opp'n, Ex. W at 85–88; Resp't's Opp'n, Ex. X at 46–48; Resp't's Opp'n, Ex. Z at 4.) For example, counsel vigorously questioned Captain McGee regarding his actions immediately following his arrival at the scene of A.J.'s shooting. (Resp't's Opp, Ex. W at 84–88.) Likewise, counsel crossed Officer Elmore about an inconsistency regarding Petitioner's name as it appeared in the police records. (Resp't's Opp'n, Ex. X at 46–47.) Because Petitioner cannot demonstrate any reasonable likelihood of prejudice under *Strickland*, his claim regarding ineffective assistance of counsel based on counsel's failure to adequately cross-examine witnesses is denied.

### E. Counsel's Failure to Argue Lack of Probable Cause

**\*7** Petitioner argues that his counsel was ineffective in failing to argue that "Mrs. Clay's statement to [the] police did not provide them with probable cause" to arrest Petitioner because the statement did not provide Petitioner's "name, full description, height, weight, [tattoos], [or] hair length." (Pet. at 20.) This contention is meritless because the record clearly demonstrates that Mrs. Clay identified Petitioner to the police by providing his name and a description of his clothing at the time of the shooting. (*See* Resp't's Opp, Ex. W at 115–16.)

### F. Counsel's Failure to Challenge the Identification Lineup

Petitioner argues that he received ineffective assistance of counsel because trial counsel failed to challenge the identification lineup from which Mrs. Clay identified him as one of A.J.'s shooters. (Pet'r's Mem. at 18–19.) In support of this claim, Petitioner asserts that the identification lineup was unduly suggestive because (1) all of the men in the lineup were told to wear hats, although the two men who shot A.J. were not wearing hats at the time of the shooting, and (2) the "fillers" in the lineup weighed between 160 and 175 pounds, whereas Petitioner weighed 245 pounds. (*Id.* at 18.)

Contrary to Petitioner's assertion, trial counsel did question the police regarding the procedures they employed when creating the lineup. (Resp't's Opp, Ex. T at 25–32; Resp't's Opp, Ex. X at 103–04.) In response to this questioning, Detective Richard Harper stated that the police generally ask all persons in an identification lineup to wear hats and sit down to mitigate differences in hairstyles, height, and build, and thus make the entire procedure "as fair as possible for the subject." (Resp't's Opp, Ex. T at 46–47.) Petitioner's counsel specifically asked Detective Harper whether some of the fillers were "bigger" or "stockier" than Petitioner. (*Id.* at 47.) Detective Harper did not recall. (*Id.*) Therefore, Petitioner's argument that his counsel failed to challenge the lineup is simply without merit.

### G. Counsel's Failure to Investigate

Petitioner argues that he received ineffective assistance because his counsel failed to go to the crime scene or hire a private investigator to identify seventy-five potential witnesses who were purportedly present at the time of A.J.'s shooting. Petitioner maintains that had his counsel conducted further investigation, the result of the proceedings would have been different because those potential eyewitnesses might have provided sufficient testimony to exonerate Petitioner. (Pet'r's Mem. at 20–21.)

2022 WL 523555

Petitioner has failed, however, to present any additional facts or evidence to support this contention.[3] That is, Petitioner has failed to argue the testimony of any possible witness might have helped his case. *See McCollough v. Bennett*, 2010 WL 114253, at *12 (E.D.N.Y. Jan. 12, 2010) (rejecting a habeas petitioner's claim that his counsel was ineffective in failing to interview two witnesses who might have been able to offer helpful defense testimony where the petitioner failed to specify who the witnesses were or what testimony they could have provided); *Waters v. Hoke*, 1986 WL 14616, at *2 (E.D.N.Y. Nov. 18, 1986) (rejecting a habeas petitioner's claim that his counsel was ineffective for failing to interview potential defense witnesses where "there [was] no evidence that the testimony of the possible witnesses would have exculpated or even helped petitioner's case" and the petitioner "failed to show any prejudice caused by defense counsel's failure to interview certain defense witnesses"). In any event, the Supreme Court has held that even if defense counsel "does not conduct a substantial investigation into each of several plausible lines of defense, assistance may nonetheless be effective." *Strickland*, 466 U.S. at 681. When evaluating whether counsel fulfilled his or her duty to investigate, the Court gives great deference to counsel's judgment and actions. *See id.* ("[S]trategic choices about which lines of defense to pursue are owed deference commensurate with the reasonableness of the professional judgments on which they are based."). For these reasons, Petitioner's claim that he received ineffective assistance of counsel based on his trial counsel's failure to hire a private investigator or interview potential defense witnesses is denied.

[3]   Detective Harper testified at trial that he returned to the scene of the shooting the next day in an attempt to find witnesses, but no one came forward with information, and not a single person claimed to have witnessed the shooting. (*See* Resp't's Opp'n, Ex. X at 110.)

### H. Counsel's Failure to Challenge Prejudicial Testimony

**\*8** At some time prior to trial, the court issued an order prohibiting questioning about a 2006 shooting in which Mr. Clay was injured. (Pet'r's Mem. at 21.) During trial, in contravention of the court's order, Mr. Clay's counsel elicited such testimony from Mrs. Clay in the presence of the jury. Petitioner claims that his counsel was ineffective because he failed to challenge the introduction of this testimony as prejudicial. (Resp't's Opp, Ex. W at 155–56, 183–85.)

While this testimony had the potential to prejudice Mr. Clay by implicating him in an earlier gang-related incident, it is unclear how this testimony could have affected Petitioner's defense. And, Petitioner has failed to proffer any evidence demonstrating that he was at all prejudiced by the introduction of this testimony. Because Petitioner has failed to demonstrate that he was prejudiced by the testimony regarding Mr. Clay's 2006 shooting, Petitioner's claim is denied.

### I. Counsel's Failure to Challenge Cell Phone Testimony

Petitioner argues that his counsel was ineffective because he was unprepared for the pre-trial suppression hearing on Mr. Clay's motion to suppress the three cell phones retrieved from Lawston's car, and maintains that the results of the suppression hearing would have been different if counsel had been better prepared. (Pet'r's Mem. at 17.) Specifically, Petitioner asserts that "[t]rial counsel advised without objection the admittance of testimony about a cell phone which was allegedly recovered in a vehicle driven by the co-defendant." (*Id.* at 22.) Again, Petitioner's contention is unsupported by the record.

Contrary to Petitioner's contention that, during trial, Petitioner's counsel objected to the admission of testimony related to the cell phone on the grounds that the prosecution had failed to present any concrete evidence linking Petitioner to the cell phone in question. (Resp't's Opp, Ex. Y at 4–5.) Over counsel's objection, the court allowed testimony regarding the cell phones to be introduced into evidence finding that the jury could draw a "reasonable inference" to connect Petitioner to the cell phone. (*Id.* at 7.)

Petitioner further argues that his counsel did not adequately pursue any line of questioning which would have established that the cell phone did not belong to Petitioner. (Pet'r's Mem. at 22.) This claim is also contradicted by the record as Petitioner's counsel emphasized the fact that all three cell phones recovered from Lawston's car were linked to prepaid numbers that do not require any identification to create an account, and that the cell phone provider had "no idea who uses the phone" after the prepaid account is created. (Resp't's Opp, Ex. Y at 50–52.)

### II. PETITIONER'S SIXTH AMENDMENT RIGHT TO CONFRONT WITNESSES AGAINST HIM

Case 9:21-cv-00708-BKS-TWD    Document 14    Filed 11/03/23    Page 129 of 171
Fulcher v. Graham, Not Reported in Fed. Supp. (2022)
2022 WL 523555

Petitioner argues that the admission of A.J.'s dying statement identifying his shooter as Mr. Clay violated Petitioner's Sixth Amendment right to confront his accuser. (Pet'r's Mem. at 3–4.) Because the lower state court properly and reasonably applied clearly established federal law in adjudicating this claim on the merits and found that the admission of A.J.'s statement did not violate Petitioner's Sixth Amendment right, this decision is entitled to deference on federal habeas review. *See* 28 U.S.C. § 2254(b)(1).

As a threshold matter, A.J.'s statement identified Mr. Clay, not Petitioner, as the shooter, (Rep't's Opp., Ex. W at 41.), and thus Petitioner's Confrontation Clause rights were not implicated by the state court's admission of A.J.'s statement. Moreover, even if the Court concluded that the admission of A.J.'s statement implicated Petitioner's rights, such a finding would be of no consequence here as whether dying declarations are prohibited under the Confrontation Clause is not a settled matter of law.

Generally, the Confrontation Clause bars the "admission of testimonial statements of a witness who did not appear at trial unless he was unavailable to testify, and the defendant had had a prior opportunity for cross-examination." *Crawford v. Washington*, 541 U.S. 36, 53–54 (2004). Notably, and relevant here, the Supreme Court has expressly declined to decide whether there is a dying declaration exception under the Confrontation Clause. *See Crawford*, 541 U.S. at 56 n.6 ("We need not decide in this case whether the Sixth Amendment incorporates an exception for testimonial dying declarations."). [4] Therefore, even if the state court's admission of A.J.'s statement implicated Petitioner's Sixth Amendment rights, his claim must fail because whether a dying declaration exception exists under the Confrontation Clause is not a matter of clearly established federal law.

[4]      In the absence of such a decision, state courts have routinely permitted the admission of dying declarations at trial. *See People v. Clay*, 88 A.D.3d 14, 27 (N.Y. App. Div. 2011) (collecting cases); *see also Johnson v. Heath*, 2013 WL 2626922, at *1 (E.D.N.Y. June 11, 2013) (rejecting a habeas petitioner's claim that admitting a victim's dying statements into evidence constituted a violation of his Sixth Amendment right to confront the witnesses against him).

### III. PETITIONER'S RIGHT TO BE PRESENT DURING JURY SELECTION

**\*9** Petitioner also claims that he was impermissibly excluded from the courtroom when jurors were dismissed from the case, and that trial counsel improperly permitted jurors to be replaced without his consent. [5] (Pet. at 21.) Petitioner's contentions are yet again contradicted by the record. During trial, Juror Number 3 requested to address the court outside the presence of the other jurors. (Resp't's Opp'n, Ex. W at 57.) With all parties present in the courtroom, including Petitioner and his co-defendant, Juror Number 3, appearing anxious and distressed, revealed that she was pregnant and feared that the stress of being a juror in the trial was having a negative effect on her health. (*Id.* at 57.) Counsel for both defendants and the judge discussed the matter and agreed that Juror Number 3 should be replaced with the first alternate juror. (*Id.* at 65.) Petitioner was present in the room during these discussions. In fact, before dismissing Juror Number 3, the court expressly asked the parties for an evaluation of the juror's behavior, noting that "as all counsel are aware, as well as the defendants, since they were present as well, it is as though the more the [c]ourt spoke to [Juror Number 3], the more she cried." (*Id.* at 62.) Thus, Petitioner's claim is dismissed as meritless.

[5]      Although Petitioner suggests that multiple jurors were excused without his consent, (Pet. at 21) the record reflects that only a single juror was excused from trial.

### IV. EXCESSIVE SENTENCE

Petitioner contends that he received an excessive sentence given his limited prior criminal history. However, an excessive sentence claim must fail where the petitioner's sentence was within the range of sentences permissible under state law. *White v. Keane*, 969 F.2d 1381, 1383 (2d Cir. 1992) ("[N]o federal constitutional issue is presented where ... the sentence [provided was] within the range prescribed by state law."); *see also Alfini v. Lord*, 245 F.Supp.2d 493, 502 (E.D.N.Y. 2003) ("It is well settled that an excessive sentence claim may not be raised as grounds for habeas corpus relief if the sentence is within the range prescribed by state law."). Here, Petitioner's sentence of twenty-five years to life was within the range prescribed by New York state law for second degree murder. *See* N.Y. Penal Law § 70.00 ("For a class A-I felony, such minimum period shall not be less than fifteen years nor more than twenty-five years"); N.Y. Penal Law § 125.25 ("Murder in the second degree is a class A-I felony."). Accordingly, Petitioner's claim is meritless.

Case 9:21-cv-00708-BKS-TWD    Document 14    Filed 11/03/23    Page 130 of 171

Fulcher v. Graham, Not Reported in Fed. Supp. (2022)
2022 WL 523555

## V. PETITIONER'S PROCEDURALLY BARRED CLAIMS

In New York, a petitioner is deemed to have fully exhausted his remedies where (1) the petitioner has litigated his claims to the Appellate Division, and (2) if the claim was denied by the Appellate Division, the petitioner pursued an appeal from the denial. *See Kelly v. Griffin*, 2013 WL 1833240, at *3 (W.D.N.Y. May 1, 2013).

Here, Petitioner has failed to exhaust his prosecutorial misconduct claim because he did not assert this claim in state court on the same bases asserted in the instant petition. "To adequately exhaust a claim, a petitioner must have 'fairly presented' the claim to the state court." *Nelson v. Perez*, 2018 WL 1155992, at * 2 (E.D.N.Y. Mar. 2, 2018) (quoting *Daye v. Att'y Gen. of State of N.Y.*, 696 F.2d 186, 191 (2d Cir. 1982)). "In order to have fairly presented his federal claim to the state court[ ] the petitioner must have informed the state court of both the factual and the legal premises of the claim he asserts in federal court." *Robinson v. Kirk*, 1988 WL 2490, at *1 (E.D.N.Y. Jan. 4, 1988) (quoting *Daye*, 696 F.2d at 191). [6]

[6]     Even if the Court were to reach Petitioner's prosecutorial misconduct claim, the Court would find it to be meritless. Petitioner specifically alleges that the prosecutor knowingly presented the perjured testimonies of Officer Elmore and Captain McGee. (Pet'r's Mem. at 23–24.) The sole inconsistency identified by Petitioner is that both Captain McGee and Officer Elmore testified that they arrived at the scene of the shooting in separate cars, but that Deputy Inspector Jeffery Maddrey traveled to the scene in each of their cars. (Resp't's Opp'n, Ex. W at 77.). With respect to perjured testimony, "a conviction must be set aside if 'the prosecution knew, or should have known, of the perjury,' *and* 'there is any reasonable likelihood that the false testimony could have affected the judgment of the jury.' " *Grant v. Ricks*, 2003 WL 21847238, at *4 (E.D.N.Y. July 29, 2003) (emphasis added) (citation omitted). In Petitioner's case, there is no indication that the prosecution knowingly suborned the police officers' contradictory testimony. Even assuming *arguendo* that the testimony was knowingly false, Petitioner has failed to demonstrate any reasonable likelihood that an inconsistency regarding which police officers were riding in which vehicle could have affected the ultimate judgment of the jury. Petitioner further claims that the prosecution engaged in misconduct by improperly attributing the Marcus Karrby cell phone to Petitioner. (Pet'r's Mem. at 24.) However, the People's use of the cell phone as evidence and related attempt to link Petitioner to the cell phone were expressly permitted by the trial judge. *See Friedgood v. Keane*, 51 F.Supp.2d 327, 344 (E.D.N.Y. 1999) ("In the face of the trial court's specific determination approving the prosecutor's role, the court fails to see how the prosecutor's action could be termed misconduct.").

**\*10** Likewise, Petitioner's claim that his due-process rights were violated by the state court's refusal to permit his counsel to argue that Mrs. Clay had a motive to fabricate her testimony. (Pet'r's Mem. at 6–8.) This claim is similarly barred because he failed to raise this claim in his leave application to the Court of Appeals. *See Coleman*, 501 U.S. at 731 ("[I]n a federal system, the States should have the first opportunity to address and correct alleged violations of state prisoner's federal rights.").

Finally, Petitioner's ineffective assistance of appellate counsel claim is also barred because he failed to fully exhaust his remedies as to that claim. Although Petitioner timely filed a motion for a writ of error *coram nobis* with the Appellate Division, when the Appellate Division denied Petitioner's motion on May 28, 2014, Petitioner was required to further move for leave to appeal to the Court of Appeals in order to fully exhaust this claim. *See Diaz v. Graham*, 2011 WL 1303924, at *2 (E.D.N.Y. Mar. 31, 2011) (finding that a habeas petitioner's claim for ineffective assistance of counsel remained unexhausted where the petitioner did not appeal to the Court of Appeals following the Appellate Division's denial of a writ of error *coram nobis*). [7]

[7]     In any event, Petitioner's claim is meritless. Petitioner argues that he received ineffective assistance of appellate counsel because his attorney raised only Petitioner's Sixth Amendment right to confront witnesses in the leave application to the Court of Appeals, omitting other claims such as ineffective assistance of trial counsel and an excessive sentence claim. (Pet'r's Mem. at 26–29.) New York courts have consistently held that defendants are not necessarily denied effective assistance of appellate counsel if their

Fulcher v. Graham, Not Reported in Fed. Supp. (2022)
2022 WL 523555

attorney failed to raise certain issues on appeal, where the decision to "raise some issues and not others was a strategy decision." *People v. Little*, 88 A.D.2d 671, 672 (N.Y. App. Div. 1982). In this case, Petitioner's appellate counsel could have justifiably concluded that some of Petitioner's claims, including his claims regarding ineffective assistance of trial counsel and an excessive sentence, were sufficiently meritless to omit them from the leave application to the Court of Appeals. Further, the Supreme Court has suggested that defendants do not have a right to counsel on a second-level appeal. *See Wainwright v. Torna*, 455 U.S. 586, 587–88 (1982). If Petitioner did not have a clearly established right to second-level appellate counsel, he certainly did not have a right to the effective assistance of second-level appellate counsel. *See id.* ("Since [petitioner] had no constitutional right to counsel, he could not be deprived of the effective assistance of counsel by his retained counsel's failure to file the application timely.")

"In the case of a procedural default ... [the court] may reach the merits of the claim only if the defendant can first demonstrate either cause and actual prejudice, or that he is actually innocent." *Harrison v. Griffin*, 2017 WL 3105853, at *4 (E.D.N.Y. July 20, 2017) (quotation marks omitted) (citing *St. Helen v. Senkowski*, 374 F.3d 181, 184 (2d Cir. 2004)). Here, Petitioner is unable to overcome his procedural defaults because he has failed to demonstrate cause or prejudice, or present any additional facts or evidence to suggest actual innocence. Accordingly, Petitioner's claims for prosecutorial misconduct, violation of his right to due process, and ineffective assistance of appellate counsel must be dismissed.

### CONCLUSION

**\*11** For the foregoing reasons, the Court denies Petitioner's petition for a writ of habeas corpus in its entirety. Because Petitioner has not made a substantial showing of the denial of any constitutional right, no certificate of appealability will issue. *See* 28 U.S.C. § 2253; *see also Lucidore v. N.Y. State Div. of Parole*, 209 F.3d 107, 112–13 (2d Cir. 2000). The Court certifies pursuant to 28 U.S.C. § 1915(a)(3) that any appeal from this order would not be taken in good faith. *See Coppedge v. United States*, 369 U.S. 438, 444–45 (1962). The Clerk of Court is respectfully directed to close the case.

**All Citations**

Not Reported in Fed. Supp., 2022 WL 523555

---

© 2023 Thomson Reuters. No claim to original U.S. Government Works.

 © 2023 Thomson Reuters. No claim to original U.S. Government Works.

2020 WL 6785498
Only the Westlaw citation is currently available.
United States District Court, W.D. New York.

Emario ALLEN, Petitioner,

v.

Dale A. ARTUS, Respondent.

6:17-CV-6074 CJS
|
Signed 11/18/2020

**Attorneys and Law Firms**

E'Mario Allen, Attica, NY, pro se.

David Anthony Heraty, Erie County District Attorney's Office, Buffalo, NY, for Respondent.

DECISION AND ORDER

CHARLES J. SIRAGUSA, United States District Judge

INTRODUCTION

**\*1** Petitioner Emario Allen ("Allen" or "Petitioner") brings this *pro se* petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254, challenging his convictions after a jury trial, in New York State Supreme Court, Erie County, for Assault in the First Degree, Attempted Assault in the First Degree, and Robbery in the First Degree (2 counts), for which he was sentenced to determinate prison for terms of 25 years, 15 years, 25 years and 25 years, respectively, with the three 25-year sentences to run concurrently to each other but consecutively to the 15 year sentence, for a total sentence of 40 years. The Petition asserts three claims: 1) "the trial court erroneously denied Petitioner's *Batson* objection"; 2) "denial of effective assistance of counsel"; and 3) "the trial court violated Petitioner's right to due process and to remain silent." For the reasons explained below, the petition for a writ of habeas corpus is denied.

BACKGROUND

The following is a summary of the relevant facts that a jury could have reasonably found from the evidence at trial. During the early morning hours of November 12, 2011,

Aaron Green ("Green") was celebrating his 25 th birthday in nightclubs in the City of Buffalo. Green began the evening with approximately $600 of cash in his possession, and throughout the evening he purchased drinks for himself, friends and acquaintances. At a nightclub called Buffalo Live, Green encountered Petitioner, who he had known since childhood. Green offered to buy Petitioner a drink, but Petitioner declined. At approximately 3:00 a.m., Green left that nightclub and drove with Frank Booker ("Booker") to another nightclub, Pandora's Sports Bar ("Pandora's"). At that time, Green still had approximately $300 in cash.

At approximately 3:15 a.m., Green and Booker parked their vehicles on Victoria Avenue and were walking toward Pandora's on the corner of Victoria and Fillmore Avenue when they were accosted in the middle of the street by Petitioner and two other individuals, Cordero Jones-Hicks ("Jones-Hicks") and Dwayne Gordon ("Gordon"), who had followed them after they left Buffalo Live. Petitioner, Gordon and/or Jones-Hicks announced it was a robbery. Petitioner, who was wearing a red hoodie sweatshirt and a baseball cap, then pulled a pistol from his waistband and fired at Booker, who turned and ran. Petitioner then fired a bullet into each of Green's legs, fracturing both femurs. As Green lay in the street, Petitioner, Gordon and/or Jones-Hicks beat and kicked him, then went through his pockets removing cash, keys and a phone.

Jones-Hicks or Gordon then commented that Petitioner needed to kill Green, since he knew Petitioner's name. Petitioner pointed the pistol at Green's face, and Green, turning his face away and closing his eyes, believing that he was about to die, heard several clicks from the pistol, but no further gunshot. Petitioner, Gordon and Jones-Hicks then drove off in a gray SUV.

Parts of the incident were witnessed by two residents of Victoria Avenue who called 911 after they were awakened by the gunshots. Ulysees Wingo ("Wingo") told the 911 operator that the individual who pointed a gun at Green, and who appeared to fire twice, was wearing a red jacket or red sweatshirt and a baseball cap, while Daria Pratcher ("Pratcher"), who could not see the actual assault and robbery from her vantage point, indicated that three males, one of whom was wearing red, ran past her home and fled from the scene in a gray SUV. Booker, who had returned to the scene by the time the police arrived, also told officers that the shooter was wearing a red sweatshirt and a baseball cap.

**\*2** Based on a description of the gray SUV that Pratcher provided to the 911 operator, Buffalo Police pulled over the SUV moments later. Inside the vehicle were Petitioner, Gordon and Jones-Hicks. Within a few minutes thereafter, police brought Petitioner back to the scene for a show-up, and Booker identified Petitioner as the shooter.

During booking, officers found that Jones-Hicks possessed $320 and a cell phone. Officers searched for a gun, both inside the SUV and along the route that the SUV had traveled from Victoria Avenue before being stopped, but found no firearm. [1]

[1]    Although not part of the evidence at trial, the record indicates that shortly after Petitioner, Gordon and Jones- Hicks were arrested, Jones-Hicks told an officer that he had not been involved in the incident, but that he had been with Petitioner and Gordon, and had gotten separated from them. Jones-Hicks stated that he then heard gunfire, after which Petitioner and Gordon rejoined him, and the three drove away. Jones-Hicks indicated that either Gordon or Petitioner had thrown the gun out of the car window somewhere along the route that they had driven, and he returned to the area with officers to help them search, but no gun was found.

Petitioner was questioned at the police station by two detectives, who administered *Miranda* warnings. Petitioner waived his right to remain silent and indicated that he was surprised at being custody, since he had been asleep immediately prior to being arrested. One of the detectives, Cedric Holloway ("Holloway"), then attempted, without success, to goad Petitioner into explaining what had really happened, by telling him that the police had many witnesses against him, and that he should admit his guilt to help his co-defendants, one of whom (Gordon) was on parole. However, Petitioner remained silent in response to Holloway's statements. The entire interview lasted approximately thirteen minutes. [2]

[2]    Transcript at p. 528.

On December 2, 2011, an Erie County Grand Jury returned a five-count Indictment (Indictment No. 02505-2011) against Petitioner, charging him with Attempted Murder in the First Degree, Assault in the First Degree, Attempted Assault in the First Degree and two counts of Robbery in the First Degree. Petitioner was indicted along with Jones-Hicks and Gordon, though Petitioner was later granted severance.

Petitioner's attorney filed pretrial motions, including an application for a *Huntley* hearing. On April 2, 2012, the trial court conducted a *Huntley* hearing, and on July 11, 2012, the trial court ruled that Petitioner's statements to the detectives were admissible.

On July 16, 2012, jury selection began. Toward the end of jury selection, the prosecutor exercised a peremptory challenge to an African American man, Leonard Lannie ("Lannie"). Lannie had indicated that he was 23 years of age, was a college student, worked part-time at a supermarket and resided with his parents. [3] Lannie further indicated that he knew a prosecution witness, police officer Darren Exum ("Exum"), who was the officer who had pulled over the gray SUV in which Petitioner, Gordon and Jones-Hicks were riding. The prosecutor asked Lannie how he knew Exum, and Lannie indicated that Exum was a friend of his sister. When asked if his familiarity with Exum would affect his ability to be fair, Lannie answered, "No, I don't think so." [4] When asked if he would evaluate Exum's credibility the same as any other witness, Lannie responded, "I think I could." Later, the prosecutor asked Lannie again if his acquaintance with Exum was a problem for him, and Lannie answered, "No, it's not." Similarly, the prosecutor asked whether Lannie would treat Exum fairly, and Lannie stated, "Yes." [5]

[3]    Transcript at pp. 125-126.

[4]    Transcript at p. 126.

[5]    Transcript at p. 163.

**\*3** After the prosecutor exercised a peremptory challenge to Lannie, defense counsel raised a *Batson* objection. In that regard, defense counsel stated that prior to that point, there had been several African-American potential jurors, two of whom the prosecution had already excused using peremptory challenges. Defense counsel noted that other African-American potential jurors had also been excused, though not due to peremptory challenges by the prosecution. In response to the *Batson* challenge, the prosecutor indicated that he had challenged Lannie for essentially two reasons: First, because of Lannie's young age and perceived immaturity; and second, because Lannie knew Exum, who was going to be an important witness to the prosecution's case. The prosecutor noted that he had also used peremptory challenges to excuse white jurors similar in age to Lannie, since he felt that they were also too young or immature to serve on a

jury considering an A level felony. [6] Further, the prosecutor indicated that he did not feel Lannie had been forthcoming about his feelings for Exum, stating: "And when I inquired of him whether he knew Officer Exum or whether that might be an issue for him, I wasn't satisfied that his answers were credible. It just seemed incredible to me that he has no feelings whatsoever about Officer Exum one way or the other. And given the fact that [Exum is] a key witness, for all of those reasons, we exercised a peremptory challenge." [7]

[6]     Transcript at pp. 189-190.

[7]     Transcript at p. 191.

Defense counsel argued that the purported concern about Exum was pretextual, since Lannie had "answered the questions about his familiarity with [Exum] in all the detail that was requested of him," and had indicated that he could be fair and objective. [8] Defense counsel further argued that the prosecutor was treating Lannie disparately, since the prosecutor had not excused Kara Wutz ("Wutz"), a white female juror who was only two years older than Lannie.

[8]     Transcript at p. 192.

The prosecutor responded that Wutz was not similarly situated to Lannie, since she was older, was employed full-time and did not live with her parents. [9] Further, with regard to Lannie's familiarity with Exum, the prosecutor reiterated that he felt uncomfortable with Lannie since he could not interpret Lannie's feelings for Exum "one way or the other":

[W]ith respect to the relationship with Darren Exum, I just simply don't know what it is. I don't know if it's positive or if it's negative. It's most likely positive. Usually it is. He didn't indicate it was negative. But he wouldn't say one way or the other, and that was the concern. And that's the same reason we used on prospective juror Lisa Macaluso. She knows not just cops, she knows a witness. She knows Stu Easter. And we exercised a challenge on her. With respect to [Lannie], he doesn't just know cops, he knows a witness, a specific witness in this case. That's the reasons we're challenging him.

And finally, Your Honor, with respect to Mr. Samuel [a black prospective juror against whom the prosecutor had previously exercised a peremptory challenge], I recognized he's a forty-six-year-old black man. We challenged him for wholly different reasons. Had nothing to do with his age. Had everything to do with the answers to the questions he

gave. And I know there was no *Batson* challenge at that time by Mr. Terranova, but to suggest, somehow piggyback to say that because we challenged Mr. Samuel, that it means we're exercising non-race-neutral purposes here, Your Honor, I just want to respond and say that's not the case. [10]

The trial court then denied the *Batson* challenge, stating:

> I do have to find that, based on the District Attorney's explanations, that there are many race-neutral explanations for the challenge, and particularly knowing a witness per se pretty much would explain, no matter what the race of the prospective juror. In most cases, I'm sure you would agree, Mr. Terranova, that that is a reason, as in the Stuart Easter example, so the *Batson* challenge is denied.

(Transcript at p. 195). Defense counsel did not respond to the court's statement.

[9]     Transcript at p. 193.

[10]     Transcript at pp. 194-195.

Turning to the testimony at trial, Green, the shooting victim, who was incarcerated at that time for a probation violation, initially indicated (outside the presence of the jury) that he did not want to testify, because Petitioner had confronted him the day before at the holding center where they were both housed. Green then decided to testify, and stated that he and Petitioner knew each other. Green, though, then testified in a manner inconsistent with his prior statements, and indicated that he did not see the person who had shot him, since it was "dark" and he was "drunk." [11]

[11]     Transcript at p. 355.

**\*4** It then became evident that the prosecutor was about to impeach Green with a prior written statement, at which time defense counsel asked to address the court outside of the presence of the jury. [12] With the jury excused, defense counsel indicated that to the extent that the prosecution was going to impeach Green and/or ask to treat him as a

hostile witness, Green's answers could subject him to criminal liability, which required the appointment of independent legal counsel to advise him.[13] The prosecutor and the trial court agreed with defense counsel, and adjourned the trial for the day to allow Green to consult with an attorney. The trial resumed the next day, and Green, having consulted an attorney, acknowledged on direct questioning by the prosecutor that he had not testified truthfully the day before when he said he did not see who had shot him. In that regard, Green indicated that he had testified falsely since he did not want to be labeled a snitch, and because he had been fearful that "something might happen to [him]."[14] Green stated that he had seen Petitioner in the jail law library, and Petitioner had told him, "Just basically, don't come to court."[15] Green further testified that earlier that week, when he and Petitioner and other inmates were in the court's holding cells, Petitioner had pointed him out to other inmates, after which an inmate whom Green did not know attacked him and punched him in the face.

[12]    Transcript at p. 355-356.

[13]    Transcript at p. 357.

[14]    Transcript at p. 362.

[15]    Transcript at p. 363.

After explaining his inconsistent testimony the previous day, Green testified that after he and his companions parked their cars on Victoria and began walking towards Pandora's, he saw Petitioner, who was wearing a "red hoodie," coming toward him with a gun in his hand. Green stated that Petitioner then shot him once in each leg, whereupon he fell in the street and then felt an individual, not Petitioner, going through his pockets and taking his money, phone and keys. Green testified that one of the persons with Petitioner then stated that Petitioner needed to kill Green, since Green knew Petitioner, whereupon Petitioner pointed the gun at Green's face. Green indicated that he closed his eyes, thinking that he was about to die, and heard four "clicks," after which Petitioner and those with him ran off.

Wingo, who lived in the house in front of which Green was shot, testified at trial that on the morning of the crime he was awakened by the sound of multiple gunshots, and looked out his window where he saw "three gentlemen beating, kicking a guy laying in the street."[16] He saw one of three attackers hand a pistol to another of the attackers who was wearing a red

jacket and a baseball cap. Wingo stated that after the attackers took the victim's property, the individual in the red jacket and baseball cap "shot [the victim] a couple more times and then they ran."[17] In that regard, Wingo stated that it appeared that the individual in red had fired two shots at the person laying in the street, since the victim's body had moved as if he had been hit. Wingo indicated, though, that he could not say whether the victim had actually been hit with gunfire.[18]

[16]    Transcript at p. 419.

[17]    Transcript at p. 421.

[18]    Transcript at p. 430.

Pratcher, who lived a few houses away from Wingo on Victoria Avenue, indicated that on the morning of the crime she was awakened by gunfire and called 911. Pratcher stated that while she was on the phone with the 911 operator, three males, one of whom was wearing red, ran by her home and drove away in a gray SUV.

Holloway, one of the detectives who had interviewed Petitioner, also testified. In conjunction with Holloway's testimony, the prosecutor played the audio tape of the 13-minute interrogation that had occurred on the morning of the shooting. The trial court permitted the prosecutor to play the recording in its entirety, over the defense's objection. Regarding the objection, Defense counsel indicated that while, following the *Huntley* hearing, the court had ruled that Petitioner's statements were admissible, he had not anticipated that the court would admit the entire recording. Defense counsel argued that it was unfair to play the entire recording, since the detective's statements to Petitioner suggested that there were many witnesses against Petitioner. Defense counsel further argued that by repeatedly urging Petitioner to speak, the detectives had improperly "shifted the burden" onto Petitioner to explain his silence.

**\*5**  The trial court overruled the objection, observing that defense counsel would have the opportunity to cross-examine Holloway, who had made the recording and who was then testifying. After the audio tape was finished playing, defense counsel made a motion for a mistrial, again arguing that the questioning by the detectives was highly prejudicial to Petitioner, since the detectives' questions shifted the burden of proof onto Petitioner to explain himself, in violation of his right to remain silent. The prosecutor responded, in part, by arguing that there was no burden shifting, and no improper

conduct since Petitioner had agreed to waive his *Miranda* rights and make a statement:

> The question about his commenting or shifting the burden is absurd, Your Honor. There is no burden shifting here. The defendant chose to speak. He did not choose to remain silent. When early on in this interview he was asked about his involvement he said, I was asleep, I'm surprised I'm here. That's what prompted the follow-up questions [by Holloway] and the long delays of silence by this defendant. And the case law is also clear that once a defendant chooses to speak, not only can we play or acknowledge his silence thereafter, we can comment on it if we want in summation or any point in the trial because he chose to speak, he chose to say something, and what he said is incompatible with what the evidence shows.

Transcript at p. 536. The court denied the application for a mistrial.

During summations, defense counsel revisited the recorded interview and spent some time arguing that Detective Holloway had acted "illegally" during the interview by attempting to shift the burden onto Petitioner to explain himself. [19] Defense counsel further told the jury that it would be "illegal" for them to consider the "long stretches of silence" during the interview as some evidence of guilt. [20] In response to this, during the prosecutor's summation, he emphasized to the jury that the recorded interview was significant not because of Petitioner's silence but because of what Petitioner said, which was inconsistent with the rest of the evidence:

> Defense counsel wants to make a big deal about all the silence and all the other things you heard when you heard the entire interview. It's not burden shifting. I wanted you to hear what the defendant had to say. And

what – everything Cedric Holloway did was absolutely not illegal. He's investigating an attempted murder. It's not nice, and it's not his job to be nice to this defendant. I wanted you to hear that statement [ (Petitioner's statement that he had been asleep and was surprised to find himself at the police station) ] because it's completely untrue. He was observed running – this defendant was observed running to that gray Trailblazer. He was observed running in that direction by Ulysees Wingo, he was observed by Daria Pratcher getting in that vehicle and he was caught fleeing the scene in the same vehicle by Darren Exum. He was not sleeping. You can't be running and sleeping at the same time.

Transcript at p. 670.

[19]    Transcript at pp. 650-652.

[20]    Transcript at p. 651 ("What a big mistake it would be, and how illegal it would be, for you to consider those long stretches of silence as...requiring my client to explain himself[.]").

Following the summations of counsel, the court instructed the jury, *inter alia*, that it could not draw any negative inference from Petitioner's silence, and that the detectives' questions to Petitioner were not evidence. [21]

[21]    Transcript at pp. 691, 693-4.

On July 24, 2012, the jury returned with a partial verdict. The jury could not reach a unanimous verdict on Count I of the Indictment, charging Attempted Murder, but it found Petitioner guilty on Counts II-V. The court granted a mistrial as to Count I, and later dismissed that count of the Indictment.

**\*6** On August 28, 2012, the trial court sentenced Petitioner, as noted earlier, on Counts 2-5 of the Indictment, to determinate prison for terms of 25 years, 15 years, 25 years and 25 years, respectively, with the three 25-year sentences to run concurrently to each other but consecutively to the 15-year sentence, for a total sentence of 40 years.

Petitioner appealed his convictions, asserting the following grounds: 1) the conviction for Attempted Assault in the First Degree was against the weight of the evidence; 2) the trial court erroneously denied the motion for a mistrial based on admission of the taped statement of Petitioner's questioning "which featured the officer's badgering of [Petitioner] and ridiculing his silence," and trial counsel was ineffective for failing to raise the interrogating detective's "bullying manner of interrogation and the comments of the detective [about Petitioner's] silence"; 3) Petitioner was denied equal protection under the constitutions of the United States and the State of New York when the court allowed the prosecutor to use a peremptory challenged to remove a prospective juror without giving a non-pretextual race-neutral reason; 4) the court erred in finding that a jailhouse informant was not an agent of the prosecution; 5) the court failed to properly instruct the jury concerning the verdict sheet; 6) the court failed to rule on all parts of Petitioner's motion to dismiss the indictment; and 7) the sentences should be concurrent and are harsh and excessive.

On November 21, 2014, the Fourth Department unanimously denied Petitioner's appeal and affirmed his convictions and sentence.

On December 17, 2014, Petitioner sought leave to appeal from the New York Court of Appeals primarily on two issues: 1) the Fourth Department erred in denying the equal protection/*Batson* challenge; and 2) trial counsel was ineffective in making his *Batson* challenge, because he "failed to note that a similarly situated white juror [ (Carol Schiferle ("Schiferle")) ] who knew a police witness was allowed on the jury by the prosecutor." The second of these arguments was not raised by Petitioner before the Appellate Division. In addition to those arguments, Petitioner included a blanket statement asking the Court of Appeals to a review every other issue in his brief to the Fourth Department. [22]

[22] See, *Jordan v. Lefevre*, 206 F.3d 196, 198 (2d Cir. 2000) ("In this case, Jordan forcefully argued his *Batson* claim in the first three paragraphs of his application for leave, but made no reference to his other claims. In the fourth paragraph of his counsel's letter to the New York Court of Appeals he asked that he be given permission to appeal "[f]or all of these reasons and the reasons set forth in his Appellate Division briefs." Arguing a single claim at length and making only passing reference to possible other claims to be found in the attached

briefs does not fairly apprise the state court of those remaining claims.").

On April 7, 2015, the Court of Appeals denied leave to appeal.

Petitioner moved for reconsideration, but on July 14, 2015, the Court of Appeals denied the application for reconsideration.

On July 22, 2016, Petitioner filed a motion for writ of error coram nobis with the Fourth Department, alleging ineffective assistance of appellate counsel. In particular, Petitioner argued that his appellate attorney had failed to raise issues of ineffective assistance by trial counsel, even though Petitioner had asked him to do so. In the coram nobis motion, Petitioner alleged that trial counsel had provided ineffective assistance in the following ways: 1) with respect to the charge of Attempted Assault in the First Degree, he never discussed with Petitioner "the possibility of requesting a charge down to the lesser included offense of Attempted Assault in the Third Degree"; 2) he erred, during the prosecution's examination of Green, by asking the trial court to declare Green a hostile witness and appoint him counsel, and by failing to object to aspects of Green's testimony.

**\*7** On September 30, 2016, the Fourth Department denied the motion for writ of error coram nobis.

On November 10, 2016, Petitioner sought leave to appeal to the Court of Appeals. However, on January 23, 2017, the Court of Appeals denied that application.

On January 31, 2017, Petitioner filed the subject habeas petition, proceeding *pro se*. As indicated above, the Petition purports to set forth three separate grounds for relief: 1) "the trial court erroneously denied the defense's *Batson* objection"; 2) "denial of effective assistance of counsel"; and 3) "the trial court violated Petitioner's right to due process and to remain silent." With regard to Claim 1, Petitioner alleges that the trial court erred in denying his *Batson* challenge where the Prosecutor used a peremptory challenge to excuse an African-American juror, while leaving two other jurors (Wutz and Schiferle) who were similarly situated except that they were white. With regard to Claim 2, Petitioner alleges that his trial defense attorney was ineffective in the following respects: At the *Huntley* hearing he "failed to raise the bullying manner of interrogation and comments by detective Cedric Holloway; he failed to ask for a jury charge on the voluntariness of Petitioner's statement to police; he failed, when making his *Batson* challenge, to argue that Petitioner was being

treating differently than a similarly-situated white juror; he erred in requesting that prosecution witness Aaron Green be declared a hostile witness, "which led the prosecution to elicit inadmissible and highly prejudicial testimony"; and he "never discussed with Petitioner the possibility of requesting a charge down to the lesser included offense of Attempted Assault in the Third Degree given the weak and insubstantial evidence on Count Three of [the Indictment charging] Attempted Assault in the First Degree." As for Claim 3, Petitioner alleges that the trial court erred, since

> [t]he tape of the statement by Petitioner taken by Detective Holloway was admitted into evidence at trial [and] was played in its entirety at trial over defense counsel's objection in an unredacted state[ment]. The Prosecution placed a portion of the taped statement to the jury during summation despite the detectives ridiculing and mocking of Petitioner's silence to cajole Petitioner to break that silence and answer his questions and shifting the burden to Petitioner to explain himself.

Petition, ECF No. 1 at p. 21.

On June 16, 2017, Respondent filed an Answer and Memorandum of Law. (ECF Nos. 5, 6). Respondent contends that the Petition is untimely; that the trial court did not err in denying the *Batson* challenge since the Prosecutor provided two "permissible, race-neutral reasons for his peremptory challenge of an African-American juror, and Petitioner failed to establish that the explanation was a pretext for discrimination"; that the alleged instances of ineffective assistance of counsel are unexhausted except for one – counsel's failure to challenge the voluntariness of Petitioner's statement – and as to that claim counsel was not ineffective; and the trial court's admission of the audiotape of Petitioner's interrogation, in which a detective made "comments critical of Petitioner's silence," did not violate Petitioner's right to remain silent, since Petitioner waived his *Miranda* rights and agreed to speak with police, since the admission of the tape was not fundamentally unfair, and since the trial court gave "a limiting instruction to curtail any possible prejudice."

**\*8** On July 17, 2017, Petitioner field a Traverse/Reply. (ECF No. 8) in which he asserts that Respondent's arguments are "baseless." In particular, Petitioner contends that Respondent's argument that the Petition is untimely is incorrect, based on the timing of Petitioner's request for reconsideration that he filed with the New York Court of Appeals.

The Court has considered the parties' submissions and the entire record. Pursuant to Rule 8 of Rules Governing Habeas Corpus cases under Section 2254 in the United States District Courts and upon review of the answer, transcript and record, the Court determines that an evidentiary hearing is not required. After considering the parties' submissions and the entire record, the petition is denied for the reasons set forth below.

## DISCUSSION

### Petitioner's *Pro Se* Status

Since Petitioner is proceeding *pro se*, the Court has construed his submissions liberally, "to raise the strongest arguments that they suggest." *Burgos v. Hopkins*, 14 F.3d 787, 790 (2d Cir.1994).

### Section 2254 Principles

Petitioner brings this habeas corpus petition pursuant to 28 U.S.C. § 2254, and the general legal principles applicable to such a claim are well settled.

As amended by the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA") and interpreted by the Supreme Court, 28 U.S.C. § 2254—the statutory provision authorizing federal courts to provide habeas corpus relief to prisoners in state custody—is "part of the basic structure of federal habeas jurisdiction, designed to confirm that state courts are the principal forum for asserting constitutional challenges to state convictions." *Harrington v. Richter*, 562 U.S. 86, 131 S.Ct. 770, 787, 178 L.Ed.2d 624 (2011). A number of requirements and doctrines...ensure the centrality of the state courts in this arena. First, the exhaustion requirement ensures that state prisoners present their constitutional claims to the state courts in the first instance. *See id.* (citing 28 U.S.C. § 2254(b)). Should the state court reject a federal claim on procedural grounds, the procedural default doctrine bars further federal review of the claim, subject to certain well-established exceptions. *See generally Wainwright v. Sykes*, 433 U.S. 72, 82–84,

97 S.Ct. 2497, 53 L.Ed.2d 594 (1977). If the state court denies a federal claim on the merits, then the provisions of § 2254(d) come into play and prohibit federal habeas relief unless the state court's decision was either: (1) "contrary to, or involved an unreasonable application of, clearly established Federal law," or (2) "based on an unreasonable determination of the facts in light of the evidence presented in the State court." 28 U.S.C. § 2254(d)(1)-(2). Finally, when conducting its review under § 2254(d), the federal court is generally confined to the record before the state court that adjudicated the claim. *See Cullen v. Pinholster*, ___ U.S. ___, 131 S.Ct. 1388, 1398–99, 179 L.Ed.2d 557 (2011).

*Jackson v. Conway*, 763 F.3d 115, 132 (2d Cir. 2014). As just mentioned, regarding claims that were decided on the merits by state courts,

> a federal court may grant habeas corpus relief to a state prisoner on a claim that was adjudicated on the merits in state court only if it concludes that the state court's decision "was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States" or "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d)(1)–(2).

**\*9** A state court decision is contrary to clearly established Federal law if the state court arrives at a conclusion opposite to that reached by the Supreme Court on a question of law or if the state court confronts facts that are materially indistinguishable from a relevant Supreme Court precedent and arrives at a result opposite to the Supreme Court's result.

A state court decision involves an unreasonable application of clearly established Federal law when the state court correctly identifies the governing legal principle but unreasonably applies it to the facts of the particular case. To meet that standard, the state court's decision must be so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement. It is well established in this circuit that the objectively unreasonable standard of § 2254(d)(1) means that a petitioner must identify some increment of incorrectness beyond error in order to obtain habeas relief.

*Santana v. Capra*, No. 15-CV-1818 (JGK), 2018 WL 369773, at \*7–8 (S.D.N.Y. Jan. 11, 2018) (Koeltl, J.) (citations and internal quotation marks omitted).

<u>The Timeliness of the Petition</u>

Respondent contends that the Petition is untimely, and the legal principles generally applicable to this issue are well settled:

> Under the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), habeas petitions must be filed within one year of the date on which the petitioner's state judgment became final. 28 U.S.C. § 2244(d)(1). A judgment becomes final "after the denial of certiorari [by the U.S. Supreme Court] or the expiration of time for seeking certiorari." *Williams v. Artuz*, 237 F.3d 147, 151 (2d Cir. 2001). Consequently, state judgments are deemed final if no petition for a writ of certiorari has been filed with the Supreme Court within 90 days. *See Ross v. Artuz*, 150 F.3d 97, 98 (2d Cir. 1998); Sup. Ct. R. 13.
>
> The filing of certain state court collateral attacks on a judgment, including New York *coram nobis* petitions, tolls AEDPA's one-year statute of limitations. 28 U.S.C. § 2244(d)(2); *see Smith v. McGinnis*, 208 F.3d 13, 15–16 (2d Cir. 2000). "[P]roper calculation of § 2244(d)(2)'s tolling provision excludes time during which properly filed state relief applications are pending but does not reset the date from which the one-year statute of limitations begins to run." *Smith*, 208 F.3d at 16 (emphases added). In "rare and exceptional" circumstances, AEDPA's one-year statute of limitations can be equitably tolled to permit the filing of an otherwise time-barred petition. *Id.* at 17 (citation omitted). Courts must decide whether equitable tolling is applicable on a "case-by-case basis," while still being "governed by rules and precedents" and "draw[ing] upon decisions made in other similar cases for guidance." *Holland v. Florida*, 560 U.S. 631, 649–50, 130 S.Ct. 2549, 177 L.Ed.2d 130 (2010) (citations omitted). To invoke the doctrine of equitable tolling, a petitioner bears the burden of establishing two elements: "(1) that he has been pursuing his rights diligently, and (2) that some extraordinary circumstance stood in his way." *Pace v. DiGuglielmo*, 544 U.S. 408, 418, 125 S.Ct. 1807, 161 L.Ed.2d 669 (2005).

*Davis v. Lempke*, 767 F. App'x 151, 152–53 (2d Cir. 2019).

Here, as discussed earlier, with regard to Petitioner's direct appeal, the New York Court of Appeals denied his application for leave to appeal on April 7, 2015, and then denied his motion for reconsideration on July 14, 2015. In arguing that the Petition is untimely, Respondent does not mention the request for reconsideration. Rather, Respondent states: "In petitioner's case, leave to appeal was denied on April 27, 2015, meaning that the conviction became final on July 26, 2015 (90 days later)." [23] (Respondent inaccurately uses the date of April 27, 2015, when the actual date of the initial denial by the Court of Appeals was April 7, 2015). Consequently, a preliminary issue is what effect, if any, did Petitioner's request for reconsideration have on the date that his conviction became "final" for purposes of 28 U.S.C. § 2244(d)(1)(A)?

[23]     ECF No. 6 at p. 8.

**\*10**  As this Court has previously held, the conviction becomes final ninety days after the Court of Appeals denies a motion for reconsideration. *Brockway v. Burge*, 710 F. Supp. 2d 314, 321–22 (W.D.N.Y. 2010) ("As respondent points out, the Appellate Division affirmed the judgment of conviction on November 13, 1998, and the New York Court of Appeals denied Brockway's application for reconsideration on June 22, 1999. Petitioner's conviction became "final" ninety (90) days later, on September 20, 1999, the date on which his time to seek a writ of certiorari from the United States Supreme Court expired."); *see also, Hizbullahankhamon v. Walker*, 255 F.3d 65, 68 (2d Cir. 2001) ("On direct appeal, the Appellate Division, First Department, unanimously affirmed the conviction, *People v. Johnson*, 181 A.D.2d 509, 580 N.Y.S.2d 357 (1st Dep't 1992). The Court of Appeals denied petitioner's application for leave to appeal, *People v. Johnson*, 80 N.Y.2d 833, 587 N.Y.S.2d 917, 600 N.E.2d 644 (1992), *and, on December 10, 1992, denied his application for reconsideration*, *People v. Johnson*, 81 N.Y.2d 763, 594 N.Y.S.2d 725, 610 N.E.2d 398 (1992). Petitioner's conviction thus became final on March 10, 1993, the date on which the time to petition for certiorari to the Supreme Court of the United States expired. *See Ross v. Artuz*, 150 F.3d 97, 98 (2d Cir.1998).") (emphasis added).

Consequently, Petitioner's conviction became "final" on October 12, 2015, which was ninety days after the Court of Appeals denied his application for reconsideration. Petitioner then had one year in which to file an application under 28 U.S.C. § 2254.

The 1-year clock then ran for more than nine months, from October 13, 2015, until July 22, 2016, when Petitioner filed his motion for writ of error coram nobis, at which point the clock was tolled pursuant to § 2244(d)(2). The clock remained tolled until January 23, 2017, when the New York Court of Appeals denied Petitioner's request for leave to appeal the Fourth Department's denial of his coram nobis application. At that time, Petitioner still had more than two months remaining on his 1-year clock. On January 31, 2017, eight days after the Court of Appeals denied his application for leave to appeal, Petitioner filed this action. Accordingly, the action is timely as it was filed within one year after Petitioner's conviction became final.

Respondent disagrees and contends that the clock was tolled only until September 30, 2016, when the Appellate Division denied the motion for writ of error coram nobis. On that point, Respondent asserts that, "[t]he limitation period was not tolled...during the interval between the denial of the motion and the denial of petitioner's application [to the Court of Appeals] for leave to appeal. *Hizbullahankhamon v Walker*, 255 F3d 65, 71-72(2nd Cir 2001), cert 536 US 925." However, Respondent's reliance on *Hizbullahankhamon* is misplaced, since at the time that decision was issued, a defendant had no right under New York law to apply to the Court of Appeals for leave to appeal from a denial of a coram nobis motion. *Id.*, 255 F.3d at 69-72. New York State law was subsequently amended, and now defendants are permitted to seek such relief from the Court of Appeals. [24] Consequently, Petitioner's coram nobis motion remained pending, within the meaning of § 2244(d)(2), until January 23, 2017.

[24]     *See, McPherson v. Greiner*, No. 02 CIV.2726 DLC AJP, 2003 WL 22405449, at \*12 (S.D.N.Y. Oct. 22, 2003) ("In 2002, the New York Criminal Procedure Law was amended to allow permissive appeals to the New York Court of Appeals from the denial of coram nobis petitions. C.P.L. § 450.90(1).)"; *see also, Witherspoon v. New York*, No. 11-CV-5815 DLI, 2015 WL 5676020, at \*2 (E.D.N.Y. Sept. 24, 2015) ("In *Hizbullahkhamon v. Walker*, the Second Circuit held that "the one-year limitations period was not tolled during the intervals between [the coram nobis] denials [by the Appellate Division] and the dates on which the Court of Appeals dismissed Petitioner's applications for leave to appeal these denials" because New York law did not authorize appeals from coram nobis denials. 255 F.3d 65, 70–

71 (2d Cir.2001). However, in 2002, New York law changed to allow the Court of Appeals to consider requests for leave to appeal coram nobis denials. N.Y. C.P.L. § 450.90(1); *see also People v. Stultz*, 2 N.Y.3d 277, 281, 778 N.Y.S.2d 431, 810 N.E.2d 883 (2004) (recognizing that New York State law "authoriz[es] appeals (by permission) to this Court from appellate orders granting or denying coram nobis relief based on claims of ineffective assistance or wrongful deprivation."). Subsequently, the Second Circuit held that "a § 440.10 motion is 'pending' for purposes of AEDPA at least from the time it is filed through the time in which the Petitioner could file an application for a certificate for leave to appeal the Appellate Division's denial of the motion." *Saunders v. Senkowski*, 587 F.3d 543, 548 (2d Cir.2009). Although the Second Circuit has yet to address whether the limitation period is tolled during the 30–day period in which the denial of a coram nobis petition is appealable, the reasoning of Saunders suggests that AEDPA's one-year limitation period is tolled during this period."); *Mohsin v. Ebert*, 626 F. Supp. 2d 280, 294 (E.D.N.Y. 2009) ("Mohsin filed his Coram Nobis Motion on September 1, 2004, tolling the statute of limitations 321 days after his conviction became final. The court denied the Coram Nobis Motion on March 21, 2005. Under earlier case law, that event would have ended the tolling period for purposes of the one-year statute of limitations, on the ground that the denial of such a motion is not appealable. See, e.g., *Hizbullahankhamon v. Walker*, 255 F.3d 65, 70–71 (2d Cir.2001) (citing cases). However, a change in New York law permitted Mohsin to seek leave to appeal the denial of his Coram Nobis Motion. *See* N.Y.Crim. Pro. Law 450.90(1) (2002). As a result, the denial of the Coram Nobis Motion became final no earlier than August 8, 2005, when the Court of Appeals denied Mohsin leave to appeal.").

**\*11** For these reasons, Petitioner's contention that the petition is untimely lacks merit. The Court finds, instead, that the petition was timely filed.

Unexhausted and Procedurally Defaulted Claims
Respondent next contends that all but one of the instances of alleged ineffective assistance of trial counsel, set forth Petitioner's "Ground Two," are unexhausted and procedurally

defaulted since Petitioner failed to raise them in his direct appeal. The applicable legal principles are clear:

> If anything is settled in habeas corpus jurisprudence, it is that a federal court may not grant the habeas petition of a state prisoner "unless it appears that the applicant has exhausted the remedies available in the courts of the State; or that there is either an absence of available State corrective process; or the existence of circumstances rendering such process ineffective to protect the rights of the prisoner." 28 U.S.C. § 2254(b)(1). To satisfy § 2254's exhaustion requirement, a petitioner must present the substance of "the same federal constitutional claim[s] that he now urges upon the federal courts," *Turner v. Artuz*, 262 F.3d 118, 123-24 (2d Cir.2001), "to the highest court in the pertinent state," *Pesina v. Johnson*, 913 F.2d 53, 54 (2d Cir.1990).

> When a claim has never been presented to a state court, a federal court may theoretically find that there is an "absence of available State corrective process" under § 2254(b)(1)(B)(i) if it is clear that the unexhausted claim is procedurally barred by state law and, as such, its presentation in the state forum would be futile. In such a case the habeas court theoretically has the power to deem the claim exhausted. *Reyes v. Keane*, 118 F.3d 136, 139 (2d Cir.1997). This apparent salve, however, proves to be cold comfort to most petitioners because it has been held that when "the petitioner failed to exhaust state remedies and the court to which the petitioner would be required to present his claims in order to meet the exhaustion requirement would now find the claims procedurally barred," federal habeas courts also must deem the claims procedurally defaulted. *Coleman v. Thompson*, 501 U.S. 722, 735 n. 1, 111 S.Ct. 2546, 115 L.Ed.2d 640 (1991).

\*\*\*

> Dismissal for a procedural default is regarded as a disposition of the habeas claim on the merits....For a procedurally defaulted claim to escape this fate, the petitioner must show cause for the default and prejudice, or demonstrate that

> failure to consider the claim will result in a miscarriage of justice (*i.e.*, the petitioner

> is actually innocent). *Coleman*, 501 U.S. at 748-50, 111 S.Ct. 2546 (1991).

*Aparicio v. Artuz*, 269 F.3d 78, 89–90 (2d Cir. 2001).

Here, in "Ground Two," as mentioned earlier Petitioner alleges that his trial defense attorney was ineffective in the following five instances: 1) At the *Huntley* hearing he "failed to

raise the bullying manner of interrogation and comments by detective Cedric Holloway; 2) he failed to ask for a jury charge on the voluntariness of Petitioner's statement to police; 3) he failed, when making his *Batson* challenge, to argue that Petitioner was being treating differently than a white juror, Carol Schiferle, who also knew a police witness; 4) he erred in requesting that prosecution witness Aaron Green be declared a hostile witness, "which led the prosecution to elicit inadmissible and highly prejudicial testimony"; and 5) he "never discussed with Petitioner the possibility of requesting a charge down to the lesser included offense of Attempted Assault in the Third Degree given the weak and insubstantial evidence on Count Three of [the Indictment charging] Attempted Assault in the First Degree."

**\*12** Respondent contends that only the first of these, number 1) above, was properly exhausted, while the remaining four are unexhausted and procedurally defaulted. The Court agrees.

Number 1) was exhausted because Petitioner raised it both in his direct appeal brief to the Appellate Division, and in his application for leave to appeal to the Court of Appeals. On the other hand, number 2) was *not* exhausted, since it was never raised in the state courts.

Number 3) was raised in the state courts, but only in Petitioner's application for leave to appeal to the Court of Appeals, following the denial of his appeal by the Appellate Division. Petitioner did not raise that claim before the Appellate Division. Consequently, the claim is unexhausted, since "raising a federal claim for the first time in an application for discretionary review to a state's highest court is insufficient for exhaustion purposes." *St. Helen v. Senkowski*, 374 F.3d 181, 183 (2d Cir. 2004); *see also, Clark v. Dolce*, No. 9:11-CV-00893-JKS, 2014 WL 2573119, at \*4 (N.D.N.Y. June 9, 2014) ("Clark's challenge to the imposition of consecutive sentences is also unexhausted. He raised this claim for the first time in his application for leave to appeal to the Court of Appeals. Because he raised this claim only in a discretionary leave application, it is unexhausted.") (citing *St. Helen v. Senkowski*).

Numbers 4) and 5) were raised in the state courts, but only indirectly, in the coram nobis application. That is, in the coram nobis motion, Petitioner alleged that *appellate* counsel had been ineffective for failing to raise the instances of alleged ineffectiveness by trial counsel described in numbers 4) and 5).

Courts in this circuit routinely hold that raising an ineffective-assistance-of-appellate-counsel claim in a coram nobis motion does not exhaust the underlying claims that appellant counsel failed to raise. *See, e.g., Roberts v. Lamanna*, No. 19 CV 880 (AMD)(LB), 2020 WL 5633871, at \*6 (E.D.N.Y. Aug. 31, 2020) (" "[C]ourts in this circuit have consistently recognized[ ] an ineffective assistance claim is an insufficient vehicle for exhausting the underlying allegations when those allegations are asserted for the first time as separate claims on habeas. *Hall v. Phillips*, No. 04 CV 1514 (NGG) (VVP), 2007 WL 2156656, at \*5 (E.D.N.Y. July 25, 2007) (citing cases)."), report and recommendation adopted, No. 19CV00880AMDLB, 2020 WL 5633078 (E.D.N.Y. Sept. 21, 2020); *see also, Cobb v. Unger*, No. 09-CV-0491MAT, 2013 WL 821179, at \*3 (W.D.N.Y. Mar. 5, 2013) ("Under New York law, a writ of error coram nobis is available "only to vacate an order determining an appeal on the ground that the defendant was deprived of the effective assistance of appellate counsel," and other constitutional errors may only be advanced in coram nobis applications to the extent that they are "predicates for the claim of ineffectiveness, on the theory that effective counsel would have appealed on those grounds." *Turner v. Artuz*, 262 F.3d 118, 123 (2d Cir.2001) (internal quotation marks omitted). *In other words, no claim besides ineffective assistance of appellate counsel can be exhausted through an application for a writ of error coram nobis.* Thus, Petitioner has exhausted his ineffective assistance of appellate counsel claim by virtue of his coram nobis application, the denial of which he appealed to the state's highest court. See 28 U.S.C. § 2254(b). *However, none of the underlying claims in the habeas petition were exhausted by this procedure, and thus they remain unexhausted for purposes of federal habeas review.*") (emphasis added).

**\*13** However, in *Aparicio v. Artuz*, cited earlier, the Second Circuit ruled that a habeas petitioner had exhausted a claim for ineffective assistance of trial counsel that was asserted in a coram nobis petition, along with a claim for ineffective assistance of appellate counsel, stating:

> Petitioner did raise, in his coram nobis petition to the Appellate Division, the ineffectiveness of his trial counsel for failing to request an eyewitness identification

instruction. See supra, at 86 & n. 1. However, the Appellate Division did not explicitly address this claim, writing only, "appellant has failed to establish that he was denied effective assistance of appellate counsel." *Aparicio*, 696 N.Y.S.2d at 697. Although the trial counsel claim was not explicitly addressed, it was, as a technical matter, adjudicated; the Appellate Division denied Aparicio's coram nobis application. *Id.* Thus, this claim is exhausted. *Picard v. Connor*, 404 U.S. 270, 275, 92 S.Ct. 509, 30 L.Ed.2d 438 (1971).

*Id.*, 269 F.3d at 92. The foregoing quote suggests that, unlike in the instant case, the petitioner in *Aparicio* raised the alleged ineffectiveness of trial counsel as a stand-alone claim in his coram nobis motion, in addition to the alleged ineffectiveness of appellate counsel, rather than merely identifying it as a claim that appellate counsel should have raised. The Circuit Court went on to find, though, that the ineffective-assistance-of-trial-counsel claim was nevertheless procedurally barred, reasoning that the Appellate Division necessarily had to have denied the claim on state procedural grounds, insofar as the defendant had no excuse for failing to raise it in his direct appeal. *Id.*, 269 F.3d at 93 ("The Appellate Division's conclusion on coram nobis that Aparicio was not denied effective assistance of appellate counsel disposed of Aparicio's only proffered cause for the failure to raise the trial counsel claim on direct appeal. The Appellate Division's decision concerning Aparicio's trial counsel claim thus had to rest on a state procedural bar; under New York law, the decision could not possibly rest on any other ground.").

Subsequently, some district courts have interpreted *Aparicio* to find that "underlying" ineffective-assistance-of-trial-counsel claims in coram nobis motions are exhausted but nevertheless procedurally barred. *See, e.g., Davis v. Greene*, No. 04 CIV. 6132 (SAS), 2008 WL 216912, at *8-9 (S.D.N.Y. Jan. 22, 2008) ("In *Aparicio v. Artuz*, the Second Circuit held that an ineffective assistance of trial counsel claim, raised before a state court as an underlying issue in a coram nobis motion arguing ineffective assistance of appellate counsel, was actually exhausted....The reasoning in *Aparicio* applies to the five of Davis' trial counsel claims that rest on facts within the trial record...[and those claims] are therefore exhausted by Davis' coram nobis motion....[However, a]s in *Aparicio*, no good reason exists here [for the defendant's failure to raise the underlying issue on direct appeal]; in fact, once the Appellate Division denied the ineffective assistance of counsel claims neither it nor any other court could hear the trial counsel claims under section 440.10, because there was no justification for Davis' failure to raise those claims on

direct appeal. Because the claims have been defaulted under a state procedural rule, federal habeas review is precluded[.]"); *see also, Cumberland v. Graham*, No. 08 CIV. 04389 LAP DF, 2014 WL 2465122, at *32 (S.D.N.Y. May 23, 2014) ("Although it is not entirely clear whether the trial-counsel claim in *Aparicio* had actually been raised on coram nobis as an independent claim (as opposed to as a predicate for a claim challenging the effectiveness of appellate counsel), most courts have read *Aparicio* to apply to underlying claims raised on coram nobis either directly or indirectly. Ultimately, though, it does not matter whether this court finds that Petitioner's ineffective-assistance-of-trial-counsel claim is exhausted, under *Aparicio*, or unexhausted but "deemed" exhausted, as set out above, as, in either event, the claim would be procedurally barred from review by this Court.") (citation omitted).

**\*14** Based on the foregoing discussion, the Court here finds that numbers 4) and 5) are unexhausted, but that even if they were exhausted, they are nevertheless procedurally barred. Similarly, the Court finds that numbers 2) and 3) are procedurally barred, in addition to being unexhausted, since Petitioner failed to raise them in his direct appeal and presumably would not be able to raise them now in a separate collateral attack in New York state court. *See, Aparicio v. Artuz*, 269 F.3d at 91 ("New York does not otherwise permit collateral attacks on a conviction when the defendant unjustifiably failed to raise the issue on direct appeal. N.Y.Crim. Proc. Law § 440.10(2)(c)."). This is particularly true, with regard to numbers 4) and 5), where, as here, the state courts have already denied Petitioner's claim for ineffective assistance of appellate counsel. *See, Aparicio v. Artuz*, 269 F.3d at 91 ("The nagging question here is whether Petitioner's failure to assert ineffective assistance of trial counsel...might be forgiven under § 440.10 because of the ineffective assistance of Petitioner's appellate counsel. Given the Appellate Division's determination in the coram nobis proceeding that Petitioner "failed to establish that he was denied effective assistance of appellate counsel," *People v. Aparicio*, 696 N.Y.S.2d at 697, we are persuaded that it is most unlikely that another state court would suddenly find the performance of Petitioner's appellate counsel to be so ineffective as to justify Petitioner's failure to include this ineffective assistance of trial counsel claim in his direct appeal. Thus, any state court to which Petitioner might now present this claim would almost certainly find it procedurally barred.").

The Court having found that points 2), 3), 4) and 5) of Petitioner's ineffective-assistance claim are unexhausted and procedurally defaulted, those claims must be denied unless Petitioner can demonstrate either cause and prejudice or actual innocence: "That procedural default can only be cured by a showing of cause for the default plus prejudice, or a showing of actual innocence." *Aparicio v. Artuz*, 269 F.3d at 91 (citation omitted); *see also*, *St. Helen v. Senkowski*, 374 F.3d at 184 ("In the case of procedural default (including where an unexhausted claim no longer can proceed in state court), we may reach the merits of the claim "only if the defendant can first demonstrate either cause and actual prejudice, or that he is actually innocent." *Bousley v. United States*, 523 U.S. 614, 622, 118 S.Ct. 1604, 140 L.Ed.2d 828 (1998) (internal quotation marks and citations omitted).").

Petitioner, though, has not attempted to demonstrate cause, prejudice or actual innocence. Instead, the Petition incorrectly maintains that Petitioner exhausted all of his claims. Similarly, Petitioner's Traverse brief asserts that he exhausted all of his claims via his direct appeal and his coram nobis motion. Petitioner has not offered any alternative argument (regarding cause and prejudice or actual innocence) in the event that the Court were to disagree with his exhaustion argument, which it does.

To the extent that Petitioner's *pro se* submissions can be liberally construed to suggest that his failure to exhaust was caused by the ineffectiveness of his appellate counsel, to establish cause he would need to show that his appellate attorney's performance amounted to ineffective assistance of counsel in violation of the Sixth Amendment. *See*, *Aparicio v. Artuz*, 269 F.3d 78, 91 (2d Cir. 2001) ("A defense counsel's ineffectiveness in failing to properly preserve a claim for review in state court can suffice to establish cause for a procedural default only when the counsel's ineptitude rises to the level of a violation of a defendant's Sixth Amendment right to counsel."). The applicable legal principles are clear:

> With respect to claims of ineffective assistance of appellate counsel, the Supreme Court has also held, as relevant here, that "appellate counsel who files a merits brief need not (and should not) raise every nonfrivolous claim, but rather may select from among them in order to maximize the likelihood of success on appeal." *Smith v. Robbins*, 528 U.S. 259, 288, 120 S.Ct. 746, 145 L.Ed.2d 756 (2000) (describing *Barnes*, 463 U.S. 745, 103 S.Ct. 3308); *see also Lynch v. Dolce*, 789 F.3d 303, 319 (2d Cir.2015).

*Chrysler v. Guiney*, 806 F.3d 104, 118 (2d Cir. 2015). "Counsel's failure to raise a claim on appeal constitutes "constitutionally inadequate performance" where "counsel omitted significant and obvious issues while pursuing issues that were clearly and significantly weaker." *Morales v. United States*, 651 F. App'x 1, 5 (2d Cir. 2016) (quoting *Mayo v. Henderson*, 13 F.3d 528, 533 (2d Cir.1994), also *citing Jackson v. Leonardo*, 162 F.3d 81, 85 (2d Cir.1998)).

**\*15** Here, though, none of the points raised by Petitioner involve "significant and obvious issues" that were "clearly and significantly" stronger than the issues raised by appellate counsel. Consequently, Petitioner cannot demonstrate cause, and the Court therefore need not consider prejudice, though the Court does not believe that he can demonstrate that element either. Moreover, even liberally construing Petitioner's *pro se* submissions, they do not make any gateway showing of actual innocence. See, *Hyman v. Brown*, 927 F.3d 639, 656–58 (2d Cir. 2019) (discussing the standards applicable to actual innocence claims). Consequently, the procedurally defaulted claims are denied.

To reiterate, with regard to Petitioner's "Ground Two," alleging five separate incidents of alleged ineffective assistance of counsel, the Court finds that only number 1) alleging that trial counsel was ineffective at the *Huntley* hearing, for "fail[ing] to raise the bullying manner of interrogation and comments by detective Cedric Holloway," is exhausted. The remaining instances are denied on the merits as procedurally defaulted. The Court will now proceed to consider Petitioner's remaining claims on the merits.

The *Batson* Challenge

As discussed further below, the Petition asserts that "the trial court erroneously denied the defense's *Batson* objection" by failing to make the necessary findings at the third step of the *Batson* analysis. As mentioned, the *Batson* issue arose after the prosecutor used a peremptory challenge to excuse Lannie, an African-American. In response to the *Batson* challenge, the prosecutor indicated that he challenged Lannie for two reasons: First, because of Lannie's age and possible immaturity, inasmuch as he was age 23 year-old college student who lived with his parents and had a part-time job; and, second, because Lannie knew prosecution witness Exum, who was a friend of Lannie's sister.

In front of the trial court, Petitioner alleged that the prosecutor's reasons were pretextual, since Lannie had not

indicated any hostility toward Exum, and since Lannie was close in age to a white juror, Wutz. The prosecutor pointed out, though, that Wutz was two years older than Lannie and, unlike Lannie, was employed full time and lived independently of her parents. Additionally, Wutz did not know any witnesses in the case. The prosecutor also noted that he had challenged white prospective jurors similar in age to Lannie.

In the instant action, Petitioner also argues that Lannie was similarly situated to white juror Carol Schiferle, who was age 42 and employed full time, and who "knew in passing" prosecution witness, Dawn Lopez. Schiferle, when asked to explain how she knew Lopez, indicated that she was aware of Lopez through friends of hers who were police officers, adding, "I know one of the officers, Dawn Lopez, not really personally....I don't really – I'm not friends with her. I would say I just know her in passing." Transcript at p. 110. The Court observes again, though, that the argument concerning Schiferle was never made to the trial court or, for that matter, to the Appellate Division. Rather, as explained earlier, in the state courts, the argument concerning Schiferle was only raised in Petitioner's request for leave to appeal the denial of his direct appeal, in the context of a claim for ineffective assistance of trial counsel.

In *Batson v. Kentucky*, 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986), the Supreme Court, "[i]n recognition of the danger of race-based jury selection in a particular trial,"

mandated a three-step burden-shifting framework for determining whether the prosecution exercised its peremptory challenges on the basis of race. Under this framework, a defendant must first establish a prima facie case of racial bias. *Id.* at 96–97, 106 S.Ct. 1712. If he or she succeeds in doing so, the prosecution must then offer a race-neutral explanation for its challenge to the jurors in question. *Id.* at 97, 106 S.Ct. 1712; *see also Purkett v. Elem*, 514 U.S. 765, 767–68, 115 S.Ct. 1769, 131 L.Ed.2d 834 (1995). Even if the reasons the prosecution provides are neither "persuasive, [n]or even plausible," as long as those reasons are facially valid, the burden will then switch to the defendant to prove that the reasons the prosecution gave are a pretext for purposeful discrimination. *Id.* at 767–68, 115 S.Ct. 1769. At that point, the determination "largely will turn on [the court's] evaluation of credibility," *Batson*, 476 U.S. at 98 n. 21, 106 S.Ct. 1712, and, therefore, "the best evidence often will be the demeanor of the attorney who exercises the challenge," *Hernandez v. New York*, 500 U.S. 352, 365, 111 S.Ct. 1859, 114 L.Ed.2d 395 (1991).

**\*16** *Majid v. Portuondo*, 428 F.3d 112, 126 (2d Cir. 2005).

Here, Petitioner argues that "[t]he trial court fell short of adjudicating Petitioner's *Batson* claim on the merits by accepting at face value [the] prosecutor's facially neutral explanation for [the] strike, without a finding of credibility," citing *Dolphy v. Mantello*, 552 F.3d 236 (2d Cir. 2009). [25] This Court considers carefully the merit of Petitioner's argument, given the relatively terse explanation provided by the trial court for denying the *Batson* objection. However, while the trial court's explanation could have been more comprehensive, the Court disagrees with Petitioner and finds that the trial court indicated that it found the prosecutor's explanation credible and not a pretext for discrimination, thereby satisfying the requirements of *Dolphy v. Mantello*.

[25]    Traverse, ECF No. 8 at pp. 6-7.

In this regard, the legal principle referenced by Petitioner was set forth by the Second Circuit as follows:

"[T]he third step of the *Batson* inquiry requires a trial judge to make an ultimate determination on the issue of discriminatory intent based on all the facts and circumstances." *Jordan v. Lefevre*, 206 F.3d 196, 200 (2d Cir.2000) (internal quotation and citation omitted).

Trial courts applying the third *Batson* prong need not recite a particular formula of words, or mantra. *Galarza v. Keane*, 252 F.3d 630, 640 n. 10 (2d Cir.2001). An "unambiguous rejection of a *Batson* challenge will demonstrate with sufficient clarity that a trial court deems the movant to have failed to carry his burden to show that the prosecutor's proffered race-neutral explanation is pretextual." *Messiah v. Duncan*, 435 F.3d 186, 198 (2d Cir.2006). However, we have repeatedly said that a trial court must somehow "make clear whether [it] credits the non-moving party's race-neutral explanation for striking the relevant panelist." *Messiah*, 435 F.3d at 198; *see Galarza*, 252 F.3d at 636 ("We have repeatedly emphasized that a trial court may not deny a *Batson* motion without determining whether it credits the race-neutral explanations for the challenged peremptory strikes."); *Jordan*, 206 F.3d at 200 ("Jordan now declares that the district court's conclusory statement that the prosecutor's explanations were race neutral did not satisfy Batson 's third step. We agree."); *Barnes v. Anderson*, 202 F.3d 150, 156 (2d Cir.1999) (holding that "denial of a *Batson* motion without explicit adjudication of the credibility of the non-movant's race-

neutral explanations for challenged strikes" constitutes error).

*Dolphy v. Mantello*, 552 F.3d at 239.

Here, as discussed earlier, after hearing argument back and forth between the attorneys on the *Batson* challenge, the trial court stated:

> I do have to find that, based on the District Attorney's explanations, that there are many race-neutral explanations for the challenge, and particularly knowing a witness per se pretty much would explain, no matter what the race of the prospective juror. In most cases, I'm sure you would agree, Mr. Terranova, that that is a reason, as in the Stuart Easter example, so the *Batson* challenge is denied.

**\*17** (Transcript at p. 195). In this regard, the trial court indicated not only that the prosecutor had offered a race neutral reason for the challenge to Lannie, but that "based on the District Attorney's explanations," the reason was not a pretext for discrimination. Indeed, the trial court indicated that "knowing a witness" was not only a legitimate race-neutral reason for excusing Lannie, but that the prosecutor had, for the same reason, also dismissed white prospective jurors in the case, such as the prospective juror who knew prosecution witness Officer Stuart Easter.[26] Consequently, the Court finds that the trial court made the necessary finding at step three of the *Batson* inquiry, as required by *Dolphy v. Mantello*, and that Petitioner's argument to the contrary therefore lacks merit. *See, e.g., Bowman v. Lee*, No. 10-CV-0951 ERK, 2015 WL 1514378, at \*11 (E.D.N.Y. Apr. 3, 2015) ("Although the trial judge did not expressly credit the prosecutor's explanation for striking Ms. Thomas in particular, courts need not engage in "a talismanic recitation of specific words in order to satisfy *Batson*." *Messiah*, 435 F.3d at 198. In addition to the trial judge's clear statement finding a lack of subterfuge generally, the judge's explanation that the prosecutor had a right to be concerned about Ms. Thomas's potential empathy for the defendant implicitly credits the prosecutor's good faith in explaining his race-neutral reasoning. The prosecutor's good faith is further bolstered by his decision to strike Mr. Derek, a prospective juror who had participated in multiple

volunteer projects involving prison inmates."), *aff'd*, 641 F. App'x 51 (2d Cir. 2016).

26    The fact that potential white juror Schiferle also indicated that she knew a police witness, though only "in passing" and "not really personally," Transcript at pp. 109-110, seems of no consequence to the Court, since that point was never raised to the trial judge. In any event, the Court does not agree with Petitioner that Lannie and Schiferle were similarly situated, except for their races, in terms of the circumstances under which they "knew" the police witnesses. Lannie indicated that he knew Officer Exum, while Schiferle essentially indicated that she "knew of" Officer Lopez.

Ineffective Assistance of Counsel

The Petition alleges that trial counsel was ineffective during the *Huntley* hearing when he "failed to raise the bullying manner of interrogation and comments by detective Cedric Holloway." Although Petitioner does not flesh out this argument, he apparently maintains that if his attorney had "raised the bullying manner of interrogation and comments" about Petitioner's silence by Holloway, the trial court would have found that his statements were involuntarily made and suppressed them. Respondent counters that Petitioner cannot make the showing required to establish ineffective assistance, stating:

> Petitioner cannot make that showing here. He said very little in his statement to the police, and the little that he did say was an outright denial. In light of the fact that petitioner's "will was not overborne," his statement was voluntary. *Mickey v Ayers*, 606 F3d 1223, 1234 (9th Cir 2010) (O'Scannlain, J.), cert denied 565 US 952. Counsel provided excellent representation throughout the proceedings; he lodged proper objections, cross-examined the People's witnesses, made a motion for a trial order of dismissal, and successfully moved to dismiss the top count of the indictment. Counsel cannot be held ineffective for failing to

make an argument that was doomed to fail.

ECF No. 6 at pp. 13-14.

The familiar test set forth in *Strickland v. Washington*, 466 U.S. 668 (1984), for evaluating an ineffective assistance of counsel claim has two prongs. The first requires showing that counsel's performance "fell below an objective standard of reasonableness." *Id.* at 688, 694. "Constitutionally effective counsel embraces a 'wide range of professionally competent assistance,' and 'counsel is strongly presumed to have rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment.' " *Greiner v. Wells*, 417 F.3d 305, 319 (2d Cir. 2005) (quoting *Strickland*, 466 U.S. at 690). Fulfilling the second prong of an ineffective assistance claim requires a showing of prejudice which translates to "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694. "The habeas petitioner bears the burden of establishing both deficient performance and prejudice." *Greiner*, 417 F.3d at 319 (citing *United States v. Birkin*, 366 F.3d 95, 100 (2d Cir. 2004)).

**\*18** A defense attorney cannot be deemed ineffective for failing to pursue an unmeritorious defense or application. *See, United States v. Kirsh*, 54 F.3d 1062, 1071 (2d Cir. 1995) ("[T]he failure to make a meritless argument does not rise to the level of ineffective assistance, *see United States v. Javino*, 960 F.2d 1137, 1145 (2d Cir.), cert. denied, 506 U.S. 979, 113 S.Ct. 477, 121 L.Ed.2d 383 (1992), and "strategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable[.]" *Strickland v. Washington*, 466 U.S. at 690, 104 S.Ct. at 2066; *United States v. Eisen*, 974 F.2d 246, 265 (2d Cir.1992), cert. denied, 507 U.S. 998, 113 S.Ct. 1619, 123 L.Ed.2d 178 (1993); *United States v. Aguirre*, 912 F.2d 555, 560 (2d Cir.1990).").

Preliminarily, the Court observes that in his pretrial omnibus motion defense counsel moved to suppress Petitioner's statements as having been "involuntarily made." The trial court granted a *Huntley* hearing and, in connection with that hearing, received in evidence a CD recording of Petitioner's thirteen-minute interview, as well as testimony from Joy Jermain ("Jermain"), a detective who, along with Holloway, interviewed Petitioner after Petitioner waived his *Miranda* rights and agreed to speak to the detectives. The primary strategy of Petitioner's attorney, at the *Huntley* hearing, was to establish that Petitioner's statement was involuntarily made since Petitioner had been intoxicated at the time he was administered his *Miranda* warnings. The trial court denied Petitioner's motion, finding in pertinent part that Petitioner "was not impaired by alcohol at the time he was made aware of his *Miranda* rights, and that he voluntarily and knowingly waived the *Miranda* warnings."

Against this backdrop, Petitioner now maintains that counsel was ineffective because he failed to also argue that Holloway acted in a bullying manner and made statements that were improper insofar as they were designed to goad Petitioner into admitting his involvement in the crimes. Petitioner, though, offers no legal citation or analysis indicating that such an argument would have been successful. Nor does the Court believe that it would have been successful. In that regard, Petitioner has not argued or shown, nor does the record indicate, that the totality of the circumstances surrounding the interview rendered Petitioner's post-*Miranda* statements involuntary, or that Holloway's conduct was so fundamentally unfair that it denied Petitioner due process or raised the danger that it would induce a false confession. *See, People v. Green*, 73 A.D.3d 805, 805, 900 N.Y.S.2d 397, 398 (2d Dept. 2010) ("Contrary to the defendant's contention, based on the totality of the circumstances (*see People v. Anderson*, 42 N.Y.2d 35, 35–39, 396 N.Y.S.2d 625, 364 N.E.2d 1318), including the duration and conditions of his detention, the conduct and demeanor of the police toward him, and his age, physical state, and mental state (*see People v. Martin*, 68 A.D.3d 1015, 890 N.Y.S.2d 646; *People v. Pegues*, 59 A.D.3d 570, 571–572, 873 N.Y.S.2d 160; *People v. Petronio*, 34 A.D.3d 602, 604, 825 N.Y.S.2d 99), the defendant's post-*Miranda* (*see Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694) statements were voluntarily given. Moreover, the deception employed here by law enforcement officers was neither "so fundamentally unfair as to deny due process," nor did it raise the danger that it would induce a false confession. (*People v. Tarsia*, 50 N.Y.2d 1, 11, 427 N.Y.S.2d 944, 405 N.E.2d 188; *see People v. Sanabria*, 52 A.D.3d 743, 745, 861 N.Y.S.2d 359; *People v. Ingram*, 208 A.D.2d 561, 616 N.Y.S.2d 780; *People v. James*, 146 A.D.2d 712, 536 N.Y.S.2d 858)."); *see also, People v. Niemann*, 21 Misc. 3d 136(A), 873 N.Y.S.2d 514 (App. Term 2008) ("[E]ven if the Troopers informed defendant that his companion was subject to arrest, in part to induce him to admit his alcohol consumption and his involvement in the accident, the strategy was not "so fundamentally unfair as to deny due process or likely to induce a false confession" (*People v. Velez*, 211

A.D.2d 524 [1995]; see also *People v. Cannady*, 243 A.D.2d 642 [1997]).").

**\*19** Nor has Petitioner claimed that he suffered any particular prejudice as a result of his attorney's failure to advance this argument at the *Huntley* hearing. As Respondent points out, although Petitioner waived his *Miranda* rights and agreed to speak with the detectives, "[h]e said very little in his statement to the police, and the little that he did say was an outright denial." Petitioner's Traverse fails to counter this argument. At most, the Traverse baldly asserts that trial counsel committed a number of errors (referring to the five instances of alleged ineffectiveness of trial counsel described in the Petition, four of which the Court has already denied as procedurally barred), the cumulative effect of which "compromised" his right to effective assistance of counsel. [27] Petitioner is correct that under the *Strickland* test, "[i]n assessing prejudice, we consider the cumulative effect of the errors committed by counsel." *Gross v. Graham*, 802 F. App'x 16, 18 (2d Cir. 2020). However, for the reasons already discussed, Petitioner has not shown that trial counsel committed any errors of constitutional significance, and therefore he cannot demonstrate that the cumulative effect of his attorney's errors resulted in prejudice.

[27]    ECF No. 8 at p.

In sum, the Court finds that Petitioner has not made the necessary showing under either prong of the *Strickland* test, and his claim that trial counsel was ineffective is therefore denied as lacking merit.

Denial of Right to Remain Silent
Petitioner further contends that the trial court violated his right to remain silent, by admitting the tape recording of the thirteen-minute interrogation into evidence. Petitioner maintains that the jury should not have been permitted to hear Detective Holloway's questions, since his "ridiculing and mocking of Petitioner's silence to cajole Petitioner to break that silence and answer his questions [shifted] the burden to Petitioner to explain himself." [28]  Liberally construing Petitioner's submissions to raise the strongest arguments that they suggest, the Court understands Petitioner to be raising a due process claim under *Doyle v. Ohio*, 426 U.S. 610, 618, 96 S.Ct. 2240, 2245, 49 L.Ed.2d 91 (1976), in which

the Supreme Court held that "the use for impeachment purposes of [a defendant's] silence, at the time of arrest and after receiving *Miranda* warnings, violated the Due

Process Clause of the Fourteenth Amendment." *Id.* at 619, 96 S.Ct. 2240. The Court reasoned that "while it is true that the *Miranda* warnings contain no express assurance that silence will carry no penalty, such assurance is implicit to any person who receives the warnings. In such circumstances, it would be fundamentally unfair and a deprivation of due process to allow the arrested person's silence to be used to impeach an explanation subsequently offered at trial." *See id.* at 618, 96 S.Ct. 2240.

*Grigg v. Phillips*, 401 F. App'x 590, 591 (2d Cir. 2010). Here, while Petitioner did not testify and was not impeached with his silence, he nevertheless maintains that the playing of the recorded interview, in which he remained silent after making his initial statement, despite Holloway's efforts to get him to explain himself, had the effect of penalizing him for remaining silent.

[28]    Petition, ECF No. 1 at p. 21.

The Court disagrees, since Petitioner did not in fact exercise his right to remain silent, but rather, he chose to make a post-*Miranda* statement, and then never reasserted his right to remain silent. In *U.S. v. Pitre*, 960 F.2d 1112 (2d Cir. 1992), the Second Circuit held:

Otero argues that Agent McDonnell's testimony regarding the post-arrest interview and the government's remarks in rebuttal pertaining to this testimony were improper because his conduct in declining to respond to Agent McDonnell's question, regarding who gave him the bag, was an exercise of his fifth amendment right to remain silent. We find Otero's claim to be without merit.

It is undisputed that Otero was read his *Miranda* rights. *See Doyle v. Ohio*, 426 U.S. 610, 618, 96 S.Ct. 2240, 2245, 49 L.Ed.2d 91 (1976) (footnote omitted) ("[W]hile it is true that the *Miranda* warnings contain no express assurance that silence will carry no penalty, such assurance is implicit to any person who receives the warnings. In such circumstances, it would be fundamentally unfair and a deprivation of due process to allow the arrested person's silence to be used to impeach an explanation subsequently offered at trial."). Herein, despite the *Miranda* warnings, Otero made statements to Agent McDonnell during the post-arrest interview, thus, waiving his right to remain silent under *Miranda*. *See Moran v. Burbine*, 475 U.S. 412, 420–23, 106 S.Ct. 1135, 1140, 1141–42, 89 L.Ed.2d 410 (1986). Therefore, unless Otero resurrected and asserted his right to remain silent, the government was entitled to

introduce this evidence at trial and comment on it during summation. Persuaded by the view of the First Circuit in *United States v. Goldman,* 563 F.2d 501, 502–04 (1st Cir.1977), *cert. denied,* 434 U.S. 1067, 98 S.Ct. 1245, 55 L.Ed.2d 768 (1978), we believe that Otero waived his right to remain silent and did not thereafter assert this right. In *Goldman,* the defendant, upon being arrested and read his *Miranda* rights, was given a standard waiver of rights form. The defendant signed this form and answered questions asked of him by the investigating agent. However, the defendant "either refused to respond or did not respond" to two of the agent's questions. During trial, the government introduced testimony concerning the defendant's conduct with regard to the two questions and commented upon it in summation. Following his conviction, the defendant appealed, claiming the testimony concerning the two questions asked by the agent and the government's remarks relating to the questions violated his right to remain silent. In analyzing his claim, the First Circuit found no indication in the record that the defendant wished to assert his right to remain silent, and the court commented that, based on the record, it appeared the defendant wished to give an exculpatory story. Stating that the defendant's decision not to answer a question "was simply a strategic choice, perhaps based on a fear that any answer might weaken [his] story," and that "the failure to answer was not a reassertion of rights," *id.* at 504 n. 5, the First Circuit rejected the defendant's claim. Likewise, herein, since Otero clearly waived his right to remain silent and there is no indication in the record that he resurrected and asserted this right, we find his claim to be without merit.

**\*20** 960 F.2d at 1125–26; *see also, Nowicki v. Cunningham,* No. 09 CIV. 8476 KMK GAY, 2011 WL 12522139, at \*5 (S.D.N.Y. Mar. 30, 2011) ("*Doyle* does not protect a defendant's post-*Miranda* waiver silence. Therefore, the threshold question in any *Doyle* claim is whether the petitioner waived and subsequently failed to reassert their right to remain silent. In two of the challenged colloquies, the prosecutor questioned the detectives about interviews with Nowicki that occurred after he had waived his *Miranda* rights. Since petitioner waived and never reasserted his *Miranda* rights, the prosecution did not contravene *Doyle* by inquiring into Nowicki's failure to offer exculpatory statements during his interviews with the detectives.") (citations omitted); *Hogan v. Ercole,* No. 05-CV-5860 RRM, 2011 WL 3882822, at \*10 (E.D.N.Y. Sept. 2, 2011) ("The use of a defendant's post-arrest silence may violate due process and the privilege against self-incrimination. *Brecht v. Abrahamson,* 507 U.S. 619, 629–30, 113 S.Ct. 1710, 123 L.Ed.2d 353 (1993); *Doyle*

*v. Ohio,* 426 U.S. 610, 617–18, 96 S.Ct. 2240, 49 L.Ed.2d 91 (1976); *Grigg v. Phillips,* 401 F. App'x 590, 593 (2d Cir.2010). However, once an arrestee waives his right to remain silent, the government is entitled to introduce evidence at trial of the arrestee's silence in response to questions, and the government may comment on that silence during summation, as long as the arrestee did not resurrect and assert his right to remain silent. *See United States v. Pitre,* 960 F.2d 1112, 1125 (2d Cir.1992) ("[U]nless [petitioner] resurrected and asserted his right to remain silent, the government was entitled to introduce this evidence at trial and comment on it during summation."). At trial, Detective Severin testified that that petitioner was silent when asked why he had not turned himself in to the Albany police and when asked why he told his family that he was going to Virginia and went to Tennessee instead. However, prior to trial, the court determined that petitioner was properly read his *Miranda* rights by the Nassau County Police Department and that he waived his right to remain silent, thus finding admissible his post-arrest statements to Detective Severin. As such, that defendant declined to answer some questions is not constitutionally protected.") (citations to trial record omitted).

Even assuming *arguendo* that a *Doyle* violation occurred here, which the Court does not find, it would be harmless in light of the relevant factors:

> The Supreme Court has addressed directly the proper standard of review in determining whether the occurrence of a *Doyle* error during a state court trial constitutes harmless error. In *Brecht v. Abrahamson,* 507 U.S. 619, 113 S.Ct. 1710, 123 L.Ed.2d 353 (1993), the Court adopted a harmless error standard for violations of this type drawn from the Court's decision in *Kotteakos v. United States,* 328 U.S. 750, 66 S.Ct. 1239, 90 L.Ed. 1557 (1946), asking "whether the error 'had substantial and injurious effect or influence in determining the jury's verdict.' " *Brecht,* 507 U.S. at 637, 113 S.Ct. 1710 (quoting *Kotteakos,* 328 U.S. at 776, 66 S.Ct. 1239). Assessing harmless error outside the context of *Doyle* violations, we have identified four factors as particularly relevant to the analysis: "(1) the overall strength of the prosecution's case; (2) the prosecutor's conduct with respect to the improperly admitted evidence; (3) the importance of the wrongly admitted testimony; and (4) whether such evidence was cumulative of other properly admitted evidence." *Zappulla v. New York,* 391 F.3d 462, 468 (2d Cir.2004). Of the four factors, "[t]he strength of the prosecution's case is probably the single most critical factor." *United States v. Reifler,* 446 F.3d 65,

87 (2d Cir.2006) (alteration in original) (quoting *Latine v. Mann*, 25 F.3d 1162, 1167–68 (2d Cir.1994)).

*Grigg v. Phillips*, 401 F. App'x 590, 593 (2d Cir. 2010) (footnote omitted).

Considering the foregoing factors, any error here would be harmless. In that regard, the Court particularly notes that the evidence against Petitioner as to the crimes for which he was convicted was strong, if not overwhelming, and that the prosecutor did not emphasize Petitioner's silence during the interview or attempt to use it as evidence of his guilt. Rather, as already discussed, in response to defense counsel's closing argument that the interview had been "illegal," the prosecutor disputed that characterization and argued that the recording of the interview was important not because of Petitioner's silence, but because Petitioner's statement (that he had been sleeping immediately prior to his arrest), made after waiving his *Miranda* rights, was inconsistent with the rest of the evidence.

For these reasons Petitioner's claim that he was denied due process, when his right to remain silent was violated, lacks merit and is denied.

CONCLUSION

**\*21** The application under 28 U.S.C. § 2254 is denied. The Clerk of the Court is directed to close this case. Pursuant to 28 U.S.C. § 2253, the Court declines to issue a certificate of appealability, since Petitioner has not made a substantial showing of the denial of a constitutional right. The Court hereby certifies, pursuant to 28 U.S.C. § 1915(a)(3), that any appeal from this Order would not be taken in good faith and leave to appeal to the Court of Appeals as a poor person is denied. *Coppedge v. United States*, 369 U.S. 438 (1962). Further requests to proceed on appeal *in forma pauperis* should be directed on motion to the United States Court of Appeals for the Second Circuit in accordance with Rule 24 of the Federal Rules of Appellate Procedure.

So Ordered.

**All Citations**

Slip Copy, 2020 WL 6785498

---

**End of Document**

© 2023 Thomson Reuters. No claim to original U.S. Government Works.

2020 WL 5633871

2020 WL 5633871
Only the Westlaw citation is currently available.
United States District Court, E.D. New York.

Eustacio ROBERTS, Petitioner,

v.

Jaime LAMANNA, Respondent.

19 CV 880 (AMD)(LB)
|
Signed 08/31/2020

**Attorneys and Law Firms**

Eustacio Roberts, Stormville, NY, pro se.

Thomas M. Ross, Kings County District Attorney, Brooklyn, NY, Kings County District Attorneys Office, New York State Attorney Generals Office, for Respondent.

### REPORT & RECOMMENDATION

BLOOM, United States Magistrate Judge:

 **\*1** Petitioner, Eustacio Roberts, files this *pro se* petition for a writ of *habeas corpus* pursuant to 28 U.S.C. § 2254 challenging his 2014 Kings County Supreme Court conviction for Murder in the Second Degree (N.Y. Penal Law § 125.25). The Honorable Ann M. Donnelly referred this matter to me for a Report and Recommendation pursuant to 28 U.S.C. § 636(b). For the reasons set forth below, I respectfully recommend that the petition should be denied.

### BACKGROUND

#### I. The Underlying Crimes

According to the evidence adduced at trial, [1] on April 28, 2010 around 7:20 p.m., petitioner broke into the house of his long-time paramour, Maritza Jolliffe, at 723 East 81st Street in Brooklyn, and stabbed her fifteen times with a kitchen knife, causing her death. T.T. at 31–32, 41, 550, 690, 721, 781. At the time of the underlying crime, Jolliffe had a close friend named Leo Roche who she was spending more time with, id. at 540, which the prosecution argued sparked petitioner's "anger and his jealousy[.]" Id. at 463, 751. Approximately three weeks prior to her murder, Jolliffe had ousted petitioner

from their shared home because petitioner had physically assaulted her on several occasions. Id. at 542–46, 712–15.

[1]     Petitioner was tried by a jury in Kings County Supreme Court from July 29, 2014 to August 8, 2014 before the Honorable Deborah A. Dowling. Trial Transcript, ECF No. 5-1 at 10–965. References to the trial transcript (hereinafter "T.T.") are to the ECF page numbers.

In addition to her home at 723 East 81st Street, Jolliffe owned the home across the street, where her daughter from a previous marriage, Vonetta Alexander, lived. Id. at 535–36, 539. After Jolliffe expelled petitioner from their shared home, she allowed him to stay in the basement of Vonetta's home. [2] Id. at 546, 716. Petitioner was residing in Vonetta's basement leading up to Jolliffe's murder. Id.

[2]     The Court refers to witnesses who share the same last name by their first names.

On April 28, 2010, petitioner broke into Jolliffe's home through a window. Id. at 582, 721. Tanishka Alexander, Jolliffe's niece, testified that she heard screaming and glass breaking, and that she encountered petitioner, who said, "I'm gonna kill the bitch" while holding a butcher knife. Id. at 695–97.

Jolliffe and Noah Roberts, her son with petitioner, sought refuge in the basement apartment; Noah put Jolliffe in the basement bedroom to protect her. Id. at 722. Petitioner followed, breaking down the door to the basement apartment and moving past Noah and Omar James, the tenant who lived in the basement apartment. Id. at 723. Petitioner broke down the door to the basement bedroom, found Jolliffe in the bedroom, and stabbed her fifteen times in the chest and stomach. Id. at 724, 781. Petitioner then fled the scene. Id. at 702–03. Tanishka called 911; police officers and EMS arrived at the scene and discovered Jolliffe's body. Id. at 698, 704. Jolliffe was transported to the hospital where she was pronounced dead. Id. at 32, 763.

 **\*2** Petitioner fled to Ricardo Escalona's house at 765 Stanley Avenue in Brownsville. Id. at 35, 749–50. When petitioner arrived, Escalona noticed that he had blood on his clothes. Id. at 750–51. Petitioner told Escalona that he had killed Jolliffe by stabbing her. Id. When Escalona asked him why, petitioner stated that "she probably was fooling around on— was cheating on [petitioner]." Id. at 751.

Escalona called Noah, who was speaking with Detective David Miller at the time. Id. at 34, 726–27, 751. Noah informed Miller that he knew petitioner's location, and Miller, along with Detective Henn and Detective Lawrence Wein went to Escalona's address. Id. at 35, 727.

When petitioner exited Escalona's apartment, the detectives announced themselves and petitioner attempted to flee. Id. at 36. The detectives arrested petitioner and transported him to the 69th Precinct. Id. at 36–37. Henn read petitioner his Miranda warnings, and petitioner responded that he understood the warnings, waived his right to counsel, and invoked his right to remain silent. Id. at 38–40. However, after being Mirandized, petitioner stated,

> I got a call from Noah who said Leo was in the house. I went to the house and broke the window. I got a knife and chased Leo out of the house. I left. I through [sic] the knife away. I don't remember where. I know I'm gonna go to prison. Then I'm gonna get deported back to Panama. I have prostate cancer, and I could not perform for my wife. It's been about a year. And she was being unfaithful to me.

Id. at 41. After making this statement, petitioner requested a lawyer. Id.

## II. Petitioner's Trial

Petitioner was tried by a jury in Kings County Supreme Court from July 29, 2014 to August 8, 2014 before the Honorable Deborah A. Dowling. Id. at 10–965. Petitioner was charged with Murder in the Second Degree (N.Y. Penal Law § 125.25) and Criminal Possession of a Weapon in the Fourth Degree (N.Y. Penal Law § 265.01). Id. at 112. On August 28, 2014, petitioner was found guilty of Murder in the Second Degree.[3] Id. at 961. He was sentenced to twenty-five years to life in prison. Id. at 990.

[3]    The jury did not consider the Criminal Possession of a Weapon charge because the murder conviction

obviated the need for deliberations on that charge. T.T. at 958.

Despite initial questions about his mental health, petitioner was found fit to stand trial. T.T. at 24. During the first day of the proceedings, petitioner stated, "I don't want this man [Joel Walter, his assigned counsel] to represent me." Id. at 11. As petitioner had already changed counsel once, Justice Dowling advised him that he would have to represent himself, which she cautioned against. Id. at 13, 18, 22. Petitioner understood he either had to represent himself or he could continue with his assigned counsel; he decided to proceed with his assigned counsel. Id. at 22.

The prosecutor discussed petitioner's recorded phone calls from Rikers Island. Id. at 68, 431. The prosecutor shared that in the first call, petitioner stated, "I killed [Jolliffe] for what she did to me[,]" and then in the other calls, petitioner discussed his "motive and his intent ... anger at [Jolliffe]" and "describe[ed] [how] it's her fault." Id. at 68. Justice Dowling reviewed the calls with the parties and ruled that portions of certain calls were relevant and admissible at trial. Id. at 431–45.

During this discussion, petitioner's counsel advocated for the admission of the entirety of one phone call, stating, "[m]y client was operating under extreme emotional disturbance. That's what this whole thing is. And that's based upon him being a lifelong alcoholic. And I think that demons should come in." Id. at 444. The "demons" petitioner's counsel alluded to were referenced by petitioner in one of the recorded phone calls from Rikers, in which petitioner stated he was being manipulated by demons. Id. at 444–45. The prosecutor argued there was "[n]o evidence of any kind of psychological diagnosis here. No evidence of any kind of psychological treatment in the past." Id. at 444. Justice Dowling agreed that any expert witness testimony regarding petitioner's mental status had "nothing to do with demons or delusional thinking or hearing voices," and precluded petitioner's counsel from introducing the phone call regarding demons. Id. at 445.

**\*3** In his opening statement, petitioner's counsel told the jury that his client had "acted under extreme emotional disturbance. That's a psychiatric term. He acted because he was drunk. And he was a lifelong alcoholic, and that caused him to always function differently than normal people[.]" Id. at 486. Vonetta testified petitioner had two drinks around 5:00 p.m. on the day of Jolliffe's murder. Id. at 554.

On the tenth day of the trial, Justice Dowling permitted Dr. Azariah Eshkenazi, a defense expert witness, to testify regarding petitioner's mental state. Id. at 788, 807. Justice Dowling allowed Eshkenazi to testify whether petitioner's alcoholism "would affect his cognitive ability to remember[.]" Id. at 793. She allowed Eshkenazi "to opine based upon what he has before him and his interviews, the condition of the individual[,]" for the limited purpose of establishing that petitioner "suffered from a certain condition [chronic alcoholism and drug abuse]," over the prosecution's objection. Id. at 793–94, 803–04. Eshkenazi testified that he diagnosed petitioner with chronic drug and alcohol abuse. Id. at 814–16. Dr. Marc Tarle testified as the People's expert, opining that petitioner's anger toward Jolliffe was "intense, unresolved" and that petitioner "was able to form the intent to stab the victim." Id. at 846–47.

Petitioner's counsel discussed petitioner's capacity to form intent in his summation, stating that based on petitioner's chronic drug and alcohol abuse "[t]here's no question that [petitioner] caused the death of Maritza Jolliffe, but he wasn't in his right mind when he was doing it. He did it. He doesn't remember. He can't testify because he doesn't remember it." Id. at 868. Petitioner's counsel conceded that "this is not a case of whodunit. It's a case of why it happened. My client wasn't in the right state of mind when he took Ms. Jolliffe's life. He was acting under extreme emotional disturbance." Id. at 872.

### III. Procedural History

Petitioner appealed his conviction to the New York State Supreme Court, Appellate Division, Second Department and raised four claims: (1) prosecutorial misconduct based on an improper summation in which the prosecution misstated and denigrated petitioner's extreme emotional disturbance ("EED") defense; (2) ineffective assistance of counsel; (3) violation of petitioner's right to counsel based on the admission of the recorded phone calls from Rikers; and (4) that his twenty-five year to life sentence was excessive. ECF No. 5-2 at 4–6; see also ECF No. 5 at ¶ 9.

On May 18, 2016, the Appellate Division unanimously affirmed the judgment. People v. Roberts, 139 A.D.3d 985 (2d Dep't 2016); see also ECF No. 5-2 at 161–62. The Appellate Division held that petitioner's claims of ineffective assistance of counsel and improper admission of the recorded phone calls from Rikers were without merit. Id. The Appellate Division also held that petitioner's summation claim was largely unpreserved for appellate review, and in any event, the

comments made by the prosecution did not deny petitioner a fair trial. Id.; see also ECF No. 5 at ¶ 10.

Petitioner sought leave to appeal to the New York Court of Appeals, seeking to review all claims that had been raised in the Appellate Division. ECF No. 5-2 at 164–73; see also ECF No. 5 at ¶ 11. The New York Court of Appeals denied petitioner's application for leave to appeal on August 10, 2016. People v. Roberts, 28 N.Y.3d 936 (2016) (Fahey, J.); ECF No. 5-2 at 188.

**\*4** Petitioner then moved *pro se* for a writ of error *coram nobis* in the Appellate Division, raising ineffective assistance of appellate counsel. ECF No. 5-2 at 190–208; see also ECF No. 5 at ¶ 13. Petitioner claimed his appellate counsel was ineffective for failing to raise two allegedly meritorious grounds: (1) the verdict was against the weight of the evidence; and (2) the trial court did not give the defense proper notice of and an opportunity to respond to a jury note (O'Rama claim). ECF No. 5-2 at 195. The Appellate Division denied petitioner's application for a writ of *coram nobis*, holding that he failed to establish ineffective assistance of appellate counsel. People v. Roberts, 153 A.D.3d 944 (2d Dep't 2017); ECF No. 5-2 at 254. Petitioner sought leave to appeal to the New York Court of Appeals and his application was denied. People v. Roberts, 30 N.Y.3d 1063 (2017) (Feinman, J.); ECF No. 5-2 at 263.

### IV. Instant Petition

Petitioner filed the instant *pro se* petition seeking a writ of habeas corpus under 28 U.S.C. § 2254 on February 12, 2019.[4] ECF No. 1, Petition for Writ of Habeas Corpus ("Pet."). Petitioner raises the three claims that he raised on direct appeal and a free standing O'Rama claim independent from his ineffective assistance of counsel claim. Specifically, petitioner challenges his conviction stating he was denied a fair trial due to: (1) the prosecutor's improper comments during summation; (2) ineffective assistance of counsel for inadequately raising the EED defense; and (3) the erroneous admission petitioner's recorded phone calls from Rikers. Id. at 5–8. Petitioner also raises an O'Rama claim alleging that a jury note was not delivered to petitioner's counsel at trial. Id. at 9. Respondent opposes the petition, ECF No. 5 ("Opp. Aff. and Memo"); ECF Nos. 5-1–5-2, and petitioner filed a reply, ECF No. 10 ("Reply").

---

4  References to the petition (hereinafter "Pet.") are to the ECF page numbers.

# DISCUSSION [5]

[5]    Although respondent notes that the petition was untimely, he does not assert a statute of limitations defense. Opp. Aff. and Memo at 7 n.1.

## I. Standard of Review

The Antiterrorism and Effective Death Penalty Act ("AEDPA") provides that a "district court shall entertain an application for a writ of *habeas corpus* in behalf of a person in custody pursuant to the judgment of a State court only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a). Under the AEDPA, the reviewing court may only grant a habeas petition if the claim "was adjudicated on the merits in State court proceedings" and the state court proceedings:

(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

(2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence present in the State court proceeding.

28 U.S.C. § 2254(d). "This is a 'difficult to meet' ... and 'highly deferential standard[,]' " and review "is limited to the record that was before the state court that adjudicated the claim on the merits." Cullen v. Pinholster, 563 U.S. 170, 181 (2011) (citations omitted). A state court decision is "contrary to" clearly established Federal law if "the state court reached a conclusion of law that directly contradicts a holding of the Supreme Court" or, "when presented with 'facts that are materially indistinguishable from a relevant Supreme Court precedent,' " the state court arrived at an opposite result. Evans v. Fischer, 712 F.3d 125, 132 (2d Cir. 2013) (quoting Williams v. Taylor, 529 U.S. 362, 405 (2000)).

A state court decision is an "unreasonable application" of clearly established federal law if the "State court identifies the correct governing legal principle from [Supreme Court] decisions but unreasonably applies that principle to the facts of the prisoner's case." Williams, 529 U.S. at 413. The Court cautions, however, that "an *unreasonable* application of federal law is different from an *incorrect* application of federal law." Id. at 410; see also Grayton v. Ercole, 691 F.3d 165, 174 (2d Cir. 2012) ("[T]he writ may only issue where

the state court's application of the law was not only wrong, but unreasonable."). A federal habeas court may only "issue the writ in cases where there is no possibility fair[-]minded jurists could disagree that the state court's decision conflicts with [the Supreme] Court's precedents." Harrington v. Richter, 562 U.S. 86, 102 (2011).

## II. Exhaustion and Procedural Default

**\*5** A petitioner in custody pursuant to a state court judgment must exhaust his state court remedies prior to seeking federal habeas review. 28 U.S.C. § 2254(b)(1); see also Davila v. Davis 137 S. Ct. 2058, 2064 (2017) ("The exhaustion requirement is designed to avoid the 'unseemly' result of a federal court 'upset[ting] a state court conviction without' first according the state courts an 'opportunity to ... correct a constitutional violation.' ") (citation omitted). To exhaust state court remedies, the petitioner must satisfy the "fair presentation" requirement. Baldwin v. Reese, 541 U.S. 27, 29 (2004). A petitioner fairly presents a claim only if he "has informed the state court of both the factual and legal premises of the claim he asserts in federal court[,]" such that the state courts were "fairly alerted" to the claim's federal nature. Bierenbaum v. Graham, 607 F.3d 36, 47, 49 (2d Cir. 2010) (citations and quotation marks omitted); see also Baldwin, 541 U.S. at 32 (clarifying that a petitioner can "indicate the federal law basis for his claim in a state-court petition or brief, for example, by citing in conjunction with the claim the federal source of law on which he relies or a case deciding such a claim on federal grounds, or by simply labeling the claim 'federal.' "); Acosta v. Artuz, 575 F.3d 177, 188 (2d Cir. 2009) ("[A] claim is not 'fairly presented' to a state appellate court if discovery of that claim requires the court to 'read beyond a petition or a brief (or a similar document)' and conduct its own review of proceedings below.") (quoting Baldwin, 541 U.S. at 32).

An "important 'corollary' to the exhaustion requirement" is the procedural default doctrine, which provides that federal courts have no authority to review state court decisions that rest upon adequate and independent state law grounds. Davila, 137 S. Ct. at 2064 (citation omitted); see also Green v. Travis, 414 F.3d 288, 294 (2d Cir. 2005) ("A federal habeas court lacks jurisdiction to evaluate questions of federal law decided by a state court where the state court judgment 'rests on a state law ground that is independent of the federal question and adequate to support the judgment[.]' ") (quoting Coleman v. Thompson, 501 U.S. 722, 729 (1991)). "The rule applies with equal force whether the state-law ground is substantive or procedural." Lee v. Kemna, 534 U.S. 362, 375

2020 WL 5633871

(2002) (citing Coleman, 501 U.S. at 729); Whitley v. Ercole, 642 F.3d 278, 285 (2d Cir. 2011). Federal habeas review of a claim is foreclosed where the state court has expressly relied on the petitioner's procedural default as an adequate and independent state law ground. Green, 414 F.3d at 294 (citation omitted); Velasquez v. Leonardo, 898 F.2d 7, 9 (2d Cir. 1990) (*per curiam*). A petitioner may, nevertheless, obtain federal habeas review of a procedurally defaulted claim, if petitioner demonstrates either "cause for the default and prejudice," or that "failure to consider the claim will result in a miscarriage of justice (i.e., the petitioner is actually innocent)." Aparicio v. Artuz, 269 F.3d 78, 90 (2d Cir. 2001) (citing Coleman, 501 U.S. at 748–50).

### III. Petitioner's Claims

#### a. Petitioner's O'Rama Claim is Procedurally Barred

Petitioner claims he exhausted his O'Rama[6] claim because it was "fairly presented" to the Appellate Division Second Department in his writ of error *coram nobis*, which was denied August 30, 2017.[7] Pet. at 9; Reply at 9; ECF No. 5-2 at 195–97, 202–04. Respondent argues that this ground is procedurally barred from federal habeas review. Opp. Aff. and Memo at 7–9, 16. This Court agrees.

[6]   See People v. O'Rama, 78 N.Y.2d 270 (1991) (The Court has a duty to provide counsel with "meaningful notice" of a jury's inquiry — meaning "notice of the actual specific content of the jurors' request" or note).

[7]   Petitioner labels his O'Rama claim as a "mode of proceedings error." Pet. at 9. The New York Court of Appeals has interpreted Section 310.30 as requiring the trial court to give a "meaningful response to the jury," and has held that failure to do so constitutes an "error affecting the mode of proceedings[.]" People v. Alcide, 21 N.Y.3d 687, 692 (2013) (citations omitted); O'Rama, 78 N.Y.2d at 276 ("CPL 310.30 [ ] imposes two separate duties on the court following a substantive juror inquiry: the duty to notify counsel and the duty to respond.").
However, as discussed herein, petitioner's claim should be denied because it is grounded solely in state law, not Federal law as required by 28 U.S.C. § 2254(d)(1). The record reflects that the

trial court's conduct in handling the jury note did not irreparably taint the entire trial. T.T. at 532–33; see e.g., People v. Floyd, 97 A.D.3d 837 (2d Dep't 2012) ("the trial court's failure to mark the jury notes in strict compliance with the procedure set forth in O'Rama does not require reversal because the court fulfill[s] its core responsibilities under CPL 310.30 by reading each note in the record in the presence of defense counsel, and giving defense counsel a meaningful opportunity to participate in the formulation of the court's response.").

**\*6**   Petitioner raised his O'Rama claim in his writ of error *coram nobis* within his ineffective assistance of appellate counsel claim. ECF No. 5-2 at 190, 192, 195–97, 202–04. "[C]ourts in this circuit have consistently recognized[ ] an ineffective assistance claim is an insufficient vehicle for exhausting the underlying allegations when those allegations are asserted for the first time as separate claims on habeas." Hall v. Phillips, No. 04 CV 1514 (NGG)(VVP), 2007 WL 2156656, at *5 (E.D.N.Y. July 25, 2007) (citing cases); see also Rush v. Lempke, 500 Fed. App'x 12, 15 (2d Cir. 2012) (summary order) (Courts have thus declined to find a claim to be exhausted when it has been presented to the state courts only in the context of an ineffective assistance claim).[8] Accordingly, petitioner's O'Rama claim remains unexhausted because he failed to raise it as an independent claim in state court.

[8]   The Clerk of Court is directed to send petitioner the attached copies of all the unreported cases cited herein.

Collateral relief is unavailable to petitioner because the O'Rama claim, as a record-based claim, should have been raised on direct appeal, but it was not. See O'Kane v. Kirkpatrick, No. 09 Civ. 05167 (HB)(THK), 2011 WL 3809945, at *7 (S.D.N.Y. Feb. 15, 2011), adopted by, 2011 WL 3918158 (S.D.N.Y. Aug. 25, 2011) ("[A]ll claims that are record-based must be raised in a direct appeal.... It is only when a defendant's claim hinges upon facts outside the trial record, that he may collaterally attack his conviction by bringing a claim under CPL § 440.10.") (citations omitted); Lowman v. New York, No. 09 Civ. 0058T, 2011 WL 90996, at *9 (W.D.N.Y. Jan. 11, 2011) ("Collateral review of this claim—by way of another CPL § 440 motion—is also barred because the claim is a matter of record that could have been raised on direct appeal, but unjustifiably was not.)" (citing N.Y. C.P.L. § 440.10(2)(c)). Therefore, because petitioner can no longer raise his O'Rama claim in state court, the claim

2020 WL 5633871

is procedurally barred. [9] Jackson v. Conway, 763 F.3d 115, 143–44 (2d Cir. 2014); Clark v. Perez, 510 F.3d 382, 390 (2d Cir. 2008); King v. Phillips, No. 03 CV 4183 (CBA), 2005 WL 1027545, at *3 (E.D.N.Y. May 2, 2005) ("there are no longer means by which such claims can be presented to the state's highest court, because [petitioner] has used his one permissible request for leave to appeal to the New York Court of Appeals.") (citing cases).

[9]  Even if this Court were to consider petitioner's O'Rama claim, it is without merit. New York Criminal Procedural Law Section 310.30, as discussed in People v. O'Rama, requires that "whenever a substantive written jury communication is received by the Judge, it should be marked as a court exhibit and, before the jury is recalled to the courtroom, read into the record in the presence of counsel." O'Rama, 78 N.Y.2d at 277–78. Section 310.30 has no corollary under federal law; thus, any alleged error in the trial court's handling of the jury note was solely a violation of state law, not a constitutional violation. Therefore, petitioner's O'Rama claim, even if considered on the merits, is not a basis for habeas relief. See Cornado v. Bellnier, No. 10 Civ. 5265 (RA)(HBP), 2012 WL 6644637, at *5–6 (S.D.N.Y. Sept. 20, 2012), adopted by, 2012 WL 6681692 (S.D.N.Y. Dec. 21, 2012) ("A claim premised on a violation of New York Criminal Procedure Law Section 310.30 does not allege a violation of a federally protected right.") (citing cases).

**b. Petitioner's Summation Claim is Procedurally Barred**

Petitioner argues that the prosecutor's summation deprived him of due process and a fair trial. Pet. at 5; Reply at 13–17. Respondent argues that this ground is procedurally barred, and in any event, is meritless. Opp. Aff. and Memo at 9–10, 13–14. This Court agrees.

**\*7**  Petitioner objected to the prosecutor's comments regarding the EED legal standard as it applies to the difference between manslaughter and intentional murder. T.T. at 892–93. The Appellate Division rejected petitioner's improper summation claim explaining that it was "largely unpreserved for appellate review, since the [petitioner] failed to object to many of the remarks he now challenges." People v.

Roberts, 139 A.D.3d 985 (2d Dep't 2016) (citing N.Y. C.P.L. § 470.05(2)); see also ECF No. 5-2 at 161–62.

Parties are required to make specific contemporaneous objections at trial to preserve issues for appellate review. N.Y. C.P.L. § 470.05(2). The contemporaneous objection rule is an adequate and independent state law ground that procedurally bars habeas review of petitioner's summation claim. Whitley, 642 F.3d at 286–87; Vargas v. Keane, 86 F.3d 1273, 1280 (2d Cir. 1996) (holding that unpreserved claims about a prosecutor's comments during closing arguments are barred by adequate and independent state law grounds). Thus, except for the objected to comments which are discussed in Part III b. i., infra, petitioner's improper summation claim is procedurally barred from federal habeas review.

Petitioner fails to demonstrate cause for the procedural default and resulting prejudice, see Vargas, 86 F.3d at 1280 (citing Wainwright v. Sykes, 433 U.S. 72, 87–91 (1977)), or a fundamental "miscarriage of justice," Aparicio, 269 F.3d at 90 (citation omitted). Accordingly, petitioner's prosecutorial misconduct claim based on comments he failed to object to during the People's summation is procedurally barred.

**i. Petitioner's Summation Claim is Without Merit**

Even if petitioner's summation claim was not procedurally barred and could be reviewed, it should be denied as without merit. Petitioner claims that the prosecutor's improper remarks "denigrated the defense[.]" Pet. at 5. He adds that the prosecutor "inappropriately and incorrectly instructed the jury on the law[ ] regarding [EED]," "blatantly mischaracterized testimony to undermine the [EED] defense, became an unsworn witness, vouched for his witnesses, and appealed to each juror's sympathy." Id. Respondent argues even if this ground is not procedurally barred, it is meritless. Opp. Aff. and Memo at 13–14. This Court agrees.

Again, petitioner cannot demonstrate that the trial court's decision was contrary to or an unreasonable application of clearly established Federal law. 28 U.S.C.§ 2254(d). The Appellate Division ruled that "[t]o the extent that ... the prosecutor's remarks made during summation were improper, those remarks did not deprive the defendant of a fair trial[.]" People v. Roberts, 139 A.D.3d 985 (2d Dep't 2016); see also ECF No. 5-2 at 161–62. Furthermore, the Appellate Division discussed that "any other error in this regard was harmless, as there was overwhelming evidence of the defendant's guilt,

2020 WL 5633871

and no significant probability that the error contributed to the defendant's conviction." Id.

A prosecutor's comments do not deprive a defendant of a fair trial unless they "so infected the trial with unfairness as to make the resulting conviction a denial of due process." Darden v. Wainwright, 477 U.S. 168, 181 (1986) (quoting Donnelly v. DeChristoforo, 416 U.S. 637, 643 (1974)). Courts have discretion to determine whether a prosecutor's conduct rises to the level of denying the defendant a fair trial. See Parker v. Matthews, 567 U.S. 37, 48 (2012) ("[T]he Darden standard is a very general one, leaving courts 'more leeway ... in reaching outcomes in case-by-case determinations[.]' ") (quoting Yarborough v. Alvarado, 541 U.S. 652, 664 (2004)). The Court looks at the impact of the alleged prosecutorial misconduct on the trial as a whole and determines whether the comments were "sufficient to undermine the fairness of the proceedings when viewed in context." Jackson, 763 F.3d at 146. A prosecutor's inappropriate comments during closing do not undermine the fairness of the proceedings unless the evidence presented is "so closely balanced that the prosecutor's comments [are] likely to have had a substantial effect on the jury." Tankleff v. Senkowski, 135 F.3d 235, 253 (2d Cir. 1998).

**\*8** Petitioner's primary allegation is that the prosecution "inappropriately and incorrectly instructed the jury on the laws regarding extreme emotional disturbance," and relatedly, that the prosecution "denigrated the defense." Pet. at 5. During summation, the prosecution set forth the requirements for establishing the affirmative EED defense, stating, "part one of the test ... is objective reason. So you see your child hurt by someone, and you just attack that person. Lose your mind for a second. That's what we're talking about in terms of extreme emotional disturbance." T.T. at 892–94. The prosecution continued that "[p]art two of the test is whether the person who had that reason actually had that big emotion." Id. Justice Dowling overruled many of petitioner's counsel's objections to the prosecutor's explanation of EED, stating, "certainly [the prosecution] can make arguments in regard to what they wish [the jury] to consider, but, again, I'm the sole and exclusive judge of the law." Id. at 892. Justice Dowling reiterated this point while overruling another objection by petitioner's counsel, explaining, "after you [the jury] determine the facts, you will apply the law as given to you by the Court, and you will make a decision based upon the facts as you have decided them and under the law as charged by the Court." Id. at 897.

EED is an affirmative defense which requires a defendant to have acted under the influence of an EED for which there was a reasonable explanation or excuse. N.Y. C.P.L. § 125.25(1)(a). The jury determines the reasonableness "from the viewpoint of a person in the defendant's situation under the circumstances as the defendant believed them to be." Id. The state court's decision allowing the prosecution's characterization of EED as a two-part test was not an unreasonable application of clearly established Federal law. Moreover, petitioner fails to establish that he "suffered actual prejudice because the prosecutor's comments during summation had a substantial and injurious effect or influence on the jury's verdict." Bentley v. Scully, 41 F.3d 818, 824 (2d Cir. 1994).

As for the prosecutor's use of the word "we" which petitioner claims improperly expressed an opinion and vouched for the prosecution's witnesses, Pet. at 5, ECF No. 5-2 at 47, this claim is without merit. T.T. at 884–85, 896, 898; see Tankleff, 135 F.3d at 253 (prosecutorial misconduct claim rejected on habeas where "prosecutor's comments were short and fleeting and, thus much less likely to have had a substantial effect on the jury's verdict").

Furthermore, Justice Dowling instructed the jury both at the beginning and end of the trial that the summations were not evidence. T.T. at 452, 865–66, 906–07; Jackson, 763 F.3d at 150. As discussed in Darden, although petitioner's trial may not have been "perfect" it was also not "fundamentally unfair." 477 U.S. at 183. Petitioner's summation claim should be denied as the state court's decision regarding the prosecution's summation was not contrary to, or an unreasonable application of, clearly established Federal law.

### c. Petitioner's Ineffective Assistance of Counsel Claim

Petitioner argues that he was denied a fair trial based on ineffective assistance of trial counsel because counsel failed to meaningfully advance petitioner's EED defense. Pet. at 6; Reply 17–22. Petitioner argues: (1) counsel should have suggested that the trial court's instructions on EED be modified to avoid confusion and misapplication of the law in light of the "intoxication" charge and the prosecution's erroneous legal instructions in summation; (2) counsel should have requested a limiting instruction at the time prior crimes evidence was improperly introduced and when the prosecution's expert testified that petitioner was prone to violence, and objected when an additional prior bad act was

elicited; and (3) counsel should have objected to multiple egregious improprieties in the prosecution's summation. Pet. at 6. Petitioner further argues that that the admission of his recorded phone calls from Rikers into evidence deprived him of his right to effective assistance of counsel. Id. at 8. Respondent argues that petitioner's ineffective assistance of counsel claim is without merit. This Court agrees.

To establish a claim of ineffective assistance of counsel, petitioner must show that: (1) counsel's performance was deficient and (2) petitioner suffered prejudice as a result of the deficient performance. Strickland v. Washington, 466 U.S. 668, 687–88 (1984). Counsel's performance must fall "below an objective standard of reasonableness" to be deficient. Id. Specifically, counsel's conduct must have "so undermined the proper functioning of the adversarial process" that the process "cannot be relied on as having produced a just result." Id. at 686.

**\*9** To establish prejudice, petitioner must show that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." Id. at 694. Reasonable probability is "[a] probability sufficient to undermine confidence in the outcome." Id. Counsel is "strongly presumed to have rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment," and that counsel's actions were part of a "sound trial strategy." Id. at 689–90. The combined deferential standards of review under AEDPA and Strickland create a "doubly" deferential standard of review. Harrington, 562 U.S. at 105. A court should "assess counsel's overall performance throughout the case" when evaluating a claim of ineffective assistance. Kimmelman v. Morrison, 477 U.S. 365, 386 (1986).

Here, petitioner's claim fails both prongs of Strickland by failing to demonstrate that counsel's performance was deficient and that petitioner suffered prejudice as a result of the deficient performance. Petitioner's counsel successfully advocated for an expert witness to testify on petitioner's behalf regarding his chronic alcohol abuse to support the EED defense. T.T. at 788–94, 809. Petitioner's counsel also objected to the prosecution's questioning of its expert witness regarding petitioner's prior bad acts, and Justice Dowling sustained counsel's objections and struck this testimony from the record. Id. at 837–38. Petitioner's counsel also objected to the admission of certain portions of the recorded phone calls from Rikers. Id. at 442–44. Throughout trial, petitioner's counsel repeatedly argued that petitioner's mental

state and substance abuse constituted an EED that led him to murder Jolliffe. Id. at 868, 872. In short, the record reflects that defense counsel raised an appropriate EED defense throughout the trial, and argued zealously on petitioner's behalf during summation. T.T. at 868–72.

Petitioner's counsel objected on a number of occasions during the prosecutor's summation. T.T. at 892–96. Justice Dowling overruled the objections and stated she would instruct the jury as to the law regarding EED. Id. at 896–97. At the conclusion of the prosecutor's summation, petitioner's counsel moved for a mistrial. Id. at 896. Justice Dowling denied petitioner's request, stating that the prosecution was entitled to put forth the People's argument. Id.

The Appellate Division found that petitioner's counsel's "failure to object to certain summation remarks did not constitute ineffective assistance of counsel" and "defense counsel provided meaningful representation[.]" People v. Roberts, 139 A.D.3d 985 (2d Dep't 2016); see also ECF No. 5-2 at 161–62. The Appellate Division also held that petitioner's "contention that the admission of recorded phone calls made during his detention at Rikers Island violated his right to counsel under the state and federal constitutions is without merit[.]" Id. Counsel's performance was "within the range of acceptable strategic and tactical alternatives and did not cause the representation to fall below the constitutionally acceptable level mandated by Strickland." United States v. Luciano, 158 F.3d 655, 660 (2d Cir. 1998). Having thoroughly reviewed the record, I find that the state court's decision regarding petitioner's ineffective assistance claim was not contrary to, or an unreasonable application of clearly established Federal law. Therefore, petitioner's ineffective assistance of counsel claim should be denied.

## CONCLUSION

Accordingly, it is respectfully recommended that petitioner's application for a writ of *habeas corpus* should be denied. [10] As petitioner has not made a substantial showing of the denial of any constitutional right, no certificate of appealability should be issued. 28 U.S.C. § 2253; see Lozada v. United States, 107 F.3d 1011, 1017 (2d Cir. 1997), abrogated on other grounds by United States v. Perez, 129 F.3d 255, 259–60 (2d Cir. 1997) (discussing the standard for issuing a certificate for appealability). It is further recommended that for purposes of an appeal in *forma pauperis*, the Court should certify pursuant to 28 U.S.C. § 1915(a) that any appeal from a

Case 9:21-cv-00708-BKS-TWD    Document 14    Filed 11/03/23    Page 159 of 171

judgment denying this petition would not be taken in good faith. Coppedge v. United States, 369 U.S. 438 (1962).

10      Petitioner's requests for counsel pursuant to the Criminal Justice Act, 18 U.S.C. § 3006(A), and for an evidentiary hearing, Reply at 25, are denied.

### FILING OBJECTIONS TO THE REPORT AND RECOMMENDATION

**\*10**  Pursuant to 28 U.S.C. § 636(b)(1) and Rule 72(b) of the Federal Rules of Civil Procedure, the parties shall have fourteen (14) days from service of this Report and Recommendation to file written objections. See also Fed. R. Civ. P. 6. Any request for an extension of time in which to file objections must be made within the fourteen-day period. Failure to timely file an objection to the Report and Recommendation generally waives any further judicial review. DeLeon v. Strack, 234 F.3d 84, 86 (2d Cir. 2000); Spence v. Superintendent, Great Meadow Corr. Fac., 219 F.3d 162, 174 (2d Cir. 2000); see also Thomas v. Arn, 474 U.S. 140, 155 (1985).

SO ORDERED.

**All Citations**

Slip Copy, 2020 WL 5633871

---

2020 WL 5633078
Only the Westlaw citation is currently available.
United States District Court, E.D. New York.

Eustacio ROBERTS, Petitioner,

v.

Jaime LAMANNA, Respondent.

19-CV-00880 (AMD) (LB)

|

Signed 09/21/2020

**Attorneys and Law Firms**

Eustacio Roberts, Stormville, NY, pro se.

Thomas M. Ross, Kings County District Attorney, Brooklyn, NY, Kings County District Attorneys Office, New York State Attorney Generals Office, for Respondent.

**MEMORANDUM DECISION AND ORDER**

ANN M. DONNELLY, United States District Judge:

 **\*1**  On February 12, 2019, the *pro se* petitioner, currently detained at the Green Haven Correctional Facility, brought this petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254. (ECF No. 1.) I referred the petition to United States Magistrate Judge Lois Bloom. On August 31, 2020, Judge Bloom recommended that I deny the petition, withhold a

certificate of appealability and certify pursuant to 28 U.S.C. § 1915(a) that any appeal from this judgment would not be taken in good faith. (ECF No. 11.) No objections have been filed to the Report and Recommendation, and the time for doing so has passed.

A district court "may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge." 28 U.S.C. § 636(b)(1). To accept those portions of the report and recommendation to which no timely objection has been made, "a district court need only satisfy itself that there is no clear error on the face of the record." *Jarvis v. N. Am. Globex Fund L.P.*, 823 F. Supp. 2d 161, 163 (E.D.N.Y. 2011) (internal quotation marks and citation omitted).

I have reviewed Judge Bloom's thoughtful and comprehensive Report and Recommendation and find no error. Accordingly, I adopt the Report and Recommendation in its entirety. The petition for a writ of habeas corpus is denied and the case is dismissed. A certificate of appealability will not be issued. *See* 28 U.S.C. § 2253(c). The Court certifies pursuant to 28 U.S.C. § 1915(a)(3) that any appeal would not be taken in good faith and *in forma pauperis* status is therefore denied for the purpose of an appeal. *See Coppedge v. United States*, 369 U.S. 438, 444-45 (1962).

**SO ORDERED.**

**All Citations**

Slip Copy, 2020 WL 5633078

---

End of Document
© 2023 Thomson Reuters. No claim to original U.S. Government Works.

Miller v. Chapplus, Not Reported in Fed. Supp. (2018)

Case 9:21-cv-00708-BKS-TWD    Document 14    Filed 11/03/23    Page 161 of 171

2018 WL 2709228

2018 WL 2709228
Only the Westlaw citation is currently available.
United States District Court, N.D. New York.

Clarence MILLER, Petitioner,
v.
Paul D. CHAPPLUS, Jr., Respondent.

No. 9:16-CV-512 (TJM/CFH)
|
Signed 04/02/2018

**Attorneys and Law Firms**

Clarence Miller, 04-B-3274, Elmira Correctional Facility, P.O. Box 500, Elmira, New York 14092, pro se.

Hon. Eric T. Schneiderman, Attorney General for the State of New York, OF COUNSEL: MICHELLE ELAINE MAEROV, ESQ., Assistant Attorney General, New York Office, 120 Broadway, New York, New York 10271, Attorneys for Respondent.


**REPORT-RECOMMENDATION AND ORDER** [1]

[1]    This matter was referred to the undersigned for report and recommendation pursuant to 28 U.S.C. § 636(b) and N.D.N.Y.L.R. 72.3(c).

CHRISTIAN F. HUMMEL, U.S. MAGISTRATE JUDGE

**\*1**  Presently pending before the Court is a petition for a writ of habeas corpus filed pursuant to 28 U.S.C. § 2254 by petitioner pro se Clarence Miller ("petitioner"), an inmate in the custody of the New York State Department of Corrections and Community Supervision ("DOCCS"). Dkt. No. 1 ("Pet."). On November 30, 2004, after a jury trial in Onondaga County Court, petitioner was convicted of Kidnaping in the Second Degree (N.Y. Penal Law § 135.20), [2] Criminal Use of a Firearm in the First Degree (N.Y. Penal Law § 265.09 (1)(a) ), [3] Criminal Possession of a Weapon in the Second Degree (N.Y. Penal Law § 265.03 (2) ), [4] Assault in the Second Degree (N.Y. Penal Law § 120.05 (2) ), [5] Assault in the Third Degree (N.Y. Penal Law § 120.00(1) ) [6] and Reckless Endangerment in the Second Degree (N.Y. Penal Law § 120.20). [7] On May 4, 2016, petitioner filed a pro

se petition seeking a writ of habeas corpus on the grounds that (1) his trial counsel was ineffective; (2) the trial court erred in admitting his police booking video in petitioner's absence; (3) the trial court erred in admitting evidence of an excited utterance; and (4) legal insufficiency. See Pet. at 5-10. Respondent opposes the petition. Dkt. No. 10. Petitioner filed a traverse requesting that the Court conduct an evidentiary hearing. Dkt. No. 19. For the reasons that follow, the Court recommends that the petition be denied.

[2]    Under N.Y. Penal Law § 135.20, "[a] person is guilty of kidnaping in the second degree when he abducts another person."

[3]    Under N.Y. Penal Law § 265.09(1)(a), "[a] person is guilty of criminal use of a firearm in the first-degree when he commits any Class B violent felony ... and he (a) possesses a deadly weapon, if the weapon is a loaded weapon from which a shot, readily capable of producing death or other serious injury may be discharged."

[4]    Under N.Y. Penal Law § 265.03 (2) "[a] person is guilty of criminal possession of a weapon in the second degree when he possesses a loaded firearm."

[5]    Under N.Y. Penal Law § 120.05(2), "[a] person is guilty of assault in the second degree when with intent to cause physical injury to another person, he causes such injury to such person or to a third person by means of a deadly weapon or a dangerous instrument."

[6]    Under N.Y. Penal Law § 120.00(1), "[a] person is guilty of assault in the third degree when with intent to cause physical injury to another person, he causes such injury to such person or to a third person."

[7]    Under the N.Y. Penal Law § 120.20, "[a] person is guilty of reckless endangerment in the second degree when he recklessly engages in conduct which creates a substantial risk of physical injury to another person."


**I. Background**

2018 WL 2709228

### A. Procedural History

Petitioner was indicted by an Onondaga County grand jury on one count of Kidnapping in the Second Degree (N.Y. Penal Law § 135.20), one count of Criminal Use of a Firearm in the First Degree (N.Y. Penal Law § 265.09 (1) (a) ), one count of Criminal Possession of a Weapon in the Second Degree(N.Y. Penal Law § 265.03 (2) ), one count of Assault in the Second Degree (N.Y. Penal Law § 120.05 (a) ),one count of Assault in the Third Degree (N.Y. Penal Law § 120.00(1) ), and one count of Reckless Endangerment in the Second Degree (N.Y. Penal Law § 120.20). On July 26, 2004, petitioner was arraigned on the indictment in Onondaga County Court. Arraignment Tr. at 2. [8] Petitioner entered a plea of not guilty to the indictment. Id. On November 8, 2004, a jury trial commenced before the Hon. William D. Walsh, Onondaga County Court Judge. Id. at 5.

[8]    The transcripts for proceedings held on the following dates are contained at Dkt. Entry11-1: July 26, 2004 ("Arraignment Tr."); Aug. 18, 2004 ("Conference Tr."); Sept. 8, 2004 ("Discovery Conference Tr."); Sept. 29, 2004 ("Suppression Hearing Tr.") and Nov. 8, 2004 ("Trial Tr."). The Trial Transcript for Nov. 9, 2004 is contained at Dkt. Entry 11-2. The Trial Transcript for Nov. 10, 2004 is contained at Dkt. Entry 11-3 and Dkt. Entry11-4. ("Trial Tr."). Dkt. Entry 11-4 also contains the transcript for the sentencing hearing on Nov. 30, 2004 ("Sentencing Tr.").

*2  The following facts were adduced at trial. On May 31, 2004, petitioner called Cindy Mateo who he had recently begun dating. Trial Tr. at pp 447-50. Petitioner asked Ms. Mateo if they could get together that evening. Id. at 452. When Ms. Mateo declined, petitioner hung up the telephone. Id. Petitioner called back moments later, and asked Ms. Mateo to return a cellular phone that he had given her as a gift. Id. Ms. Mateo agreed to return the phone. Id. at 453.

Ms. Mateo drove to petitioner's residence in Syracuse. Trial Tr. at 454. When Ms. Mateo pulled into the driveway, petitioner's uncle, Norman Miller, informed her that petitioner was inside. Id. at 456. Petitioner came out of the residence and asked Ms. Mateo to return to her vehicle; she complied. Id. at pp 454-56,560-63. Petitioner got in the vehicle with her. Id. at 456. Petitioner instructed Ms. Mateo to back out of the driveway. Id. When she asked why, petitioner

brandished a gun and told her if she did not obey she would "get slayed right here." Id. at 457. Ms. Mateo refused to back out of the driveway, and petitioner struck her in the forehead with the gun. Id.

Ms. Mateo backed her vehicle out of the driveway and began to drive as directed by petitioner. Trial Tr. at 458. As Ms. Mateo was driving, petitioner repeatedly struck her with the gun and told her he was going to kill her. Id. He also took bullets out of his pocket and loaded the gun. Id. at 458-59. Petitioner instructed Ms. Mateo to drive to West Onondaga Park. Id. at 458. Once they arrived at the park, petitioner told Ms. Mateo to stop the car. Id. at 461. When she attempted to exit the vehicle, petitioner struck her face. Id. at 461-62. At gun point, petitioner ordered Mateo to switch seats with him. Id. at 462.

Petitioner drove Ms. Mateo to Onondaga Community College as he was "looking for a place" where he could "shoot [her] and no [one] would hear." Trial Tr. at 464. When they arrived at Onondaga Community College, the parking lot was full of police cars, and petitioner continued to drive around Syracuse. Id. at 464-65. As Petitioner was driving, he continued to strike Ms. Mateo. Id. at 467. Petitioner drove to Kirk Park. Id. At Kirk Park, petitioner exited the vehicle and instructed Ms. Mateo to look at him. Id. at 469. Petitioner tore the earring out of one of her ears, stating: "you're not going to need these where you are going." Id. at 469. Petitioner first shot the gun away from the car, before firing at Ms. Mateo, narrowly missing her. Id. Petitioner returned to the vehicle, struck Mateo, and started driving. Id.

Petitioner left Kirk Park and drove to his residence. Trial Tr. at 473. When they arrived at his residence, petitioner went in the house to store the gun. Id. at 474. Petitioner returned to the car and sat in the driver's seat. Id. Petitioner resumed screaming at and striking Mateo. Id. at 477. He also called a number of people and told them they should come over and have sex with Ms. Mateo. Id. at 477. Ms. Mateo begged petitioner to take her back to her residence so she could say goodbye to her son. Id. 479. Petitioner conceded, and drove Ms. Mateo back to her apartment. Id. As they were driving towards the apartment, petitioner continued to beat her and tell her he was going to kill her son. Id. at 479-80. When they arrived at Ms. Mateo's apartment, her clothes were covered in blood. Id. at 480. Ms. Mateo's son, her niece, and Ms. Mateo's friend, Carl Ingraham, were in the apartment. Id. at 481. When the children asked what had happened, Ms. Mateo told them that she fell down, as petitioner had instructed. Id. at 480, 481.

Case 9:21-cv-00708-BKS-TWD    Document 14    Filed 11/03/23    Page 163 of 171
Miller v. Chappius, Not Reported in Fed. Supp. (2018)
2018 WL 2709228

Ms. Mateo whispered to Mr. Ingraham and asked him to help her. Id. at 482. Mr. Ingraham left the apartment and called 911. Id. at 633.

 *3  After Mr. Ingraham left, petitioner and Ms. Mateo entered the bedroom. Trial Tr. at 486. Petitioner threw Mateo on the bed and threatened to rape her. Id. Ms. Mateo's son came into the bedroom. Id. When he refused to leave Ms. Mateo yelled at him to leave the bedroom. Id. at 488. Shortly thereafter, Mr. Ingraham called 911, and the police and paramedics arrived at the apartment. Id. at 491. Ms. Mateo initially told the police and paramedics that she sustained her injuries from a fall. Id. However, she testified that she did so because petitioner was present. Id.

Ms. Mateo left the apartment in an ambulance. Trial Tr. at 492. She informed the ambulance driver that petitioner had tried to kill her. Id. Ms. Mateo was transported to the hospital where she received stitches in her head. Id. at 494. Based on Ms. Mateo's statements, petitioner was placed under arrest. Id. at 359. While petitioner was being booked at the police station he acknowledged that he was Clarence Miller. Id. at 362,373-78. During the booking process the police recovered two nine millimeter bullets from petitioner's pants pocket, and seized his bloodstained shirt. Id.[9] While at the police station, petitioner stated that he and Ms. Mateo had gotten into an argument that had "gotten out of hand." Id. at 410.

[9]    The jury viewed a portion of the booking video. Trial Tr. at 623,635-636. Respondent filed a copy of the booking video with the Clerk of the Court.

The next day, the police executed a search warrant at petitioner's residence. Trial Tr. at 395,414-26. The police focused their search on petitioner's bedroom. Id. at 417-19. During the search, a safe was removed from the bedroom petitioner shared with Mr. Miller. Id. at 422. The officers opened the safe at the police station, and recovered an operable black handgun with a distinctive rubber band around the grip. Id. at 423-24.

The jury found petitioner guilty of Kidnaping in the Second Degree, Criminal Use of a Firearm in the First Degree, Criminal Possession of a Weapon in the Second Degree, Assault in the Second Degree, Assault in the Third Degree, and Reckless Endangerment in the Second Degree. Trial Tr. at 752-55. Petitioner appeared for sentencing on November 30, 2004. Tr. at 1. Petitioner's counsel made an oral motion, pursuant to New York Criminal Procedure Law § 330.30(1),

to set aside the verdict on the grounds that Ms. Mateo's testimony was insufficient as it failed to establish each and every element of each and every crime charged in the indictment. Id. at 4-5. The Court orally denied petitioner's motion. Id. at 5. The Court adjudicated petitioner a second felony offender, and imposed the following determinant prison sentences: twenty-five years for Kidnaping in the Second Degree, twenty-five years for Criminal Use of a Firearm in the First Degree, fifteen years for Criminal Possession of a Weapon in the Second Degree, seven years for Assault in the Second Degree, one year for Assault in the Third Degree and one year for Reckless Endangerment in the Second Degree. Id. at 15-16. The Court ordered that the sentences for Kidnapping, Criminal Possession of a Weapon, Assault in the Second Degree, Assault in the Third Degree and Reckless Endangerment run consecutively to the twenty-five year sentence imposed for Criminal Use of a Firearm. Id. at 16. As a result petitioner, received a forty year determinate sentence. Id.

Petitioner's appellate counsel filed a brief in the Appellate Division, Fourth Department. Dkt. No. 12-1 at 1-33.[10] In the brief, counsel argued that: (1) trial counsel was ineffective in failing to object to the prosecutor's inflammatory and prejudicial remarks in her opening statement and summation; (2) Ms. Mateo's utterance to the paramedic was improperly received in evidence, as it was hearsay and bolstered Mateo's testimony; and (3) petitioner's convictions were against the weight of the evidence and unsupported by a legally sufficient evidence. See id. at 1-34. Appellate counsel further argued that the forty year determinate sentence imposed by the Trial Court was illegal. See id. at 25-33.

[10]    The page numbers following Dkt. No. 12 refer to the pagination of the header numbers generated by CM/ECF, not the pagination provided in the transcripts.

 *4  The Appellate Division modified the judgment of conviction by ordering that petitioner's sentences run concurrently and unanimously affirmed the conviction as modified. Dkt. No. 12-1 at 191-94; see generally People v. Miller, 115 A.D.3d 1302 (N.Y. App. Div. 2014). The Appellate Division rejected petitioner's claim that he was denied a fair trial based upon prosecutorial misconduct during the prosecutor's opening and closing statements. Id. at 191. The Court noted that petitioner did not raise any objection at trial to the allegedly improper comments, and, therefore, failed to preserve the issue for review. Id. The Court rejected

2018 WL 2709228

petitioner's argument that his trial counsel was ineffective as he "failed to demonstrate the absence of strategic or other legitimate explanations for counsel's alleged shortcomings, and the record establishes that defense counsel provided meaningful representation to defendant." Id. at 191-192. (internal quotations and citations omitted).

The Appellate Division held that the question of the admissibility of an excited utterance is first entrusted to the trial court. Dkt. No. 12-1 at 192. The Court found that the utterance was properly admitted as "at the time the utterance[s were] made (the victim) was in fact under the stress of excitement caused by an external event significant to still ... her reflective faculties' ...." Id. (quoting People v. Bryant, 27 A.D.3d 1124,1126 (N.Y. App. Div. 2006) ). With respect to petitioner's claim that Ms. Mateo's excited utterance to the paramedic was improperly received in evidence, the Appellate Court found that as petitioner failed to raise a specific objection at trial, it was unpreserved for appellate review. Id.

The Appellate Division rejected petitioner's argument that the evidence at trial was legally insufficient to support his convictions. Dkt. No. 12-1 at 192. The Court stated that "[N]othing in the record suggests that the victim was so unworthy of belief as to be incredible as a matter of law or otherwise tends to establish defendant's innocence of those crimes ..., And thus it cannot be said that the jury failed to give the evidence the weight should be accorded." Id. at 193 (internal quotations and citations omitted).

Petitioner's counsel sought leave to appeal to the New York State Court of Appeals. Dkt. No. 12-1 at 195-97. On July 21,2014, the Court of Appeals denied petitioner's application. Dkt. No. 12-1 at 199. Petitioner subsequently filed a pro se motion for a writ of error coram nobis with the Appellate Division, Fourth Department. Dkt. No. 12-1 at 200-27. In his motion, petitioner argued that his appellate counsel was ineffective because he failed to assert that: (1) his trial counsel was ineffective in failing to request that petitioner be present during a critical stage of the trial; (2) his trial counsel erred when he stipulated that the prosecution witness was qualified to give expert testimony; and (3) the weapons count was against the weight of the evidence in the absence of any proof that the prosecution's weapons expert did not test fire the two bullets recovered with the weapon. See id. On December 23, 2015, the Appellate Division denied petitioner's motion. Id. at 233. Petitioner sought leave to appeal to the New York State Court of Appeals. Id. at 234-66.

On March 31, 2016, the Court of Appeals denied petitioner's motion. Id. at 266.

### B. Summary of Petition

Liberally construed, the petition raises the following claims for relief: (1) trial counsel was ineffective for failing to object to prosecutor's comments during her opening statement and summation; (2) the trial court erred in admitting Ms. Mateo's statement to the paramedic as an excited utterance; (3) the trial court erred in determining the admissibility of a booking video in petitioner's absence; and (4) the evidence was legally insufficient to support the verdict as Ms. Mateo's testimony was incredible as a matter of law. See generally Pet.

## II. Discussion

### A. Standard of Review

**\*5** The Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA") provides that, when a state court has adjudicated the merits of a petitioner's claim, a federal court may grant an application for a writ of habeas corpus only if "the adjudication of the claim (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d); see also Noble v. Kelly, 246 F.3d 93, 98 (2d Cir. 2001); Brown v. Alexander, 543 F.3d 94, 100 (2d Cir. 2008). [11] This is a "difficult to meet," and "highly deferential standard for evaluating state-court rulings, which demands that state court decisions be given the benefit of the doubt." Cullen v. Pinholster, 563 U.S. 170, 181 (2011) (citations omitted).

[11]     Prior to the AEDPA, the court was not required to defer to state court determinations on pure questions of law and mixed questions of law and fact. Thompson v. Keohane, 516 U.S. 99, 107-113 (1995). When presented with these questions, the court was empowered to conduct an independent review of the record. Id.

Case 9:21-cv-00708-BKS-TWD    Document 14    Filed 11/03/23    Page 165 of 171

Miller v. Chappius, Not Reported in Fed. Supp. (2018)

2018 WL 2709228

Under section 2254(d)(1), a state-court decision is contrary to clearly established Supreme Court precedent if its "conclusion on a question of law is 'opposite' to that of the Supreme Court or if the state court decides a case differently than the Supreme Court's decision 'on a set of materially indistinguishable facts.' " Cullen, 563 U.S. at 181 (quoting Williams v. Taylor, 529 U.S. 362, 413 (2000) ). A state court decision involves an unreasonable application of clearly established Supreme Court precedent if it correctly identifies the governing legal principle, but unreasonably applies or unreasonably refuses to extend that principle to the facts of a particular case. See Williams, 529 U.S. at 413; Ramdass v. Angelone, 530 U.S. 156, 166 (2000).

Under the AEDPA, a state court's factual findings are presumed correct, unless that presumption is rebutted by clear and convincing evidence. 28 U.S.C. § 2254(e)(1). If the state court failed to decide a claim "on the merits," the pre-AEDPA standard of review applies, and both questions of law and mixed questions of law and fact are reviewed de novo. Washington v. Shriver, 255 F.3d 45, 55 (2d Cir. 2001).

**B. Exhaustion**

**1. Legal Standard**

Prior to seeking federal habeas corpus relief, a petitioner must exhaust available state remedies, or demonstrate that there is either an absence of available state remedies or that such remedies cannot adequately protect petitioner's rights. [12] Aparicio v. Artuz, 269 F.3d 78,89 (2d Cir. 2001) (quoting 28 U.S.C. § 2254(b)(1); Ellman v. Davis, 42 F.3d 144,147 (2d Cir. 1994). This exhaustion requirement recognizes "respect for our dual judicial system and concern for harmonious relations between the two adjudicatory institutions." Daye v. Att'y Gen. of New York, 696 F.2d 186,191 (2d Cir. 1982). Though both federal and state courts are charged with securing a state criminal defendant's federal rights, the state courts must initially be given the opportunity to consider and correct any violations of federal law. Id. "The chief purposes of the exhaustion doctrine would be frustrated if the federal habeas courts were to rule on a claim whose fundamental legal basis was substantially different from that asserted in state court." Glover v. Bennet, No. 98-CV-0607 (RSP/DS), 1998 WL 278272, at *1 (N.D.N.Y. May 21,1998) (quoting Daye, 696 F.2d at 192). [13]

[12]    28 U.S.C. § 2254 (b)and (c) provide, in part, as follows: (b)(1) An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted unless it appears that: (A) the applicant has exhausted the remedies available in the courts of the State; or (B) (i) there is an absence of available State corrective process; or (ii) circumstances exist that render such process in effective to protect the rights of the applicant.... (c) An applicant shall not be deemed to have exhausted the remedies in the courts of the State, within the meaning of this section, if he has the right under the law of the State to raise by any available procedure, the question presented.

[13]    Since ADEPA's restriction on federal habeas power is premised upon the duty of the state courts to uphold the Constitution and faithfully apply federal laws, the ADEPA's review standards apply only to federal claims which have been actually adjudicated on the merits in the state court. Washington, 225 F.3d at 62.

**\*6** This exhaustion requirement is satisfied if the federal claim has been "fairly presented" to the state courts. See Dorsey v. Kelly, 112 F.3d 50, 52 (2d Cir. 1997) (quoting Picard v. Connor, 404 U.S. 270, 275 (1971) ). A claim has been "fairly presented" if the state courts are apprised of "both the factual and the legal premises of the claim [the petitioner] asserts in federal court." Daye, 696 F.2d at 191; Morales v. Miller, 41 F. Supp. 2d 364, 374 (E.D.N.Y. 1999). "Although the petitioner need not have cited 'book and verse on the federal [C]onstitution,' he must have articulated 'the substantial equivalent' of the federal habeas claim." Colon v. Artuz, 174 F. Supp. 2d 108, 114 (S.D.N.Y. 2001) (quoting Picard, 404 U.S. at 278); see also Daye, F. 2d at 192; Morales, 41 F. Supp. 2d at 374. Moreover, in order for a petitioner to properly exhaust his or her claim, he or she "must give the state courts one full opportunity to resolve any constitutional issues by invoking one complete round of the State's established appellate review process"; this includes presenting "both the factual and legal premise of the federal claims ultimately asserted in the [federal] habeas petition" to the New York Court of Appeals. Galdemez v. Keane, 394 F.3d 68, 73 (2d Cir. 2005) (internal citation and quotation marks omitted).

Miller v. Chappius, Not Reported in Fed. Supp. (2018)

2018 WL 2709228

### C. Ineffective Assistance of Counsel

Petitioner contends that his trial counsel was ineffective for failing to object to the prosecutor's opening and closing statements. See Pet. at 5. To prevail on this claim, a petitioner must satisfy a two-prong test showing that his counsel's performance was (1) deficient, and (2) that such deficient performance caused the petitioner actual prejudice. Strickland v. Washington, 466 U.S. 668, 687 (1984). "Deficient performance" requires the petitioner to show that counsel's performance "fell below an objective standard of reasonableness." Murden v. Artuz, 497 F.3d 178, 198 (2d Cir. 2007) (quoting Strickland, 466 U.S. at 688). In determining the reasonableness of counsel's conduct, courts must "indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." Strickland, 466 U.S. at 689. "Prejudice" requires the petitioner to show that there is a reasonable probability that, but for counsel's deficient performance, the outcome would have been different. Id. at 694. "A reasonable probability is a probability sufficient to undermine confidence in the outcome." Id.

Here, petitioner's claim of ineffective assistance of counsel was never presented to the state courts and is therefore unexhausted. Petitioner's appellate counsel filed a brief with the Appellate Division, Fourth Department. Dkt. No. 12-1 at 1-28. Petitioner's appellate counsel argued that the trial counsel was ineffective in failing to object to repeated instances of prosecutorial's conduct in both her opening statement and summation. See id. at 15-16. Appellate counsel suggested that because the trial counsel failed to object to the prosecutor's "improper and prejudicial comments," petitioner was deprived of his right to effective assistance of counsel and his right to a fair trial under both the state and federal standards. Id. at 15, 16. The Appellate Division rejected that contention, finding that petitioner failed " 'to demonstrate the absence of strategic or other legitimate explanations' for counsel's alleged shortcomings." Id. at 191-192 (quoting People v. Benevento, 91 N.Y. 2d 708, 712 (1998) ).

Petitioner sought leave to appeal to the New York State Court of Appeals. Dkt. No. 12-1 at 156-57. In the May 2, 2014 letter, petitioner argued that the Appellate Division erroneously applied the "meaningful representation" standard under New York State law. Id. at 197. As respondent argues, petitioner did not contend that he had been denied effective assistance of counsel under the federal standard, which employs a stricter

standard than its state law counterpart. See id.; Resp. Mem. of Law at 14; see also Rosario v. Ercole, 601 F.3d 118, 124 (2d Cir. 2010) ("The New York Court of Appeals clearly views the New York constitutional standard as more generous toward defendants than Strickland.") (citing People v. Turner, 5 N.Y.3d 476, 480 (2005) ("Our ineffective assistance cases have departed from the second ('but for') prong of Strickland, adopting a rule somewhat more favorable to defendants.") ). Consequently, because petitioner's ineffective assistance of counsel claim was not raised under federal law on direct appeal, and because petitioner cannot now raise that claim in state court, such claim is deemed exhausted and is procedurally barred. See Spence v. Supt., Great Meadows Corr. Facility, 219 F.3d 162, 170 (2d Cir. 2000) ("We agree that [petitioner's] claim was not exhausted on direct appeal in the state courts, and recognize that such would ordinarily preclude habeas corpus review. But when a claim is procedurally defaulted in state court by failure to abide by state procedural rules and no state remedies remain available to a defendant, his claim is deemed exhausted for purposes of a habeas application. New York permits only one application for direct review ... and having failed to raise the claim on direct appeal [petitioner] may not seek collateral relief in New York courts.") (citations omitted).

**\*7** Petitioner cannot overcome his procedural default. A federal court may review a procedurally defaulted claim if "the habeas petitioner can show cause for the default and prejudice attributable thereto, or demonstrate that failure to consider the federal claim will result in a fundamental miscarriage of justice." Coleman v. Thompson, 501 U.S.722,749-50 (1991) (internal quotation marks and citations omitted). To establish legal cause for procedural default, a petitioner must show that some objective external factor impeded his ability to comply with the state's procedural rules. Murray v. Carrier, 477 U.S. 478, 488 (1986); Restrepo v. Kelly, 178 F.3d 634, 638 ( 2d Cir. 1999). Ineffective assistance of counsel may constitute cause for procedural default; however, a claim of ineffective assistance of counsel must first "be presented to the state courts as an independent claim before it may be used to establish cause for procedural default." Murray, 477 U.S. at 488-89. The undersigned finds that petitioner has not shown "cause" for his procedural default in failing to include the federal ineffective assistance of counsel claim in his leave application. As petitioner has not established cause for his procedural default of these claims, the Court need not address prejudice. See Stepney v. Lopes, 760 F.2d 40, 45 (2d Cir. 1985) ("Since a petitioner who has procedurally defaulted

Case 9:21-cv-00708-BKS-TWD    Document 14    Filed 11/03/23    Page 167 of 171

Miller v. Chappius, Not Reported in Fed. Supp. (2018)

2018 WL 2709228

in state court must show both cause and prejudice in order to obtain federal habeas review, we need not, in light of our conclusion that there was no showing of cause, reach the question of whether or not Stepney showed prejudice."). Moreover, petitioner has not offered any basis to find that the failure to address his ineffective assistance of counsel claim will result in a fundamental miscarriage of justice. As such, the undersigned recommends that the Petition be denied with respect to petitioner's unexhausted ineffective assistance of counsel claim.

### D. Excited Utterance

Petitioner contends that the testimony of a paramedic was improperly received in evidence as it bolstered Ms. Mateo's testimony. Pet. at 8. During the trial, the prosecution's witness, paramedic Jesse Rogers, testified as to a conversation he had with Ms. Mateo in which she described for him what had occurred. See Trial Tr. at 327-31. In his direct appeal to the Appellate Division, petitioner argued that Ms. Mateo's utterance to the paramedic was improperly received in evidence as it bolstered her testimony. Dkt. No. 12-1 at 17-19. The Appellate Division rejected petitioner's claim finding that, by failing to timely object to that testimony during trial as improper bolstering, petitioner failed to preserve that issue for appellate review. Id. at 192; see Miller, 115 A.D.3d at 1304. The Court further held that "because the statements were properly determined to be excited utterances, they did not constitute improper bolstering." Id. (citing People v. Stevens, 57 A.D.3d 1515, 1516 (N.Y. App. Div. 2008); People v. Sims, 244 A.D.2d 920, 920 (N.Y. App. Div. 1997) ). As such, petitioner's claim is barred from this Court's review.

New York Criminal Procedure Law § 470.05(1) provides, inter alia, that "[f]or purposes of appeal, a question of law with respect to a ruling ... of a criminal court during a trial, is presented when a protest there too was registered, by the party claiming error, at the time of such ruling...." N.Y. CRIM. PRO. Law § 470.05(1). This rule has been interpreted by the New York courts to require, "at the very least, that any matter which a party wishes to preserve for appellate review be brought to the attention of the trial court at a time and in a way that gave the opportunity to remedy the problem and thereby avert reversible error." People v. Luperon, 85 N.Y.2d 71, 78 (1995). New York's contemporaneous objection rule is an independent and adequate state law ground which will preclude federal habeas corpus review. See e.g., Downs v. Lape, 657 F.3d 97, 104 (2d Cir. 2011) ("[W]e have also

held ... that the contemporaneous objection rule constitutes an independent and adequate state law ground for disposing of a claim that the defendant's Sixth Amendment right to a public trial has been violated.") (internal citation omitted).

Here, the Appellate Division correctly found that although petitioner objected to the paramedic's testimony on the grounds that it violated his confrontation rights and was not an excited utterance, he did not object on the ground that it bolstered Mateo's testimony. See Trial. Tr. at 151-56. As the state court holding sets forth the specific and sufficient basis in state law for that judgment, it should be upheld by the federal court unless petitioner can satisfy the cause/prejudice test. See Coleman, 501 U.S. at 749-50 (establishing that a petitioner may overcome procedural default if he can establish "cause for the default and prejudice attributable thereto.") (internal quotation marks and citations omitted).

**\*8** In order to establish legal cause for his procedural default, petitioner must show that some objective external factor impeded his ability to comply with New York state's procedural rules. Restrepo, 178 F.3d at 638. Here, petitioner has not established good cause for his procedural default of this claim. As such, the Court need not address the issue of prejudice. See Stepney, 760 F2d at 45. Moreover, petitioner has offered no basis to find that the failure to consider this claim will result in a fundamental miscarriage of justice. Accordingly, the undersigned recommends that the Petition be denied with respect to petitioner's unexhausted claim regarding Ms. Mateo's excited utterance.

### E. The Booking Video

Petitioner contends that he was deprived of a fair trial as he was not present at a critical stage of the proceedings when the Court ruled on the admissibility of the booking video. Pet. at 7. On direct appeal, petitioner's appellate counsel argued that: (1) trial counsel was ineffective in failing to object to the prosecutors improper remarks in her opening statement and summation; (2) Mateo's utterance to the paramedic was improperly received in evidence as it was hearsay and bolstered Mateo's testimony; (3) his convictions were against the weight of the evidence and unsupported by legally sufficient evidence; and (4) the sentence imposed by the court was illegal and improper. See Dkt. No. 21-1 at 1-33. Petitioner did not raise any claim relating to the admissibility of the booking video or his absence from the courtroom when the issue of the transcript was discussed by the Court

2018 WL 2709228

and counsel. Id. As petitioner never raised this claim which pertains to a matter of record in state court and can no longer do so it is unexhausted and procedurally barred. See Wilson v. Heath, 938 F. Supp. 2d 278, 294-95 (N.D.N.Y. 2013) ("Petitioner's claims set forth under grounds (c) through (f) above have never been raised in any state proceeding. Instead, it appears they are being asserted for the first time in this petition. Accordingly, these claims are unexhausted ... [and also are] procedurally defaulted because petitioner cannot now pursue them by way of any state court procedure.") (citing Spence, 219 F.3d at 170) ("Because [the petitioner] failed to raise his claim in the ordinary appellate process and can now no longer do so, it is procedurally defaulted.").

To the extent that petitioner suggests that his motion for writ of error *coram nobis*, Dkt. No. 12-1 at 200-27, exhausted his claim, such contention is false. In his motion, petitioner asserted an ineffective assistance of counsel claim against his appellate counsel for her failure to raise, on direct appeal, that petitioner's trial counsel was ineffective when he failed "to request that his client be at a critical stage of the trial." Id. at 206. Petitioner specifically contended that he was not present when the Court and counsel had an on the record conversation on November 10, 2004 regarding the transcript based on the booking video. Id. at 212. On December 23, 2015, the Appellate Division denied petitioner's motion. Id. at 233. Petitioner sought leave to appeal to the New York State Court of Appeals. Id. at 234-66. On March 31, 2016, that application was denied. Id. at 266.

Petitioner's filing of the *coram nobis* petition did not exhaust his challenge to the underlying state trial court error. See Turner v. Artuz, 262 F.3d 118, 123 (2d Cir. 2001) (concluding that the petitioner's underlying claim was not exhausted through his *coram nobis* petition alleging ineffective assistance of counsel for failing to raise said claim). Raising the issue in a writ of error *coram nobis* "does not exhaust the underlying claims advanced to support the claim of ineffective assistance of appellate counsel." Zimmerman v. Burge, 492 F. Supp. 2d 170, 189 (E.D.N.Y. 2007) (concluding that the "petitioner's claim was not fairly presented to the state courts [in his coram nobis petition] and, accordingly, it is unexhausted.") (citation omitted). Consequently, the filing of a petition for *coram nobis* does not resolve petitioner's procedural default. See Rush v. Lempke, 500 Fed.Appx. 12, 15 ( 2d Cir. 2012) (summary order) ("Filing a *coram nobis* petition would not 'fairly present[ ] [the petitioner's] federal claim to the state courts.'

Consequently, a *coram nobis* proceeding would not resolve Rush's procedural default.") (quoting Daye, 696 F.2d at 191).

**\*9** Petitioner's contention that his Sixth Amendment rights were violated because he was not present during the November 10, 2004 discussion regarding the video is without merit. On November 10, 2004 petitioner arrived late to court. See Trial Tr. at 516. Judge Walsh, the prosecutor and defense counsel were present prior to petitioner's arrival. Id. at 513. In petitioner's absence the Court and counsel had a conversation regarding the booking video. Id. at 515-516. Defense counsel indicated that he listened to the video on two separate VCRs but could not hear all of the audio. Id. The Court indicated that during the next recess "we can play it and you can listen to it." Id. The Court further indicated that "the transcript is simply a guide." Id. at 516. Judge Walsh advised the parties that he would instruct the jury that the transcript is "what we believe they said, but that's not dispositive of what they said, of what was said on the tape." Id. Shortly after that colloquy took place on the record Petitioner was brought into the court room. Id.

The question is whether, in light of the entire record, petitioner's presence during the subject proceeding would have contributed to his ability to defend himself against the charges. U.S. v. Gagnon, 470 U.S. 522, 526-27 (2015) ("The constitutional right to presence is rooted to a large extent in the Confrontation Clause of the Sixth Amendment, but we have recognized that this right is protected by the Due Process Clause in some situations where the defendant is not actually confronting witnesses or evidence against him. [Supreme Court precedent establishes that] a defendant has a due process right to be present at a proceeding 'whenever his presence has a relation, reasonably substantial, to the fulness of his opportunity to defend against the charges....') (citing Snyder v. Massachusetts, 291 U.S. 97, 105-06, 108 (1934) (internal citations omitted) ). As such, "[t]he presence of a defendant is a condition of due process to the extent that a fair and just hearing would be thwarted by his absence, and to that extent only." Id.

Here, petitioner's absence from the November 10, 2004 discussion regarding the video did not materially affect the fairness of that proceeding. See, e.g., Contreras v. Artus, 778 F. 3d 97, 113 (2d Cir. 2015) (holding that the petitioner's absence from the proceeding in question did not "materially undermine the fairness of the procedure in violation of his due process right to be present.") (internal citation and quotations marks omitted). The trial court had already determined, in

Miller v. Chappius, Not Reported in Fed. Supp. (2018)

2018 WL 2709228

petitioner's presence, that the video would be played for the jury and that a transcript would be provided to the jury. Trial Tr. at 10. On November 8, 2004, prior to jury selection, Judge Walsh stated, on the record, and in front of petitioner that he granted the prosecution's application to allow the booking videotape to be played to the jury. Id. Judge Walsh indicated that this had been "stipulated to by the parties," and that transcripts had been provided to both parties. Id. at 10-11. He also advised that "[t]he transcript would simply be a guide to the jury. It would not be submitted into evidence. What words come from the tape will be up to the jury." Id. Given the Court's prior ruling, the colloquy on November 10, 2004, which occurred in petitioner's absence, was ministerial in nature. Moreover, plaintiff has failed to demonstrate cause for the default. Insofar as petitioner seems to suggest, as he did in his *coram nobis* petition, that the alleged ineffectiveness of his appellate counsel caused the failure to raise booking video issues in his direct appeal, the undersigned concludes, as noted above, that raising the issue in a writ of error *coram nobis* "does not exhaust the underlying claims advanced to support the claim of ineffective assistance of appellate counsel." Zimmerman, 492 F. Supp. 2d at 189. Accordingly, the undersigned recommends that petitioner's Sixth Amendment claim be denied.

### F. Sufficiency of the Evidence

**\*10** In his traverse, petitioner argues that "the verdict is legally insufficient in that his guilt has not been approved beyond a reasonable doubt." Dkt. No. 19 at 37. Although petitioner contends that his conviction is unsupported by legally sufficient evidence, he does not point to any specific defects in the evidence that was presented to the jury. See Pet. at 10; Dkt. No. 19 at 37-38. Petitioner contends that "the reliability of the evidence (and, thus, the jury verdict) is called into question by the revelation above argued Points I-III, the victim's credibility, and the firearms expert examination." Dkt. No. 19 at 38. Respondent argues that petitioner's challenge to the sufficiency of the evidence is meritless. Resp. Mem. of Law at 29.

The Due Process Clause of the Fourteenth Amendment requires that a criminal conviction be based on "proof beyond a reasonable doubt of every fact necessary to constitute the crime [with] which [the defendant] is charged." Einaugler v. Supreme Court of the State of New York, 109 F. 3d 836, 839 (2d Cir. 1997) (quoting In re Winship, 397 U.S. 358, 364 (1970) (internal quotation marks omitted) ). A petitioner

challenging a state court conviction based on the sufficiency of the evidence bears a heavy burden. Ponnapula v. Spitzer, 297 F. 3d 172, 179 (2d Cir. 2002) (citing Quirama v. Michele, 983 F.2d 12, 14 (2d Cir. 1993) ). In order to succeed on such a claim the petitioner must show that no rational finder of fact could have found the essential elements of each crime beyond a reasonable doubt. Fama v. Comm'r of Corr. Servs., 235 F. 3d 804, 811 (2d Cir. 2000).

The Court has addressed the arguments raised at Points I-III of the petition earlier in this decision. See discussion II.C-D supra. The Court would note that the Appellate Division specifically addressed petitioner's arguments attacking Ms. Mateo's credibility, finding that "nothing in the record suggests that the victim was so unworthy of belief as to be incredible as a matter of law or otherwise tends to establish defendant's innocence of those crimes ..., and thus it cannot be said that the jury failed to give the evidence the weight it should be accorded." Dkt. No. 12-1 at 193; Miller, 118 A.D.3d at 1305 (quoting People v. Woods, 26 A.D.3d 818, 819 (N.Y. App. Div. 2006) (internal quotation marks omitted) ).

It is well-established that credibility determinations are the exclusive province of the jury and are beyond the scope of habeas corpus review. See Lopez v. Supt. of Five Points Corr. Facility, No. 14-CV-4615 (RJS)(JLC), 2015 WL 1300030, at *9 (S.D.N.Y. Mar. 23, 2015). The court reviewing a habeas petition must defer to the jury's evaluation of the weight of the evidence and the credibility of witnesses. See Maldonado v. Scully, 86 F.3d 32, 35 (2d Cir. 1996) (concluding that, in reviewing a habeas corpus petition, "assessments of the weight of the evidence or the credibility of witnesses are for the jury and not grounds for reversal on appeal; we defer to the jury's assessments of both of these issues.") (citations omitted). Thus, because petitioner's legal insufficiency claim essentially challenges Ms. Mateo's credibility, petitioner's argument fails to state a basis for habeas relief. See Alexis v. Griffin, No. 11-CV-5010-DLC-FM, 2014 WL 3545583, at *20 (S.D.N.Y. July 18, 2014) (dismissing the petitioner's "sufficiency of the evidence claim" as it forced the Court to assess witness credibility).

Petitioner's contention that the evidence against him was insufficient is without merit as the evidence in the record supports plaintiff's conviction. As to petitioner's conviction for Kidnaping in the Second Degree, at trial, Ms. Mateo testified that petitioner brandished a weapon, and told her that if she did not follow his instructions he would kill her. Trial Tr. at 457. At petitioner's direction she drove all over Syracuse

Miller v. Chappius, Not Reported in Fed. Supp. (2018)

2018 WL 2709228

while he continued to strike her and threatened to kill her. See id. at 458-68. Ms. Mateo's testimony is sufficient to establish that petitioner abducted Mateo in violation of Penal Law § 135.20 and is guilty of Kidnaping in the Second Degree. As to petitioner's conviction for convicted of Criminal Use of a Firearm Ms. Mateo testified that while she and petitioner at Kirk Park, petitioner exited the vehicle and fired a pistol away from the vehicle. Id. at 473. Petitioner then looked in the vehicle and fired at Ms. Mateo, narrowly missing her. Id. Petitioner later returned home where he stored what Ms. Mateo described as a gun with rubber band around it. Id. at 458, 474. The police later located that distinctive gun in a safe petitioner's bedroom. Id. at 423-24. Such evidence is sufficient to establish that petitioner is guilty of the offense Criminal Use of a Firearm in the First Degree. Moreover, it is sufficient to sustain petitioner's conviction for Criminal Possession of a Weapon in the Second Degree, as he possessed a loaded firearm.

 *11  As to petitioner's conviction for Assault in the Second Degree and Third Degree, the trial testimony by Ms. Mateo that petitioner used a gun to repeatedly strike her causing her substantial pain and the need for medical attention including stitches is sufficient to support each of those convictions. Id. at 492-94. As to petitioner's conviction for Reckless Endangerment in the Second Degree, Ms. Mateo testified that petitioner shot a pistol at which narrowly missed striking her. Id. at 473. She further testified that petitioner repeatedly struck her with a pistol. See id. at 457-58, 462-63, 467. Such evidence is sufficient to establish that petitioner recklessly engaged in conduct which pose a substantial risk of physical injury to Ms. Mateo. The jury, in weighing the evidence, was entitled to Ms. Mateo's testimony more credible than that of defense's witnesses. See Alexis, 2014 WL 3545583, at *21 ("A sufficiency claim therefore does not permit the reviewing court to redetermine the credibility or reliability of witnesses or substitute its view of the evidence for that of the trier of fact."). Accordingly, the undersigned recommends that petitioner's sufficiency of the evidence claim be denied.

### III. Conclusion

For the reasons stated herein, it is hereby

**RECOMMENDED**, that the Clarence Miller's petition (Dkt. No. 1) be **DENIED** and **DISMISSED**; and it is further

**RECOMMENDED**, that no certificate of appealability should be issued with respect to any of petitioner's claims as petitioner has not made a "substantial showing of the denial of a constitutional right" pursuant to 28 U.S.C. § 2253(c)(2). See 28 U.S.C. § 2253(c)(2) ("A certificate of appealability may issue ... only if the applicant has made a substantial showing of the denial of a constitutional right."); see also Lucidore v. New York State Div. of Parole, 209 F.3d 107, 112 (2d Cir. 2000); and it is further

**ORDERED**, that the Clerk of the Court serve a copy of this Report-Recommendation and Order on all parties in accordance with Local Rules.

**IT IS SO ORDERED.**

Pursuant to 28 U.S.C. § 636(b)(1), the parties may lodge written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. **FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN (14) DAYS WILL PRECLUDE APPELLATE REVIEW**. Roldan v. Racette, 984 F.2d 85, 89 (2d Cir. 1993); Small v. Sec'y of HHS, 892 F.2d 15 (2d Cir. 1989); 28 U.S.C. § 636(b) (1); FED. R. CIV. P. 72, 6(a), 6(e). [14]

[14]     If you are proceeding pro se and are served with this Order by mail, three additional days will be added to the fourteen-day period, meaning that you have seventeen days from the date the Order was mailed to you to serve and file objections. FED. R. CIV. P. 6(d). If the last day of that prescribed period falls on a Saturday, Sunday, or legal holiday, then the deadline is extended until the end of the next day that is not a Saturday, Sunday, or legal holiday. Id. § 6(a)(1)(C).

### All Citations

Not Reported in Fed. Supp., 2018 WL 2709228

---

**End of Document**                    © 2023 Thomson Reuters. No claim to original U.S. Government Works.

Miller v. Chapplus, Not Reported in Fed. Supp. (2018)

2018 WL 2694425

2018 WL 2694425
Only the Westlaw citation is currently available.
United States District Court, N.D. New York.

Clarence MILLER, Petitioner,

v.

Paul D. CHAPPLUS, Jr., Respondent.

9:16-CV-512
|
Signed 06/05/2018

**Attorneys and Law Firms**

Clarence Miller, Elmira, NY, pro se.

Michelle Elaine Maerov, Office of Attorney General, New York, NY, for Respondent.

**DECISION & ORDER**

Thomas J. McAvoy, Senior, U.S. District Judge

**\*1** This petition for a writ of *habeas corpus* pursuant to 28 U.S.C. § 2254 was referred to the Hon. Christian F. Hummel, United States Magistrate Judge, for a Report-Recommendation pursuant to 28 U.S.C. § 636(b) and Local Rule 72.3(c).

The April 2, 2018, Report-Recommendation, dkt. # 22, recommended that the instant petition be denied and dismissed and no certificate of appealability issued. The Magistrate Judge concluded that Petitioner had not made a "substantial showing of the denial of a constitutional right". See 28 U.S.C. § 2253(c)(2) ("A certificate of appealability may issue ... only if the applicant has made a substantial showing of the denial of a constitutional right.").

Petitioner filed timely objections to the Report-Recommendation. He contends that the Magistrate Judge erred in finding unexhausted Miller's claim of ineffective assistance of counsel, and the trial court erred in determining the admissibility of the booking video. Petitioner also insists that he established cause for procedural default. Petitioner further contends that his case represents a fundamental miscarriage of justice and was decided improperly. Finally, he asserts several claims that echo his petition's original claims. Petitioner fails to object to the Magistrate Judge's recommendation that his sufficiency of the evidence claim be denied.

When objections to a magistrate judge's Report-Recommendation are filed, the Court makes a "*de novo* determination of those portions of the report or specified proposed findings or recommendations to which objection is made." See 28 U.S.C. § 636(b)(1). After such a review, the Court may "accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge. The judge may also receive further evidence or recommit the matter to the magistrate judge with instructions." Id.

Having reviewed the record *de novo* and considered the issues raised in the Petitioner's objections, this Court has determined to accept and adopt the recommendation of Magistrate Judge Hummel for the reasons stated in the Report-Recommendation.

Accordingly,

The Report-Recommendation of Magistrate Judge Hummel, dkt. # 22, is hereby **ACCEPTED** and **ADOPTED.** Petitioner Clarence Miller's petition for a writ of *habeas corpus*, dkt. #1, is hereby **DENIED**. No certificate of appealability will be issued with respect to any of petitioner's claims. Petitioner has not made a "substantial showing of the denial of a constitutional right" pursuant to 28 U.S.C. § 2253(c)(2).

**IT IS SO ORDERED.**

**All Citations**

Not Reported in Fed. Supp., 2018 WL 2694425

**End of Document**    © 2023 Thomson Reuters. No claim to original U.S. Government Works.